UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————x
In re UBS AUCTION RATE SECURITIES    )
LITIGATION                           )
                                     )    Master File No. 08-cv-02967
THIS DOCUMENT RELATES TO:            )
ALL ACTIONS                          )
——————————————————————x

[*additional captions follow*]


**MEMORANDUM OF LAW OF ARIC A. STREIT AND MARY STREIT AS TRUSTEES FOR THE BENEFIT OF THE STREIT LIVING TRUST IN FURTHER SUPPORT OF LEAD PLAINTIFF APPOINTMENT, AND IN OPPOSITION TO COMPETEING LEAD PLAINTIFF MOTIONS**


**MILBERG LLP**
Jerome M. Congress
Kent A. Bronson
One Pennsylvania Plaza, 49th Floor
New York, New York 10119
Telephone:  (212) 594-5300
jcongress@milberg.com
kbronson@milberg.com

**LAW OFFICES OF GEORGE A. SHOHET,
A PROFESSIONAL CORPORATION**
George A. Shohet  (Not yet admitted Pro Hac Vice)
245 Main Street, Suite 310
Venice, CA 90291
Telephone: (310) 452-3176
georgeshohet@gmail.com


**MILBERG LLP**
Jeff Westerman (JW-6500) (Not yet admitted Pro Hac Vice)
One California Plaza
300 South Grand Avenue, Suite 3900
Los Angeles, CA 90071-3172
Telephone: (213) 617-1200
jwesterman@milberg.com


*Proposed Co-Lead Counsel for the Class*

——————————————————————x
RANDOLPH BONNIST, Individually and On )
Behalf Of Himself And All Others Similarly )
Situated, )
                                                          )
                             Plaintiff, )  Case No. 08-cv-4352
                                                            )
        vs. )
                                                            )
UBS AG, UBS SECURITIES LLC and UBS )
FINANCIAL SERVICES, INC., )
                                                            )
                            Defendants. )
                                                          )
——————————————————————x
RONALD D. KASSOVER, on behalf of himself )
and all others similarly situated, )
                                                            )
                             Plaintiff, )
                                                            )  Case No. 08-cv-02753
        vs. )
                                                            )
UBS AG and UBS FINANCIAL SERVICES, )
INC., )
                                                            )
                            Defendants. )
                                                          )
——————————————————————x
ARIC A. STREIT and MARY STREIT as )
Trustees for the benefit of the STREIT LIVING )
TRUST, Individually And On Behalf of All Others )
Similarly Situated, )
                                                            )  Case No. 08-cv-5251
                            Plaintiffs, )
                                                            )
v. )
                                                            )
UBS AG, UBS SECURITIES LLC and UBS )
FINANCIAL SERVICES, INC., )
                                                            )
                            Defendants. )
——————————————————————x

<u>**TABLE OF CONTENTS**</u>

**Page**

<u>PRELIMINARY STATEMENT</u> ............................................................................ 1

<u>ARGUMENT</u> ...................................................................................................... 3

   I.    THE STREITS HAVE THE LARGEST FINANCIAL INTEREST IN THIS
LITIGATION........................................................................................................ 3

      A.   The Streits Have the Largest Financial Interest Of Any Individual Movant ................. 3

      B.   The Streits' Financial Interest In This Litigation Includes the More Than $10 Million
Obligation They Have To UBS as a Result of Defendants' Fraud ........................................ 4

      C.   The Streits' Financial Interest In This Litigation Is Larger Than The Combined
Financial Interests of All the Chandler Individuals ................................................. 5

      D.   The Streits Also Have the Largest Financial Interest With Respect to the Class
Members' Claims for Having Been Paid an Insufficient Rate of Interest On Their ARS ...... 8

   II.    UNDER THE PSLRA, THE FINANCIAL INTERESTS OF THE CHANDLER
MOVANTS SHOULD NOT BE AGGREGATED. ............................................... 11

      A.   The Chandler Individuals Are Not a PSLRA Group, But Rather an Artificial,
Apparently Chance-Driven, Amalgam Of Unrelated Investors Who Have No Pre-Existing
Relationship and Lack A Decision-Making Structure ........................................ 11

      B.   The Chandler Motion Misstates Applicable Case Law In Their Effort To Claim Lead
Status................................................................................................................. 15

<u>CONCLUSION</u>.................................................................................................. 17

## TABLE OF AUTHORITIES

### FEDERAL CASES

*In re Northwestern Corp. Sec. Litigation*,
   299 F. Supp. 2d 997 (D.S.D.2003) .................................................................................13

*In re Doral, Financial Corp. Securities Litigation,*
   414 F. Supp. 2d 398 (S.D.N.Y. 2006)....................................................................11, 12

*Ezra Charitable Trust v. Rent-Way, Inc.*,
   136 F. Supp. 2d 435 (W.D. Pa. 2001)..........................................................................5

*Ferrari v. Gisch*,
   225 F.R.D. 599 (C.D. Cal. 2004)..............................................................................17

*In re Centerline Holding Company Securities Litigation*, 2008 U.S. Dist. LEXIS
   36406 (S.D.N.Y. May 5, 2008)..................................................................................16

*In re Donnkenny Inc. Sec. Litig.,* ................................................................................13
   171 F.R.D. 156, 157 (S.D.N.Y.1997)

*In re eSpeed, Inc. Securities Litigation*,
   232 F.R.D. 95 (S.D.N.Y. 2005) ...............................................................................16

*In re Pfizer Inc. Sec. Litigation*,
   233 F.R.D. 334 (S.D.N.Y. 2005) ..............................................................................11

*Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. LaBranche & Co.,
Inc.*,
   229 F.R.D. 395 (S.D.N.Y.2004) ..........................................................................9, 10
*Reimer v. Ambac Financial Group, Inc.*
   2008 U.S. Dist. LEXIS 38729 ..................................................................................15

*In re Unumprovident Corp. Sec. Litigation*,
   2003 U.S. Dist. LEXIS 24633 (E.D. Tenn. Nov. 6, 2003) ...........................................5

*Weltz v. Lee*,
   199 F.R.D. 129 (S.D.N.Y. 2001) .............................................................................16

*In re Superior Offshore Intern., Inc. Sec. Litigation*,
   No. H-08-0687, 2008 WL. 2148745 (S.D. Tex. May 20, 2008).................................11

*In re Tarragon Corp. Sec. Litig.*,
   No. 07 Civ. 7972 (PKC), 2007 WL. 4302732 (S.D.N.Y. Dec. 6, 2007) ...........14,15,16

*Goldberger v. PXRE Group, Ltd.*,
   No. 06-C 2007 WL. 980417 (S.D.N.Y. Mar. 30, 2007) ...............................................11

*Tsirekidze v. Syntax-Brillian Corp.*,
   No. 07-cv-2204 2008 WL. 942273 (D. Ariz Apr. 7, 2008) ........................................12

## FEDERAL STATUTES

15 U.S.C. § 78u-4(a)(3)(B)(iii) .............................................................................................1

Investment Advisors Act, 15 U.S.C. §§80b-1 et seq ..........................................................1

15 U.S.C. § 78u-4(a)(3)(B)(iii) ...........................................................................................17

15 U.S.C. §§78j(b) .................................................................................................................1

Federal Rule of Civil Procedure 23 ....................................................................................1

## PRELIMINARY STATEMENT

Plaintiffs Aric A. Streit and Mary Streit as Trustees for the benefit of the Streit Living Trust ("the Streits") submit this memorandum in further support of their motion for appointment as lead plaintiff and in opposition to the other four motions.[1]  The Private Securities Litigation Reform Act of 1995 (the "PSLRA") provides that in assessing the competing motions, the Court "shall adopt a presumption" that the most adequate plaintiff is the movant with the "largest financial interest in the relief sought by the class" and "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure."  15 U.S.C. § 78u-4(a)(3)(B)(iii).

The Court should appoint the Streits as lead plaintiffs because, viewed from all relevant perspectives, they have the largest financial interest in this litigation and fully satisfy the requirements of Federal Rule of Civil Procedure 23.  They have a far larger face amount of illiquid auction rate securities ("ARS") than any other individual who is competing to be a lead plaintiff.  Furthermore, the Streits' financial interest, including both the face amount of their frozen ARS and the additional $10 million debt obligation they were forced to incur because of defendants' fraud, exceeds the total financial interest of the Chandler individuals, who improperly seek to aggregate their interests.

The face amount of ARS currently held by the Chandler individuals is an unreliable basis for determining their financial interest, in light of the fact that a substantial portion of their

---

[1] At the time they filed their lead plaintiff motion, the Streits had not yet filed a complaint in this matter but stated their intention to do so.  On June 9, 2008 the Streits filed an action entitled *Aric A. Streit and Mary Streit as Trustees for the benefit of the Streit Living Trust, Individually And On Behalf of All Others Similarly Situated, against UBS AG, UBS Securities LLC and UBS Financial Services, Inc.*, 08-cv-5251 (S.D.N.Y.), alleging wrongdoing by UBS with respect to their marketing and sale of auction rate securities.  The Streits allege claims under §10(b) and §20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§78j(b) and 78t(a) and the Securities and Exchange Commission Rule 10b-5, as well as claims under the Investment Advisors Act, 15 U.S.C. §§80b-1 et seq..

holdings has already been redeemed by the issuers and additional redemptions are anticipated. In contrast, no portion of the Streits' ARS portfolio has been redeemed in any amount and, moreover, the Streits' portfolio consists of a category of ARS (student loans) as to which almost no redemption activity has occurred or is expected to occur.  Going forward the dollar amount of the Streits' financial interest in this litigation is, therefore, far more likely to *remain constantly larger* than any  of the seven Chandler movants, whose holdings diminish as they are redeemed.

Additional considerations also point to the Streits as having the largest financial interest. To the extent that sales are occurring in the very limited secondary market for ARS, the discounts from face value in that market for the types of ARS held by the Streits are greater than the discounts for the types of ARS that make up most of the Chandler individuals' portfolios.  In addition, the Streits appear to have the largest claim for a further element of damages over and above the amount paid for the frozen ARS - a claim to recover the additional interest that the class members would have received throughout the class period had the investing public known that ARS were far more risky than cash equivalents, and had the interest rates for ARS been set accordingly.

Finally, the holdings of the seven Chandler movants  are not properly aggregated because they are not really a group as that term is defined by the PSLRA and the interpreting cases.[2] Their so-called group is too large, unwieldy and disorganized.  No pre-existing relationship or decision-making structure appears to exist among these seven disparate individuals, who may reside in different counties or states.  Other than the Chandlers themselves, there is no showing that any of these individuals  have ever spoken to each other or even know of one another's

---

[2] The Chandler Group is composed of seven individuals, one married couple and five other unrelated people.  They include: David and Shelly Chandler, Robert Bee, Edward Taras, Larry S. Watanabe, David Ghiz and M. Richard Goldberg.

existence.  Rather, they were apparently brought together by their lawyers for the sole purpose of

serving as a "group" in an effort to claim lead status.  This is precisely the type of aggregation

courts in this district and elsewhere reject time and again on the ground that it undercuts the

fundamental purpose of the PSLRA because it is a non-cohesive amalgam that will deliver

control of the case to its lawyers.[3]

The Court should appoint the Streits as Lead Plaintiff because they have a greater

financial interest in this litigation than any of the other individuals, or purported "groups", and

are most likely to lead the litigation with a firm hand.

## ARGUMENT

## I.    THE STREITS HAVE THE LARGEST FINANCIAL INTEREST IN THIS LITIGATION

### A.    The Streits Have the Largest Financial Interest Of Any Individual Movant

The Streits have a total of $20.3 million of auction rate securities frozen in their two

accounts at UBS.   In one of those accounts they have $3.45 million in ARS holdings that were

purchased through another broker-dealer and transferred to UBS.  Thus, the Streits have

$16,850,000 of ARS that were purchased directly through Defendants.  That amount

substantially exceeds the claimed financial interest of any of the moving individuals.

David Ghiz is the movant with the largest face amount of ARS after the Streits.  Taking

into account post class period redemptions of ARS that have already occurred and additional

redemptions that will occur shortly, he now has an individual financial interest in face value of

---

[3] We anticipate that the Chandler movants may belatedly submit an affidavit of some sort
attesting that they are determined to function as a cohesive, non-lawyer driven group.  Any such
affidavit should be evaluated with some skepticism in light of the fact that only David and Shelly
Chandler have filed a complaint, suggesting that the other members of the group were added
later solely for the purpose of aggregating their financial interests on the lead plaintiff motion.

ARS securities of only $6,358,000, compared with the Streits' illiquid holdings of more than $16.8 million.  See Exhibit L to the accompanying Declaration of Jerome M. Congress (the "Congress Decl."). Although the Chandler movants seek to aggregate the face amount of their securities, the practical reality is that none of them have a financial incentive to litigate this action beyond the amount of their own personal holdings.

**B.    The Streits' Financial Interest In This Litigation Includes the More Than $10 Million Obligation They Have To UBS as a Result of Defendants' Fraud**

The Streits' total financial interest in this action is not limited to the $16.8 million they paid for the ARS that are now illiquid.  Because the ARS are not the cash equivalents that UBS represented them to be, the Streits were forced to borrow $10.1 million from UBS.[4]  Like other class members, the Streits  accepted UBS' offer to let them borrow up to half of the face value of their ARS holdings, with the debt secured by *all* of the account assets. In the Streits' case, their entire $20.3 million in ARS holdings is securing their margin loans.[5]

As the Streit Aff. explains, the collapse of the ARS market in February 2008 caused  a serious problem for the Streits because they needed the funds that had been unexpectedly tied up in their ARS for working capital to maintain their real estate business and to self-insure their

---

[4] The Streits invested in ARS after UBS represented that those securities were cash equivalents, because their real estate business depended on having cash readily available.  Affidavit of Aric A. Streit and Mary Streit filed together with this Memorandum (the "Streit Aff.") ¶¶ 2-4, attached as Exhibit A to the Congress Decl.

[5] UBS can make these and similar loans to class members because it knows that class members depended on the liquidity of their ARS as cash equivalents.  In effect, Defendants are requiring class members like the Streits to borrow their own money back and pay UBS even more fees and interest.  This two-to-one collateralization requirement imposed by UBS evidences defendants' total lack of faith in the value of the ARS sold to the Streits and other class members, and is a strong indication of damages and UBS' total abdication of its fiduciary duties and responsibilities to its clients.  Such conduct by UBS not only adds insult to injury, but further harms the Streits and other similarly affected class members by requiring them to incur a debt obligation that they would not have incurred but for the Defendants' wrongdoing.

properties.  Seeing no other option to restore some of their prior liquidity, they opened two margin accounts, executed account agreements with UBS Financial on February 26 and 28, 2008, and then borrowed on margin approximately $10.1 million.  Under the account agreements, UBS Financial will claim that it can call their margin loans at any time, and require the Streits to pay the loans in full.  Because their ARS holdings are frozen, they would have to use their other personal assets to repay the loan, potentially causing a major hardship for the Streits.  Streit Aff. ¶ 6.

Given the illiquidity of their ARS holdings and the on going business needs the Streits have for the funds they borrowed on margin, the Streits have a more than $10 million financial incentive to litigate this case, over and above the $16,850,000 that they paid for auction rate securities that cannot be sold.  Many cases have recognized that the concept of a plaintiffs' "financial interest" for the purposes of Lead Plaintiff motions under the PSLRA may include factors in addition to monetary loss that significantly strengthen a plaintiffs' incentive to pursue the action aggressively and effectively.  *See*, *e.g.*, *In re Unumprovident Corp. Sec. Litig*., 2003 U.S. Dist. LEXIS 24633, at*31 (E.D. Tenn. Nov. 6, 2003) (finding that the incentive for the fund manager moving to be lead plaintiff is "much greater than the actual dollar value of its clients' loss because [fund manager] also [s ought] to maintain customer trust and goodwill in order to sustain its business."); *Ezra Charitable Trust v. Rent-Way, Inc*., 136 F. Supp. 2d 435, 442-3 (W.D. Pa. 2001) (discussing that it would be unduly narrow to limit "financial interest" under the PSLRA to out-of-pocket losses, and finding an investment advisor to have a "significant financial interest in attempting to recover the $10.1 million allegedly lost by its clients in order to maintain their goodwill and future business.").

**C.    The Streits' Financial Interest In This Litigation Is Larger Than The Combined Financial Interests of All the Chandler Individuals**

In light of the forgoing, the Streits' total financial interest in this litigation exceeds $26,850,000. That amount substantially exceeds the $24,731,583 in face amount of ARS that are held by all the Chandler movants after accounting for past redemptions and additional redemptions that have been announced and will shortly be implemented.[6]

The Chandler individuals report that they collectively held $31,675,083 in ARS as of February 13, 2008, the close of the Class Period. They acknowledge that in May 2008 certain issuers redeemed $3,200,000 of those ARS, leaving them with $28,475,083 in face amount as of the date they filed they filed their lead plaintiff motion. Recently, however, several issuers of ARS preferred securities held by certain of the Chandler movants announced additional redemptions, which will reduce the face amount of the individual and collective holdings by an additional $3,743,500.[7] This will bring down their aggregate holdings to $24,731,583 by the end of July 2008.

---

[6] The remaining movants hold ARS in face amounts that are far lower than the Streits. Movant Steven Oppenheimer claims face amount holdings of only $1,550,000. Movant "UBS ARS Group" claims holdings of $1,095,000. And the 13 individuals calling themselves the "Sanchez Group" claim holdings of only $398,456.

[7] As set forth in Exhibits C-E, respectively, to the Congress Decl.:

On June 2, 2008 BlackRock Preferred Income Strategies Fund announced that it would redeem 50% of its outstanding auction rate securities beginning June 5, 2008. David Ghiz and Edward Taras of the Chandler Group will have will each have their financial interest reduced by $1 million due to this redemption.

On May 17, 2008 Kayne Anderson MLP Investment Fund announced that it would redeem its outstanding ARS held by David Ghiz on July 10, 2008. David Ghiz will have his financial interest reduced by $975,000 due to this redemption.

On May 21, 2008 the Franklin Templeton Limited Duration Income Trust Fund announced that it would redeem 53% of its outstanding ARS beginning on or about June 9, 2008. David Ghiz will have his financial interest reduced by $768,500 due to this redemption.

Furthermore, various closed-end fund managers have recently announced that they are making efforts to redeem all or part of their auction rate preferred securities, and this may also produce additional redemptions that effect the Chandler movants. For example, DNP (Duff & Phelps) issued a press release on May 8, 2008, in which it stated that "the Fund (DNP Select Income Fund) is hopeful that it can start the redemption process in June with the goal of completion in the third quarter of this year." Congress Decl. Exh. F. This development would further reduce the Chandler Group's holdings by another $3.625 million. Furthermore, closed-end fund manager Cohen & Steers issued a press release on May 16, 2008, in which it announced that to date, four of eight of its funds have announced financing arrangements that will enable them to redeem more than 50% (approximately $600 million) of their outstanding auction rate preferred securities. Congress Decl. Exh. G. Continued progress toward redemptions by Cohen & Steers would further erode the Chandler Group's holdings by another $1.5 million.[8]

In contrast, the Streits's ARS holdings are 100% student loan ARS, which are unlikely to be redeemed. Streit Aff. ¶ 7; *See*, news articles set forth in Congress Decl. Exhs. B, H, and I. Apparently this is so for several reasons, not the least of which is the relatively low interest rate being paid by issuers on the student loan ARS, creating little incentive to redeem. *Id*. The Streit Aff. states, "[t]o our knowledge, there have been no successful auctions for our ARS since the market collapsed on February 13, 2008, and no issuer has sought to redeem our securities." Streit Aff. ¶ 7.

---

[8] *See* Congress Decl. Exhs. F (press release dated May 8, 2008 announcing DNP Select Income Fund's intention to redeem its ARS by the third quarter of 2008), and G (press release dated May 16, 2008 announcing Cohen & Steers, Inc.'s intention to redeem its ARS).

The conclusion that the Streits have the largest financial interest in this litigation is further supported by information concerning the prices at which the various categories of ARS have been selling, to the extent sales are possible, on the secondary market which has emerged since the end of the class period. That marketplace is insufficiently developed to provide an adequate basis for measuring the current value of ARS. However, the financial press reports that when sales of student loan ARS do occur, they are at discounts well below what other investors are willing to pay for other types of ARS, particularly the closed end mutual fund preferred stock ARS that constitute most of the Chandler movant holdings. According to one article, the activity in the Restricted Securities Trading Network, a recently established secondary market, is "small but revealing. Barry Silbert, the network's founder, said that about 10 trades occur daily, with an average size of $350,000. He said municipal issues trade at discounts of 2 percent to 10 percent while closed-end fund shares trade at a 15 percent haircut. Student loan securities are the hardest to sell: their discounts are 25 percent or more." Congress Decl., Exh. B. [9]

### D. The Streits Also Have the Largest Financial Interest With Respect to the Class Members' Claims for Having Been Paid an Insufficient Rate of Interest On Their ARS

The class members sustained loss over and above the loss of the face value of their ARS, because the interest rates on their ARS were much lower than the market rates that would have prevailed had the investing public understood that ARS were far more risky than the cash equivalents UBS was representing them to be. Because the risks of ARS and the ARS market

---

[9] In short, while the Streits were injured by the very same common course of conduct that UBS inflicted on all their ARS customers, the Streits have a particularly strong claim because they were deceived into investing in one of the more risky categories of ARS. Therefore, while they fully meet the requirements of typicality and adequacy of representation with respect to all ARS purchasers, they have an especially strong incentive to achieve the maximum possible recovery in this litigation.

were not disclosed to Class members throughout the Class Period, the interest rates paid on these securities were much lower than market rates for comparable securities that were recognized to be more risky than cash equivalents.

To further substantiate this aspect of financial interest, the Streits are filing the Declaration of Marc Vellrath, an expert economist and financial analyst (the "Vellrath Dec." Exh. J to the Congress Decl.). Mr. Vellrath assumes the truth of the allegations in the pending complaints and states that had investors not been deceived concerning the nature of, and market for, ARS, "ARSs would have carried higher interest and dividend rates than they actually did." Vellrath Dec. ¶ 13. As a result, "investors who bought auction rate securities were harmed not just when the market 'seized up,' and not just when the true nature of these securities was revealed, but throughout the period over which they held the securities, because they were being paid inadequate interest and dividend rates throughout the class period." *Id*.

Mr. Vellrath then discusses and applies an approach to measuring the relative financial interest of the competing lead plaintiff movants with respect to their claims for insufficient interest and dividend payments during the class period. His approach is to utilize "a measure of financial interest that takes into account plaintiffs' holdings over the full class period." Vellrath Decl. ¶ 14. [10] According to Mr. Vellrath, "[o]ne way to quantify this is to compute each lead plaintiff movants' average dollar holdings of ARSs over the class period. This is the dollar value of holdings, on average, each day of the class period." *Id*. at ¶ 16. Mr. Vellrath's computation is

---

[10] Consideration of alternative methods for determining financial interest is appropriate when, due to the early stage of the proceedings, losses may not be easily calculated or alternative methods exist for doing so. *See, e.g.*, *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. LaBranche & Co., Inc.*, 229 F.R.D. 395, 402 (S.D.N.Y.2004) (determining financial interest on the basis of the movants' aggregate trading during the class period rather than with reference to the prices at which the securities traded).

based on the information set forth in the certifications filed by the competing movants.  Based on that information, he concludes that "[t]he Streit movants had the largest average dollar holdings of ARSs, holding approximately $8.76 million of auction rate securities on an average day during the class period.  The Chandler individuals had the second largest average dollar holdings of ARSs, holding approximately $5.38 million of auction rate securities on an average day during the class period." *Id.* at ¶ 20.  The other movants all had much smaller average dollar holdings.  *Id.*[11]  As shown in the Vellrath Dec., this computation supports a conclusion that the Striets likely sustained more harm from the failure to pay sufficient interest during the class period than any other movant, and that they therefore have the largest interest in that component of the class members claims.  *Id.* at ¶ 18

Addressing lost interest as well as loss of face value not only increases the damage claim on behalf of the class; it also constitutes a critical element of damages for persons whose ARS were initially frozen but ultimately redeemed, because even a repayment of face value in the redemptions would not address the claim for loss of interest.  Therefore the Vellrath Dec. provides additional strong support for the conclusion that, seen from all the relevant perspectives, the Streits have the largest financial interest among the movants and should be appointed lead plaintiffs.

---

[11] In order to make this computation, Mr. Vellrath took into account all the ARS transaction reported by the various movants.  However, it is unclear whether, as required by the PSLRA, the Chandler and other movants reported all of their class period purchases and sales or simply reported their ARS holdings as of February 13, 2008.  The Streits complied with the PSLRA  and reported all of their purchases and sales during the class period.  Although counsel for the Streits asked counsel for the other movants by letter on May 22, 2008 to confirm all of their transactions during the Class Period, including any sales that occurred but were not set forth in their certifications, none of the movants provided any further information about their ARS transactions.  *See* Congress Decl., Exh. K.

II.    **UNDER THE PSLRA, THE FINANCIAL INTERESTS OF THE CHANDLER MOVANTS SHOULD NOT BE AGGREGATED.**

A.    **The Chandler Individuals Are Not a PSLRA Group, But Rather an Artificial, Apparently Chance-Driven, Amalgam Of Unrelated Investors Who Have No Pre-Existing Relationship and Lack A Decision-Making Structure**

Although the PSLRA allows groups to serve as lead plaintiffs, "[t]o allow an aggregation of unrelated plaintiffs to serve as lead plaintiffs defeats the purpose of choosing a lead plaintiff." *In re Pfizer Inc. Sec. Litig.*, 233 F.R.D. 334, 337 (S.D.N.Y. 2005) (Owen, J.) (rejecting unrelated group of institutional investors as lead plaintiffs); *see also Goldberger v. PXRE Group, Ltd.*, No. 06-CV-3410 (KMK), 2007 WL 980417, at *5 (S.D.N.Y. Mar. 30, 2007) (Karas, J.) (noting conflicting rulings in the district, agreeing that the assessment of a lead plaintiff group is contextual, and declining to appoint an unrelated group that "shares only this lawsuit in common."). *See also In re Superior Offshore Intern., Inc. Sec. Litig.*, No. H-08-0687, 2008 WL 2148745 (S.D. Tex. May 20, 2008) ("Where a plaintiff bases his claim to have the largest financial loss on the aggregate loss of several investors, the group must have a pre-litigation relationship based on more than the losing investments at issue in the securities fraud class action.") (citations and quotations omitted).

In *In re Doral Financial Corporation Securities Litigation*, the court declined to appoint various collections of individuals who had moved to be lead plaintiff, and instead appointed one member from one of the "groups" that had large losses. 414 F. Supp. 2d 398 (S.D.N.Y. 2006) (Owen, J.). In doing so, the court stated:

> [T]he putative plaintiffs have aggregated themselves into "groups" of otherwise unrelated investors, and their *collective* financial interest is thus calculated. Nothing before this Court indicates that these random cumulations of plaintiffs are anything more than an effort to achieve the highest possible "financial interest" figure to be chosen, which, however, also cumulates case control problems and rival disagreements, resulting in delay and increased expense. I reject this approach as essentially

11

> inconsistent with the intention of the PSLRA. As I have recently noted, based on earlier precedent, by allowing attorneys to designate otherwise unrelated plaintiffs as a purported "group," and by allowing unrelated groups to aggregate investments in an effort to generate the "largest financial interest," a strong possibility emerges that lawyers will form such groups to manipulate the selection process, and thereby gain control of the litigation.

*In re Doral*, 414 F. Supp. 2d at 401-02 (emphasis in original).

The Chandler movants appear to be exactly what the *Doral* and other courts reject, unrelated individuals put on the papers for the sole purpose of combining their reported losses, thus enabling their lawyers to claim that that they represent the presumptive lead plaintiff "group" and, therefore, should be appointed lead counsel.

Aside from one married couple, the individual group members do not appear to have had any relationship prior to the commencement of this litigation. There is no evidence that the Chandler individuals spoke to each other before the filing of the motion or that they even now know of each others' existence. On the contrary, such a prior relationship appears unlikely. They all have different last names, may reside in different counties or states, and were apparently organized by their lawyers for the purpose of gaining lead status. Had there been a prior relationship, one would have expected the other individuals to have joined in the complaint filed by David and Shelly Chandler on March 21, 2008. Such was not the case.

The Chandler movants are also akin to a purported group denied lead status in the recent case of *Tsirekidze v. Syntax-Brillian Corp.,* No. 07-cv-2204 2008 WL 942273 (D. Ariz Apr. 7, 2008). The court saw through the thinly-veiled attempt to create a group of unrelated investors through law firm solicitation:

> "Although the PSLRA allows groups to serve as lead plaintiffs, 'courts have uniformly refused to appoint as lead plaintiff groups of unrelated individuals, brought together for the sole purpose of aggregating their claims in an effort to become the presumptive lead plaintiff.' *In re Gemstar-TV Guide Int'l, Inc. Sec. Litig.,* 209 F.R.D. 447, 451

(C.D.Cal.2002). For the most part, to 'allow an aggregation of unrelated plaintiffs to serve as lead plaintiffs defeats the purpose of choosing a lead plaintiff.' *In re Donnkenny Inc. Sec. Litig., 171 F.R.D. 156, 157 (S.D.N.Y.1997).* Such a group is unlikely to 'fairly and adequately represent the class' because it is unlikely to engage in the litigation in a meaningful way at all. Fed.R.Civ.P. 23(a)(4). What is more, when unrelated investors are cobbled together, the clear implication is that counsel, rather than the parties, are steering the litigation. *See In re Donnkenny Inc. Sec. Litig., 171 F.R.D. at 158* ('[With the PSLRA,] Congress hoped that the lead plaintiff would seek the lawyers, rather than having the lawyers seek the lead plaintiff.').

From their papers, it appears that the Farrukh 'Group' consists of three completely unrelated individuals from different parts of the country. There is no suggestion how they plan to work together as a cohesive unit. As far as we can tell, each individual has so far participated only to the extent of signing his name onto a boilerplate 'certification in support of application of lead plaintiff.' ….

Given no evidence of cohesiveness, we are not convinced that the Farrukh Group will adequately represent this class. *Cf. In re Northwestern Corp. Sec. Litig., 299 F.Supp.2d 997, 1006 (D.S.D.2003)* (approved group had established a plan for conducting litigation, including mechanisms to call meetings and resolve disagreements).

[T]he Farrukh Group does not contest that their participation was a product of counsel's 'press release.' They even suggest that their signing certifications on the same day (the day motions were due) is evidence of the group's cohesiveness. We are not persuaded. Without determining the ethical implications of counsel's patent effort to solicit clients, we conclude that the Farrukh Group's formation runs directly contrary to the goals of the PSLRA-to reduce lawyer-driven litigation."

Id. at *3-*4 (citations omitted).

Further, even if the Chandler individuals were able - albeit belatedly - to join together as a genuine group, their ability to work out a stable organizational structure is uncertain. With so many people involved, it would probably take a week just to schedule and convene a conference call. If they are geographically dispersed, it is unlikely that they could, as a practical matter, come together to direct lead counsel. There is also the very real problem of competition among these individuals for decision-making authority and the risk that they will devolve into factions

even if they could somehow manage to initially overcome the seemingly insurmountable problems of cohesiveness, organization and decision-making.

These problems are compounded by the discrepant amount of their individual financial interests and the constantly shrinking nature of those interests in light of the recurrent redemptions of their ARS holdings described above. For example, one of the individuals, David Ghiz purchased ARS worth $10,150,000 during the Class Period. He later had $2,075,000, (20% of face amount) redeemed after the Class Period and, based on recent issuer announcements, is expected to have an additional $1,743,500 of his holdings redeemed over the next two months, another 21% of his outstanding balance. *See* his certification and Exhs. C, D, and E to Congress Decl. He has a financial interest in the litigation that dwarfs the interests of the Chandlers and Larry Watanabe, who allegedly purchased $1,100,083 and $2,825,000 of ARS, respectively, during the Class Period. According to their certifications, both the Chandlers and Mr. Watanbe had $100,000 of their respective holdings redeemed after February 13, 2008, the last day of the Class Period. Under these circumstances, one can only wonder how this newly-formed amalgam of plaintiffs will allocate decision-making authority in light of the redemptions and their dissolving financial interests. One thing is certain, however, they will have an ever changing dynamic where, among other possible outcomes, the person with the largest investment today may not be the one with the largest investment three months from now.

In sum, there is zero evidence that these seven individuals can or will act collectively and separately from their lawyers. Accordingly, their Lead Plaintiff motion should be denied. *See, e.g., In re Tarragon Corp. Sec. Litig.*, No. 07 Civ. 7972 (PKC), 2007 WL 4302732, at *1 (S.D.N.Y. Dec. 6, 2007) (Castel, J.) (declining to appoint a group where "[t]here has been no showing that the members of either 'group' have, in fact, functioned as a group.").

14

**B.    The Chandler Motion Misstates Applicable Case Law In Their Effort To Claim Lead Status**

A handful of cases are cited in the Chandler motion in support of their incorrect view that the PSLRA permits a large collection of unrelated investors to serve as Lead Plaintiff.  The cases they cite do not do the trick.  *Reimer v. Ambac Financial Group, Inc.* is cited for the proposition that "disallowing unrelated class members to aggregate and serve as lead plaintiff is 'now the minority view.'"  Chandler Mot. at 12 (citing *Reimer*, No. 08-civ-0411 (NRB), 2008 U.S. Dist. LEXIS 38729, *7-8 (S.D.N.Y. May 9, 2008) (Buchwald, J.).  However, *Reimer* does not depart from prevailing legal standards as the opinion explains:

> We note, however, that a group appointment may be inappropriate where the group is too large or where it has not evinced an ability (and a desire) to work collectively to manage the litigation. In other words, the group must not be "so cumbersome as to deliver the control of the litigation into the hands of the lawyers." *Weltz,* 199 F.R.D. at 133. For example, in *In re Tarragon,* Judge Castel rejected the applications from two separate groups because they did not provide any evidence that they would "act separately from their lawyers." 2007 U.S. Dist. LEXIS 91418, 2007 WL 4302732, at *1. Specifically, "[t]here [wa]s no evidence that the members of these groups have ever communicated with other members of their respective group or will do so in the future." *Id.*

*Reimer*, 2008 U.S. Dist. LEXIS 38729, at *8-9.  Ultimately, the court in *Reimer* appointed a group of only three institutional investors that were already "cooperating and pursuing the litigation separately and apart from their lawyers." *Id*., 2008 U.S. Dist. LEXIS 38729, at *9-10. These institutions "held joint conference calls to discuss the litigation and formulate strategy" and  had "prior working relationships." *Id.*  In fact, they worked cooperatively in numerous prior securities class actions. *Id.*  In stepping forward in *Reimer*, they further represented that they would pursue the maximum recovery on behalf of all class members."  The court concluded that this small  group of three institutional investors was capable of serving as Lead Plaintiff given their prior and successful working relationship and apparent desire to vigorously pursue the

current case.  *Id.*, 2008 U.S. Dist. LEXIS 38729, at *10.  In contrast to *Reimer*, there are no

institutional investors among the Chandler individuals and no evidence of pre-existing, working

relationships.

 The Chandler motion also relies on *In re Centerline Holding Company Securities*

*Litigation*, 08-civ-0508, 2008 U.S. Dist. LEXIS 36406 (S.D.N.Y. May 5, 2008) (Scheindlin, J.).

The passage they cite (Chandler Mot. at 12) is one in which Judge Scheindlin quoted from her

previous decision in *In re eSpeed, Inc. Securities Litigation*, 05-civ-2091, 232 F.R.D. 95, 98-99

(S.D.N.Y. 2005) (Scheindlin, J.).  In *eSpeed*, the court adopted a "**general presumption that**

**unrelated groups with more than five members are too large to work effectively**."  232

F.R.D. at 99 (emphasis added).  Moreover, the court in *eSpeed* cited a Fifth Circuit decision

which noted that the Securities and Exchange Commission limits lead plaintiff groups to

between 3 and 5 investors.  232 F.R.D. at 99, n.21. Even if the Court were to consider appointing

three or four individuals identified in the Chandler motion with the largest holdings, which it

should not do, the total amount of their holdings would still be less than the face value of the

Streits' UBS ARS holdings of over $16.8 million, plus their ARS-related loan obligation to UBS

of approximately $10 million, for a total of over $26.8 million.

 A fair reading of *In re Tarragon Corp. Securities Litigation*, another case cited in the

Chandler motion, actually supports the selection of the Streits as lead plaintiff.   The court held:

  The issue is not whether losses or holdings may be aggregated by
  members of a group seeking to become the lead plaintiff; indisputably,
  they may. *See Weltz v. Lee*, 199 F.R.D. 129, 132-33 (S.D.N.Y. 2001).  **But**
  **to enjoy the rebuttable presumption that the statute confers, there**
  **must be some evidence that the members of the group will act**
  **collectively and separately from their lawyers. With respect to the**
  **[groups moving for lead plaintiff] that evidence is wholly lacking.**

*In re Tarragon*, 2007 U.S. Dist. LEXIS 91418, at *6 (S.D.N.Y. Dec. 6, 2007) (Castel, J.)

(emphasis added).  Here, not only is there no evidence that the Chandler individuals can and will

"act collectively and separately from the lawyers," but it appears that they, in fact, were solicited and recruited by their lawyers for the sole purpose of claiming lead status. As a consequence of this inauspicious beginning, the opposite inference may well be drawn. *Id*.

The Class will not benefit from appointment of an artificial group to lead this litigation, none of whom have an individual financial interest which is even close to the face amount of the ARS securities the Streits purchased through UBS and continue to hold. In contrast to the lawyer-driven and non-cohesive nature of the Chandler individuals, the Streits are a married couple acting as trustees for their family trust who also have the largest financial interest in this litigation.[12] The Streits clearly have "an incentive to prosecute the case vigorously," and will be the best investor to "fairly and adequately protect the interests" of the Class. *Ferrari v. Gisch*, 225 F.R.D. 599, 607 (C.D. Cal. 2004). The Streits are not subject to an ever-changing, internal dynamic of declining face amounts of ARS holdings as the Chandler movants continue to experience.

As demonstrated herein and in the moving papers in support of the Streits' motion to be designated as Lead Plaintiff, the Streits satisfy the typicality and adequacy requirements of Rule 23 of the Federal Rules of Civil Procedure and therefore satisfy the additional prerequisites for appointment as Lead Plaintiff. PSLRA,15 U.S.C. § 78u-4(a)(3)(B)(iii). The Court should select the Streits as Lead Plaintiff and deny the Chandler motion for all of the foregoing reasons.

## CONCLUSION

For the reasons stated herein and in all of the prior submissions of the Streits, the Court should grant the Streits' motion in all respects and deny the motions of the competing movants.

---

[12] *See* the Streit Aff. ¶1, Exh. A to the Congress Decl.

Dated: June 9, 2008

                                          Respectfully submitted,

**MILBERG LLP**

By: /s/ Kent A. Bronson
Jerome M. Congress
Kent A. Bronson
One Pennsylvania Plaza, 49th Floor
New York, New York 10119
Telephone:    (212) 594-5300
Facsimile:     (212) 868-1229
jcongress@milberg.com
kbronson@milberg.com

**MILBERG LLP**
Jeff Westerman (JW-6500)
One California Plaza300 South Grand Avenue,
Suite 3900
Los Angeles, CA 90071-3172
(213) 617-1200
jwesterman@milberg.com

**LAW OFFICES OF GEORGE A. SHOHET**
George A. Shohet  (Pro Hac Vice Admission
Pending)
245 Main Street, Suite 310
Venice, CA 90291
(310) 452-3176
georgeshohet@gmail.com
*Counsel for Aric A. Streit and Mary Streit as*
*Trustees for the benefit of the Streit Living Trust*
*And The Proposed Class*

18

## <u>CERTIFICATE OF SERVICE</u>

I, Joshua Keller, an associate at the law firm Milberg LLP, hereby certify that I caused a

true and correct copy of the following documents to be served with the Clerk of the Court using

the CM/ECF system, which will send notifications of filing to the CM/ECF participants listed on

the attached Service List, and caused all counsel listed on the Service List to be served by regular

U.S. Mail on this 9th day of June 2008:

1. MEMORANDUM OF LAW OF ARIC A. STREIT AND MARY STREIT AS TRUSTEES FOR THE BENEFIT OF THE STREIT LIVING TRUST IN FURTHER SUPPORT OF LEAD PLAINTIFF APPOINTMENT, AND IN OPPOSITION TO COMPETEING LEAD PLAINTIFF MOTIONS; and

2. DECLARATION OF JEROME M. CONGRESS IN FURTHER SUPPORT OF THE MOTION OF ARIC A. STREIT AND MARY STREIT AS TRUSTEES FOR THE BENEFIT OF THE STREIT LIVING TRUST FOR LEAD PLAINTIFF APPOINTMENT, AND IN OPPOSITION TO COMPETING LEAD PLAINTIFF MOTIONS.

*s/ Joshua Keller*

Joshua Keller

# UBS AG

## Service List

*Counsel for Plaintiffs*

Samuel P. Sporn
Joel P. Laitman
Frank R. Schirripa
**SCHOENGOLD SPORN LAITMAN & LOMETTI, P.C.**
19 Fulton Street, Suite 406
New York, NY 10038
Tel.: (212) 964-0046
Fax: (212) 267-8137

Jonathan K. Levine
Daniel C. Girard
Aaron M. Sheanin
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, CA 94108
Tel.: (415) 981-4800
Fax: (415) 981-4846

Eduard Korsinsky
Joseph E. Levi
Juan E. Monteverde
**LEVI & KORSINSKY, LLP**
39 Broadway, Suite 1601
New York, NY 10006
Tel.: (212) 363-7500
Fax: (212) 363-7171

Joseph P. Danis
Michael J. Flannery
Corey D. Sullivan
**CAREY & DANIS, LLC**
8235 Forsyth Blvd., Suite 1100
St. Louis, MO 63105
Tel.: (314) 725-7700
Fax: (314) 721-0905

Christopher A. Seeger
Stephen A. Weiss
David R. Buchanan
**SEEGER WEISS LLP**
One William Street
New York, NY 10004
Tel.: (212) 584-0700
Fax: (212) 584-0799

Norman E. Siegel
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, MO 64112
Tel.: (816) 714-7100
Fax: (816) 714-7101

Joe R. Whatley
Edith M. Kallas
Joseph P. Guglielmo
**WHATLEY, DRAKE & KALLAS, LLC**
1540 Broadway, 37th Floor
New York, NY 10036
Tel.: (212) 447-7070
Fax: (212) 447-7077

Edward M. Gergosian
**GERGOSIAN & GRALEWSKI LLP**
655 West Broadway, Suite 1410
San Diego, CA 92101
Tel.: (619) 237-9500
Fax: (619) 237-9555

20

A. Hoyt Rowell III
Daniel O. Myers
T. Christopher Tuck
**RICHARDSON, PATRICK, WESTBROOK,**
**BRICKMAN, LLC**
1037 Chuck Dawley Blvd., Bldg. A
Mt. Pleasant, SC 29464
Tel.: (843) 727-6500
Fax: (843) 216-6509

George Carpinello
**BOIES, SCHILLER & FLEXNER, LLP**
10 North Pearl Street, 4th Floor
Albany, NY 12207
Tel.: (518) 434-0600


*Counsel for Defendants*

Keith W. Miller
**PAUL, HASTINGS, JANOFSKY & WALKER LLP**
75 East 55th Street
New York, NY 10022
Tel.: (212) 318-6000

James D. Wareham
**PAUL, HASTINGS, JANOFSKY & WALKER LLP**
875 15th Street, N.W.
Washington, DC 20005
Tel.: (202) 551-1700

William F. Sullivan
Howard M. Privette
John S. Durrant
**PAUL, HASTINGS, JANOFSKY & WALKER LLP**
515 S. Flower Street
Los Angeles, CA 90071
Tel.: (213) 683-6000