## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

———————————————————x
In re UBS AUCTION RATE SECURITIES    )
LITIGATION                          )
                                    )
                                    )    Master File No. 08-cv-02967
THIS DOCUMENT RELATES TO:           )
ALL ACTIONS                         )
                                    )
———————————————————x

[*additional captions follow*]


## DECLARATION OF JEROME M. CONGRESS
## IN FURTHER SUPPORT OF THE MOTION OF ARIC A. STREIT AND MARY STREIT
## AS TRUSTEES FOR THE BENEFIT OF THE STREIT LIVING TRUST FOR LEAD
## PLAINTIFF APPOINTMENT, AND IN OPPOSITION TO COMPETING LEAD
## PLAINTIFF MOTIONS

```
----------------------------------------x
RANDOLPH BONNIST, Individually and On      )
Behalf Of Himself And All Others Similarly )
Situated,                                  )
                                           )
                    Plaintiff,             )    Case No. 08-cv-4352
                                           )
        vs.                                )
                                           )
UBS AG, UBS SECURITIES LLC and UBS         )
FINANCIAL SERVICES, INC.,                  )
                                           )
                    Defendants.            )
                                           )
                                           )
----------------------------------------x
RONALD D. KASSOVER, on behalf of himself   )
and all others similarly situated,         )
                                           )
                    Plaintiff,             )
                                           )    Case No. 08-cv-02753
        vs.                                )
                                           )
UBS AG and UBS FINANCIAL SERVICES,         )
INC.,                                      )
                                           )
                    Defendants.            )
                                           )
                                           )
----------------------------------------x
ARIC A. STREIT and MARY STREIT as          )
Trustees for the benefit of the STREIT LIVING )
TRUST, Individually And On Behalf of All Others )
Similarly Situated,                        )
                                           )    Case No. 08-cv-5251
                    Plaintiffs,            )
                                           )
        v.                                 )
                                           )
UBS AG, UBS SECURITIES LLC and UBS         )
FINANCIAL SERVICES, INC.,                  )
                                           )
                    Defendants.            )
----------------------------------------x
```

I, Jerome M. Congress, under penalties of perjury, hereby declare:

1.      I am a member of Milberg LLP.  I submit this declaration in further support of the Motion of Aric A. Streit and Mary Streit as Trustees for the Benefit of The Streit Living Trust for Lead Plaintiff Appointment, and in opposition to competing lead plaintiff motions.

2.      Attached hereto as Exhibit A is a true and correct copy of the Affidavit of Aric A. Streit and Mary Streit dated June 6, 2008.

3.      Attached hereto as Exhibit B is a true and correct copy of a May 4, 2008 *New York Times* article by Gretchen Morgenson entitled "How to Clear A Road to Redemption".

4.      Attached hereto as Exhibit C is a true and correct copy of a *Business Wire* press release dated May 19, 2008 entitled "Black Rock Announces Redemption for Auction Rate Preferred".

5.      Attached hereto as Exhibit D is a true and correct copy of a *Market Wire* press release dated May 17, 2008 entitled "Kayne Anderson MLP Investment Company Files Notice with SEC to Redeem All of Its Outstanding Auction Rate Senior Notes in Early July 2008".

6.      Attached hereto as Exhibit E is a true and correct copy of a *Franklin Advisors, Inc.* press release dated May 21, 2008 entitled "Franklin Templeton Limited Duration Income Trust Announces Refinancing of Certain Auction Preferred Shares".

7.      Attached hereto as Exhibit F is a true and correct copy of a *PR Newswire - FirstCall* press release dated May 8, 2008 entitled "Boards Authorize Action on Preferred Stock".

8.      Attached hereto as Exhibit G is a true and correct copy of a *Cohen & Steers, Inc.* press release dated May 16, 2008 entitled "Cohen & Steers Arranging New Financing to Redeem Auction Market Preferred Securities".

9.    Attached hereto as Exhibit H is a true and correct copy of a *Bloomberg* article dated April 25, 2008 by Michael B. Marois and Jeremy R. Cooke entitled "Auction-Bond Flops Stick Student-Loan Holders With 0%".

10.    Attached hereto as Exhibit I is a true and correct copy of a *Financial Times* article dated June 4, 2008 entitled "Discounts on offer leave disappointed investors hanging on".

11.    Attached hereto as Exhibit J is a true and correct copy of the Affidavit of Marc Vellrath, Ph.D., CFA, dated June 9, 2008.

12.    Attached hereto as Exhibit K is a true and correct copy of a letter dated May 22, 2008 from Jerome M. Congress, Esq. of Milberg LLP to Daniel C. Girard, Esq., Edward Korsinsky, Esq., Joe R. Whatley, Jr., Esq., and Jules Brody, Esq., re: *In re UBS Auction Rate Securities Litigation.*

13.    Attached hereto as Exhibit L are true and correct copies of charts entitled "Impact of Post Class Period Redemptions and Announced Redemptions on Streit and Chandler ARS Holdings", and "Streit and Chandler ARS Holdings by Category as of June 9, 2008".

Dated: June 9, 2008                                Respectfully submitted,

                                                        **MILBERG LLP**
                                                        By: /s/ Jerome M. Congress
                                                        Jerome M. Congress
                                                        One Pennsylvania Plaza, 49th Floor
                                                        New York, New York 10119
                                                        Telephone:     (212) 594-5300
                                                        Facsimile:     (212) 868-1229
                                                        jcongress@milberg.com

                                                        *Proposed Co-Lead Counsel for the Class*

4

# EXHIBIT A

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

```
————————————————————————x
In re UBS AUCTION RATE SECURITIES       )
LITIGATION                              )
                                        )
                                        )   Master File No. 08-cv-02967
THIS DOCUMENT RELATES TO:               )
ALL ACTIONS                             )
                                        )
————————————————————————x
```

[*additional captions follow*]

**AFFIDAVIT OF ARIC A. STREIT AND MARY STREIT**

```
―――――――――――――――――――――x
RANDOLPH BONNIST, Individually and On      )
Behalf Of Himself And All Others Similarly )
Situated,                                  )
                                           )
                    Plaintiff,             )   Case No. 08-cv-4352
                                           )
         vs.                               )
                                           )
UBS AG, UBS SECURITIES LLC and UBS         )
FINANCIAL SERVICES, INC.,                  )
                                           )
                    Defendants.            )
                                           )
―――――――――――――――――――――x
RONALD D. KASSOVER, on behalf of himself   )
and all others similarly situated,         )
                                           )
                    Plaintiff,             )
                                           )   Case No. 08-cv-02753
         vs.                               )
                                           )
UBS AG and UBS FINANCIAL SERVICES,         )
INC.,                                      )
                                           )
                    Defendants.            )
                                           )
                                           )
―――――――――――――――――――――x
ARIC A. STREIT and MARY STREIT as          )
Trustees for the benefit of the STREIT LIVING )
TRUST, Individually And On Behalf of All Others )
Similarly Situated,                        )
                                           )   Case No.
                    Plaintiffs,            )
                                           )
         v.                                )
                                           )
UBS AG, UBS SECURITIES LLC and UBS         )
FINANCIAL SERVICES, INC.,                  )
                                           )
                    Defendants.            )
―――――――――――――――――――――x
```

STATE OF CALIFORNIA      )

COUNTY OF LOS ANGELES  )

ARIC A. STREIT AND MARY STREIT, as Trustees for the benefit of the STREIT LIVING TRUST, being duly sworn, hereby depose and state:

1.      We have applied to the Court to be appointed Lead Plaintiff in the above-captioned action and make this affidavit in support of that application. We have personal knowledge of the facts and matters set forth herein. We are married to each other and are the Trustees for the benefit of the Streit Living Trust (the "Trust"). We, together with our four adult children and our parents, are the only beneficiaries of the Trust.

2.      We operate a real estate business that owns apartment buildings and other commercial properties. As part of our business, we sometimes refinance the properties to obtain funds for working capital, including acquiring suitable additional properties for our portfolio, among other needs. Our business depends on having cash available to make acquisitions of new real estate. It is frequently the ability to close a transaction quickly that has allowed our business to grow and remain successful. Put simply, cash is the oxygen that keeps our business healthy and alive.

3.      We deposited much of our available cash, including the proceeds from refinancing our properties, into accounts at UBS Financial Services Inc. ("UBS Financial"). These accounts are in the name of the Trust and the securities, cash and other assets, if any, contained therein are property of our Trust.

4.      We began purchasing auction rate securities ("ARS") in 2005 after we opened our first UBS Financial account.  Representatives of UBS Financial's Corporate

1

Cash Management Group recommended ARS to us. We understood from them that ARS were cash equivalents that would preserve our principal while providing us with liquidity.

5.    When we learned that our ARS were frozen in our accounts, we immediately contacted our UBS Financial advisors to see if there was any way to access some or all of our monies. We need those funds for working capital to maintain our real estate business. In addition, we self-insure against earthquake damage to our properties and must have funds readily available for that purpose. We were told to open margin accounts so that we could borrow in cash up to fifty percent of the par value of our ARS holdings. Because we saw no other option for restoring some of our prior liquidity, we opened two margin accounts and executed account agreements with UBS Financial on February 26 and 28, 2008, respectively. We then borrowed on margin approximately $10.1 million.

6.    Based on our account statements dated May 30, 2008, we have paid UBS Financial $202,841 on these loans, including $52,152 in interest through May 21, 2008. Under the account agreements, UBS Financial can call our margin loans at any time requiring us to pay the loans in full. Because our ARS holdings are frozen, we would have to repay the loans out of our other personal assets. Our net worth is primarily in real estate. A margin call would be a major hardship and could further damage our business.

7.    We understand that all of our ARS holdings are backed by issuers that make student loans. To our knowledge, there have been no successful auctions for our ARS since the market collapsed on February 13, 2008, and no issuer has sought to redeem our securities. Our collective holdings on average are earning (as of May 30, 2008) less than 4% interest.

2

_____
Mary Streit, individually and
as a Trustee for the benefit of
the Streit Living Trust

_____
Aric A. Streit, individually and
as a Trustee for the benefit of
the Streit Living Trust


Sworn to before me this
____ day of June, 2008

_____
Notary Public
Notary Public, State of California
No. 1744171
Qualified in Los Angeles County
Commission Expires: 5/8/2011



BENNY LAKATOS
NOTARY PUBLIC - CALIFORNIA
COMMISSION # 1744171
LOS ANGELES COUNTY
My Comm. Exp. May 8, 2011

3

# EXHIBIT B

2 of 2 DOCUMENTS

Copyright 2008 The New York Times Company
The New York Times

May 4, 2008 Sunday
Late Edition - Final

**SECTION:** Section BU; Column 0; Money and Business/Financial Desk; FAIR GAME; Pg. 1

**LENGTH:** 1054 words

**HEADLINE:** How to Clear A Road to Redemption

**BYLINE:** By GRETCHEN MORGENSON

**BODY:**

IT is Day 79 in the hostage crisis otherwise known as the auction-rate securities market. Some $300 billion worth of investors' funds -- advertised as being easy as pie to cash in -- are still locked up. And the brokerage firms that got investors into this mess are doing little to help.

But investors trapped in these securities are not the only victims of this debacle; taxpayers are, too. That's because municipal issuers of auction-rate notes -- towns, school districts, hospitals, highway authorities and others -- are being asked to pay up to redeem and restructure the debt.

Even as investors and taxpayers are hurt by this frozen market, Wall Street is making money from it. In fact, the auction-rate securities mess is another illustration of damaging conflicts of interest at the nation's big brokerage firms.

Auction-rate securities are debt obligations issued by municipalities, nonprofit entities and closed-end mutual funds. Interest rates on the securities are set by periodic auctions, based on investor demand. The market froze in February when buyers disappeared, and brokerage firms refused to step in.

Naturally, investment bankers who agreed to operate these auctions were paid for their services: 0.25 percent of the security's total issue for each year of its life. Unnaturally, big firms still earn these fees even though 70 percent of the weekly auctions of these securities are failing.

The firms also rake in banking fees when municipal issuers redeem the securities. They haul in another round of revenue when they help issuers unwind derivative contracts that are often intertwined with the securities. These derivatives were designed to reduce costs for the issuers by hedging their interest rate risks. Thanks to the decline in interest rates, however, they can be frightfully expensive to unspool.

By my arithmetic, that's Wall Street 3, Investors/Issuers 0.

Sure, investors get interest on their money -- but nowhere near enough to compensate for being stuck in their holdings.

Issuers of $78 billion in auction-rate securities have announced plans to redeem the paper. Almost three-quarters of that involves municipal notes, many with extra-high penalty rates of interest that must be paid to holders when an auction fails. These rates encourage redemption.

But investors in the remaining issues are not so fortunate. They are receiving no offers to redeem their securities, at least in part because the penalty rates on this paper are ridiculously low -- 120 percent of the London Interbank Offered Rate, or now around 3.5 percent. So issuers have little incentive to redeem.

Investors desperate to sell can tap the Restricted Securities Trading Network, a secondary market recently set up by Restricted Stock Partners in New York. The action in the market is small but revealing.

How to Clear A Road to Redemption The New York Times May 4, 2008 Sunday

Barry Silbert, the network's founder, said that about 10 trades occur daily, with an average size of $350,000. He said municipal issues trade at discounts of 2 percent to 10 percent, while closed-end fund shares trade at a 15 percent haircut. Student loan securities are the hardest to sell: their discounts are 25 percent or more.

Joseph S. Fichera, chief executive of Saber Partners, said discounts like these present opportunities for municipal issuers to buy back the securities at a savings while also letting investors exit if they choose. This would provide the liquidity that some people crave.

For example, the Metropolitan Transportation Authority in New York recently said it had $1.3 billion in failed auction securities outstanding after a buyback. If it repurchased 15 percent at a discount of 8 percent, it would save $16 million. Imagine what a hospital or university, short of cash, could do with such a windfall.

Issuers would also benefit by renegotiating contracts to eliminate payments for unsold securities and failed auctions. This would align Wall Street's incentives with its customers' needs, Mr. Fichera said. Since February, New York State would have saved $1 million if it had not had to pay for failed auctions on its securities, he estimated.

After redeeming some debt, issuers could reap additional savings by refinancing the rest at current market rates.

For now, however, most Wall Street firms are advising their municipal issuer clients to buy back their securities at par. This is where the potential conflicts come in: discounted prices on these securities pose problems for investment banks that sold them to investors as cash.

If an investment bank advised an auction-rate note issuer to redeem at a discount, for example, that bank's customers who decided to sell would record a loss and have a claim for damages in an arbitration case. (Until an investor sells, he technically has no loss.)

Encouraging issuers to redeem at discounted prices could also force the firm to mark down similar securities on its own books. While the market is frozen, firms can avoid these markdowns.

"The firms hold a lot of this themselves," Mr. Silbert said, "and they are trying to minimize the damage to their balance sheets."

Wall Street should stop with this me-first routine. Pronto. It should stop billing issuers for failed auctions and should recommend that they redeem securities at fair value in the marketplace.

Failing that, issuers should work to fix the situation. "Governments need to be as vigorous in representing their clients, the citizens, as Wall Street is in representing its own interests," Mr. Fichera said. "The market will only produce efficient and fair results if this happens."

For securities left outstanding, issuers should help thaw the market by opening their auctions to more potential buyers; in recent years, issuers have been happy with just one brokerage firm involved. The results of the auctions should also be transparent instead of shrouded in secrecy -- showing how many bidders there are and at what prices. If investors knew that one auction had four bidders and another had 400, it would be pretty clear which security was riskier.

"Transparency in the conduct of the auction is absolutely necessary to restore investor confidence and get the bidding going again," Mr. Fichera said. "That way, investors can be informed about the risks they are taking and compensated for them."

**URL:** http://www.nytimes.com

**GRAPHIC:** GRAPHIC: A ROBOTIC WAY TO HEAL THE HEART: Surgery performed with robots is still finding its role in the medical marketplace. A new remote robotic system, used to treat electrical malfunctions in the heart linked to stroke and heart failure, is a closely watched touchstone for how successful robotics can be for patients, doctors and ultimately, investors.
HEART SURGERY WITH LESS CUTTING: Open heart surgery to treat the electrical malfunctions has been largely replaced by the use of minature tools at the end of long catheters. Now robots are being used to control the catheter, which could lead to better results.
AND LESS FATIGUE: X-rays and ultrasound images allow doctors to monitor work inside the heart. The robot allows doctors to avoid the fatigue of five hours at an operating table wearing a lead vest to limit exposure to X-rays.

How to Clear A Road to Redemption The New York Times May 4, 2008 Sunday

INSIDE THE HEART: Stray electrical currents can cause abnormal contractions. Catheters are used to scar the muscle to block the pathways of the stray signals. (Source: Hansen Medical) (DRAWING BY AL GRANBERG)

**LOAD-DATE:** May 4, 2008

# EXHIBIT C

BUS         BlackRock Announces Redemption Dates for Auction Rate Preferred
            May 19 2008  9:14:01


Shares Issued by BlackRock Taxable Fixed Income Closed-End Funds


NEW YORK--(BUSINESS WIRE)--May 19, 2008
BlackRock, Inc. (NYSE:BLK) today announced the redemption dates
for auction rate preferred shares (ARPS) issued by its five taxable
fixed income closed-end funds that utilize ARPS. The five funds are
BlackRock Preferred Opportunity Trust (NYSE:BPP), BlackRock Preferred
and Equity Advantage Trust (NYSE:BTZ), BlackRock Preferred and
Corporate Income Strategies Fund, Inc. (NYSE:PSW), BlackRock Preferred
Income Strategies Fund, Inc. (NYSE:PSY) and BlackRock Global Floating
Rate Income Trust (NYSE:BGT). BlackRock has secured alternative forms
of borrowing that will enable these funds, based on current market
conditions, to redeem approximately 54% of their total outstanding
ARPS.

    The new financing, which has been approved by each fund's Board of
Directors, is expected to lower the cost of leverage for common
shareholders, while providing liquidity, at liquidation preference,
for certain preferred shareholders. This new financing seeks to
balance the immediate benefit of a lower cost of financing for the
common shareholders and liquidity for a portion of the holders of ARPS
against the relative risks that the maximum rates on the ARPS may rise
and the risk that the alternative forms of leverage may become more
expensive in the future or unavailable.

    For the four funds that invest primarily in preferred stock, BPP,
BTZ, PSW and PSY, there will be a redemption of approximately 50% of
each fund's outstanding ARPS (for a total of $684.65 million). For
BGT, the fund will redeem approximately 76% of the ARPS outstanding
($184.65 million).

    Please see the following chart for redemption amounts and
scheduled dates:

-0-
*T
BPP

----------------------------------------------------------------------
          CUSIP Number    Number of        Amount          Redemption
Series                    Shares Redeemed   Redeemed        Date
----------------------------------------------------------------------
T7        09249V202       1,472            $36,800,000     June 11, 2008
----------------------------------------------------------------------
W7        09249V301       1,472            $36,800,000     June 12, 2008
----------------------------------------------------------------------
R7        09249V400       1,472            $36,800,000     June 13, 2008
----------------------------------------------------------------------

*T

-0-
*T

Copyright (c) 2008

```
BUS           BlackRock Announces Redemption Dates for Auction Rate Preferred
              May 19 2008  9:14:01
BTZ
```

| Series | CUSIP Number | Number of Shares Redeemed | Amount Redeemed | Redemption Date |
|--------|--------------|---------------------------|-----------------|-----------------|
| T7 | 092508209 | 2,310 | $57,750,000 | June 11, 2008 |
| W7 | 092508308 | 2,310 | $57,750,000 | June 12, 2008 |
| R7 | 092508407 | 2,310 | $57,750,000 | June 13, 2008 |
| F7 | 092508506 | 2,310 | $57,750,000 | June 9, 2008 |

```
*T

-0-
*T
PSW
```

| Series | CUSIP Number | Number of Shares Redeemed | Amount Redeemed | Redemption Date |
|--------|--------------|---------------------------|-----------------|-----------------|
| M7 | 09255J200 | 1,365 | $34,125,000 | June 10, 2008 |
| T7 | 09255J309 | 1,365 | $34,125,000 | June 11, 2008 |

```
*T

-0-
*T
PSY
```

| Series | CUSIP Number | Number of Shares Redeemed | Amount Redeemed | Redemption Date |
|--------|--------------|---------------------------|-----------------|-----------------|
| M7 | 09255H204 | 1,400 | $35,000,000 | June 10, 2008 |
| T7 | 09255H303 | 1,400 | $35,000,000 | June 11, 2008 |
| W7 | 09255H402 | 1,400 | $35,000,000 | June 5, 2008 |
| TH7 | 09255H501 | 1,400 | $35,000,000 | June 6, 2008 |
| F7 | 09255H600 | 1,400 | $35,000,000 | June 9, 2008 |
| W28 | 09255H709 | 2,000 | $50,000,000 | June 5, 2008 |
| TH28 | 09255H808 | 2,000 | $50,000,000 | June 20, 2008 |

```
*T

-0-
*T
BGT
```

| | Number of Shares | Amount | Redemption |
|---|------------------|--------|------------|

Copyright (c) 2008

```
BUS            BlackRock Announces Redemption Dates for Auction Rate Preferred
               May 19 2008  9:14:01
```

| Series | CUSIP Number | Redeemed | Redeemed | Date |
|--------|--------------|----------|----------|------|
| T7 | 091941203 | 2,462 | $61,550,000 | June 11, 2008 |
| W7 | 091941302 | 2,462 | $61,550,000 | June 12, 2008 |
| R7 | 091941401 | 2,462 | $61,550,000 | June 13, 2008 |

*T

The ARPS being redeemed will be replaced with an alternative form of financing that will incorporate a combination of a credit facility and reverse repurchase agreements. The Depository Trust Company (DTC), the securities' holder of record, will determine by random lottery how a partial series redemption will be allocated among each participant broker-dealer account and each participant broker-dealer determines how to allocate each redemption among the holders of the relevant series of ARPS held by it.

BlackRock will continue to provide periodic updates to market participants and shareholders via press releases and on its website at www.blackrock.com. As stated in the firm's April 15, 2008 press release, BlackRock anticipates that it will provide more specifics on the refinancing of its tax-exempt ARPS, including the specific funds and tranches, by early June.

Conference Call

BlackRock will host a conference call at 4:15 p.m. (ET) on Tuesday May 20, 2008 to discuss the refinancing of these ARPS. Those interested in listening to the call may dial 1-877-238-4671 and reference conference ID number 481067. BlackRock does anticipate high call volume and will also provide an audio webcast at https://cis.premconf.com/sc/scw.dll/usr?cid=vlllrznwcwlvwzczc.

To access the replay of the call, please dial 1-888-348-4629 or 1-719-884-8882, referencing conference ID number 481067 or visit the closed-end fund section of the company's website at www.blackrock.com. The replay will be available for 14 days following the call.

BlackRock has also posted a Q&A document on its website, www.blackrock.com, to provide further details on this refinancing.

About BlackRock

BlackRock is one of the world's largest publicly traded investment management firms. At March 31, 2008, BlackRock's AUM was $1.364 trillion. The firm manages assets on behalf of institutions and individuals worldwide through a variety of equity, fixed income, cash management and alternative investment products. In addition, a growing number of institutional investors use BlackRock Solutions investment system, risk management and financial advisory services. Headquartered in New York City, as of March 31, 2008, the firm has approximately 5,600 employees in 19 countries and a major presence in key global markets, including the U.S., Europe, Asia, Australia and the Middle East. For additional information, please visit the Company's website

Copyright (c) 2008

BUS          BlackRock Announces Redemption Dates for Auction Rate Preferred
             May 19 2008  9:14:01
at www.blackrock.com.

    Forward-Looking Statements

    This press release, and other statements that BlackRock may make,
may contain forward-looking statements within the meaning of the
Private Securities Litigation Reform Act, with respect to the
BlackRock closed-end funds' future financial or business performance,
strategies or expectations. Forward-looking statements are typically
identified by words or phrases such as "trend," "potential,"
"opportunity," "pipeline," "believe," "comfortable," "expect,"
"anticipate," "current," "intention," "estimate," "position,"
"assume," "outlook," "continue," "remain," "maintain," "sustain,"
"seek," "achieve," and similar expressions, or future or conditional
verbs such as "will," "would," "should," "could," "may" or similar
expressions.

    BlackRock cautions that forward-looking statements are subject to
numerous assumptions, risks and uncertainties, which change over time.
Forward-looking statements speak only as of the date they are made,
and BlackRock and the closed-end funds managed by BlackRock and its
affiliates assume no duty to and do not undertake to update publicly
or revise any forward-looking statements. Actual results could differ
materially from those anticipated in forward-looking statements and
future results could differ materially from historical performance.

    The following factors, among others, could cause actual results to
differ materially from forward-looking statements or historical
occurrences: (1) the ability of the BlackRock closed-end funds that
have announced these refinancing plans to implement those plans on a
timely basis; (2) the effects of changes in market and economic
conditions; (3) other legal and regulatory developments; and (4) other
additional execution risks and uncertainties.


CONTACT:
BlackRock, Inc.
Closed-End Fund Shareholders
1-800-882-0052
or
Media Relations:
Brian Beades, 212-810-5596

-0- May/19/2008 13:14 GMT

# EXHIBIT D

MWR          Kayne Anderson MLP Investment Company Files Notice With SEC to
             May 17 2008  8:22:57


Kayne Anderson MLP Investment Company Files Notice With SEC to Redeem
All of Its Outstanding Auction Rate Senior Notes in Early July 2008

HOUSTON, TX -- (MARKET WIRE) -- 05/17/08 --  Kayne Anderson MLP
Investment Company (the "Company") (NYSE: KYN) announced today that
it has filed with the Securities and Exchange Commission a notice of
its intention to redeem $505 million aggregate principal amount of
its outstanding Series A, B, C, E, and F auction rate senior notes
("ARNs") in early July 2008. The table below sets forth amounts
outstanding under each series of ARNs and anticipated redemption
dates.   The Company currently expects to finance the redemption
using borrowings under its existing revolving credit facility and a
private placement of debt securities.

*T

| Series | CUSIP | Principal Outstanding | Total Notes Outstanding | Expected Redemption Date |
|--------|-------|----------------------|-------------------------|--------------------------|
| A | 486606AA4 | $  85,000,000 | 3,400 | July 8, 2008 |
| B | 486606AB2 | 85,000,000 | 3,400 | July 10, 2008 |
| C | 486606AC0 | 90,000,000 | 3,600 | July 14, 2008 |
| E | 486606AD8 | 60,000,000 | 2,400 | July 7, 2008 |
| F | 486606AE6 | 185,000,000 | 7,400 | July 9, 2008 |
| Total | | $ 505,000,000 | 20,200 | |

*T

Update for Auction Rate Preferred Shareholders

The Company continues to evaluate options for refinancing its Series
D auction rate preferred shares ("ARPs") (CUSIP 486606205) in a manner
that preserves flexibility under asset coverage ratios required by the
Investment Company Act of 1940, as amended ("the 1940 Act"), and that
has an appropriate cost relative to leaving the ARPs in place.   At
this time, the Company does not have a viable option for refinancing
its ARPs as the currently available solutions are either more
expensive than the current dividend rate on the ARPs or would reduce
the Company's flexibility in complying with asset coverage tests
under the 1940 Act.

Kayne Anderson MLP Investment Company is a non-diversified,
closed-end management investment company registered under the
Investment Company Act of 1940, whose common stock is traded on the
NYSE. The Company's investment objective is to obtain a high
after-tax total return by investing at least 85% of its total assets
in energy-related master limited partnerships and their affiliates,
and in other companies that, as their principal business, operate
assets used in the gathering, transporting, processing, storing,
refining, distributing, mining or marketing natural gas, natural gas
liquids (including propane), crude oil, refined petroleum products or
coal.

Copyright (c) 2008

MWR        Kayne Anderson MLP Investment Company Files Notice With SEC to
           May 17 2008  8:22:57
CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS: This press
release contains "forward-looking statements" as defined under the
U.S. federal securities laws. Generally, the words "believe,"
"expect," "intend," "estimate," "anticipate," "project," "will" and
similar expressions identify forward-looking statements, which
generally are not historical in nature. Forward-looking statements
are subject to certain risks and uncertainties that could cause
actual results to differ from the Company's historical experience and
its present expectations or projections indicated in any
forward-looking statements. These risks include, but are not limited
to, changes in economic and political conditions; regulatory and
legal changes; MLP industry risk; leverage risk; valuation risk;
interest rate risk; tax risk; and other risks discussed in the
Company's filings with the SEC. You should not place undue reliance
on forward-looking statements, which speak only as of the date they
are made. The Company undertakes no obligation to publicly update or
revise any forward-looking statements made herein. There is no
assurance that the Company's investment objectives will be attained.


CONTACT:

KA Fund Advisors, LLC
Monique Vo
877-657-3863
http://www.kaynefunds.com
-0- May/17/2008 12:22 GMT

Copyright (c) 2008

# EXHIBIT E



UNITED STATES

< GAIN FROM OUR PERSPECTIVE® >
FRANKLIN • TEMPLETON • MUTUAL SERIES

| Funds & Performance | Retirement Center | Products & Services | Education & Planning | Commentary & Outlook | Forms & Literature |

Site Search    Fund Search    Log In : Are you a New User?

Our Company

**+ Company information**

**− News room**

   Recent press releases

  » Archived press releases

   Industry issues

   Media contacts

   Statement on PetroChina

**+ Investor relations**

**+ Corporate governance**

**+ Corporate citizenship**

## For Immediate Release

### Franklin Templeton Limited Duration Income Trust Announces Refinancing of Certain Auction Preferred Shares

From:
**Franklin Advisers, Inc.**

Telephone:                Contact:
(800) 223-2141            Franklin Templeton Fund Information

San Mateo, CA, May 21, 2008 – Franklin Templeton Limited Duration Income Trust [AMEX:FTF], a closed-end investment company managed by Franklin Advisers, Inc., announced today its intention to refinance approximately $100 million of its auction preferred shares (APS), representing approximately 53% of the Fund's outstanding APS. Franklin Templeton Limited Duration Income Trust (the "Fund") is the only fund within Franklin Templeton Investments that has outstanding APS.

Approved by the Fund's Board of Trustees, the alternate form of leverage, principally through the use of mortgage dollar rolls, is expected to lower the cost of leverage for common shareholders. It is also expected that this action will provide liquidity, at the liquidation preference per share, for a portion of the APS held by the Fund's preferred shareholders. Franklin Advisers believes that this financing option is in the best interest of the Fund's common shareholders and holders of APS. Franklin Advisers presently believes that mortgage dollar rolls provide an attractive and available source of financing. However, Franklin Advisers can make no assurance that any alternative forms of leverage, including mortgage dollar rolls, used by the Fund can be entered into or will not become more expensive or unavailable in the future.

Following this proposed refinancing, the Fund will continue to meet the asset coverage requirements mandated by the Investment Company Act of 1940 and the appropriate rating agencies. Franklin Advisers, as the Fund's investment manager, continues to work with the underwriters of the APS and other financial institutions to explore alternative financing options that could be in the best interests of the Fund's common shareholders and the holders of the remaining APS.

The Fund intends that this partial redemption of the APS will be implemented on a pro rata basis across the Fund's three outstanding series of APS, beginning on or about June 9, 2008. The Depository Trust Company (DTC), the securities' holder of record, will determine how a partial series redemption will be allocated among participant broker dealer accounts. Each participant broker dealer will decide how to allocate redeemed shares among its underlying beneficial owners. The Fund anticipates that the refinancing will be completed by June 12, 2008. As of May 20, 2008, the Fund had total assets of approximately $548 million, of which approximately $121 million are in U.S. government agency mortgage-backed securities. Upon completion of the proposed refinancing, it is expected that the Fund will have $100 million in mortgage dollar rolls outstanding and $90 million of APS. Going forward, the Fund will treat such mortgage dollar rolls as indebtedness or a borrowing of the Fund and will comply with the related asset coverage requirements of the Investment Company Act of 1940 and the Fund's fundamental investment restrictions relating thereto. The Fund will no longer segregate liquid assets with respect to the mortgage dollar rolls. For a brief period of time while the redemption of the APS is being processed, the total leverage of the Fund represented by the mortgage dollar rolls and the APS will exceed 38% of the Fund's managed assets. However, upon completion of the redemption, the Fund's total leverage will again fall below such 38% target limit.

Franklin Advisers, Inc., is a wholly owned subsidiary of Franklin Resources, Inc. [NYSE:BEN], a global investment management organization operating as Franklin Templeton Investments.

Franklin Templeton Investments provides global and domestic investment management solutions managed by its Franklin, Templeton, Mutual Series, Fiduciary Trust, Darby and Bissett investment teams.  The San Mateo, CA-based company has more than 60 years of investment experience and over $617 billion in assets under management as of April 30, 2008.  For more information, please call 1-800/DIAL BEN® or visit franklintempleton.com.

For U.S. residents only. Terms of Use  |  Privacy Policy

**FRANKLIN. TEMPLETON. INVESTMENTS**
Copyright © 1999 - 2008. Franklin Templeton Investments. All rights reserved.

# EXHIBIT F

PRN        Boards Authorize Action on Preferred Stock
           May 8 2008  18:35:52

    CHICAGO, May 8 /PRNewswire-FirstCall/ -- The Boards of Directors of DNP
Select Income Fund Inc. (DNP) and Duff & Phelps Utility and Corporate Bond
Trust Inc. (DUC) approved a proposal by the Funds' investment adviser, Duff &
Phelps Investment Management Co., to proceed with securing a syndicated bank
loan facility to enable both Funds to redeem their outstanding preferred
stock.  The action taken today reflects the Boards' continued efforts to
address the lack of liquidity in the auction securities market for the Funds'
preferred shareholders.  The Funds' management believes that the current
preferred stock auction and remarketing process may not provide liquidity for
an extended period of time, if ever, and that the best near-term solution to
the liquidity crisis is to obtain secured credit facilities from a commercial
bank. The Boards concurred with management's recommendation that two of the
three funds advised by Duff & Phelps Investment Management Co. redeem their
outstanding preferred stock and replace most of it with debt financed
leverage. Management is in talks with a commercial bank about securing a
facility that would provide liquidity for preferred stock shareholders.

    The portion of preferred stock not redeemed with a credit facility would
be redeemed with the proceeds from asset sales, resulting in a reduction in
the amount of leverage used by DNP and DUC.  A reduction in leverage is
necessitated by a requirement under the Investment Company Act of 1940 to
maintain higher asset coverage for debt than for preferred stock.  Management
and the Boards of Directors believe that a reduction in leverage outstanding
and the costs associated with securing a credit facility are necessary given
market conditions, and are in the best long-term interests of the common and
preferred shareholders.

    Prior to implementing the above actions, there are several hurdles that
will have to be overcome.  DNP Select Income Fund Inc. (DNP), in its original
1987 prospectus, established certain fundamental investment restrictions that
govern its investment activities, including a limit on aggregate borrowings by
the Fund to 15% of the fund's total assets.  Unless and until this limitation
is modified, the Fund can utilize debt-financed leverage to replace some, but
not all, of the Fund's preferred stock.  Under the Investment Company Act of
1940, any change to a fundamental investment restriction requires shareholder
approval.  Replacing the Fund's preferred stock with debt financed leverage
will therefore require approval by the Fund's shareholders of an increase in
the percentage of debt financing that the Fund may utilize. The DNP Board of
Directors has called a special shareholder meeting for June 30th to hold a
vote.

    In the meantime, the DNP management team plans to proceed with the
syndication of the secured credit facility.  Once the credit facility is in
place, the Board has authorized management to do a partial call of the
preferred stock, with the redemption process and required asset sales to be
completed after receiving shareholder approval to modify the fundamental
investment restriction.  The Fund is hopeful that it can start the redemption
process in June with the goal of completion in the third quarter of this year.

    Duff & Phelps Utilities and Corporate Bond Trust Inc. (DUC) has a
fundamental investment restriction on debt of 33 1/3%, which would allow the
Copyright (c) 2008

PRN      Boards Authorize Action on Preferred Stock
           May 8 2008  18:35:52
Fund to replace its preferred stock with debt financed leverage without a
shareholder vote.  The DUC Board of Directors encouraged management to move
forward with the syndication of the bank facility and authorized the
redemption of the preferred stock and required asset sales once the bank
facility is in place.  The Fund is hopeful that it can start the redemption
process in June with the goal of completion in the third quarter of this year.


    DTF Tax-Free Income Inc. (DTF) has the same dilemma as all municipal
closed-end funds employing preferred stock leverage. Municipal closed-end
funds seek to pass through tax-exempt income to shareholders, and income
generated from debt financing is generally taxable, with the result that debt
leverage is generally a less advantageous form of leverage than preferred
stock. Currently, regulatory authorities and industry associations are
considering various proposals as industry-wide solutions to the liquidity
crisis.  The DTF Board of Directors and management continue to review these
and other potential alternative structures for the DTF preferred stock but
have not yet arrived at a workable solution.  The DTF Board has directed Fund
management to continue its efforts to develop and evaluate potential solutions
that would be in the best interests of all of the Fund's shareholders.  Any
potential solution will be subject to execution risk and dependent on both
economic and market factors beyond management's control.

    The Boards of Directors and management of the Funds remain committed to
fulfilling their obligations to both preferred and common shareholders.  We
believe that DNP and DUC are in the process of implementing a solution that
will create the desired liquidity for their preferred shareholders while at
the same time allowing for the use of leverage for the benefit of the Funds'
common shareholders.  Although there remain many forces outside the control of
the Boards and management that may still impact the Funds' ability to
implement the above strategy, the Boards and management believe that they will
ultimately succeed in achieving these goals.

    Management will implement the proposed refinancing of the preferred stock
on a fund-by-fund and tranche-by-tranche basis. The implementation of any
refinancing described above will depend on a variety of factors, including
challenging financial market conditions and regulatory, market and economic
factors. Management cannot be certain that it will be able to refinance any
specified portion of its Funds' preferred stock, that credit facilities or
other mechanisms can be entered into or that it will be able to take all the
necessary actions within the specified time frame. There can be no assurance
that any alternative forms of leverage used to refinance the Funds will not
become prohibitively expensive or unavailable in the future.


    DNP Select Income Fund Inc. is a closed-end diversified investment
management company.  The Fund's primary investment objectives are current
income and long-term growth of income.  The Fund seeks to achieve these
objectives by investing primarily in a diversified portfolio of equity and
fixed income securities of companies in the public utilities industry.  For
more information, visit the Fund's website at http://www.dnpselectincome.com
or call the Fund at (800) 864-0629.


SOURCE  DNP Select Income Fund Inc.

Copyright (c) 2008

PRN          Boards Authorize Action on Preferred Stock
             May 8 2008  18:35:52

CONTACT:
Joseph C. Curry, Jr., +1-502-588-8602, or Dianna P. Wengler, +1-502-588-8603,
or Timothy P. Riordan, +1-502-588-1786, all of DNP Select Income Fund Inc.
-0- May/08/2008 22:35 GMT

Copyright (c) 2008

# EXHIBIT G

# COHEN & STEERS

**Cohen & Steers, Inc.**
280 Park Avenue
New York, NY 10017-1216
Tel (212) 832-3232

**Contact:**
Francis C. Poli
Executive Vice President and General Counsel
Cohen & Steers Inc.
(212) 446-9112

## Cohen & Steers Arranging New Financing to Redeem Auction Market Preferred Securities

NEW YORK, May 16, 2008—Cohen & Steers announced today that it has reached an agreement with a financial institution on the terms of a $300 million credit facility that will allow one of its closed-end funds to redeem, at par value, a portion of its auction market preferred securities (AMPS). Subject to final documentation and approvals, Cohen & Steers Quality Income Realty Fund, Inc. (NYSE: RQI) intends to redeem, on a pro rata basis,* approximately 65% of the AMPS across all series. The proposed facility, which is expected to carry a lower interest rate than the current AMPS rate, will not affect the fund's level of leverage.

To date, four of eight leveraged Cohen & Steers closed-end funds have announced financing arrangements that will enable them to redeem more than 50% (approximately $600 million) of their outstanding AMPS. Cohen & Steers intends to redeem additional AMPS provided that financing is obtained on acceptable terms.

Cohen & Steers will keep all shareholders informed as further information regarding the redemptions becomes available. For more information and periodic updates, please visit www.cohenandsteers.com.

*\* Redemptions will be allocated among participating broker/dealers by the Depository Trust Company using a predetermined methodology, and each broker/dealer allocates the redeemed shares to the underlying beneficiaries according to its own procedures.*

### About Cohen & Steers
Cohen & Steers is a manager of income-oriented equity portfolios specializing in U.S. and international real estate securities, large cap value stocks, utilities and listed infrastructure securities, and preferred securities. The company also offers private alternative investment strategies, such as hedged real estate securities portfolios and real estate funds of funds. Headquartered in New York City, with offices in Brussels, Hong Kong, London and Seattle, Cohen & Steers serves individual and institutional investors through a broad range of investment vehicles. Through a subsidiary, Cohen & Steers provides investment banking services.

**Forward-Looking Statements**

This press release and other statements that Cohen & Steers may make may contain forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934, which reflect the company's current views with respect to, among other things, its operations and financial performance. You can identify these forward-looking statements by the use of words such as "outlook," "believes," "expects," "potential," "continues," "may," "will," "should," "seeks," "approximately," "predicts," "intends," "plans," "estimates," "anticipates" or the negative versions of these words or other comparable words. Such forward-looking statements are subject to various risks and uncertainties.

Accordingly, there are or will be important factors that could cause actual outcomes or results to differ materially from those indicated in these statements. The company undertakes no obligation to publicly update or review any forward-looking statement, whether as a result of new information, future developments or otherwise.

The following factors, among others, could cause actual results to differ materially from forward-looking statements: (1) the ability of Cohen & Steers and the Cohen & Steers closed-end funds that have issued AMPS to develop and finalize fund-by-fund specific proposals to restructure the leverage of such funds; (2) the need for such Cohen & Steers funds to obtain formal fund-by-fund approval from the funds' Board of Directors for certain types of specific proposals as they are developed and finalized; (3) the ability of such Cohen & Steers funds to negotiate and obtain from third parties the necessary debt facilities and other commitments and agreements necessary for the Cohen & Steers funds to refinance all or a portion of their leverage on terms and conditions acceptable to the funds and in a timely manner; (4) the ability of such Cohen & Steers funds to develop new forms of preferred stock that could replace existing AMPS on terms acceptable to the Cohen & Steers funds and in a timely manner; (5) the effects of changes in market and economic conditions, including higher costs and expenses associated with refinancing; (6) other legal and regulatory developments; and (7) other additional risks and uncertainties.

# EXHIBIT H

Auction-Bond Flops Stick Student-Loan Holders With 0% (Update1)
2008-04-25 09:48 (New York)


     (Adds comments on student-loan refinancings in last three
paragraphs.)

By Michael B. Marois and Jeremy R. Cooke
     April 25 (Bloomberg) -- More than $9 billion of auction- rate
bonds sold by student-loan agencies in U.S. states from Pennsylvania to
Utah have trapped investors in debt that's not paying interest.
     Rates on Pennsylvania Higher Education Assistance Agency bonds
backed by student loans were set at 0 percent April 4 after auctions to
determine interest costs attracted too few bidders. The same occurred
on more than 10 percent of the $86 billion of student-loan debt, as
failures triggered provisions in bond documents that limit the interest
agencies must pay, according to data compiled by Bloomberg.
     The collapse of the auction-rate market drove interest costs paid
by states, hospitals and student-lending agencies as high as 20
percent, and froze investors in securities they couldn't sell. Now,
holders of student-loan debt are stuck with bonds paying less than the
0.66 percent rate on the one-month Treasury bill.
     ``It's hard to explain, to conceptualize or even understand how
someone can borrow money and not pay you interest,'' said Mike
Saunders, who manages $1 billion in taxable student-loan bonds for
Acton, Massachusetts-based Roundstone Advisors.
     The bonds pay nothing because of a formula designed to ensure that
borrowers don't pay more interest on their debt than they receive from
their student-loan clients. The mechanism kicked in as rates climbed
above 10 percent since February, when dealers stopped buying securities
that went unsold at auctions.
     ``The investor loves you when he sees the 10 percent coupon, but
how do you explain to him that it's gone from 10 percent to zero?''
Saunders said.

                         Dropping Down

     A Utah State Board of Regents bond with interest that changes
every 35 days jumped to 16.58 percent on March 5, up from 3.8 percent
in January. The same bond's interest then dropped to 0 percent on April
9, when the provision took effect.
     Rates on $97 million of bonds sold by the Pennsylvania lending
agency more than doubled to 9.85 percent on March 7 before falling to 0
percent this month.
     The formula typically is based on a 12-month average of benchmark
money-market yields, which have fallen as the Federal Reserve slashed
its target rate for overnight loans between banks to 2.25 percent from
5.25 percent in September.
     Auction-rate bonds are long-term securities with interest rates
determined through bidding run by dealers every seven, 28 or 35 days.
When there aren't enough buyers, the auction fails and the rate resets
to a level proscribed when the obligations were initially sold.

                         Dealers Retreat

     The $330 billion auction-rate market unraveled in February after
investors shunned the debt and dealers that had routinely stepped in as

buyers of last resort stopped supporting the securities under the
weight of subprime-related losses.

   More than 60 percent of the thousands of auctions conducted each
week have failed since Feb. 13, data compiled by Bloomberg show.

   The collapse left public student-loan issuers unable to raise
additional capital in the market. No new municipal bonds backed by
student loans, including auction-rate debt, were sold in the first
quarter, the first time that happened in almost 40 years, according to
Thomson Reuters.

   ``We need bonds that are out there for 30 to 40 years,''
said Jamie Wolfe, chief financial officer of NorthStar Education
Finance Inc., a nonprofit organization in St. Paul, Minnesota, that
provides student loans to medical students. ``That's what these auction
bonds do for us.''

                         Halting Loans

   Without access to funds, NorthStar stopped processing applications
this month for federally backed loans, joining dozens of state
agencies, private firms and nonprofit groups that have curbed lending
to students.

   NorthStar bundled $800 million, or 20 percent, of its loans into
auction-rate debt sold to investors since 2002. One $30 million issue
of NorthStar bonds reset at 0 percent on March 5 from 6.9 percent in
January.

   ``I'm dealing with people who have tax payments and payroll to
meet with what they thought were liquid funds,'' Wolfe said of
NorthStar's investors.

   JPMorgan Chase & Co. this week said it will buy as much as
$1.1 billion in auction-rate notes from three student-loan trusts
created by a company the New York-based bank later bought, providing
limited relief to some investors.

   Cities, hospitals, universities and other municipal borrowers have
redeemed or plan to refinance at least $54 billion of auction debt by
June 2, according to a compilation of disclosure notices by Bloomberg.

                    Student Loan Refinancings

   Student-loan refinancings have been rarer, since the so- called
look-back formulas that cap rates are designed to prevent the trusts
from becoming insolvent, said Barry Silbert, chief executive officer of
Restricted Stock Partners.

   The New York-based company runs the Restricted Securities Trading
Network, which Silbert says provides the largest secondary market for
the various forms of failed auction bonds, averaging 10 transactions a
day.

   ``On the student loan side, there really aren't many other
situations like that, where there's any expectation that there's going
to be a mass refinance or tender offer,'' Silbert said.

*T
For related news:
Today's top municipal finance stories: {TOP MUN <GO>} Stories on
auction-rate bond woes:  {STNI AUCTIONRATE <GO>} Issuers' plans to bid
on/convert debt: {STNI MUNIAUCTION <GO>} *T

--With reporting by Michael Quint in Albany, New York. Editors:

# EXHIBIT I

**FT.com**
FINANCIAL TIMES

HOME UK
UK

Close

# Discounts on offer leave disappointed investors hanging on

`Print`

By Michael Mackenzie and Aline van Duyn
Published: June 4 2008 03:00 | Last updated: June 4 2008 03:00

The implosion of the $300bn auction rate securities market nearly four months ago is continuing to cause huge headaches for investors, regulators and debt issuers.

At the core of the problem is enormous uncertainty about exactly what these securities should be worth. Many investors, who mostly bought the securities as a slightly higher-yielding alternative to cash, are still aiming to get 100 cents on every dollar they invested.

"There is no resolution in sight in many cases," said Michael Gallanis, partner at Treasury Strategies, which is working with many companies which parked their cash in auction rate securities and are now left with illiquid assets.

At the same time, hedge funds and other investors are hoping to snap up huge chunks of the debt at discounts. So far, though, many investors are balking at the idea of taking a loss on what they believed was a cash-like investment.

"Hedge funds are willing to step in with billions of dollars," said Espen Robak, president of Pluris Valuation Advisors, which specialises in valuing illiquid securities. "The primary issue is the lack of sellers at the current discounts."

The ARS market became one of the casualties of the credit crunch after Wall Street dealers withdrew their backing amid concerns about the strength of guarantees from bond insurers that backed many ARS and pressure on banks to preserve capital amid losses on mortgage-backed securities.

The problems today are at different stages of resolution.

The market is broadly split into three types of securities: municipal ARS used by towns, cities, hospitals, schools and other municipal entities; preferred ARS issued by fund managers; and student loan ARS used by loan providers to finance their lending.

There are also a small number of ARS linked to collateralised debt obligations, a part of the structured finance market that has suffered huge losses due to mortgage defaults.

The market's failure in February imposed high penalty interest rates for many municipal borrowers in particular.

Many of these have worked to refinance this debt, replacing ARS with longer-dated bonds, spurred on by a desire to lower interest rate costs.

"Holders of municipal ARS have had the best experience so far, with widespread restructuring," said Alex Roever, fixed income strategist at JPMorgan Chase.

Holders of ARS issued by closed-end funds - often called auction rate preferreds - have, in some cases, been bought out. Some still have not, however, and there is an effort by funds to get regulatory approval for a new type of security as a way to resolve the problem.

The impasse is in the student loan sector. Interest payments do not escalate significantly when an auction fails, leaving little incentive for the borrowers to refinance. Indeed, in many cases there is no clear alternative financing available, with large parts of the securitised markets still largely closed.

"Closed-end funds and municipal borrowers are refinancing, but student loan providers do not have the ability to refinance," said Dwight Grant, managing director at Duff & Phelps, the financial advisory firm.

For the student loan ARS, it is hard to work out the maturity of the debt, a vital component of any valuation. Although the legal maturity of the structures may be 30, 40 or even 50 years, the real maturity could be less if there is enough interest income from underlying loans to repay the principal early.

Investor discontent and uncertainty are leading to a torrent of complaints to regulators and law enforcers. New York's attorney-general Andrew Cuomo and others are pressing banks and brokers for information about ARS sales.

With some issuers terming out the debt and redeeming ARS at par, plenty of investors are hoping for exactly that treatment, said Mr Grant.

Efforts are continuing to find a solution. But some observers believe there will have to be a co-ordinated industry effort, similar to that which recently resolved a liquidity crisis in Canada's asset-backed commercial paper market.

"Particularly for the student loan sector, there may be a need for some sort of global co-ordinated effort by the industry or regulators to unfreeze the market," said Mr Roever.

*Additional reporting by Joanna Chung in New York*

**How auction rate securities work**

Auction rate securities are regular sales of short-term rolling debt issued by municipalities and other borrowers to fund long- term obligations, writes **Michael Mackenzie.**

Issuers rolled over debt every seven, 28 or 35 days and buyers of the securities, including cash-rich companies and high net worth individuals, received interest rates that were higher than regular cash deposits. When Wall Street dealers stopped supporting the market in February, many auctions failed. While investors in many cases received high penalty rates of interest, they were unable to claim their principal. ARS that are not bought back by issuers remain highly illiquid.

**Parking space for companies' cash**

Auction rate securities have become a popular place for companies to park their spare cash, writes **Aline van Duyn.**

Of 395 US companies owning $30bn worth of ARS, 185 have taken a writedown on their investments in the first quarter of 2008, according to research by Pluris Valuation Advisors.

The total value of the writedowns was $1.85bn, with the discounts ranging from 57 per cent by Bristol- Myers Squibb to less than 10 per cent at other companies. Many continue to value their ARS investments at par.

US companies owning ARS include Google, Texas Instruments and Allstate Corp. Non-US companies also investing in ARS include SAP, the German software company, Adecco the Swiss human resources company and Norwegian oil and gas service provider NOPEC.

Copyright The Financial Times Limited 2008

"FT" and "Financial Times" are trademarks of the Financial Times. Privacy policy | Terms
© Copyright The Financial Times Ltd 2008.

# EXHIBIT J

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

————————————————————————x
In re UBS AUCTION RATE SECURITIES    )
LITIGATION    )
    )    Master File No. 08-cv-02967
    )
THIS DOCUMENT RELATES TO:    )
ALL ACTIONS    )
————————————————————————x

   [*additional captions follow*]

# DECLARATION OF MARC VELLRATH, Ph.D., CFA

## June 9, 2008

————————————————————————x

RANDOLPH BONNIST, Individually and On )
Behalf Of Himself And All Others Similarly )
Situated, )
                                      )
                        Plaintiff, )    Case No. 08-cv-4352
                                        )
           vs. )
                                          )
UBS AG, UBS SECURITIES LLC and UBS )
FINANCIAL SERVICES, INC., )
                                        )
                     Defendants. )
                                        )

————————————————————————x

RONALD D. KASSOVER, on behalf of himself )
and all others similarly situated, )
                                        )
                        Plaintiff, )
                                        )    Case No. 08-cv-02753
           vs. )
                                          )
UBS AG and UBS FINANCIAL SERVICES, )
INC., )
                                        )
                     Defendants. )
                                        )

————————————————————————x

ARIC A. STREIT and MARY STREIT as )
Trustees for the benefit of the STREIT LIVING )
TRUST, Individually And On Behalf of All Others )
Similarly Situated, )
                                        )    Case No.
                        Plaintiffs, )
                                          )
v. )
                                        )
UBS AG, UBS SECURITIES LLC and UBS )
FINANCIAL SERVICES, INC., )
                                        )
                     Defendants. )

————————————————————————x

# CONTENTS

1. Summary ...................................................................................................... 1

2. Qualifications and Assignment ..................................................................... 1

   2.1. Qualifications ......................................................................................... 1

   2.2. Assignment ............................................................................................ 4

3. Auction Rate Securities ................................................................................. 4

   3.1. Overview ................................................................................................ 4

   3.2. Average dollar holdings of movants as an indicator of financial interest ...................... 7

4. Computations ................................................................................................. 8

# EXHIBITS

Exhibit 1: Resume of Marc Vellrath, Ph.D., CFA

## 1.    Summary

1.    This declaration provides information relevant to assessing the financial interests in the present litigation of the plaintiffs who have moved to be named lead plaintiffs. The measure of financial interest that I examine herein is average dollar holdings of auction-rate securities ("ARSs") during the class period. This measure is closely related to at least one major element of potential harm to class members, namely, losses suffered because the interest rates and dividends class members received on their holdings of ARSs did not fully reflect the true characteristics of their ARSs. Based on the information available to me as of the date of this declaration, I find that the Streit movants had the largest average dollar holdings of ARSs, holding approximately $8.76 million of auction rate securities on an average day during the class period. The Chandler movants had the second largest average dollar holdings of ARSs, holding approximately $5.38 million of auction rate securities on an average day during the class period. The Oppenheimer, Bonnist and Sanchez movants all had much smaller average dollar holdings, in all cases holding less than $250,000 of auction rate securities on an average day during the class period.

## 2.    Qualifications and Assignment

### 2.1.    Qualifications

2.    I am an economist and financial analyst, and a Director and President of Finance Scholars Group, a consulting firm located in Orinda, California. I hold M.S. and Ph.D. degrees in economics from Carnegie Mellon University, an MBA degree from the University of

---

DECLARATION OF MARC VELLRATH, Ph.D., CFA

Washington, and a BA degree from the University of Pennsylvania. I also have earned the Chartered Financial Analyst designation, or CFA, awarded by the CFA Institute, which is the preeminent professional organization of security analysts and investment managers throughout the world.

3.     Before organizing Finance Scholars Group in July 2006, I was the Director of the Finance and Commercial Damages Practice at ERS Group, a large, national economic consulting firm. Prior to joining ERS Group in 2004 (as a result of a merger), I was a Principal and founder of KeyPoint Consulting LLC, which provided economic and financial analysis of issues arising in complex business litigation. Before founding KeyPoint in 1996, I was a Vice President and Principal of Analysis Group, Inc., an economics consulting firm, for six years, and a senior economist with Ernst & Young, an international accounting and consulting firm, for five years. For a total of eight years, I served on the faculties of the graduate schools of business of New York University and the University of Washington. I also have taught in the loan officer training programs of two large commercial banks, Morgan Guaranty Trust Company and Chemical Bank of New York, and have been a contract researcher for Frank Russell Company, a pension fund advisory firm.

4.     I have conducted numerous investigations and consulting engagements involving a variety of economic and financial issues in many different industries. As a consultant to law firms, I have investigated economic and financial issues, including damages, arising in disputes involving antitrust, patent infringement, fraud and fraudulent conveyances, breaches of fiduciary duty, contract breaches, and other matters. As a consultant to businesses and governmental agencies, I have prepared strategic plans, marketing plans, feasibility studies, valuations, and

---

various other studies to improve management decision-making, increase productivity and efficiency, control costs, and, in the case of corporations, raise profits.

5.      My consulting work for law firms includes extensive work on a variety of financial issues arising in securities matters.  For example, I have written a number of expert reports on the informational efficiency of markets for various securities.  I also have prepared and provided consulting assistance related to Plans of Allocation for both private parties and for the U.S. Securities and Exchange Commission ("SEC") which set forth procedures for allocating settlement funds in securities fraud cases.  In 2006, I was the lead expert on damages for the Enron Task Force of the U.S. Department of Justice and prepared expert reports on the harm caused by the so-called "Broadband" fraud at Enron and by the fraudulent conduct for which Jeffrey Skilling and Kenneth Lay were convicted in their criminal trials.  In 2003 I developed a measure of the financial interest of lead plaintiff movants in litigation arising from improper market timing and late trading in mutual funds.  It is my understanding that the court used the measure of financial interest that I developed, among other considerations, in appointing lead plaintiffs and lead plaintiffs' counsel in the various "subtracks" of this litigation (MDL 1586).

6.      Exhibit 1 to this report is a copy of my resume.  This includes a list of my consulting activities and testimony over the past four years.[1]  I am being compensated for my work on this engagement at my standard hourly rate for consulting services, which is $575.  The hourly rates for professionals assisting me on this engagement range between $125 and $450.

---

[1] My resume does not list any publications because I have not published any articles or books in the past ten years.

---

### 2.2.    Assignment

7.    I was retained by counsel for Aric and Mary Streit to examine certain financial issues related to the financial interests of lead plaintiff movants in the presnt litigation. Specifically, I was asked to propose a measure of financial interest for this matter based on the measure I developed for the mutual fund investment litigation. I also was asked to compute this measure of financial interest for all of the plaintiffs who filed motions seeking to be named as lead plaintiffs in this matter, based on the data available as of the date of this declaration.

## 3.    Auction Rate Securities

### 3.1.    Overview

8.    I begin with a very brief overview of the present litigation. I have been informed that the central claim in this litigation is that defendants concealed from investors the true nature of the auction rate securities they recommended for sale to investors during the class period and also concealed the true nature of the mechanism and practices by which interest rates and dividends on these securities were set. Specifically, among other things, plaintiffs allege that UBS failed to disclose that these securities were not cash equivalents as represented and that these securities appeared to be highly liquid at the time of sale only because UBS and other broker-dealers in the auction market were artificially supporting and manipulating the market to maintain the appearance of liquidity and stability. Furthermore, plaintiffs allege that UBS failed to disclose that it and other broker-dealers routinely intervened in auctions for their own benefit and that without this manipulation, many auctions likely would have failed. Had UBS disclosed these

and other relevant facts, investors would have had the ability to determine the true risk and liquidity features of auction rate securities, and would have demanded and earned interest and dividends that reflected these characteristics.

9.      The effect of this was to mislead investors as to the true economic characteristics of the auction rate securities they bought from UBS. Specifically, investors were led to believe that ARSs were and would remain highly liquid investments that could be converted to cash readily and reliably without loss of principal. However, plaintiffs allege, the mechanism and practices by which UBS and other broker-dealers set interest rates and dividends on auction rate securities were such that these securities in fact were *not* highly liquid, or at least not reliably so. Instead, because the *apparent* liquidity of these securities depended on defendants' and others' (undisclosed) support and manipulation of the auctions in which rates and dividends on these securities were set, there was always some non-trivial chance of widespread failure of these auctions and, consequently, always some non-trivial chance that investors would not be able to liquidate (sell) their holdings of ARSs when they wanted to and without loss of principal.

10.     Recent events have made clear that ARSs were not reliably liquid investments. In the summer of 2007, auctions for ARSs representing a small percentage of the total market began to fail. More auctions began to fail in the fall and winter of 2007. Then on February 13, 2008, 87% of all auctions of auction rate securities failed when the major broker-dealers active in these markets, including UBS, terminated their support for the auctions.

11.     For a variety of reasons, investors value liquidity; in other words, all other things being equal, investors prefer more liquid investments to less liquid investments. Financial markets reflect and reveal this preference for liquidity through the rates of return that different

instruments provide to the investors that hold them.  More liquid investments provide lower rates of return to investors, while less liquid investments provide higher rates of return to investors. Financial markets set the return differentials between less liquid securities and more liquid securities at levels that fairly compensate investors for the liquidity they give up when they hold less desirable, less liquid securities.

12.     Importantly, investors demand and earn a higher rate of return on less liquid investments even if they are able to sell those securities when they want to and at par.  It is the *possibility* of not being able to sell a security when desired and the *possibility* of losing principal upon sale for which investors demand and earn a "liquidity premium".

13.     Had investors understood (a) that ARSs were not reliably liquid, (b) that they might not always be able to convert their holdings of ARSs into cash when they wanted to, and (c) that they might under some circumstances not be able to sell their securities at their full principal value, ARSs would have carried higher interest and dividend rates than they actually did.  This implies that, throughout the class period, holders of auction rate securities earned lower rates of return than they would have, had the truth about ARSs been fully disclosed.     Thus, investors who bought auction rate securities were harmed not just when the market "seized up", and not just when the true nature of these securities was revealed, but throughout the period over which they held the securities, because they were being paid inadequate interest and dividend rates throughout the class period.

---

### 3.2.    *Average dollar holdings of movants as an indicator of financial interest*

14.    It is my understanding that under the Private Securities Litigation Reform Act, among the factors to be considered in the selection of a lead plaintiff movant is the financial interests of competing lead plaintiff movants in the pending litigation. It is my further understanding that there is no single authoritative legal definition of financial interest. Presumably, the court is free to consider multiple indicators of the financial interests of competing lead plaintiff movants. The purpose of this declaration is to provide a measure of financial interest that reflects the economic reasoning set forth above.

15.    Based on the reasoning above, the harm suffered by a given plaintiff in this case will depend not just on that plaintiff's holdings of ARSs at the end of the class period, but on his or her holdings of ARSs over the full duration of the class period. It is therefore useful to consider a measure of financial interest that takes into account plaintiffs' holdings over the full class period.[2]

16.    One way to quantify this is to compute each lead plaintiff movant's average dollar holdings of ARSs over the class period. This is the dollar value of holdings, on average, each day of the class period. This average can be computed by adding up a movant's holdings on each day of the class period and then dividing the sum by the number of days in the class period.

---

[2] The method set forth here and the computations reported below are presented solely to assist in the analysis of the relative financial interests of the plaintiffs who have filed motions seeking to be appointed as lead plaintiffs. At a later stage of this litigation, it will be possible to compute the harm suffered by class members on a "macro" and class-wide basis.

---

DECLARATION OF MARC VELLRATH, Ph.D., CFA                    *Page 7*

17.    For example, suppose we have a class period of just three days. Suppose investor A buys $100,000 of ARSs on day 1 and holds them for two days. Suppose investor B buys $100,000 of ARSs on day 2 and holds them for one day. And suppose investor C buys $50,000 of ARSs on day 1, buys another $50,000 of ARSs on day 2, and holds all of these ARSs through the end of the class period. Note first that all three of these investors have the same holdings as of the end of the class period, namely $100,000 of ARSs. However, they have different average dollar holdings. Investor A's average dollar holdings total $66,667; investor B's average dollar holdings totaled $33,333; and investor C's average dollar holdings total $50,000.

18.    This example shows why average dollar holdings can be a useful indicator of one component of the overall financial interests of plaintiffs in this case. Suppose that the interest rate that these investors *actually* earned on their holdings was, say, 5%, but that an apropriate liquidity premium based on the true characteristics of these ARSs would have raised that rate to 6%. Then these three investors were not equally harmed by the defendants' actions (as might be suggested by their end-of-period holdings). Rather, investor A lost the most, investor B lost the least, and investor C lost an amount in between the amounts lost by A and B. Of course, this is precisely the relationship indicated by these three investors' average dollar holdings.

## 4.    Computations for the Pending Lead Plaintiff Motions

19.    Counsel for Aric and Mary Streit recently provided me with certain information related to the holdings of the lead plaintiff movants in this matter, including information set forth in the Certifications filed by all the movants. I have relied upon the Certifications from the following movants (based on the first named plaintiff in each collection of movants): the Oppenheimer

---

DECLARATION OF MARC VELLRATH, Ph.D., CFA                    *Page 8*

movants; the Bonnist movants; the Sanchez movants; the Chandler movants; and the Streit movants.

20.    Based on the information available to me as of the date of this declaration, I computed the average dailing holdings of auction rate securities of each set of lead plaintiff movants. My results are summarized in Table 1 below. As reported there, the Streit movants had the largest average dollar holdings of ARSs, holding approximately $8.76 million of auction rate securities on an average day during the class period.[3] The Chandler individuals had the second largest average dollar holdings of ARSs, holding approximately $5.38 million of auction rate securities on an average day during the class period. The Oppenheimer, Bonnist and Sanchez individuals all had much smaller average dollar holdings, in all cases holding less than $250,000 of auction rate securities on an average day during the class period.[4]

---

[3] This figure excludes additional holdings of ARSs which I understand were not acquired originally through UBS. Including these securities would increase the average dollar holdings of the Streit movants to $9.25 million.

[4] For the Sanchez movants, there is a conflict between information provided on individual certifications and on a summary spreadsheet that accompanies these certifications. Because the spreadsheet appears to be more complete and accurate than the individual certifications, I used this source to compute the average dollar holdings of the Sanchez movants. Also, acquisition dates (which are neccesary to compute average dollar holdings) are available for only about half of the dollar holdings of the Sanchez movants. Even if one doubles the computed average dollar holdings of the Sanchez movants to account for this, the result remains that the Sanchez movants held less than $250,000 of auction rate securities on an average day during the class period.

---

_____
Marc Vellrath, Ph.D., CFA

June 9, 2008
_____
Date

**Table 1**

| Lead Plaintiff Movants' Average Dollar Holdings of Auction Rate Securities | |
|---|---|
| Lead Plaintiff Movants | Average Dollar Holdings of ARSs |
| Streit Movants | $8,757,310 |
| Chandler Movants | $5,377,190 |
| Bonnist Movants | $226,210 |
| Oppenheimer Movants | $137,430 |
| Sanchez Movants | $96,180 |

# EXHIBIT 1

## RESUME OF MARC VELLRATH, Ph.D., CFA

# MARC VELLRATH, Ph.D., CFA

<u>CURRENT POSITION</u>

### *Finance Scholars Group*

- Founder and President (July 2006 to present)

<u>PAST POSITIONS</u>

### *ERS Group (successor to KeyPoint Consulting by acquisition)*

- Director (March 2004–June 2006)

### *KeyPoint Consulting LLC*

- Founder and Managing Director (September 1996–March 2004)

### *Analysis Group, Inc.*

- Vice President and Principal (September 1990–August 1996)

### *Ernst & Young*

- Senior Economist (January 1986–August 1990)

### *Frank Russell Company*

- Contract Consultant, Financial Research (September 1985–December 1985)

### *University of Washington*

- Assistant Professor, Finance and Business Economics (September 1983–August 1985)
- Visiting Lecturer, Finance and Business Economics (September 1981–August 1982)

### *New York University*

- Instructor, Graduate School of Business Administration (September 1977–August 1983)

### *Morgan Guaranty Trust Company; Chemical Bank*

- Lecturer, Credit Training Programs (part time, September 1977–August 1981)

<u>EDUCATION AND PROFESSIONAL CERTIFICATION</u>

Ph.D., Economics, Carnegie Mellon University, 1983
M.S., Economics, Carnegie Mellon University, 1976
M.B.A., Business Economics, University of Washington, 1974
B.A., History, University of Pennsylvania, 1972

CFA (Chartered Financial Analyst), Institute of Chartered Financial Analysts, 1987

MEMBERSHIPS

>Aircraft Owners and Pilots Association
>American Finance Association
>Andrew Carnegie Society, Carnegie Mellon University
>CFA Institute and CFA Society of San Francisco
>Licensing Executives Society

RECENT TESTIMONY AND EXPERT REPORTS
(2003 to present in chronological order, starting with most recent matters)

>*In re Mutual Fund Investment Litigation (Janus Track)*, U.S. DISTRICT COURT, DISTRICT OF MARYLAND
>Expert report on damages caused by improper rapid trading in Janus mutual funds. (2008)

>*In re Mutual Fund Investment Litigation (Putnam Track)*, U.S. DISTRICT COURT, DISTRICT OF MARYLAND
>Expert report on damages caused by improper rapid trading in Putnam mutual funds. (2008)

>*In re Mirant Corporation Securities Litigation,* U.S. DISTRICT COURT, NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION
>Expert report examining the financial issues related to causation and damages. (2007)

>*Hall Family Investments, L.P. v. McKesson Corporation, et al.,* STATE COURT OF FULTON COUNTY, STATE OF GEORGIA
>Expert report, deposition testimony and testimony at *Daubert* hearing on motion to exclude testimony of another economist on damages resulting from a securities fraud. (2007)

>*Uecker & Associates, Inc., Liquidating Trustee for the Estate of Clarent Corporation v. Ernst & Young LLP*, JAMS DISPUTE RESOLUTION CENTER, SAN FRANCISCO
>Expert report and deposition testimony on damages suffered by Clarent Corporation as a result of alleged breach of contract and professional negligence by Ernst & Young. (2007)

>*In re Scientific-Atlanta, Inc. Securities Litigation,* U.S. DISTRICT COURT, NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION
>Expert report examining the efficiency of the market for common stock of Scientific-Atlanta, Inc. (2007)

>*United States of America v. Jeffrey K. Skilling and Kenneth L. Lay*, U.S. DISTRICT COURT, SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION
>Expert report on the harm caused by the fraudulent conduct of Jeffrey K. Skilling prepared for consideration in determining Mr. Skilling's sentence under applicable federal sentencing guidelines. (2006)

---

*United States of America v. Kevin Howard and Michael Krautz*, U.S. DISTRICT COURT, SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION
Expert report on the harm caused by the "Braveheart" scheme to inflate revenues and earnings of Enron Broadband Services, prepared for purposes of determining Mr. Howard's sentence under applicable federal sentencing guidelines. (2006)

*United States of America v. Kevin Howard and Michael Krautz*, U.S. DISTRICT COURT, SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION
Expert report on the harm caused by the "Braveheart" scheme to inflate revenues and earnings of Enron Broadband Services, prepared for purposes of determining Mr. Howard's sentence under applicable federal sentencing guidelines. (2006)

*In re Mutual Fund Investment Litigation (Janus Track)*, U.S. DISTRICT COURT, DISTRICT OF MARYLAND
Declaration examining the magnitude of possible shareholder losses arising from improper rapid trading in Janus mutual funds. (2006)

*In re Friedman's, Inc. Securities Litigation,* U.S. DISTRICT COURT, NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION
Expert report and reply report examining the efficiency of the market for common stock of Friedman's, Inc. (2006)

*McDaniel Family Trust v. Wells Fargo & Company, et al.*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA
Declaration setting forth a method for comparing the "financial interests" of competing groups of proposed lead plaintiffs in class action litigation involving revenue sharing and sales practices in the marketing of mutual funds. (2006)

*Geneva Pharmaceuticals Corp. as successor in interest to Invamed, Inc. v. Barr Laboratories, Inc., et al., and Apothecon, Inc. v. Barr Laboratories, Inc., et al.,* U.S. DISTRICT COURT, SOUTHERN DISTRICT OF NEW YORK
Multiple expert reports and deposition testimony on antitrust damages arising from alleged efforts to delay a manufacturer's launch of a competing generic product. (2001-2005)

*In re: Patriot American Hospitality, Inc., Securities Litigation*, U.S. DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
Declaration setting forth a proposed plan of allocation for a class action settlement fund, approved by the court as drafted. (2005)

*Compañia Nitrógeno de Cantarell S.A. de C.V v. ICA/Fluor Daniel – Linde A.G., Joint Venture, et al.*, JUDICIAL ARBITRATION AND MEDIATION SERVICES
Testimony at an arbitration hearing regarding consequential damages resulting from design defects at the world's largest nitrogen production facility. (2005)

---

*Michael Hoffman, at al., v. UBS-AG, et al.*, U.S. DISTRICT COURT, SOUTHERN DISTRICT OF NEW YORK
Declaration setting forth a method for comparing the "financial interests" of competing groups of proposed lead plaintiffs in class action litigation involving revenue sharing and sales practices in the marketing of mutual funds. (2005)

*Ultimax Cement Manufacturing Corporation, et al., v. CTS Cement Manufacturing Corporation, et al.*, U.S. DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
Expert report and deposition testimony on reasonable royalty and lost profits damages from patent infringement and on unjust enrichment from theft of trade secrets. (2004)

*In re: Mutual Fund Investment Litigation*, U.S. DISTRICT COURT, DISTRICT OF MARYLAND
Declarations in multiple actions setting forth a method for comparing the "financial interests" of competing groups of proposed lead plaintiffs in class action litigation arising from improper market timing and late trading in mutual funds; declarations files in actions involving the following mutual fund families and other entities. (2003 – 2004)

| | |
|---|---|
| Alliance Capital Management LP | Janus Capital Group, Inc. |
| Bank of America Corp. | Massachusetts Financial Services Company |
| Bank One Corp. / Nations Funds | Pilgrim Baxter Holding Group |
| Columbia Funds | PIMCO |
| Excelsior | Putnam Investments Trust |
| Federated Investors, Inc. | Scudder |
| Franklin Templeton | Security Brokerage |
| Fred Alger Management, Inc. | Security Trust Company |
| Invesco / AIM | Strong Financial Corp. |

*Naresh Chand v. American Express Company, et al.*, U.S. DISTRICT COURT, SOUTHERN DISTRICT OF NEW YORK
Declaration setting forth a method for comparing the "financial interests" of competing groups of proposed lead plaintiffs in class action litigation involving revenue sharing and sales practices in the marketing of mutual funds. (2004)

*John M. Spahn, IRA v. Edward D. Jones & Co., et al.*, U.S. DISTRICT COURT, EASTERN DISTRICT OF MISSOURI
Declaration setting forth a method for comparing the "financial interests" of competing groups of proposed lead plaintiffs in class action litigation involving revenue sharing and sales practices in the marketing of mutual funds. (2004)

*Richard S. Johnson, at al., v. Morgan Stanley DW, Inc., et al.*, U.S. DISTRICT COURT, SOUTHERN DISTRICT OF NEW YORK
Declaration setting forth a method for comparing the "financial interests" of competing groups of proposed lead plaintiffs in class action litigation involving revenue sharing and sales practices in the marketing of mutual funds. (2003)

*Medicus Formulas, Inc. at al. v. Thane, Inc., et al.*, CALIFORNIA SUPERIOR COURT, COUNTY OF RIVERSIDE
Deposition testimony on damages arising from breach of an agreement involving telemarketing of diet products. (2003)

*International Insurance Underwriters, Inc., at al. v. Takagi & Associates, Inc., et al.*, SUPERIOR COURT OF GUAM
Trial testimony on the market effects of certain pricing practices in the market for commercial brokerage services in Guam. (2003)

*Joseph Grazel, M.D., v. St. Jude Medical, Inc., et al.*, U.S. DISTRICT COURT, DISTRICT OF NEW JERSEY
Expert report and deposition testimony on the commercial success of patented improvements in a medical (vascular closure) device. (2003)

*Southwest Pet Products, Inc. at al. v. Koch Industries, et al.*, U.S. DISTRICT COURT, DISTRICT OF ARIZONA
Expert report and deposition testimony on damages, including added costs and lost profits, arising from contamination and recall of premium pet foods. (2003)

OTHER LITIGATION EXPERIENCE (selected matters, by type of case)

*This section includes matters in which Dr. Vellrath submitted expert testimony, but which concluded before 2003; matters in which Dr. Vellrath was retained in a consulting role, but not as a testifying expert; matters in which no expert report was submitted and no expert testimony was offered by Dr. Vellrath; and matters managed by Dr. Vellrath in which another economist served as the designated testifying expert.*

### Antitrust Damages

*Intergraph Corporation v. Intel Corporation*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF ALABAMA
Expert report and deposition testimony on lost profits, lost going concern value, and reliance damages arising from alleged fraud, suppression of material facts, breach of warranty, interference with business relationships, and related business torts. (2002)

*Kopies, Inc., et al. v. Eastman Kodak Company*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA
Multiple expert reports and deposition testimony on price discrimination and antitrust damages to end-users of high-volume copiers arising from a manufacturer's refusal to sell parts to independent service organizations and from other anti-competitive behavior. (1997)

*Richie v. American Council on Gift Annuities*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF TEXAS
Expert report and testimony in deposition and at a hearing on class certification, testimony on methods of calculating class-wide antitrust and other damages arising from the illegal sale of annuities and trust services. (1995)

*Banking*

*Carteret Bancorp v. The United States*, U.S. COURT OF FEDERAL CLAIMS
Retained by the U.S. Department of Justice to analyze investment banking issues arising from the
government's breach of contract in a savings and loan "goodwill" case; provided analytical
support for expert witness Roy C. Smith, former general partner of Goldman Sachs and Professor
of Finance at New York University. (2007)

*Fifth Third Bank v. The United States*, U.S. COURT OF FEDERAL CLAIMS
Retained by the U.S. Department of Justice to analyze financial issues and damages arising from
the government's breach of contract for the acquisition of a group of failed savings and loans;
provided analytical support for expert witness Professor Anthony Saunders of New York
University. (2005)

*Hamilton v. Delta National Bank*, CALIFORNIA SUPERIOR COURT, STANLISLAUS
COUNTY
Deposition testimony on financial issues and damages in a lender liability lawsuit. (2000)

*Tangtrongsakdi v. Bangkok Metropolitan Bank*, CALIFORNIA SUPERIOR COURT, COUNTY
OF SAN FRANCISCO
Deposition testimony on the structure and economic substance of a complex real estate financing
transaction and on the effects of alleged irregularities in a lender's loan processing procedures
and loan documentation. (1999)

*Ben S. Branch, Trustee for the Bank of New England Corp. v. Federal Deposit Insurance
Company*, U.S. DISTRICT COURT, DISTRICT OF MASSACHUSETTS
Led a team including four academic economists retained by the FDIC to investigate all aspects of
the failure of a large commercial bank and to respond to charges by the bankruptcy trustee for the
bank's parent holding company that regulatory agencies had arranged the fraudulent conveyance
of holding company assets to the bank. (1996)

*Vappi & Company v. U.S. Trust*, MASSACHUSETTS SUPERIOR COURT, SUFFOLK
COUNTY
Deposition and trial testimony assessing the reasonableness of a lender's financial analysis of a
failed high-rise condominium project. (1993)

*Sprincin Company v. Security Pacific National Bank*, CALIFORNIA SUPERIOR COURT,
COUNTY OF SAN FRANCISCO
Deposition and trial testimony on damages to a developer arising from a bank's alleged failure to
fulfill terms of a contract to sell land to the developer and provide construction financing. (1990-
1991)

---

**Damages Arising in Commercial and Contract Disputes**

*Westside Cellular, Inc. d/b/a Cellnet, Inc. v. New Par, et al.*, COURT OF COMMON PLEAS OF CUYAHOGA COUNTY, OHIO
Analyzed damages to a reseller of cellular telephone services and related valuation issues arising from alleged overcharges for wholesale minutes; provided analytical support for expert witness Professor David Sibley of the University of Texas at Austin. (2002)

*Miller-Thompson Constructors, Inc. v. Lucas Marine Construction, Inc.*, AMERICAN ARBITRATION ASSOCIATION
At an arbitration hearing, testimony responding to a claim for diminished value of goodwill arising from an alleged wrongful termination of a marine construction contract. (2002)

*ATS Products, Inc. v. Fab-Tech, Inc.*, CALIFORNIA SUPERIOR COURT, COUNTY OF SAN FRANCISCO
Expert report and deposition testimony on profits lost as a result of a competitor's alleged false advertising. (1998)

*Katz v. Karmouche*, CALIFORNIA SUPERIOR COURT, COUNTY OF SAN FRANCISCO
Trial testimony on business income lost by a partner in a law firm because of injuries sustained in an automobile accident. (1998)

*JMB Realty Corporation v. Cadillac Fairview*, ILLINOIS CIRCUIT COURT, COOK COUNTY
Deposition and trial testimony on damages to a real-estate asset-management firm arising from breach of a long-term contract for real estate advisory services. (1995)

*Chaminade, Ltd. v. The Owl Companies*, AMERICAN ARBITRATION ASSOCIATION, SAN FRANCISCO
Testimony, in deposition and at an arbitration hearing, on increased energy costs incurred by a hotel/conference center as a result of alleged negligence, misrepresentation and breach of contract by the developer, builder, and operator of an energy cogeneration facility. (1995)

*Twin Cities Insurance Company v. Seeno Construction Company*, U.S. DISTRICT COURT, DISTRICT OF NEVADA
Deposition and trial testimony on damages to a large regional developer/homebuilder caused by an insurance company's refusal to pay a significant claim. (1993)

*Trammel Crow Company v. Peterson*, DISTRICT COURT, DALLAS COUNTY, TEXAS
Deposition testimony related to accounting and valuation issues arising in a dispute among partners of the one of the country's largest real estate developers. (1993)

*RTR Trading Company v. The Sharper Image*, CALIFORNIA SUPERIOR COURT, COUNTY OF SAN FRANCISCO
Deposition testimony on damages to an international trading company arising from a specialty retailer's decision to cancel an allegedly non-cancelable order for 10,000 units of a home burglar alarm. (1991)

---

*J.W. Mitchell Company v. Boral Industries*, CALIFORNIA SUPERIOR COURT, ORANGE COUNTY
Deposition and trial testimony on damages arising from breach of a contract for the purchase and sale of a rock quarry. (1990)

*Boeing Construction (Boecon) v. Catalytic*, U.S. DISTRICT COURT, SAN FRANCISCO
Deposition testimony on statistical issues in the analysis of data on productivity of workers during construction of a power plant, in response to a contractor's claim for damages caused by disruption and forced acceleration. (1989)

*Huston Enterprises v. Tri-C Machine Shop*, CALIFORNIA SUPERIOR COURT, SACRAMENTO
Deposition testimony on profits lost by a manufacturer of tire-shredding equipment when a machine shop failed to complete design and fabrication of a prototype tire-shredder. (1987)

### *Intellectual Property*

*ATS Products, Inc. v. Shea Technology LLC et al.*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA
Expert report and deposition testimony on financial issues arising from alleged breach of a "most favored licensee" clause in a technology license. (2002)

*Atmel Corporation v. Silicon Storage Technologies, Inc.*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA
Expert report, deposition testimony and trial testimony on price erosion damages arising from alleged infringement of patents disclosing technology used in non-volatile memory devices. (2001-2002)

*Overhead Door Corporation v. The Chamberlain Group*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF TEXAS
Deposition testimony on reasonable royalties and lost profits damages arising from alleged infringement of a patent disclosing coding technology used in garage door openers. (2000)

*Trend Micro Inc. v. Network Associates, Inc.*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA
Deposition testimony on reasonable royalties and lost profits arising from alleged infringement of a software patent. (2000)

*Symantec Corporation v. McAfee Associates, Inc.*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA
Deposition testimony on benefits gained through infringing use of copyrighted software code and on profits gained through alleged wrongful use of a competitor's customer list. (1998)

***Securities, Derivatives, and Other Finance Matters***

*Securities and Exchange Commission v. PIMCO Advisors Fund LLC et al.*, UNITED STATES
DISTRICT COURT, SOUTHERN DISTRICT OF NEW YORK
Retained by the SEC to analyze financial issues and damages arising from market timing in
PIMCO mutual funds; provided analytical support for expert witness Professor Sheridan Titman
of the University of Texas at Austin. (2006)

*Securities and Exchange Commission v. PIMCO Advisors Fund LLC et al.*, UNITED STATES
DISTRICT COURT, SOUTHERN DISTRICT OF NEW YORK
Retained by the SEC to analyze financial issues and damages arising from market timing in
PIMCO mutual funds; provided analytical support for expert witness Professor Sheridan Titman
of the University of Texas at Austin. (2006)

*Securities and Exchange Commission v. PIMCO Advisors Fund LLC et al.*, UNITED STATES
DISTRICT COURT, SOUTHERN DISTRICT OF NEW YORK
Retained by the SEC to analyze financial issues and damages arising from market timing in
PIMCO mutual funds; provided analytical support for expert witness Professor Sheridan Titman
of the University of Texas at Austin. (2006)

*In re PMA Capital Corp. Securities Litigation*, U.S. DISTRICT COURT, EASTERN DISTRICT
OF PENNSYLVANIA
Retained to analyze the efficiency of the market for common stock of PMA Capital Corp. and to
estimate aggregate damages for use in settlement negotiations; provided analytical support for
expert witness Professor Anthony Saunders of New York University. (2006)

*United States of America v. Daniel Bayly, et al.,* U.S. DISTRICT COURT, SOUTHERN
DISTRICT OF TEXAS, HOUSTON DIVISION
Retained by the U.S. Department of Justice to analyze harm caused by the "Nigerian barge" fraud
at Enron; provided analytical support for expert witness Professor Anthony Saunders of New
York University. (2004-2005)

*In re Asia Pulp and Paper Securities Litigation*, U.S. DISTRICT COURT, SOUTHERN
DISTRICT OF NEW YORK
Retained to analyze the efficiency of the market for securities of Asia Pulp and paper, to estimate
aggregate damages for use in settlement negotiations, and to assist counsel in drafting a plan of
allocation; provided analytical support for expert witness Professor Anthony Saunders of New
York University. (2004)

*Willis v. J.G. Wentworth Structured Settlement Funding Corporation*, CALIFORNIA SUPERIOR
COURT, COUNTY OF SAN FRANCISCO
Deposition testimony on the nature and characteristics of certain financial transactions involving
payment streams derived from structured settlements. (1999)

---

*Los Rios Community College District v. County of Sacramento*, CALIFORNIA SUPERIOR COURT, SACRAMENTO COUNTY
Testimony, in deposition and at a mini-trial, on sampling procedures and accounting issues arising from the County's management of a pooled investment fund and on proper allocation of interest earned by the fund among pool participants. (1989-1990)

*Long Island Lighting Company v. General Electric Company*, U.S. DISTRICT COURT, EASTERN DISTRICT OF NEW YORK
Deposition testimony related to calculation of additional financing costs attributable to delays caused by alleged errors in design of the containment vessel for the Shoreham Nuclear Power Plant. (1990)

*Kirk Corporation v. First American Title Insurance Company*, CALIFORNIA SUPERIOR COURT, EL DORADO COUNTY
Deposition testimony on the effects of repeated refinancings and related fees and costs on the financial viability of a condominium/time-share project at a Lake Tahoe ski resort. (1987)

OTHER CONSULTING (non-litigation, selected matters)

Led a team of consultants providing assistance on a broad range of operational and strategic issues to a rapidly growing design and construction firm. Assignments included restructuring operations to support future growth, revamping reporting and management support systems, implementing a planning and budgeting process, and preparing business plans for several new ventures.

Led a team of consultants preparing product-development strategies for a low-cost internet-access device. Conducted market research to assess consumers' willingness-to-pay for the device and for information services accessible via the device, and prepared projections of cash flows for the project under various scenarios.

Valued a lessor's interests in a portfolio of long-term ground leases to assist owners of condominiums in negotiating a buy-out of the leases.

Investigated the impact of clean-fuel regulations on the costs and competitive position of a mid-size oil refiner. Testified at hearings held by a state regulatory agency.

Analyzed conditions in Canadian financial markets and prepared a rate-of-return study for a Canadian natural-gas-pipeline company to assist the company in establishing tariffs for transportation services.

Multiple engagements related to financial management of a fourteen-year project to develop a disposal site for low-level radioactive waste in California. Designed and implemented a system for monitoring costs of engineering and environmental studies and public-relations efforts to comply with state regulations. Recommended pricing strategies to provide a reasonable return on investment for the developer/operator of the facility. Prepared a report on the prudence and reasonableness of certain costs incurred to select a site and develop the facility.

Conducted surveys of users of personal computers and analyzed other data sources to quantify the benefits flowing from the company's $70 million investment in personal computers. Identified constraints limiting benefits of PC-use and recommended ways to increase returns on existing and future investments in personal computers.

Led a team of consultants helping to plan the introduction of a family of innovative LAN bridger/routers for data communications networking. Developed a financial model to generate cash flow projections for the products under alternative scenarios.

Reviewed operations, procedures and program requirements to improve management of this agency's Health Facility Mortgage Insurance Program and assess the solvency of the agency's Health Facility Construction Loan Insurance Fund.

Prepared an economic analysis and financial projections for a large geothermal energy plant to assess the ability of the project's sponsor to repay partial funding of the project by the State of California.

Managed feasibility studies of 40 energy-development projects and assessments of the creditworthiness, financial strength and management capabilities of the projects' sponsors. Technologies used by the projects included compressed air energy storage; methanol-fueled cogeneration-turbines; low-head hydroelectric power generation; and solar electric/thermal hybrid power-and-hot-water-heating systems.

Prepared a business plan for development and marketing of a computer system to provide fast and efficient access to comprehensive, up-to-date information needed by mechanics repairing automobiles. Assisted in negotiations with venture capital firms to secure $4.5 million in financing for product development and test marketing.

Prepared economic evaluations and feasibility studies of municipal energy projects, including both large-scale and modular waste-to-energy facilities.

CONTACT INFORMATION

Marc Vellrath, Ph.D., CFA              Phone:  (925) 258-9600
President, Finance Scholars Group      Fax:  (925) 258-9096
Two Theatre Square, Suite 218          Cell:  (510) 332-9394
Orinda, California  94563              mvellrath@finsch.com

March 2008

# EXHIBIT K

# MILBERG LLP

Jerome M. Congress
Direct Dial: 212-946-9373
jcongress@milbergweiss.com

May 22, 2008

<u>VIA E-MAIL AND U.S. MAIL</u>

Daniel C. Girard, Esq.
Girard Gibbs LLP
601 California Street, 14th Floor
San Francisco, CA 94108

Edward Korsinsky, Esq.
Levi & Korsinsky, LLP
39 Broadway, Suite 1601
New York, NY 10006

Joe R. Whatley, Jr., Esq.
Whatley, Drake & Kallas, LLC
1540 Broadway, 37th Floor
New York, NY 10036

Jules Brody
Stull, Stull & Brody
6 East 45th Street
New York, NY 10017

Re:     *In re UBS Auction Rate Securities Litigation*

Dear Counsel:

We have reviewed the certifications filed in connection with your lead plaintiff motions in the above action, and you do not appear to have set forth information concerning any class period sales of auction rate securities purchased during the class period. We believe that full information concerning each transaction in auction rate securities during the class period should be provided so that all the parties can do a full analysis, including the name of the security, the face amount, date of transaction, and whether it was a purchase or sale. To the extent that you have not fully provided that information, we request that you circulate it no later then May 30, 2008.

**Milberg LLP**
One Pennsylvania Plaza · New York, NY 10119-0165 · (212) 594-5300 · Fax: (212) 868-1229 · www.milberg.com

Daniel C. Girard, Esq.
Edward Korsinsky, Esq.
Joe R. Whatley, Jr., Esq.
Jules Brody
May 22, 2008
Page 2

Sincerely yours,

Jerome M. Congress

JMC:jg


cc:    Jeff S. Westerman, Esq.
       George A. Shohet, Esq.

**Milberg LLP**

DOCS\436071v1

# EXHIBIT L

**Impact of Post Class Period Redemptions and Announced Redemptions on Streit and Chandler ARS Holdings**

| | Aric and Mary Streit | David Ghiz (Ghiz Trust) | Edward Taras | Robert Bee | Richard Goldberg | Larry Watanabe (Watanabe Trust) | David and Shelly Chandler (Chandler Trust) |
|---|---|---|---|---|---|---|---|
| Class Period ARS Purchases | **$16,850,000** | $10,150,000 | $6,400,000 | $6,975,000 | $4,225,000 | $2,825,000 | $1,100,083 |
| Post Class Period Redemptions and Announced Redemptions as of 6/9/2008 | **$0** | $3,818,500* | $1,000,000** | $1,925,000 | $0 | $100,000 | $100,000 |
| Total Face Value of Illiquid ARS Held as of 6/9/2008 (accounting for redemptions and announced redemptions) | **$16,850,000** | $6,331,500 | $5,400,000 | $5,050,000 | $4,225,000 | $2,725,000 | $1,000,083 |

**Streit and Chandler ARS Holdings by Category as of June 9, 2008**

| Breakdown of Illiquid ARS Holdings as of 6/9/08 | Aric and Mary Streit | David Ghiz (Ghiz Trust) | Edward Taras | Robert Bee | Richard Goldberg | Larry Watanabe (Watanabe Trust) | David and Shelly Chandler (Chandler Trust) |
|---|---|---|---|---|---|---|---|
| Student Loan Auction Rate Securities | **$16,850,000** | $0 | $4,400,000 | $0 | $0 | $0 | 0 |
| Auction Rate Preferreds Issued by Closed End Funds | **$0** | $6,825,000* | $2,000,000 | $5,050,000 | $3,625,000 | $2,725,000 | $1,000,083 |
| Auction Rate Securities Issued by Municipalities | **$0** | $1,250,000 | $0 | $0 | $600,000 | $0 | $0 |
| Total Illiquid ARS Holdings as of 6/9/08 | **$16,850,000** | $8,075,000 | $6,400,000 | $5,050,000 | $4,225,000 | $2,725,000 | $1,000,083 |

* The BlackRock Preferred Income Strategies Fund redeemed 50% of its outstanding Series W-7 auction rate securities on June 5. Ghiz held $2 million worth of Series W-7 auction rate securities issued by this closed-end fund as of May 19. BlackRock has therefore redeemed $1 million worth of ARS held by Ghiz. Additionally, the Kayne Anderson MLP Investment Fund announced on May 17 that it will redeem 100% of its outstanding ARS on July 10. Ghiz holds $975,000 worth of ARS issued by this fund which will be redeemed on July 10. Furthermore, the Franklin Templeton Limited Duration Income Trust Fund announced on May 17 that it would redeem 53% of its outstanding ARS beginning on June 9. Ghiz holds $1.45 million of ARS issued by this fund and will therefore have $768,500 of his holdings redeemed.

** The BlackRock Preferred Income Strategies Fund announced on June 2 that it would redeem 50% of its outstanding M-7 auction rate securities on June 10. Taras holds $2 million worth of Series M-7 auction rate securities issued by this closed-end fund. BlackRock will therefore redeem $1 million worth of ARS held by Taras on June 10.