UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————x
In re UBS AUCTION RATE SECURITIES   )
LITIGATION                          )
                                    )   Master File No. 08-cv-02967
                                    )
THIS DOCUMENT RELATES TO:           )
ALL ACTIONS                         )
———————————————————————x

[*additional captions follow*]

**REPLY DECLARATION OF JEROME M. CONGRESS
IN FURTHER SUPPORT OF THE MOTION OF ARIC A. STREIT AND MARY STREIT
AS TRUSTEES FOR THE BENEFIT OF THE STREIT LIVING TRUST FOR
CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFFS, AND APPROVAL OF
<u>LEAD PLAINTIFFS' SELECTION OF CO-LEAD COUNSEL</u>**

————————————————————x
RANDOLPH BONNIST, Individually and On )
Behalf Of Himself And All Others Similarly )
Situated, )
 )
 )
                        Plaintiff, )   Case No. 08-cv-4352
 )
   vs. )
 )
UBS AG, UBS SECURITIES LLC and UBS )
FINANCIAL SERVICES, INC., )
 )
                        Defendants. )
 )
————————————————————x
RONALD D. KASSOVER, on behalf of himself )
and all others similarly situated, )
 )
                        Plaintiff, )
 )   Case No. 08-cv-02753
   vs. )
 )
UBS AG and UBS FINANCIAL SERVICES, )
INC., )
 )
                        Defendants. )
 )
————————————————————x
ARIC A. STREIT and MARY STREIT as )
Trustees for the benefit of the STREIT LIVING )
TRUST, Individually And On Behalf of All Others )
Similarly Situated, )
 )   Case No. 08-cv-5251
                        Plaintiffs, )
 )
v. )
 )
UBS AG, UBS SECURITIES LLC and UBS )
FINANCIAL SERVICES, INC., )
 )
                        Defendants. )
————————————————————x

I, Jerome M. Congress, under penalties of perjury, hereby declare:

1. I am a member of Milberg LLP. I submit this reply declaration in further support of the Motion of Aric A. Streit and Mary Streit as Trustees for the Benefit of The Streit Living Trust for Consolidation, Appointment As Lead Plaintiffs, and Approval of Lead Plaintiffs' Selection of Co-Lead Counsel.

2. Attached hereto as Exhibit A is a true and correct copy of a June 10, 2008 press release issued by DWS Scudder over the *Business Wire* entitled "DWS Scudder Announces Restructuring of Leverage and Redemption of Preferred Shares By Taxable Closed-End Funds. Provides Update on Municipal Bond Funds".

3. Attached hereto as Exhibit B is a true and correct copy of a June 17, 2008 *Wall Street Journal* article by Daisy Maxey entitled "Help Nears for Auction-Rate Holders. Mutual-Fund Firms Win U.S. Approval For Crunch Solution".

4. Attached hereto as Exhibit C is a true and correct copy of a UBS announcement entitled "Important Information UBS Auction Rate Securities 100% Loan-To-Par Value (LTPV) Program".

5. Attached hereto as Exhibit D is a true and correct copy of a June 12, 2008 *Associated Press* article by Liz Rappaport entitled "Holders of Auction-Rate Debt Have Choices".

Dated: June 19, 2008    Respectfully submitted,

**MILBERG LLP**
By: /s/ Jerome M. Congress
Jerome M. Congress
One Pennsylvania Plaza, 49th Floor
New York, New York 10119
Telephone:   (212) 594-5300
Facsimile:    (212) 868-1229
jcongress@milberg.com

3

4

*Proposed Co-Lead Counsel for the Class*

# EXHIBIT A

BUS        DWS Scudder Announces Restructuring of Leverage and Redemption
           Jun 10 2008  17:10:01


of Preferred Shares by Taxable Closed-End Funds


                    Provides Update on Municipal Bond Funds


NEW YORK--(BUSINESS WIRE)--June 10, 2008
DWS Scudder announced today further progress in the refinancing of
the auction rate preferred shares ("ARPS") issued by DWS RREEF Real
Estate Fund, Inc. (AMEX: SRQ) ("RREEF I") and DWS RREEF Real Estate
Fund II, Inc. (AMEX: SRO) ("RREEF II") (together, the "Fund(s)"), each
a closed-end management investment company. The Funds have secured
committed new financing from two major financial institutions, which,
as discussed in more detail below, will be used to facilitate the
redemption of the Funds' ARPS.

   The Funds' Board of Directors has approved the basic terms and
implementation of the proposed borrowing arrangements and the full
redemption of the Funds' ARPS. The Board and management believe that
the proposed borrowing arrangements and ARPS redemption are
appropriate and in the best interests of each Fund, taking into
account the interests of both common and preferred shareholders. The
new borrowing arrangements are expected to benefit the Funds' common
shareholders by reducing each Fund's borrowing costs as compared to
current dividend payments on the Fund's ARPS at mandatory maximum
rates. While the new borrowing arrangements are expected to have an
initial term of 364 days (as is common for fund bank loan facilities),
management has advised the Board that it will seek to renew the
arrangements several months prior to expiration and take other steps
to mitigate non-renewal risk well in advance of expiration.

   The following ARPS are expected to be redeemed:

-0-
*T
                                                         Liquidation
                                    Total                Preference of
Auction Rate Preferred Shares       Shares   Par Value   Shares Redeemed
-----------------------------------------------------------------------

DWS RREEF Real Estate Fund
DWS RREEF Real Estate Fund A         3,200   $25,000     $80,000,000
DWS RREEF Real Estate Fund B         3,200   $25,000     $80,000,000
-----------------------------------------------------------------------
RREEF I Total                        6,400               $160,000,000

DWS RREEF Real Estate Fund II
DWS RREEF Real Estate Fund II A      2,800   $25,000     $70,000,000
DWS RREEF Real Estate Fund II B      2,800   $25,000     $70,000,000
DWS RREEF Real Estate Fund II C      2,800   $25,000     $70,000,000
DWS RREEF Real Estate Fund II D      2,800   $25,000     $70,000,000
DWS RREEF Real Estate Fund II E      2,800   $25,000     $70,000,000
-----------------------------------------------------------------------
RREEF II Total                      14,000               $350,000,000
                          Copyright (c) 2008

BUS           DWS Scudder Announces Restructuring of Leverage and Redemption
              Jun 10 2008   17:10:01
*T

   In the case of RREEF I, management anticipates that the Fund's
proposed borrowing arrangement will be used to redeem all of its
outstanding ARPS. In the case of RREEF II, management anticipates that
the Fund's proposed borrowing arrangement will be used to redeem
approximately 75% of its outstanding ARPS. The portion of the RREEF II
ARPS not redeemed by using the proposed credit facility will be
redeemed with the proceeds from asset sales, resulting in a reduction
of the Fund's overall leverage. The reduction in leverage is
necessitated by a requirement under the Investment Company Act of 1940
to maintain higher asset coverage for debt than for preferred stock.
Fund management believes that a reduction in RREEF II's outstanding
leverage is appropriate given current market conditions.

   Subject to, among other things, the successful negotiation and
execution of appropriate credit agreements and the satisfaction of
notice and other legal requirements applicable to the redemption of
the Funds' ARPS, management anticipates that the proposed refinancing
and full ARPS redemption can be completed sometime during the third
quarter of 2008. There is no assurance that the proposed refinancing
will be successfully negotiated and completed. Moreover, the
implementation of the proposed refinancing and ARPS redemption is
subject to economic and market risks beyond the Funds' and
management's control. Accordingly, it is possible the above-mentioned
anticipated timeframe for completion could be delayed.

   DWS Scudder continues to evaluate alternatives for restructuring
the leverage of its other closed-end funds that have issued preferred
shares: DWS Municipal Income Trust (NYSE: KTF) and DWS Strategic
Municipal Income Trust (NYSE: KSM), which have $265 million and $70
million in preferred shares outstanding, respectively.

   Management anticipates that further details on the ARPS redemption
schedule for RREEF I and RREEF II will be provided in a future press
release and will be posted on the DWS Scudder Funds web site,
www.DWS-Scudder.com.

                            IMPORTANT INFORMATION

   Shares of common stock of closed-end funds, unlike open-end funds,
are not continuously offered. There is a one time public offering and,
once issued, shares of common stock of closed-end funds are traded in
the open market generally through a stock exchange. Common shares of
closed-end funds frequently trade at a discount to net asset value.
The price of common shares is determined by a number of factors,
several of which are beyond the control of the fund. Therefore, the
fund cannot predict whether its common shares will trade at, below, or
above net asset value.

   This press release shall not constitute an offer to sell or a
solicitation to buy, nor shall there be any sale of fund securities in
any state or jurisdiction in which such offer or solicitation or sale
would be unlawful prior to registration or qualification under the
laws of such state or jurisdiction.

                              Copyright (c) 2008

BUS        DWS Scudder Announces Restructuring of Leverage and Redemption
           Jun 10 2008  17:10:01

   Certain statements contained in this release may be
forward-looking in nature. These include all statements relating to
plans, expectations, and other statements that are not historical
facts and typically use words like "expect," "anticipate," "believe,"
and similar expressions. Such statements represent management's
current beliefs, based upon information available at the time the
statements are made, with regard to the matters addressed. All
forward-looking statements are subject to risks and uncertainties that
could cause actual results to differ materially from those expressed
in, or implied by, such statements. Management does not undertake any
obligation to update or revise any forward-looking statements, whether
as a result of new information, future events, or otherwise.

   The following factors, among others, could cause actual results to
differ materially from forward-looking statements: (i) the ability of
DWS Scudder and RREEF I and RREEF II to finalize and execute the
proposed plan to restructure the Funds' existing leverage; (ii) the
ability of DWS Scudder and the Funds to finalize acceptable credit
agreements and other documents necessary to implement the proposed
borrowing arrangements with the proposed lending institutions; (iii)
the need to obtain any necessary regulatory approvals and/or any
additional final Board approvals; (iv) the effects of changes in
market and economic conditions; (v) other legal and regulatory
developments; and (vi) other additional risks and uncertainties.

-0-
*T
NOT FDIC/ NCUA INSURED -- MAY LOSE VALUE -- NO BANK GUARANTEE
NOT A DEPOSIT -- NOT INSURED BY ANY FEDERAL GOVERNMENT AGENCY
*T

   DWS Scudder is part of Deutsche Asset Management, which is the
marketing name in the US for the asset management activities of
Deutsche Bank AG, Deutsche Bank Trust Company Americas, Deutsche
Investment Management Americas Inc. and DWS Trust Company. Copyright
(C) 2008 DWS Scudder Distributors, Inc. (R-4542-1 6/08)


CONTACT:
For DWS Scudder
Media:
Deutsche Bank Press Office, 212-250-7171
or
Investors:
DWS Closed-End Funds, 800-349-4281

-0- Jun/10/2008 21:10 GMT

# EXHIBIT B

**WSJ.com THE WALL STREET JOURNAL ONLINE**

June 17, 2008

FUND TRACK

# Help Nears for Auction-Rate Holders

**Mutual-Fund Firms Win U.S. Approval For Crunch Solution**

By DAISY MAXEY
*June 17, 2008; Page C15*

DOW JONES REPRINTS
This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit: www.djreprints.com.

• See a sample reprint in PDF format.
• Order a reprint of this article now.

Now that regulators have cleared the way, mutual-fund companies appear to be a step closer to creating a new type of security that could be purchased by money-market funds and used to rescue stranded holders of auction-rate preferred shares.

A Treasury Department notice and a decision by the Securities and Exchange Commission on Friday opened the way for some asset managers to create securities they've proposed.

> **RESCUED?**
> • **The News:** Two regulatory actions could mean that money-market funds are closer to solving the "auction rate" securities problem.
> • **The New Investment:** Eaton Vance Management plans to offer what are called Liquidity Protected Preferred Shares.
> • **Impact on Investors:** The new securities could be bought by money funds and used to rescue stranded holders of auction-rate preferred shares.

These proposed securities would have an unconditional "put" feature to ensure that a liquidity provider would purchase shares that couldn't be sold.

**Eaton Vance** Corp.'s Eaton Vance Management, **Nuveen Investments** LLC and **BlackRock** Inc. have said such securities could serve as a low-cost form of leverage to replace auction-rate preferred securities issued by closed-end funds.

### Failed Auctions

The funds issued the shares, which were routinely sold at auction, as a way to boost income for their common shareholders, but many preferred shareholders have been unable to sell their shares since February, when buyers pulled back and auctions failed.

A Treasury Department notice Friday said that the Internal Revenue Service "will not challenge the equity characterization of auction-rate preferred stock...as a result of adding a liquidity feature."

**Crunch-Beater**

"It's an important step in dealing with the credit crunch," said Pamela Olson, a former assistant secretary for tax policy at the Treasury, now a partner at the law firm Skadden Arps, Slate, Meacher & Flom LLP. "The significance is that the character of the income of the fund is going to flow through to the shareholders. So that if it's a tax-free fund, then tax-exempt interest would continue to flow through."

That means that closed-end fund issuers may be able to use the new securities to replace leverage on tax-free funds, thereby freeing shareholders of preferreds issued by those funds.

Andrew DeSouza, a spokesman for the Treasury Department, said, "We've been monitoring the market for a while now, looking at areas where clarity in the tax code could provide some certainty for the markets in today's challenging times, so trying to issue clarifying guidance has been a top priority for us."

He added: "This notice is just the latest example of that, and we will continue to issue guidance that's both helpful and appropriate."

In addition, Eaton Vance Management, the subsidiary of Eaton Vance Corp., received a no-action letter from the SEC on Friday, making it possible for the asset manager to offer the new security it is proposed: Liquidity Protected Preferred Shares.

The no-action relief assures the SEC won't recommend enforcement action against money-market funds that purchase the new LPPs, a preferred equity security that will pay a dividend rate that resets weekly and is based on a rate determined by a remarketing agent.

Unlike auction-rate preferred shares, the LPP would have liquidity backing from a bank or group of banks, so that the holder of the LPP will have an unconditional put to that liquidity provider.

Existing auction-rate preferred securities, as currently structured, cannot be purchased by money-market funds.

**Coming Soon**

Eaton Vance hopes to have the first of the new securities to market soon, said Payson Swaffield, chief income investment officer at the firm.

"The hope is to open up a much larger market for LPPs than ever existed for auction-rate preferred shares," he said. The issuance of the LPP is subject to approval by the board of Eaton Vance's funds, which will be sought "as soon as possible," Mr. Swaffield said.

In addition, five taxable income funds sponsored by Eaton Vance have asked the SEC for exemptive relief that would permit the funds to take on additional debt so they could redeem auction-rate preferred shares, the firm said.

Both of the developments are important, said Cecilia Gondor, executive vice president at Thomas J. Herzfeld Advisors Inc. "There have been several hurdles to bringing out this new security, and there were probably the most important ones."

Nuveen and BlackRock didn't return calls Monday seeking comment on the latest developments.

**Write to** Daisy Maxey at daisy.maxey@dowjones.com[1]

**URL for this article:**
http://online.wsj.com/article/SB121366992594179695.html

**Hyperlinks in this Article:**
(1) mailto:daisy.maxey@dowjones.com

Copyright 2008 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our **Subscriber Agreement** and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit **www.djreprints.com**.

**RELATED ARTICLES FROM ACROSS THE WEB**
**Related Articles from WSJ.com**
• Money-Market Loan Facility Planned  Jun. 17, 2008
• Foreign Acquisitions Of U.S. Securities Soar  Jun. 17, 2008
• Macquarie, Babcock Seek Solutions  Jun. 17, 2008
• Judge Kaplan Reprimands Hedge Funds in Takeover Battle with CSX  Jun. 12, 2008
**Related Web News**

- Eaton Vance Closed-End Enhanced Equity Income Funds Declare Monthly Distrib... Jun. 14, 2008 msn.foxsports.com
- The man who beat the SEC Jun. 11, 2008 money.cnn.com

**More related content**   *Powered by Sphere*

# EXHIBIT C



# Important Information
# UBS Auction Rate Securities
# 100% Loan-To-Par Value (LTPV) Program

## Primary Objective

This Program offers a lending solution to UBS clients who are invested in certain types of Auction Rate Securities (ARS) and have an immediate non-purpose liquidity need. Before submitting an application for a 100% LTPV loan, Financial Advisors and clients should first discuss the full range of liquidity options available, including our traditional Securities Backed Loans and our existing ARS 50% loan-to-market value program. The 100% LTPV Program is designed solely for clients with a critical and immediate need for 100% liquidity.

## Eligible Securities

**To be eligible for the 100% LTPV Program, clients must have held any of the following securities at UBS as of February 14, 2008:**

- Auction Preferred Securities (APS)
- Formulaic Municipal Auction Rate Certificates (ARCs)
- Student Loan ARCs
- Non-proprietary ARCs/APS

NOTE: Max rate Municipal ARCs are excluded

## Rate

- Variable, 1-month LIBOR + 50 basis points
- Fixed Rate loans are not available

## Turn-Around Time, Including Credit Review

- Turn-around time for a credit decision is estimated at 7-10 business days from when the application is submitted
- Typically, funds for credit-approved loans will be available within five business days of receipt of fully executed and acceptable documentation at UBS Bank USA

## Client Account Types: Collateral Account and Loan Account

**Two types of accounts must be opened to participate in the 100% ARS LTPV Program. Each account has distinct requirements and/or restrictions:**

**ARS-Only Collateral Account:** This is a new and separate, *ARS-only Resource Management Account® (RMA®)* collateral account that must be opened to segregate and hold eligible ARS securities. This account must be opened prior to submitting the loan application. It will not have any RMA banking features, and there is no fee for this account.

If an existing collateral account is already fully segregated with ARS-only securities and has RMA banking features, it should not be used as a collateral account for this loan program because the banking features will be terminated upon loan approval (i.e., checks may be returned, UBS American Express® Card transactions may be declined, ACH/EFT and automatic bill pay orders may be rejected).

The collateral account must be a standard lending-eligible account, which typically excludes IRA, ERISA, UTMA, etc.

**100% LTPV Loan Account:** This is a line of credit account that is secured by the ARS-only collateral account. These loans are subject to normal credit decision processes and policies and the creditworthiness of the borrower.



### More About the ARS-Only Collateral Account

- The collateral account must be in the same name as the ARS loan account.
- The collateral account must be opened prior to submission of the loan application.
- There may be only one collateral account for each loan account. The collateral account may have multiple acceptable ARS positions that may be used to secure one single loan account. If the collateral account holds any ineligible securities, the application will not be accepted.
- Collateral accounts may hold only the eligible ARS securities.
- Collateral accounts will not have any banking features (i.e., checking, UBS cards, ACH/EFT orders, etc.).
- Cash positions existing before the loan is drawn will continue to sweep to an RMA money fund or bank deposit account; once the loan is drawn, there is no access to collateral or cash in the collateral accounts.
- Cash positions realized after the loan is drawn will sweep automatically each day to reduce the loan balance.
- Good-to-Cancel orders are required on all ARS used as collateral and must remain in effect for the life of the loan. This means that in the event the ARS are sold or redeemed, the funds will be used automatically to reduce or settle the outstanding loan balance, and the loan approval amount will be adjusted accordingly.
- The account fee is waived.

### More About the Loan Account

**Access to Credit Line**
- Clients may access funds only through wire orders placed through a branch; no checks are available on this account. Money may not be journaled to another UBS account; funds must leave UBS and may not be used to purchase, trade or carry other securities or to pay off margin debits.
- RMA banking features are not available on this loan account.
- Minimum loan approval size is $25,001; Minimum initial disbursement is $25,001

**Loan Account Repayment and Maintenance**
- Clients are responsible for repaying the full amount of their loan. The client's obligation to repay their loan in full is based on the amount borrowed plus interest and any other fees or charges and not on the value of the pledged ARS.
- Any new cash deposited, settled trades or previously unswept cash, as well as any dividends paid or interest earned in the collateral account once the loan is drawn, will sweep automatically each day to the loan account to pay down the loan balance.
- Any redemptions/sales credits in the collateral account will sweep automatically each day to pay down the loan balance.
- Clients will be required to make payments, including interest payments, if the loan balance exceeds the loan approval amount.
- Clients may be required to make margin call payments if the ARS in the collateral account declines in value. Generally, the market value of the ARS positions will have to decline by 33% in order to trigger a margin call. The margin call process will be similar to the existing WMUS margin call process.

### Important Disclosures

LTPV credit lines are provided by UBS Bank USA, an affiliate of UBS Financial Services Inc. LTPV credit lines are demand loans and are subject to credit approval and collateral maintenance requirements. UBS Bank USA can demand repayment at any time without notice. If the required collateral value is not maintained, the lender can require the borrower to post additional collateral, repay part or all of their loan and/or sell their securities. Failure to promptly meet a request for additional collateral or repayment or other circumstances (e.g., a rapidly declining market) could cause the lender to liquidate some or all of the collateral supporting the LTPV credit lines. Any required liquidations may interrupt the borrower's long-term investment strategies and may result in adverse tax consequences. LTPV credit lines may not be used to purchase, trade or carry securities or to repay debt (a) used to purchase, trade or carry securities or (b) to any affiliate of UBS Bank USA. Additional limitations and availability may vary by state.

**Additional Important Disclosures**
Neither UBS Financial Services Inc. nor UBS Bank USA provides legal or tax advice. Clients should consult their legal and tax advisors regarding the legal and tax implications of borrowing using securities as collateral for a loan. For a full discussion of the risks associated with borrowing using securities as collateral, clients should review the Loan Disclosure Statement that will be included in their application package.

**Equal Opportunity Lenders**
The RMA is a brokerage account. Resource Management Account and RMA are registered service marks of UBS Financial Services Inc. American Express is a federally registered service mark of American Express and is used by UBS pursuant to a license. The UBS American Express Card is issued and administered by Barclays Bank Delaware.



UBS Financial Services Inc.
www.ubs.com/financialservicesinc
080501-1057

UBS Financial Services Inc. is a subsidiary of UBS AG.

©2008 UBS Financial Services Inc. All Rights Reserved. Member SIPC.

# EXHIBIT D

5 of 322 DOCUMENTS

Copyright 2008 Associated Press
All Rights Reserved
The Associated Press

June 12, 2008 Thursday 2:43 PM GMT

**SECTION:** BUSINESS NEWS

**LENGTH:** 1287 words

**HEADLINE:** Holders of auction-rate debt have choices

**BYLINE:** By LIZ RAPPAPORT, The Wall Street Journal

**BODY:**

Following her broker's advice, Cecilia Walsh put her entire $375,000 divorce settlement into auction-rate securities last December, planning on using the money for her day-to-day needs.

Yet before she ever withdrew a penny from the account, the auction-rate-debt market froze up, and Ms. Walsh, a 47-year-old actor in Delray Beach, Fla., was unable to withdraw any of her money. Her broker, UBS AG, gave her a margin loan secured by her account so that Ms. Walsh could pay her living expenses. But UBS later marked down the value of the securities in her account and has demanded that she repay part of the loan.

In the four months since auction-rate securities stopped trading normally, investors like Ms. Walsh have been taking out loans, selling their securities at big discounts, filing arbitration cases against their brokers, or simply waiting and hoping that the market will start functioning again. The one thing they haven't found is an easy way to get their money back.

For decades, individuals and companies bought auction-rate debt from municipalities, charitable organizations, student lenders and closed-end mutual funds. The securities had long-term maturities but functioned like a short-term investment, paying interest rates that were reset in weekly or monthly auctions conducted by Wall Street firms. Brokerage firms and financial advisers pitched them to investors as a safe place to stash one's cash and collect a higher yield than a money-market fund offered, often tax-free.

As a result, the $330 billion auction-rate securities market attracted many investors who were risk-averse or, like Ms. Walsh, knew they would need the money in the near future. But beginning in February, as the subprime-lending crisis spread to affect nearly all areas of the credit markets, auctions failed to attract sufficient bidders. Wall Street firms stopped supporting the market, causing it to freeze up and blindsiding thousands of small investors.

In Ms. Walsh's case, UBS first marked down the value of her $375,000 account by about 26 percent, or $96,200, as of March 31, using proprietary models that in part compared these securities unfavorably to long-term bonds. Ms. Walsh took out the margin loan on April 2, amounting to $202,000, or about 73 percent of the new marked-down value of her securities.

Within three weeks she got a margin call, meaning UBS wanted some of its money back because the auction-rate securities in Ms. Walsh's account had fallen further in value. She had to return $7,757 immediately. She received another margin-call notice last week after UBS marked down the value of her auction-rate securities to about $187,500, or 50 percent of their original value. Ms. Walsh says she has yet to receive details on how much money she owes.

"This has affected every area of my life," Ms. Walsh says. "It feels like a heist."

Ms. Walsh has filed an arbitration claim against UBS through the Miami-based law firm Dimond Kaplan & Rothstein, seeking the full value of her original investment, plus $1.125 million in punitive damages.

UBS declines to comment on individual accounts, but a spokeswoman said the firm is working with "a small number" of clients who have been affected by write-downs of student-loan auction-rate securities to help them meet their margin calls. According to the Financial Industry Regulatory Authority, the securities industry's nongovernmental regulator, about 80 arbitration claims tied to auction-rate securities have been filed to date.

Ms. Walsh's portfolio of auction-rate securities was entirely student-loan backed. This $80 billion portion of the auction-rate market was hit particularly hard because the interest rates reset to very low levels in some cases to 0 percent when the auctions failed, leaving already troubled student-loan companies little incentive to refinance.

The interest rates on other types of auction-rate securities, such as those issued by mutual funds or municipalities, have generally fared better. When an auction fails, rates on these securities automatically reset to a set percentage above a benchmark rate or to a high fixed interest rate.

Some investors who hold auction-rate securities have succeeded in dumping them, but have taken a big haircut.

Thirty-three-year old attorney Laranne Breagy, who lives in Durango, Colo., came into a $1.25 million windfall last fall but knew she would need quick access for a tax payment. The money came from the sale of stock in a start-up company, Momentum Energy Group Inc., she helped found.

So Ms. Breagy opened a brokerage account with A.G. Edwards Inc. last September to park her cash and "postpone the responsibility" of handling so much new money until after tax season. On the advice of her broker, she says, she put her entire stash into auction-rate securities issued by mutual-fund companies. In February, they stopped trading, and her money was frozen.

She took out a home-equity line of credit to pay her taxes, but wasn't sleeping or eating from the stress. Ms. Breagy moved her securities from A.G. Edwards to an independent financial adviser, Laurie McRay, and her Houston-based firm, McRay Money Management. The firm helped her sell her auction-rate securities at a big discount on a secondary market called the Restricted Stock Trading Network.

The network found a California-based hedge fund willing to purchase the entire batch at a discounted price of 87 cents on the dollar, or a $162,000 loss on Ms. Breagy's investment. Ms. Breagy paid off her home-equity loan and says she can now sleep at night. She is considering filing an arbitration claim against A.G. Edwards for her losses, she says. A.G. Edwards declined to comment on an individual account.

Some investors who don't need the cash are simply waiting it out, hoping the situation improves. In some case, they've been rewarded. Some large issuers of auction-rate securities, such as Nuveen Investments LLC, Eaton Vance Corp. and many municipalities have redeemed the securities, paying their investors in full. On Wednesday, Nuveen announced that its board approved plans to redeem another $1.56 billion of its auction-rate debt.

In all, about $80 billion, or nearly a quarter of the entire auction-rate securities market, has been redeemed.

Jim Buchanan, a 72-year-old Texas-based retired Shell Chemicals Ltd. employee, is among those waiting it out.

Mr. Buchanan had $150,000 in auction-rate securities issued by mutual-fund companies in two accounts with UBS. Fund company Calamos Holdings has redeemed $25,000 of the securities held by Mr. Buchanan. Now he's stuck in $125,000 of auction-rate securities issued by Pacific Investment Management Co. and Scudder Investments, which are paying him interest rates between 2.6 percent and 4.5 percent, similar to what he was receiving prior to the auctions' failures.

The value of Mr. Buchanan's securities has been marked down by UBS by about $2,000. Mr. Buchanan says the money is an emergency fund for him, and he can afford to wait and hope for a resolution.

He doesn't blame his broker for putting him in the securities. "This is a lot bigger than she," says Mr. Buchanan about his auction-rate securities. "I'm willing to ride with it for a while and see how things go."

What You Can Do

Take out a loan from your broker. The risk is that the value of the securities will continue to fall and you'll get hit with a margin call.

Sell in the secondary market. Investors who need cash can sell their securities at a discount to hedge funds or other parties.

File an arbitration claim. Investors can seek to get their money back and damages in arbitration hearings.

Wait it out. Many investors have chosen to wait out the storm, hoping the market will return to normal functioning.

**LOAD-DATE:** June 13, 2008