**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

SEP 05 2008

U.S.D.C. S.D. N.Y.
CASHIERS

| | |
|---|---|
| In re UBS AUCTION RATE SECURITIES LITIGATION | **08-cv-2967 (LMM)** |
| This Document Relates To: | **CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| All Actions | **JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................. 1

JURISDICTION AND VENUE ......................................................................... 2

PARTIES............................................................................................................3

  A. Lead Plaintiffs.......................................................................................... 3

  B. Defendants ............................................................................................... 4

CLASS ACTION ALLEGATIONS .................................................................. 5

FACTUAL ALLEGATIONS ............................................................................ 8

  A. Background: Auction Rate Securities....................................................... 8

  B. The Auction Process ................................................................................ 9

  C. UBS Engaged In A Scheme To Defraud Purchasers Of UBS Auction Rate
     Securities................................................................................................ 11

    i.     UBS Routinely Intervened In The Auctions To Create The Appearance Of
         Stability And Liquidity ...................................................................... 11

    ii.    UBS Routinely Intervened In Auctions to Set the Rates of Interest Paid on
         UBS Auction Rate Securities.............................................................. 13

    iii.   The Viability of the Auction Market Depended Not Only Upon UBS's
         Manipulative Conduct, But Also on the Manipulative Conduct of the Other
         Broker-Dealers .................................................................................. 14

  D. As Credit Markets Deteriorated In The Summer Of 2007, UBS's Scheme BeganTo
     Unravel................................................................................................... 15

    i.     As UBS's Inventory Of Auction Rate Securities Increased, UBS Pressured
         Its Financial Advisors To Sell The Securities To Unsuspecting Class
         Members ............................................................................................ 15

    ii.    UBS Contemplated A Complete Withdrawal from the Auction Rate
         Securiites Market Beginning in Fall 2007 .......................................... 19

    iii.   To Perpetuate The Auction Rate Securities Market, UBS Persuaded Issuers to
         Waive The Caps On Interest Rates Paid On UBS Auction Rate Securities ...... 22

    iv.   UBS Withdraws Its Support For The Auction Rate Securities Market ............ 23

    v.    Regulators Settle Claims Against UBS for Faud in the Auction Rate
         Securities  Market .............................................................................. 26

E. During The Class Period, UBS Omitted Material Facts About Its Role In The Auction Market And Materially Misrepresented The Liquidity Of And Risks Associated With Auction Rate Securities................................................................................................ 26

    i.    Omissions and Misrepresentations in UBS's Marketing Materials................... 27

    ii.    Omissions and Misrepresentations by UBS's Financial Advisors and Other Sellers of UBS Auction Rate Securities.............................................................. 28

    iii.    Misrepresentations and Omissions in UBS's Client Account Statements and Other Account Documentation ...................................................................... 32

    iv.    Lead Plaintiffs' Experiences ........................................................................... 33

        (a)    David and Shelly Chandler ....................................................... 33

        (b)    Robert Bee ................................................................................. 34

        (c)    Edward Taras ............................................................................. 35

        (d)    Larry S. Watanabe .................................................................... 36

        (e)    David Ghiz ................................................................................. 37

        (f)    M. Richard Goldberg ................................................................. 39

ADDITIONAL SCIENTER ALLEGATIONS................................................................. 40

  A. Auction Rate Securities Were Highly Profitable For UBS And The UBS Financial Advisors Who Sold Them.................................................................................... 40

  B. Insider Sales.............................................................................................................. 41

NO SAFE HARBOR ......................................................................................................... 43

LOSS CAUSATION/ECONOMIC LOSS ........................................................................ 43

TRANSACTION CAUSATION: ...................................................................................... 46

APPLICABILITY OF THE PRESUMPTION OF RELIANCE ....................................... 46

  A. Reliance on Material Omissions.............................................................................. 46

  B. Fraud on the Market................................................................................................ 47

  C. Fraud-Created-The-Market .................................................................................... 48

COUNT I - Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5(a) and (c) Promulgated Thereto Against All Defendants By Lead Plaintiffs And The Class................................................................................................................ 49

COUNT II – Violation Of Section 20(a) Of The Exchange Act Against The Control Person Defendants By Lead Plaintiffs And The Class .................................... 52

COUNT III – Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5(b) Promulgated Thereto Against All Defendants By Lead Plaintiffs And The Subclass ....................................................................................... 53

COUNT IV - Violation of Section 20 (a) Of The Exchange Act Against The Control Person Defendants Lead Plaintiffs And The Subclass.................................... 56

PRAYER FOR RELIEF ...................................................................................... 57

JURY TRIAL DEMANDED................................................................................. 58

1.     Lead Plaintiffs, by their undersigned counsel, allege the following based upon personal knowledge as to their own acts and upon the investigation of by their counsel, which included, among other things, a review of:  (a) public statements, sales presentations and marketing materials by UBS AG, UBS Securities LLC and UBS Financial Services Inc. (collectively "UBS"), and their affiliates, agents and employees; (b) Securities and Exchange Commission ("SEC") filings made by UBS and other brokerages, financial services firms and investment companies; (c) public filings and statements in court proceedings and civil government and regulatory investigations involving UBS and other brokerages, financial services firms and investment companies; (d) documents believed to be authentic copies of internal UBS emails and other business records obtained from public record sources; (e) securities analysts' reports, press releases and media reports; (f) interviews with purchasers of auction rate securities and other knowledgeable individuals; and (g) discussions with consultants.

## INTRODUCTION

2.     This is a class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") on behalf of all persons or entities who, between March 21, 2003 and February 13, 2008, inclusive ("Class Period"), purchased auction rate securities that UBS underwrote or sold, or for which UBS managed auctions ("UBS Auction Rate Securities"), including Auction Preferred Shares ("APS"), Municipal Auction Rate Certificates ("Municipal ARCs"), Student Loan-Backed Auction Rate Certificates ("Student Loan ARCs" or "SLARS") and Collateralized Debt Obligations Auction Rate Certificates ("CDO ARCs"), and who were damaged thereby.

3.     Auction rate securities are bonds or preferred stocks that pay interest or dividends at rates set at periodic auctions.  During the Class Period, UBS underwrote and managed auctions for auction rate securities, and sold those securities to investors as highly liquid investments and appropriate short-term investments.

4.     During the Class Period, UBS engaged in a comprehensive scheme to defraud purchasers of UBS Auction Rate Securities by manipulating the market for those securities and by making omissions and misrepresentations of material fact about the risks, value and liquidity of those securities.   The scheme allowed UBS to reap hundreds of millions of dollars in underwriting and auction management fees at the expense of investors who purchased UBS Auction Rate Securities at overvalued prices.

5.     UBS perpetuated an artificial market for UBS Auction Rate Securities and pushed tens of billions of dollars of those securities onto investors, including its own inventory of UBS Auction Rate Securities, in order to avoid being stuck with them on its own balance sheet.   UBS manipulated the auctions for UBS Auction Rate Securities by routinely intervening in auctions to prevent auction failures and to influence the rates of interest (or dividends) paid on UBS Auction Rate Securities.

6.     UBS failed to disclose material facts relating to UBS's conduct of the auctions, including the scope and extent to which it intervened in the auctions and rigged interest and dividend rates paid on UBS Auction Rate Securities; the conflicts of interest that pervaded UBS's management and conduct of the auctions; and the risk characteristics of UBS Auction Rate Securities.

7.     UBS's scheme came to light on February 13, 2008, when the auction rate securities market collapsed after UBS and the other major auction rate securities broker-dealers abruptly ended their policy of propping up the market.   UBS's withdrawal of "support" for the auction market left Class Members holding tens of billions of dollars in illiquid UBS Auction Rate Securities, often earning interest far below market rates.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).   The claims asserted

herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. 240.10b-5).

9.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §§ 1391(b) and 1337. Defendants UBS Securities LLC and UBS Financial Services Inc. maintain their principal places of business within this District and many of the acts giving rise to the violations complained of herein took place in this District.

10.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

### A.    Lead Plaintiffs

11.     Lead Plaintiffs David and Shelly Chandler, as set forth in Attachment A incorporated by reference herein, purchased UBS Auction Rate Securities directly from UBS during the Class Period and were damaged thereby.

12.     Lead Plaintiff Robert Bee, as set forth in Attachment A incorporated by reference herein, purchased UBS Auction Rate Securities directly from UBS during the Class Period and was damaged thereby.

13.     Lead Plaintiff Edward Taras, as set forth in Attachment A incorporated by reference herein, purchased UBS Auction Rate Securities directly from UBS during the Class Period and was damaged thereby.

14.     Lead Plaintiff Larry S. Watanabe, as set forth in Attachment A incorporated by reference herein, purchased UBS Auction Rate Securities directly from UBS during the Class Period and was damaged thereby.

15.     Lead Plaintiff David Ghiz, as set forth in Attachment A incorporated by reference herein, purchased UBS Auction Rate Securities directly from UBS during the Class Period and was damaged thereby.

16.     Lead Plaintiff M. Richard Goldberg, as set forth in Attachment A incorporated by reference herein, purchased UBS Auction Rate Securities directly from UBS during the Class Period and was damaged thereby.

17.     Unless specifically noted, "Lead Plaintiffs" refers collectively to plaintiffs David Chandler, Shelly Chandler, Robert Bee, Edward Taras, Larry S. Watanabe, David Ghiz and M. Richard Goldberg.

**B.      Defendants**

18.     Defendant UBS AG is a Swiss corporation headquartered in Zurich and Basil, Switzerland.  UBS AG is one of the world's leading financial firms and does business in the United States through its subsidiaries UBS Securities LLC and UBS Financial Services Inc.

19.     Defendant UBS Securities LLC ("UBS Securities") is incorporated in Delaware and maintains its principal executive offices in New York, New York.  UBS Securities, a wholly owned subsidiary of UBS AG, is registered with the SEC as a broker-dealer pursuant to Section 15(b) of the Exchange Act and is a member of the New York Stock Exchange and the Financial Industry Regulatory Authority.

20.     Defendant UBS Financial Services Inc. ("UBS Financial Services") is incorporated in Delaware and maintains its principal executive offices in New York, New York.  UBS Financial Services, a wholly owned subsidiary of UBS AG, is registered with the SEC as a broker-dealer and investment adviser pursuant to the Exchange Act and the Investment Advisers Act of 1940, and is a member of the Securities Industry and Financial Markets Association ("SIFMA").  UBS Financial Services offers investment advisory and brokerage services to UBS's Wealth Management clients.

21.     Unless specifically noted, "UBS" refers collectively to defendants UBS AG, UBS Securities and UBS Financial Services.

22.     Defendant David Shulman ("Shulman") was the Global Head of Municipal Securities Group and the Head of Fixed Income Americas at UBS Securities during the Class Period. Shulman managed UBS's auction rate securities program during the Class Period and allowed to manipulate and perpetuate the market for UBS Auction Rate Securities during the Class Period.

23.     Defendant Joseph Scoby ("Scoby") was the Chief Risk Officer for UBS AG during the Class Period. He is a member of UBS AG's Governing Executive Board ("GEB"), UBS's top policymaking body. Scoby participated in UBS's scheme to manipulate and perpetuate the market for UBS Auction Rate Securities during the Class Period.

24.     Defendant Marcel Rohner ("Rohner") was the Group Chief Executive Officer of UBS AG and a member of the GEB during the Class Period. Rohner participated in UBS's scheme to manipulate and perpetuate the market for UBS Auction Rate Securities during the Class Period.

25.     Defendant Marten Hoekstra ("Hoekstra") was UBS Financial Services' Deputy CEO Global Wealth Management and Head of Wealth Management Americas during the Class Period, and is a member of the SIFMA Board of Directors. Hoekstra participated in UBS's scheme to manipulate and perpetuate the market for UBS Auction Rate Securities during the Class Period.

26.     Unless specifically noted, "Defendants" refers collectively to UBS AG, UBS Securities, UBS Financial Services, Shulman, Scoby, Rohner and Hoekstra.

27.     Unless specifically noted, "Control Person Defendants" refers collectively to UBS AG, UBS Securities, Shulman, Scoby, Rohner and Hoekstra.

## CLASS ACTION ALLEGATIONS

28.     Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), (b)(2) and/or (b)(3), and 23(c)(4) on behalf of a Class consisting of all persons and entities that purchased UBS Auction Rate Securities between March 21, 2003 and February 13, 2008, inclusive, and were damaged thereby (the "Class").

29.     Lead Plaintiffs also bring this action on behalf of a Subclass consisting of all persons and entities that purchased UBS Auction Rate Securities directly from UBS between March 21, 2003 and February 13, 2008, inclusive, and were damaged thereby (the "Subclass").

30.     References hereafter to the Class shall be deemed to include the Class and the Subclass unless otherwise specified.

31.     Excluded from the Class are Defendants; the subsidiaries and affiliates of any Defendant; any person or entity who is a partner, officer, director, employee or controlling person of any Defendant; members of Defendants' immediate families and their legal representatives, heirs, successors or assigns; and any entity in which any Defendant has or had a controlling interest.

32.     The members of the Class are so numerous that joinder of all members is impracticable. The market for auction rate securities, while it existed, was estimated to exceed $300 billion in the United States.

33.     UBS was the second largest broker-dealer of auction rate securities while the market for such securities existed. During the Class Period, UBS and its clients held approximately $51 billion of auction rate securities that UBS underwrote and sold.

34.     During the Class Period, UBS sold UBS Auction Rate Securities to approximately 40,000 retail customers, charities and small to mid-sized businesses, as well as to numerous larger corporations and institutional customers. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members of the proposed Class.

35.     Record owners and other members of the Class may be identified from records maintained by Defendants and other brokerage firms and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

6

36.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

   (a)     Whether the federal securities laws were violated by Defendants' acts as alleged herein;

   (b)     Whether Defendants joined, directed, participated in, or otherwise engaged in a scheme to defraud purchasers of UBS Auction Rate Securities during the Class Period;

   (c)     Whether Defendants manipulated the market for UBS Auction Rate Securities during the Class Period; and

   (d)     Whether Class members have sustained damages and the proper measure of damages.

37.     Among the additional questions of law and fact common to the Subclass are:

   (a)     Whether Defendants made omissions or misrepresentations of material fact about the risks, value and liquidity of UBS Auction Rate Securities and the market for such securities; and

   (b)     Whether Defendants failed to disclose that UBS artificially supported and manipulated the market for UBS Auction Rate Securities to maintain the appearance of liquidity and stability, and other facts relating to UBS Auction Rate Securities, and if so, whether the omitted facts are material.

38.     Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

39.     Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

40.     A class action is superior to all other available methods for the fair and efficient adjudication of Lead Plaintiffs' claims. The damages suffered by individual Class members are relatively small given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the Class to individually redress the wrongs done to them.

41.     Furthermore, even if Class members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or

contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, is in fact manageable, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. The benefits of adjudicating this controversy as a class action far outweigh any difficulties in managing the Class.

42.     In the alternative, the Class and the Subclass may be certified under the provisions of Fed. R. Civ. P. 23(b)(1), 23(b)(2) and/or 23(c)(4) because:

(a)     the prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for Defendants;

(b)     the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests;

(c)     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole; and

(d)     The claims of Class members are comprised of common issues that are appropriate for certification under Rule 23(c)(4).

## FACTUAL ALLEGATIONS

### A.     Background: Auction Rate Securities

43.     Auction rate securities are long-term or perpetual variable-rate equity or debt instruments that pay interest or dividends at rates set at periodic "auctions."

44.     "Auction Preferred Shares" ("APS"), also referred to as "Auction Rate Preferred Stocks" ("ARPS"), are auction rate equity instruments. APS and ARPS have no maturity date and are issued by closed-end mutual funds.

45.     "Auction Rate Certificates" ("ARCs") are auction rate debt instruments. ARCs have long-term maturities, typically 30 years.

46.     ARCs include three types of debt instruments:  (a) Municipal ARCs issued by states, state agencies, municipalities or other governmental authorities; (b) SLARS issued by public or private student loan originators and lenders; and (c) CDO ARCs issued by corporations and other entities.

47.     The market for auction rate securities experienced dramatic growth since the securities were first introduced in 1984.

48.     By February 2008, approximately $330 billion of auction rate securities were outstanding.

49.     Investments in auction rate securities when they were first marketed in the 1980s were limited to institutional investors, with required minimums of $250,000.

50.     Prior to the beginning of the Class Period, issuers and underwriters lowered the minimum investment to $25,000.

51.     The reduced minimum investment enabled sellers to market auction rate securities to retail investors including individuals, charities and small businesses.

**B.      The Auction Process**

52.     Prior to February 2008, auction rate securities typically traded at par value through periodic auctions.

53.     The rates of interest or dividends paid on auction rate securities were determined at the periodic auctions, which were conducted as "Dutch" auctions.

54.     Although the amount of time between each auction varied between individual securities, in general auctions were held every 7, 28 or 35 days, with interest paid at the end of the auction period.

55.     According to typical auction procedures, each prospective buyer submitted a bid for a specified amount of securities and a specified interest or dividend rate.  Sell orders were filled beginning with bids at the lowest rate and continuing with bids at progressively higher rates, until all securities available for sale were sold.  The interest or dividend rate bid at which the last

of the securities were sold was the "clearing rate." The clearing rate was then applied to all securities sold in the auction.

56.     Auction procedures typically provided for the following types of orders:

(a)     Hold: The holder kept the securities regardless of the clearing rate;

(b)     Hold at Rate: The prospective seller kept the securities only if the clearing rate was at least as much as the rate that the person specified; if the clearing rate was less than the rate specified, then the person sold his or her securities;

(c)     Sell: The prospective seller sold the securities regardless of the clearing rate; and

(d)     Buy: The prospective buyer submitted a bid to purchase securities at a specified minimum interest or dividend rate.

57.     Auctions could end in one of three ways: as a successful auction, an "all-hold" auction, or a failed auction.

58.     In a successful auction, the number of shares bid for purchase was equal to or greater than the number of shares offered for sale. All shares for sale were purchased, and the clearing rate applied to all securities sold until the next auction. If several bidders had bids at the clearing rate, and there were more bids than shares offered for sale, the shares were divided pro-rata between the clearing rate bidders.

59.     As an example of a successful auction, assume an auction took place in which $1,000,000 of securities were for sale, and the auction received four bids: Bid A was for $500,000 at 3.2 percent; Bid B was for $500,000 at 3.3 percent; Bid C was for $500,000 at 3.3 percent; and Bid D was for $250,000 at 3.4 percent. In this example, the clearing rate would be 3.3 percent, which would be paid as interest or dividends on all securities in the auction until the next auction. Bid A would be allocated $500,000, Bids B and C would receive pro-rata allocations of $250,000 each, and Bid D would not receive any allocation.

60.     If all investors decided to hold and not sell their securities, then the auction was an all-hold auction. No securities changed hands, and a formula specified in the offering documents set the interest or dividend rate for all securities until the next auction.

61.     The all-hold rate was generally lower than the market rate. Thus, if investors failed to bid their auction rate securities at rate, the interest or dividend rate on those securities would be reduced.

62.     An auction failed if the number of shares offered for sale exceeded the number of shares bid for purchase. If the auction failed, then none of the current shareholders could sell their shares, no matter what type of order they issued. An interest or dividend rate called the "penalty rate" or "maximum rate" (hereafter referred to as the "maximum rate") would then apply until the next auction. The maximum rate was specified in the offering documents as either a formula or a multiplier of a reference rate, such as a specified index rate.

63.     The maximum rate on an auction rate security was intended to ensure that the security remained liquid if the auction failed, by attracting new buyers or prompting the issuer to refinance. If the maximum rate was insufficient to attract liquidity in the event of an auction failure, however, the risk characteristics of an auction rate security were fundamentally altered. An auction rate security that carried a low penalty rate was dependent on the broker-dealers' intervention and "support" for the periodic auctions to ensure liquidity, and in the absence of the broker-dealer's support, any auction failure would render the security illiquid.

64.     Auction rate securities have no "put" feature guaranteeing that an investor could either sell the securities back to the broker-dealer on demand at par value or force the issuer to redeem the securities if the auctions failed. Most auction rate securities also required that any sale take place through the broker-dealer. In consequence, holders of auction rate securities dependended on the integrity of the broker-dealers and the auctions to ensure that the securities remained liquid.

## C.    UBS Engaged In A Scheme To Defraud Purchasers Of UBS Auction Rate Securities

### i.    UBS Routinely Intervened In The Auctions To Create The Appearance Of Stability And Liquidity

65.     During the Class Period, UBS underwrote billions in auction rate securities that carried insufficient maximum rates to ensure the liquidity of those securities if the auctions

failed. To mask the inherent lack of liquidity of those securities, UBS engage in a wide range of deceptive and manipulative tactics directed at auction rate securities investors and the market for auction rate securities. As credit markets deteriorated in the summer and fall of 2007, the range and extent of the deceptive practices employed by UBS increased as UBS attempted simultaneously to conceal the liquidity characteristics of the UBS Auction Rate Securities while protecting itself from the consequences of its policy of intervening in auctions to prevent failures.

66.     Throughout the Class Period, UBS intervened in the auctions by placing "support bids" to purchase UBS Auction Rate Securities for its own account when the auctions otherwise would have failed due to lack of sufficient demand.

67.     According to defendant David Shulman, who managed UBS's Auction Rate Securities program, where UBS was the lead broker-dealer, UBS followed a uniform policy of placing support bids in any auction that UBS believed would fail if no support bid was placed.

68.     Between January 1, 2006 and February 28, 2008, UBS placed support bids in more than 30,000 auctions of its Municipal ARCs and SLARS which prevented more than 85 percent of those auctions from failing.

69.     Between January 1, 2006 and February 28, 2008, UBS placed support bids in more than 27,000 auctions of its APS which prevented more than 50 percent of those auctions from failing.

70.     UBS was able to place support bids and prevent auctions from failing, because it was aware of the other bids in the auctions and could place its own bids after the bidding deadline for other investors.

71.     UBS failed to disclose to investors the extent to which it made support bids during the Class Period, UBS's reasons for intervening to prevent auction failures, and the impact of its support bids on the market for UBS Auction Rate Securities.

72.     UBS's extensive and sustained interventions to prevent auction failures created the outward appearance that UBS Auction Rate Securities were readily liquid investments, and that the auction market functioned by the natural interplay of supply and demand.

73.     By intervening to prevent auction failures, UBS masked the liquidity risks inherent to UBS Auction Rate Securities. Due to the lack of transparency in the auction market, Class members had no way of knowing the extent to which UBS's interventions were needed to sustain the auction rate market and ensure that auctions continued to clear.

74.     Had UBS not supported these auctions, or had UBS disclosed the extent of its interventions to support the market, widespread auction failures would have alerted the public to the risk characteristics of the auction rate securities underwritten and sold by UBS.

### ii.     UBS Routinely Intervened In Auctions to Set the Rates of Interest Paid on UBS Auction Rate Securities

75.     Unlike fixed rate bonds, commercial paper or money market funds, auction rate securities are designed with the understanding that the holder will actively "trade" the securities by monitoring the relative rates of return paid on auction rate securities in relation to other short term investment options available to the holder, and "hold at rate," (an instruction to sell unless the rate paid on the security is equal to or greater than a specified rate of interest) or sell the security outright if the rate of return the holder anticipates receiving on the auction rate security is inferior to other alternatives.

76.     In the absence of active trading by holders, auction rate securities became increasingly vulnerable to intervention by UBS and other auction managers to influence interest and dividend rates.

77.     As a result of insufficient investor participation in the auctions, UBS was able to assert almost complete control over the rates of interest paid on UBS Auction Rate Securities.

78.     UBS's Short Term Desk set the clearing rate for the auctions that would have failed but for UBS's support bids throughout the Class Period.

79.    UBS did not base its pricing decisions on a hypothetical market rate or fair value. Instead, when UBS set the clearing rate, it did so in a manner that placed its own interests ahead of investors.

80.    Throughout the Class Period, UBS set interest rates in such a manner as to allow continued sales of auction rate securities to the public without letting clearing rates become or stay so high as to alienate the issuer clients on whom UBS depended for continuing business and attendant underwriting commissions and auction management fees.

81.    While at times during the Class Period UBS engaged in an "aggressive price approach," increasing rates to draw buyers, UBS generally caused interest rates to decrease once it had sold sufficient UBS Auction Rate Securities to reduce its own inventory.

82.    The interest rates on UBS Auction Rate Securities failed to compensate holders for the risk of illiquidity and in general were below the interest rates for comparable, but more liquid, securities such as variable-rate debt obligations and commercial paper.

83.    By managing the clearing rates, rather than allowing them to be set at a competitive auction by true market forces, UBS was able to and did deprive Class members of the rates of return on their investments they were entitled to receive absent such interference.

84.    UBS's conduct in rigging the clearing rates sent a false signal about the fair price of UBS Auction Rate Securities.

### iii.    The Viability of the Auction Market Depended Not Only Upon UBS's Manipulative Conduct, But Also on the Manipulative Conduct of the Other Broker-Dealers

85.    Broker-dealers, including UBS, knew that the continued viability of the auction rate securities market depended upon their own conduct as well as that of the other broker-dealers. UBS and other broker-dealers knew that if one broker-dealer permitted widespread auction failures, a "run on the bank" would ensue, with panic selling by investors, and the broker-dealer being forced to choose between attempting to sustain the auction rate securities market by buying all securities offered at auction and allowing the auctions to fail *en masse*.

86.     As a result, UBS and other broker-dealers, had a common interest in suppressing auction failures.   In furtherance of their common interests, and with a tacit or express understanding that other broker-dealers would similarly act to suppress auction failures, UBS continued to intervene to prevent auction failures even after the ultimate demise of the auction rate market was widely anticipated by decision-makers at UBS;  UBS monitored the actions of its competitors to determine if other broker-dealers appeared likely to withdraw their support for the auctions; and UBS communicated directly with competitors in an attempt to determine the time and circumstances under which UBS's competitors were likely to withdraw their support for the market.

87.     As the credit market deteriorated in the summer of 2007, UBS and several other major broker-dealers chose not to intervene to prevent failures of auctions for securities that were viewed by the credit markets as particularly undesirable.

88.     Following this initial wave of auction failures, UBS stepped up its monitoring of the actions of its competitors in supporting auctions.  Jennifer D'Ambrosio, Director of Institutional Short Term Sales for UBS Securities, compiled a report she sent to Long.  Her report showed that during the months of August and September 2007, Merrill Lynch, Deutsche Bank and Lehman Brothers had also refused to place support bids, allowing several of their auctions to fail.

89.     Following these auction failures, Christopher Long ("Long"), UBS's short term desk manager, compiled weekly or daily reports of failed auctions and circulated them to Shulman and others at UBS.  UBS continued to monitor the industry for auction failures by other broker-dealers throughout the fall of 2007 and into early 2008.  Thereafter, UBS and other broker-dealers continued to support the market until they collectively withdrew in February 2008.

**D.**   <u>As Credit Markets Deteriorated In The Summer Of 2007, UBS's Scheme Began To Unravel</u>

**i.**   **As UBS's Inventory Of Auction Rate Securities Increased, UBS Pressured Its Financial Advisors To Sell The Securities To Unsuspecting Class Members**

90.     When UBS intervened to support an otherwise failing auction, it increased the amount of UBS Auction Rate Securities in its proprietary account, pressing the limits of its risk

15

management ceiling. UBS's risk management policies allowed UBS to hold no more than a specified amount of UBS Auction Rate Securities at any given time.

91.     When UBS's inventory exceeded the risk management ceiling, the Short Term Desk sought extensions of the ceiling from the Risk Management Division. The ensuing internal communications and actions at UBS belied the company's public representations of UBS Auction Rate Securities as highly liquid, cash-equivalent investments.

92.     In general, the Risk Management Division granted the Short Term Desk's requests for extensions of the ceiling for UBS Action Rate Securities inventory, while, in the words of Risk Management employee Nerissa Alexis, directing the Short Term Desk to "price aggressively to work off inventory." As she explained in an August 15, 2007 email, "There is little tolerance for increased inventory firm wide; please continue to price aggressively to keep inventory down."

93.     By November 2007, the expanding inventory of UBS Auction Rate Securities had become a significant concern at UBS. Joel Aresco ("Aresco"), Chief Risk Officer, Americas for UBS Investment Bank, made several demands for the Short Term Desk to reduce UBS's exposure to those securities.

94.     The Short Term Desk responded by pushing for further sales of UBS Auction Rate Securities on retail, corporate cash management, and other clients, and by further manipulating the clearing rate to entice buyers.

95.     In a November 15, 2007 email, Long explained that UBS was "aggressively widening spreads across all silos in efforts to attract cross over and non-traditional buyers. . . . We will continue to price securities to attempt to attract those investors mentioned above."

96.     Similarly, in response to a November 27, 2007 email from Aresco demanding "progress on reducing overall exposure," defendant Shulman wrote, "we continue to cheapen up our levels to clear this paper."

97.    By December 2007, UBS's exposure to UBS Auction Rate Securities had caught the attention of defendant Scoby, UBS AG's Chief Risk Officer. In a December 11, 2007 email to Shulman, Scoby wrote:

> I am very nervous about getting long a bunch of paper.  As I understand it, we are now slightly over limit in ARC's.  [¶] I also know that there is a risk that wm [Wealth Management] bb clientele pressure us to support auctions. [¶] We can't afford to have another blow up at the IB [Investment Bank] and if this means that you need to burn $50 million to reduce your inventory now, go ahead. [¶] I know there are year end pressures, but do u [sic] must keep a lid on inventory. You must get below your limit also.

Shulman responded: "I am pushing every angle here to move product."

98.    One week later, Scoby indicated that UBS would consider allowing auctions to fail, rather than continue to provide support. In a December 17, 2007 email to Shulman, Hoekstra, Aresco and others, Scoby said: "If you find yourself experiencing a horrible auction: ie youn eed [sic] to support more than 25% or more money that you have used in any other auctions, Call risk control BEFORE you support it."

99.    UBS and other brokerages that sold UBS Auction Rate Securities ("distributing firms"), sold UBS Auction Rate Securities to retail and corporate cash management clients throughout the Class Period.

100.    To reduce its increasing inventory of UBS Auction Rate Securities in 2007 and 2008, UBS placed additional pressure on its financial advisors in UBS Financial Services' Wealth Management franchise to sell these securities.

101.    For instance, on August 22, 2007, UBS held a conference call with several hundred financial advisors in order to, in Shulman's words, "mobilize the troops internally to focus on value so that we can move more product through the system…this is our best and most effective way of hedging our exposure..and to demonstrate the relative value in the muni product area."

102.    Long explained that the conference call was meant to "re-educat[e] the field as to the structure and credit quality" of UBS Auction Rate Securities. "Our hope is that this gains some traction with the sales force and alleviates capital usage concerns over the coming days."

103.    On August 23, 2007, the day after the conference call, the par value of UBS's sales of UBS Auction Rate Securities to its retail clients more than doubled from the previous day.

104.    UBS management held at least 11 similar conference calls with UBS's financial advisors between September 2007 and UBS's withdrawal of "support" for the auction market in mid-February 2008.  A primary purpose of these conference calls was to encourage financial advisors to sell UBS Auction Rate Securities at none of these conference calls did UBS disclose the risks associated with UBS Auction Rate Securities that it knew to exist.

105.    In an August 30, 2007 email to Michael Weisberg, Global Head of Products & Services and Head of Products & Services North America, Shulman acknowledged that UBS was pressuring its financial advisors to sell UBS Auction Rate Securities:

> We are working pretty closely with [James] Hausmann [Head of Transaction Products US for UBS Financial Services] and the marketing forces to demonstrate municipal bond relative value to the FA national salesforce.  As your division is critically important to us from a distribution perspective for specifically APS and ARCS product, it is important that the lines of communication stay wide open …As you can imagine during these stressful times, the pressure is on to move our inventory.

106.    In an email dated September 10, 2007, Shulman directed members of the UBS's Municipal Securities Group to "broaden our distribution base" for UBS Auction Rate Securities:

> The extreme pricing in this market clearly creates opportunities for us to distinguish ourselves with our clients…and show them value …Please work with the desk and prepare a quick summary sheet as well as an EASY access to our inventory so that our salesforce can access this product easily …It is critical that we reach out on a wholesale basis away from our traditional buying base to recognize this value and similarly understand the credit dynamics…I want to broaden our distribution base and need us to better market this product and educate our groups.

107.    Two days later, Shulman again acknowledged to fellow management personnel that he was "under a lot of pressure to move paper."  In contrast, UBS's financial advisors were kept in the dark about UBS's increasing inventory of these securities and UBS's manipulation of the auction process.

108.    In September 2007, the Municipal Securities Group prepared a sales memo and a presentation on SLARS for internal use at UBS, both of which described the interest rates for those products as being set "via competitive auction."

109.    The sales memo and presentation were designed as tools for UBS's financial advisors to use in selling SLARS.  These documents failed to explain that UBS managed the interest rates by routinely intervening in the auctions, and failed to disclose the risks of associated with UBS Auction Rate Securities that UBS knew to exist.

110.    UBS's aggressive campaign to sell UBS Auction Rate Securities continued throughout the fall of 2007 and into early 2008.  For example, in an email dated December 11, 2007, Shulman wrote to members of the Municipal Securities Group that, "we need to move this paper [Municipal ARCs and SLARS] and have to explore all angles possible…we need to do this a s [sic] quickly as possible ..please work on this priority."  In response, the Institutional Sales Manager for the Municipal Securities Group sent an email request "looking for any clients" to purchase Municipal ARCs and SLARS.

##### ii.    UBS Contemplated A Complete Withdrawal From The Auction Rate Securities Market Beginning In Fall 2007

111.    Even as it was aggressively marketing UBS Auction Rate Securities from its own inventory to retail investors, UBS was beginning to plan its exit from the auction rate securities market as early as September 2007.

112.    For example, in an email dated September 6, 2007, Shulman wrote that exiting the auction market was one way that the Municipal Securities Group planned to contribute to UBS's liquidity creation and balance sheet reduction.  Among other things, Shulman stated, "[I] don't want to service this product either –quite frankly and am happy to responsibly dispose of it---we are trying for sure."

113.    By October 2007, Shulman had escalated UBS's auction rate securities problem to Robert Wolf ("Wolf"), the Chairman of UBS Group Americas, Chief Executive Officer of UBS

Group Americas, President and Chief Operating Officer of Investment Bank, and a member of the GEB.

114.    In an October 31, 2007 email titled, "holding the bag," Shulman told Wolf that retail Wealth Management "now is demanding liquidity –putting more pressure on balance sheet etc...this is the gift that keeps on giving." Shulman continued, *"this is a huge albatross."* (Emphasis added.)

115.    Between October 2007 and December 2007, UBS recognized that some auditing firms were directing more of their large corporate clients to reclassify their auction rate securities holdings as investments, rather than cash or cash equivalents.  As a result of the required reclassifications, many large corporations sold their auction rate securities.

116.    UBS often purchased these securities when it placed support bids to keep the auctions from failing, but when it encountered difficulty re-selling those securities to other institutional investors, it caused its sales force of financial advisors to target Class members.

117.    UBS knew what would happen if an auction were to fail on an issue where the maximum interest rate was below the prevailing market rate for similar securities.  As Edward Hynes, the Institutional Sales Manager for UBS's Municipal Securities Group, explained in an email dated December 7, 2007:  "[W]e do not have a rip cord to collapse these issues.  If the auction fails and the max rate is instituted, there is no more movement on the auction date unless better than max rate occurs.  We won't be hit with more paper, and there will be no liquidity.  I imagine clients will look for liquidity in the secondary market and can imagine a secondary market trading at a discount."

118.    UBS acknowledged that these problems could be avoided only if the "Entire book" is "restructured out of Auctions."  According to Ross Jackman ("Jackman") of the Municipal Securities Group, "we need to be in the Bs' [billions] to be meaningful.........timeframe prior to hitting max rates."

119.    In December 2007, UBS formed a working group to address the general market conditions for auction rate securities and UBS's continued role in the auctions.  The working group held at least five meetings between December 2007 and February 2008.

120.    During those meetings, the working group focused on the increase in UBS's inventory of auction rate securities and UBS's plans to exit the auction market.  For example, documents prepared for a December 21, 2007 meeting of the working group referred to one of the benefits of failed auctions as "Limit[ing] inventory and balance sheet usage."

121.    By December 15, 2007, Shulman sought guidance from Scoby and other members of the GEB about UBS's "overall position and philosophy as it relates to continuing to support these auctions....What is clear is that the fundamental mechanism of the ARCS structure is not working in a liquidity squeezed environment-where the only real outlet for distribution is WM and corp cash management."  Shulman continued:

> Last point .// these ARCS instruments —obviously not ideal as a structure ..but I believe have been sold for years as a cash alternative instrument —and retail clients have —I am confident been told that these are "demand" notes..and will be redeemed at par on demand —thereby relying always on the remarketing agent to provide this liquidity 100 cents on the dollar on auction date ...although there is no formal liquidity provision in place and always relies on the dutch auction mechanism to clear....the moral obligation runs very deep.

122.    At a meeting on December 19, 2007, the GEB discussed UBS's exposure to auction rate securities.  Following the meeting, Scoby instructed members of the Securities' Municipal Securities Group and Risk Management team to prepare a memorandum to "inform the GEB thoroughly" about the size of UBS's auction rate securities program; the percentage of securities sold to retail clients, corporate cash management clients, and other clients; the extent of UBS's current inventory of auction rate securities; what occurs when an auction fails; UBS's history of failing to support auctions; UBS's ability to re-purchase securities held by its clients; plans to reduce UBS's exposure to auction rate securities; and an estimate of the potential losses if the auctions were to fail, among other things.

123.    The draft response to the GEB dated December 19, 2007, stated:

In the event of a failed auction, the securities in question would be rendered illiquid. The liquidity for these securities is contingent solely on the basis of successful auctions taking place. Investors (who have predominantly been "retail" and "cash management accounts") would be forced to hold the securities, at the fail rate pursuant to the documents, until the next scheduled auction. ... While in failed mode we would have difficulty establishing fair market prices, due to the lack of outside pricing services as well as the lack of inter broker marketplace.

*       *       *

Mark to market losses would be significant to all parties involved.

124.    Scoby demanded an additional report to the GEB on January 9, 2008.

125.    By January 2008, UBS Securities was no longer authorized to underwrite new issuances of auction rate securities, because those securities, once brought to market, would likely remain on UBS's books.

126.    This directive not to underwrite new UBS Auction Rate Securities placed UBS Securities in a bind. As Jeffrey Scruggs, a member of the Municipal Securities Group, explained in an email dated January 8, 2008, "If I actually tell bankers we are not permitted to do an ARC deal ... it will be another indication (perhaps preliminarily) that we are killing this thing."

### iii.    To Perpetuate Its Fraudulent Scheme, UBS Persuaded Issuers to Waive The Caps On Interest Rates Paid On UBS Auction Rate Securities

127.    Many UBS Auction Rate Securities contained caps on the interest rates that issuers paid to investors. When UBS increased its inventory of UBS Auction Rate Securities in the fall of 2007, it also increased the clearing rates for those securities—to the point of approaching the rate caps—in order to sell those securities to investors. Unbeknownst to investors, if the rate caps were triggered, the interest rates would be reset automatically to levels well below market rates for comparable securities.

128.    UBS avoided reaching the interest rate caps in the fall of 2007 by seeking and obtaining waivers of those rate caps from issuers and credit rating agencies. As the rate cap waivers neared their expiration dates in early 2008, however, UBS became increasingly concerned that it would be forced to purchase all of the outstanding UBS Auction Rate Securities at below market interest rates, if it continued to support the auctions.

129.    In an email dated February 6, 2008, Jackman described UBS's predicament: "D Day will come soon on the max rate issue on the ARCs we need solutions or we are going to be left buried with below market securities and no options."

130.    According to an analysis by Shulman from February 10, 2008, purchasing all outstanding UBS Auction Rate Securities with interest rate caps would cost UBS 300 basis points or approximately $500 million. To avoid owning these securities at below market rates, UBS withdrew its support for the auction market three days later.

### iv.    UBS Withdraws Its Support For The Auction Rate Securities Market

131.    While UBS and other broker-dealers allowed some auctions to fail between August 2007 and early February 2008, these securities represented a small fraction of the entire auction rate securities market, and the failures were not widely known to the market or investors in auction rate securities.

132.    During that time, UBS engaged in an aggressive campaign to increase sales of its own inventory of UBS Auction Rate Securities to Class members by describing the securities as safe, highly liquid, cash equivalent investments, without disclosing the risks associated with those securities, the fact that it had allowed several auctions to fail, and the likelihood that it would abandon the auction market leaving investors with illiquid securities.

133.    UBS continued to encourage its financial advisors and distributing firms to sell UBS Auction Rate Securities through the first half of February 2008.

134.    As Scoby explained to Shulman in an email dated February 12, 2008, "we need to be the bushes harder than ever to unload this paper."

135.    Despite failures of auctions conducted by Lehman Brothers, Piper Jaffray, Stifel Nicolaus and Goldman Sachs during the last week of January 2008 and the first week of February 2008, UBS told its financial advisors that UBS had no intention of allowing its auctions to fail.

136.    For instance on February 8, 2008, UBS management held a conference call with its financial advisors in which Long, Hausmann and others assured the financial advisors that UBS

23

stood behind the auctions. For example, Long dismissed the failed auctions conducted by other broker-dealers as not relevant to UBS:

> I am of the firm belief that we will make decisions or this organization will make decisions based on what they feel is best, not what other broker-dealers, not what other financial institutions are doing. So the currents of failed auctions out of Piper Jaffray or Goldman Sachs or Lehman Brothers in no way, shape or form, you know, play into a decision that UBS doing all their—having performed their due diligence will make a decision based on the best outcome for their clients and their shareholders.

137.    Also on February 8, 2008, UBS circulated a document entitled, "Fixed-Income Alert: Update on the auction-rate securities market," to its financial advisors, which sought to assuage fears of failing auctions: "The public auction market continues to clear hundreds of auctions daily, with lead broker-dealers frequently bidding to clear auctions where needed. While broker-dealers are not obligated to bid in auctions, we do not have reason to change our current practice when UBS is lead underwriter."

138.    Just one day earlier, however, Shulman summed up his views about the continued viability of the auctions rate securities market as, "Clock ticking-not sustainable."

139.    On February 12, 2008, the GEB held an "Extraordinary Audio Conference" on the auction rate securities market. During that conference, the GEB generally favored withdrawing support for the SLARS auctions and allowing them to fail. The GEB directed Scoby to follow the auction rate securities markets and to decide on the following day whether UBS would withdraw support for the auctions.

140.    On February 13, 2008, UBS refused to place support bids in its auctions, allowing the vast majority of its auctions to fail.

141.    On or around February 13, 2008, all major broker-dealers of auction rate securities refused to continue to support the auctions. As a result, 87% of all auctions of auction rate securities failed.

142.    UBS did not notify Class members or publicly announce that it would allow the auctions to fail before February 13, 2008.

143.   That same day, UBS notified its 8,200 financial advisors that it was no longer supporting the market for UBS Auction Rate Securities.  This information was not released to UBS investors or to the public, but was leaked to the press and publicly reported the next day.

144.   In a conference call with UBS's financial advisors on February 13, 2008, Marten Hoekstra, UBS's Deputy CEO Global Wealth Management and Head of Wealth Management US, blamed UBS's decision to allow the auctions to fail on conduct by the other broker-dealers as well as the interest rate caps on UBS Auction Rate Securities:

> UBS has made a choice in recent weeks to bid in auctions in spite of the fact that we are not obligated to do so.  We have made a choice in recent days to bid in spite of the fact that our competitors don't.  Given the overall situation with regard to credit and the UBS fund sheet, we're making the decision today to not be the only important dealer bidding in the market.
>
> *     *     *
>
> [T]he simple fact is that the primary problem with these securities is that they have maximum rate caps and that in the current rate environment some of them either have or will reset unattractive rates and many people don't want to own them at those rates.  That's what's really going on.

145.   As a result of the withdrawal of support by UBS and all other major broker-dealers, the market for auction rate securities collapsed, rendering more than $300 billion of securities illiquid.

146.   UBS expected benefits from the collapse of the auction rate securities market by:  (1) refinancing certain UBS Auction Rate Securities that had high penalty rates and reaping substantial underwriting fees from the issuers of those securities; (2) offering to make margin loans to its investor clients using their UBS Auction Rate Securities as collateral—in effect, loaning Class members back their own cash at a profit; and (3) selectively clearing auctions to benefit particular UBS Financial Services' Wealth Management clients.

147.   As Shulman explained in an email dated February 14, 2008, the collapse of the auction market created an "unprecedented [sic] opportunity to restructure a 300bn overall failed

auction market." Shulman also wrote: "This is a bankers['] dream market – as well as a traders…"

### v. Regulators Settle Claims Against UBS For Fraud In The Auction Rate Securities Market

148.    UBS has been at the center of investigations and civil litigation by state and federal securities regulators and law enforcement officials since the collapse of the auction rate securities market. On August 8, 2008, UBS announced that it had agreed to a settlement-in-principle with federal and state regulators that involves restoring liquidity to its clients' auction rate securities holdings.

149.    The proposed regulatory settlement, while beneficial, provides only partial relief to Class members. Among other things, the settlement does not : (a) include Class members who purchased UBS Auction Rate Securities from distributing firms, rather than from UBS directly, and whose securities remain illiquid; (b) include Subclass members who transferred their UBS Auction Rate Securities to another brokerage and whose securities remain illiquid; (c) compensate Class members for damages caused by UBS's manipulation of interest and dividend rates for UBS Auction Rate Securities; and (d) account for damages caused to Class members who have held UBS Auction Rate Securities at interest rates well below market value, often at or near zero, following the collapse of the market.

### E.    During The Class Period, UBS Omitted Material Facts About Its Role In The Auction Market And Materially Misrepresented The Liquidity Of And Risks Associated With Auction Rate Securities

150.    In order to perpetuate the auction rate securities market and sustain its business underwriting auction rate securities and managing auctions, UBS represented to investors in its written materials and uniform sales presentations that UBS Auction Rate Securities were the same as cash and were highly liquid, safe investments for short-term investing.

151.    Pursuant to uniform sales materials and top-down management directives, UBS's financial advisors throughout the United States represented to current and potential UBS clients that UBS Auction Rate Securities were equivalent to cash or money market funds and were safe,

highly liquid short-term investment vehicles suitable for any investor with at least $25,000 of available cash and as little as one week in which to invest.

### i.    Omissions and Misrepresentations in UBS's Marketing Materials

152.    During the Class Period, UBS Financial Services posted the following information about auction rate securities on its website under the title, "Cash & Cash Alternatives Addressing Your Short-Term Needs":

> As you develop a portfolio strategy to work toward your long-term goals, the need to fund short-term financial goals may arise. For this reason, you should consider maintaining a portion of your portfolio in liquid assets.    Liquidity refers to the ability to quickly convert investments into cash when you need it.  Investing in cash alternatives can add this flexibility to your overall portfolio strategy.    Cash alternatives are highly liquid, short-term investments.  They include:
>
> - Agency Discount Notes (GSEs)
> - Auction Preferred Stock (APS)
> - Auction Rate Certificates (ARCs)
> - Certificates of Deposit (CDs)
> - Commercial Paper
> - U.S. Treasury Bills (T-Bills)
> - Variable-Rate Demand Obligations (VRDOs)

153.    In August 2007, UBS Financial Services sent a quarterly "statement stuffer" entitled "Investment Intelligence" to all of its retail clients and employees.  An article in "Investment Intelligence" entitled "Planning Your Retirement Cash Flow Strategy" described ways to develop a "well-designed cash management strategy for your retirement cash flow."  The article urged UBS clients to "Reposition short-term investments to earn more":

> Where are you keeping your liquid funds now?  Liquidity refers to the ability to quickly convert investments into cash when you need it. You can choose from a wide selection of cash alternatives including:
>
> — Agency Discount Notes (GSEs)
> — Auction Preferred Stock (APS)
> — Auction Rate Certificates (ARCs)
> — Certificates of Deposit (CDs)
> — Commercial Paper
> — U.S. Treasury Bills
> — Variable Rate Demand Obligations (VRDOs)

ii.   **Omissions and Misrepresentations by UBS's Financial Advisors and Other Sellers of UBS Auction Rate Securities**

154.   UBS developed and engaged in a comprehensive fraudulent scheme to sell UBS Auction Rate Securities to Class members that included making omissions and false and misleading statements of material fact.

155.   Implementation of a standardized sales pitch by UBS's financial advisors was facilitated, among other things, by UBS's senior management's organizing conference calls involving participation by hundreds of financial advisors at a time.

156.   UBS directed its financial advisors to contact investors and inform them that UBS Auction Rate Securities were the same as cash and were highly liquid, safe investments similar to money-market funds.

157.   As Shulman, explained in an email dated December 15, 2007, UBS sold auction rate securities "for years as a cash alternative instrument –and retail clients have –I am confident been told that these are 'demand' notes.. and will be redeemed at par on demand[.]"

158.   Pursuant to management directives, UBS's financial advisors sold UBS Auction Rate Securities without disclosing the following material facts about those securities:

  (a)   UBS Auction Rate Securities were not cash alternatives, like money market funds, but were long-term financial instruments with maturity dates of 30 years or longer, or no maturity whatsoever;

  (b)   With the exception of some Municipal ARCs with maximum rates high enough to attract liquidity or cause the issuer to refinance, UBS Auction Rate Securities lacked features designed to ensure the holder's ability to sell the security, and in the event of an auction failure, the purchaser would be required to hold the security to maturity or indefinitely;

  (c)   Many UBS Auction Rate Securities were subject to interest rate caps, which if triggered, would reset their interest rates to levels well below market rates for comparable securities, often as low as zero, and render those securities unmarketable.

  (d)   UBS Auction Rate Securities appeared readily liquid at the time of purchase and sale because UBS and other broker-dealers were artificially supporting and manipulating the auction market to maintain the appearance of liquidity and stability;

(e)    The short-term nature of UBS Auction Rate Securities and the ability of investors to liquidate their auction rate securities at par depended on the perpetuation of the artificial auction market by UBS and the other broker-dealers;

(f)    UBS and other broker-dealers involved in the managing ARS auctions had reached a tacit or express understanding that the interests of each broker-dealer would be served by intervening where possible to suppress auction failures, and pursuant to that understanding, UBS systematically intervened to prevent auction failures, thereby making UBS Auction Rate Securities appear more liquid than they in fact were, and concealing the extent to which UBS Auction Rate Securities were dependent on UBS's continued intervention to remain liquid;

(g)    The periodic auctions at which the rates of interest or dividends on UBS Auction Rate Securities were set required that investors actively bid their securities to maximize the rate of return on their investments and minimize the impact of manipulative conduct by the broker-dealers and others, and in the absence of the investor's active participation in the time consuming and highly specialized process of monitoring "price talk" and the bidding process, investors were likely to earn interest or dividends at reduced rates;

(h)    UBS generally offered auction rate securities products that it had underwritten and was trying to distribute to Class members;

(i)    SLARS and many APS underwritten and sold by UBS were subject to interest rate caps which, if reached, would render those securities unmarketable, which would in turn adversely affect the entire auction market, and leave the holders of those securities earning interest at below market rates; and

(j)    In the event of persistent auction failures, the UBS Auction Rate Securities would be only be saleable at a substantial discount from their purchase price.

159.    Pursuant to management directives, UBS's financial advisors sold UBS Auction Rate Securities without disclosing the following material facts about UBS's role in the auctions and the auction market in which those securities were traded:

(a)    The auction market operated without transparency to investors, thus enabling manipulation by UBS and other broker-dealers;

(b)    The "auctions" for auction rate securities were not true auctions, as UBS and other broker-dealers submitted "support" bids and engaged in other manipulative practices for their own accounts in auctions that would have otherwise failed during the Class Period, did so with knowledge of the other bids in the auctions, and often did so after the bidding deadline imposed on other investors;

(c)    UBS routinely intervened in auctions during the Class Period for its own benefit, to set rates and prevent all-hold auctions and failed auctions;

(d)    UBS directly or indirectly set the clearing rate in most of the auctions in which it submitted bids during the Class Period;

29

(e)     UBS managed the interest rates for UBS Auction Rate Securities to ensure that rates of interest or dividends paid were at levels sufficiently low to attract continued interest from UBS's issuer clients in further UBS Auction Rate Securities issuances, while paying sufficient interest to make UBS Auction Rate Securities saleable to retail investors;

(f)     UBS had committed to its issuer clients that it would intervene to prevent auction failures and otherwise ensure that interest rates remained at acceptable levels;

(g)     UBS prevented auction failures pursuant to an internal policy of purchasing UBS Auction Rate Securities in order to preserve liquidity and manage rates, but UBS considered itself free to vary or abandon its support for UBS Auction Rate Securities at any time;

(h)     By manipulating the auctions for UBS Auction Rate Securities, UBS prevented Class members from learning the true risk, value and liquidity features of UBS Auction Rate Securities;

(i)     UBS manipulated the auctions by obtaining waivers of the interest rate caps on UBS Auction Rate Securities, thereby preventing investors from understanding the true nature of liquidity and interest rate risks associated with those securities;

(j)     UBS intended to continue to market UBS Auction Rate Securities as cash equivalent and highly liquid, safe investments similar to money market funds, even if it determined that it and other broker-dealers were likely to stop supporting and manipulating the auctions at any time; and

(k)     Purchasers of UBS Auction Rate Securities were expected to monitor the UBS auctions at all times to protect their interests, as UBS considered itself free to "manage" auction outcomes and withdraw its support for the auctions at any time.

160.    Pursuant to management directives, UBS's financial advisors sold UBS Auction Rate Securities without disclosing the following material facts about the conflicts of interest between UBS's brokerage and its investment bank with respect to UBS Auction Rate Securities:

(a)     UBS allowed the interests of its investment banking arm (UBS Securities), which underwrote Auction Rate Securities in exchange for lucrative underwriting commissions, to prevail over the obligations of fair dealing and full disclosure of its brokerage arm (UBS Financial Services);

(b)     UBS managed interest rates to ensure that the rates paid on UBS Auction Rate Securities were high enough to attract buyers, but low enough not to upset the issuer clients for whom UBS had underwritten the auction rate securities offerings and to whom UBS had made express and implied commitments that it would manage rates within acceptable levels and prevent auction failures;

(c)     UBS provided greater compensation to its financial advisors for selling products, including UBS Auction Rate Securities, that supported the growth of UBS Securities, than for selling other products;

(d)     To maintain its profitability, UBS underwrote UBS Auction Rate Securities that it knew would not clear upon issuance, creating additional pressure on UBS Financial Services to sell those securities; and

(e)     UBS viewed its involvement in the managing and underwriting Auction Rate Securities as unsustainable, and as an "albatross," as the continued viability of the market for UBS Auction Rate Securities depended on UBS committing ever greater amounts of capital to suppress auction failures.

161.    Pursuant to management directives, UBS's financial advisors sold UBS Auction Rate Securities without disclosing the following material facts about the internal pressures to decrease UBS's inventory of UBS Auction Rate Securities:

(a)     Between April 2007 and February 2008, UBS increased its inventory of UBS Auction Rate Securities in its proprietary account from less than $1 billion to more than $11 billion, and did so in order to support the auction market;

(b)     Several times in 2007 and early 2008, UBS's Short Term Desk, which managed the auctions for UBS, exceeded the amount of capital it had been authorized to support the auction market, and made repeated requests to increase the amount of capital it needed to continue to support the auction market;

(c)     UBS repeatedly pressured its financial advisors to make "every effort" to sell UBS Auction Rate Securities in order to reduce the securities in its proprietary account;

(d)     Beginning in August 2007, UBS allowed certain auctions to fail in order to avoid having to purchase additional UBS Auction Rate Securities; and

(e)     No later than September 2007, UBS was actively considering withdrawing its support for the auction market in order to avoid having to purchase additional UBS Auction Rate Securities.

162.    UBS's financial advisors failed to disclose the information in paragraphs 158-161 above to investors, because they had not been provided with that information by UBS during the Class Period.

163.    During the Class Period, UBS failed to provide mandatory instruction or compliance training about UBS Auction Rate Securities to its financial advisors.

164.    As a result, UBS's financial advisors lacked even a rudimentary understanding about UBS Auction Rate Securities and how the auction rate securities market functioned during the Class Period.

165.    UBS's practice was not to deliver a prospectus to Class members who purchased UBS Auction Rate Securities at periodic auctions, as it treated such purchases as "secondary market sales" exempt from the prospectus delivery requirement.

### iii.    Misrepresentations and Omissions in UBS's Client Account Statements and Other Account Documentation

166.    Since at least March 2005, the "Big-4" accounting firms, the Financial Accounting Standards Board ("FASB") and the SEC have adopted the position that auction rate securities do not qualify as "cash equivalents." According to the SEC, "because the auction rate securities have long-term maturity dates and there is no guarantee the holder will be able to liquidate its holdings, these securities do not meet the definition of cash equivalents in paragraphs 8 and 9 of FASB Statement No. 95, *Statement of Cash Flows*."

167.    Despite these pronouncements, account statements and other documentation that UBS provided to its clients served to reinforce UBS's effort to market UBS Auction Rate Securities as readily liquid alternatives to money market funds.

168.    During the Class Period, UBS classified UBS Auction Rate Securities as "Cash alternatives" or "Money market instruments" on its clients' account statements.

169.    In account statements for February 2008, the first month after UBS withdrew its "support" for the auction market, UBS revised its classification of UBS Auction Rate Securities holdings, so that these securities appeared under the heading, "Cash alternatives/Other" on its clients' account statements.

170.    After February 2008, however, UBS listed UBS Auction Rate Securities under the heading, "fixed income/ARS" on its clients' account statements.

171.    During the Class Period, UBS further reinforced the perceptions that UBS Auction Rate Securities were equivalent to cash or money market funds, by issuing checkbooks to some of its clients with the checks to be drawn against their holdings of UBS Auction Rate Securities.

iv.    **Lead Plaintiffs' Experiences**

(a) **David and Shelly Chandler**

172.    As identified on Attachment A, in August and September 2007, Lead Plaintiffs David and Shelly Chandler purchased UBS Auction Rate Securities directly from UBS.

173.    In August 2007, the Chandlers met with two representatives from UBS Financial Services, Richard Hall and Michael Sousa, at which time Mr. Hall encouraged the Chandlers to invest in UBS Auction Rate Securities.

174.    Mr. Hall told the Chandlers that UBS Auction Rate Securities would pay a better interest rate than a money market fund, and that their investments would be safe, liquid and available as cash within seven days at most.

175.    The Chandlers were unfamiliar with UBS Auction Rate Securities and had not considered investing in those securities before meeting with Messers. Hall and Sousa.

176.    Neither Mr. Hall nor any other UBS employee provided the Chandlers with a prospectus for the UBS Auction Rate Securities, a written description of UBS's auction rate securities practices and procedures, or any written materials concerning UBS Auction Rate Securities before, after or at the time of sale.

177.    Neither Mr. Hall nor any other UBS employee explained to the Chandlers how UBS Auction Rate Securities were traded or priced, that they could seek to influence interest rates by bidding in the auctions, or the extent to which UBS supported the auction market.

178.    Neither Mr. Hall nor any other UBS employee informed the Chandlers of the information in paragraphs 158-161 before they purchased UBS Auction Rate Securities.

179.    Had the Chandlers known about the information in paragraphs 158-161, they would not have purchased UBS Auction Rate Securities or would not have done so at the prices they paid.

### (b) Robert Bee

180.    As identified on Attachment A, Lead Plaintiff Robert Bee purchased Auction Rate Securities directly from UBS between June 2006 and September 2007.

181.    In August 2005, Mr. Bee began working with Brian N. Lawrence, a financial advisor from UBS's New Orleans, Louisiana office.  Previously Mr. Bee had worked with the UBS office in Lafayette, Louisiana.

182.    Mr. Lawrence began encouraging Mr. Bee to purchase UBS Auction Rate Securities in August 2005, after Mr. Bee sold his company and placed the cash proceeds into his UBS accounts.

183.    Mr. Bee was unfamiliar with UBS Auction Rate Securities and had not considered investing in those securities before first hearing about them from Mr. Lawrence in August 2005.

184.    Mr. Lawrence contacted Mr. Bee via telephone about UBS Auction Rate Securities and other alternative instruments several times a month between August 2005 and June 2006, the date of Mr. Bee's first purchase of UBS Auction Rate Securities.  During these conversations, Mr. Lawrence consistently told Mr. Bee that UBS Auction Rate Securities were similar to money market funds, but provided liquidity on a weekly basis and carried a higher rate of return.  Mr. Lawrence also emphasized that UBS Auction Rate Securities were AAA-rated and therefore were safe, low-risk investments.

185.    Mr. Lawrence told Mr. Bee that the interest rates on the UBS Auction Rate Securities were set at weekly auctions, and that the primary factor in the interest rate calculation was credit availability.  Because of the lack of available credit in the markets at the time, Mr. Lawrence told Mr. Bee that the interest rates on the UBS Auction Rate Securities would continue to rise.

186.    As interest rates for other instruments decreased, Mr. Bee authorized Mr. Lawrence to purchase UBS Auction Rate Securities beginning in June 2006.

187.    Neither Mr. Lawrence nor any other UBS employee provided Mr. Bee with a prospectus for the UBS Auction Rate Securities, a written description of UBS's auction rate

securities practices and procedures, or any written materials concerning UBS Auction Rate Securities before, after or at the time of sale.

188.    Neither Mr. Lawrence nor any other UBS employee explained to Mr. Bee how UBS Auction Rate Securities were traded or priced, that he could seek to influence interest rates by bidding in the auctions, or the extent to which UBS supported the auction market.

189.    Neither Mr. Lawrence nor any other UBS employee informed Mr. Bee of the information in paragraphs 158-161 before he purchased UBS Auction Rate Securities.

190.    Had Mr. Bee known about the information in paragraphs 158-161, he would not have purchased UBS Auction Rate Securities or would not have done so at the prices he paid.

### (c) Edward Taras

191.    As identified on Attachment A, Lead Plaintiff Edward Taras purchased UBS Auction Rate Securities directly from UBS in September 2004, November 2006, April 2007 and November 2007.

192.    Prior to Dr. Taras' purchase of UBS Auction Rate Securities, David Trogan, a representative of UBS, informed Dr. Taras that he was purchasing the Auction Rate Securities on Dr. Taras' behalf.

193.    Mr. Trogan told Dr. Taras that UBS Auction Rate Securities would pay a better interest rate than a money market fund, and that his investments would be safe, liquid and readily available as cash.

194.    Dr. Taras was unfamiliar with Auction Rate Securities and had not considered investing in those securities before discussing them with Mr. Trogan.

195.    Neither Mr. Trogan nor any other UBS employee provided Dr. Taras with a prospectus for the UBS Auction Rate Securities, a written description of UBS's auction rate securities practices and procedures, or any written materials concerning Auction Rate Securities before, after or at the time of sale.

196.    Neither Mr. Trogan nor any other UBS employee explained to Dr. Taras how UBS Auction Rate Securities were traded or priced, that he could seek to influence interest rates by

bidding in the auctions, or the extent to which UBS or others artificially and improperly supported the auction market.

197.   Neither Mr. Trogan nor any other UBS employee informed Dr. Taras of the information in paragraphs 158-161 before UBS purchased Auction Rate Securities for his account.

198.   Had Dr. Taras known about the information in paragraphs 158-161, he would not have permitted UBS to purchase Auction Rate Securities for his account nor would such securities been purchased at the prices paid for them.

### (d) Larry S. Watanabe

199.   Lead Plaintiff Larry S. Watanabe serves as trustee of the Watanabe Family Trust, dated 5/8/03, and brings his claims in that capacity.

200.   As identified on Attachment A, the Watanabe Family Trust purchased UBS Auction Rate Securities directly from UBS beginning in May 2006 and continuing through January 2008.

201.   Mr. Watanabe's long-time primary contact with UBS has been Marc Rosenbach, a Senior Vice President of Investments and Senior Portfolio Manager.

202.   In April or early May 2006, shortly before the Watanabe Family Trust's first purchases of UBS Auction Rate Securities, Mr. Rosenbach called Mr. Watanabe by telephone and encouraged him to purchase UBS Auction Rate Securities rather than maintain the Watanabe Family Trust funds in money market accounts.

203.   Mr. Watanabe told Mr. Rosenbach that, given the nature of the fund involved, the trust assets needed to be placed into safe, low-risk investments.

204.   Mr. Rosenbach told Mr. Watanabe that the UBS Auction Rate Securities were safe investments, would be available as cash within a few business days, and would pay a better interest rate than the money market accounts.

205.   Mr. Watanabe was unfamiliar with UBS Auction Rate Securities and had not considered investing in those securities before speaking with Mr. Rosenbach.

206. Mr. Watanabe authorized Mr. Rosenbach to make additional purchases of UBS auction rate securities for the Watanabe Family Trust in February, June and July 2007. These purchases were preceded by telephone conversations between Mr. Rosenbach and Mr. Watanabe, during which Mr. Rosenbach continued to recommend the purchase of UBS Auction Rate Securities and continued to assure Mr. Watanabe that UBS Auction Rate Securities were safe, liquid and would pay a better interest rate than money market accounts.

207. Mr. Rosenbach continued to encourage Mr. Watanabe to purchase UBS Auction Rate Securities for the Watanabe Family Trust into late January 2008, just weeks before the auctions failed.

208. Neither Mr. Rosenbach nor any other UBS employee provided Mr. Watanabe with a prospectus for the UBS Auction Rate Securities, a written description of UBS's auction rate securities practices and procedures, or any written materials concerning UBS Auction Rate Securities before, after or at the time of any of the sales of UBS Auction Rate Securities.

209. Neither Mr. Rosenbach nor any other UBS employee explained to Mr. Watanabe how UBS Auction Rate Securities were traded or priced, that the Watanabe Family Trust could seek to influence interest rates by bidding in the auctions, or the extent to which UBS supported the auction market.

210. Neither Mr. Rosenbach nor any other UBS employee informed Mr. Watanabe of the information in paragraphs 158-161 before the Watanabe Family Trust purchased UBS Auction Rate Securities.

211. Had Mr. Watanabe known about the information in paragraphs 158-161, the Watanabe Family Trust would not have purchased UBS Auction Rate Securities or would not have done so at the prices paid.

### (e) David Ghiz

212. Lead Plaintiff David Ghiz serves as trustee of the Sally Lou Ghiz Trust and the George J. Ghiz Trust (collectively, the "Ghiz Trusts"), and brings his claims in that capacity.

213.    As identified on Attachment A, the Sally Lou Ghiz Trust purchased UBS Auction Rate Securities directly from UBS in May 2005 and June 2006.  Sally Lou Ghiz, David Ghiz's mother, made these purchases in her capacity as the previous trustee of the Sally Lou Ghiz Trust.

214.    As identified on Attachment A, the Ghiz Trusts also purchased UBS Auction Rate Securities from UBS in January and February 2008.  Mr. Ghiz made these purchases in his capacity as trustee of the Ghiz Trusts.

215.    Since the mid-1990s, the Ghiz family's primary contact with UBS has been Tyson Tibshraeny, a Vice President of Investments and Financial Advisor.

216.    In late January 2008, Mr. Tibshraeny called Mr. Ghiz by telephone and encouraged him to purchase UBS Auction Rate Securities with the holdings of the Ghiz Trusts.

217.    Mr. Tibshraeny told Mr. Ghiz that UBS Auction Rate Securities would pay a better interest rate than the money market funds and other holdings in which the trusts were invested, and that the investments were safe, liquid and would be available as cash within seven days at most.

218.    Mr. Ghiz planned to use the money invested in UBS Auction Rate Securities to pay inheritance taxes and inheritance distributions to his siblings.   Mr. Ghiz therefore told Mr. Tibshraeny that the trust assets needed to be placed into safe, liquid investments.

219.    Mr. Tibshraeny assured Mr. Ghiz that UBS Auction Rate Securities were low-risk investments, that no auction had failed in the 23-year history of auction rate securities, and that the investments would remain liquid.

220.    Mr. Ghiz was unfamiliar with UBS Auction Rate Securities and had not considered investing in those securities before speaking with Mr. Tibshraeny.

221.    Mr. Tibshraeny called Mr. Ghiz several times in late January and early February 2008 to confirm the purchases of UBS Auction Rate Securities.

222.    Neither Mr. Tibshraeny nor any other UBS employee provided Mr. Ghiz with a prospectus for the UBS Auction Rate Securities, a written description of UBS's auction rate

securities practices and procedures, or any written materials concerning UBS Auction Rate Securities before, after or at the time of sale.

223.    Neither Mr. Tibshraeny nor any other UBS employee explained to Mr. Ghiz how UBS Auction Rate Securities were traded or priced, that he could seek to influence interest rates by bidding in the auctions, or the extent to which UBS supported the auction market.

224.    Neither Mr. Tibshraeny nor any other UBS employee informed Mr. Ghiz of the information in paragraphs 158-161 before he purchased UBS Auction Rate Securities.

225.    As a result of the illiquidity of the auction rate securities, Mr. Ghiz is uncertain whether he will be able to timely pay inheritance tax, and when he will be able to make inheritance distributions to his siblings.

226.    Had Mr. Ghiz known about the information in paragraphs 158-161, he would not have purchased UBS Auction Rate Securities or would not have done so at the prices he paid.

### (f)  M. Richard Goldberg

227.    As identified on Attachment A, Lead Plaintiff Dr. M. Richard Goldberg purchased UBS Auction Rate Securities directly from UBS between August 2004 and August 2007.

228.    John Lewis, Dr. Goldberg's UBS financial advisor since the early 1990s, first encouraged Dr. Goldberg to invest in UBS Auction Rate Securities in the summer of 2004, when several of his bond investments matured. Mr. Lewis suggested placing the proceeds from the bonds into UBS Auction Rate Securities until other municipal bonds with favorable interest rates became available.

229.    Mr. Lewis told Dr. Goldberg that UBS Auction Rate Securities were as safe and liquid as money market funds, but carried higher interest rates, and that Dr. Goldberg would have access to the money he used to purchase UBS Auction Rate Securities within seven days at the latest.

230.    Dr. Goldberg was unfamiliar with UBS Auction Rate Securities and had not considered investing in those securities before first hearing about them from Mr. Lewis.

231. Neither Mr. Lewis nor any other UBS employee provided Dr. Goldberg with a prospectus for the UBS Auction Rate Securities, a written description of UBS's auction rate securities practices and procedures, or any written materials concerning UBS Auction Rate Securities before, after or at the time of sale.

232. Neither Mr. Lewis nor any other UBS employee explained to Dr. Goldberg how UBS Auction Rate Securities were traded or priced, that he could seek to influence interest rates by bidding in the auctions, or the extent to which UBS supported the auction market.

233. Neither Mr. Lewis nor any other UBS employee informed Dr. Goldberg of the information in paragraphs 158-161 before he purchased UBS Auction Rate Securities. Had Dr. Goldberg known about the information in paragraphs 158-161, he would not have purchased UBS Auction Rate Securities or would not have done so at the prices he paid.

## ADDITIONAL SCIENTER ALLEGATIONS

**A.    Auction Rate Securities Were Highly Profitable For UBS And The UBS Financial Advisors Who Sold Them**

234. As one of the largest underwriters and broker-dealers of auction rate securities during the Class Period, UBS earned substantial fees for its services from the issuers of those securities.

235. To compensate UBS for its underwriting services, issuers typically paid UBS one percent (1%) of the outstanding amount of securities underwritten.

236. Pursuant to agreements with the issuers, UBS generally served as a broker-dealer for the auction rate securities it had underwritten and was paid an annualized broker-dealer fee for managing auctions.

237. Issuers typically paid UBS auction management fees of 25 basis point per year on the amount of auction rate securities for which UBS acted as a broker-dealer.

238. As UBS acted as a broker-dealer for approximately $51 billion in auction rate securities, its annual auction management fees are estimated to exceed $127,000,000.

239.   Since February 2008, UBS has continued to receive auction management fees from the issuers of auction rate securities, despite the fact that UBS no longer supports the auctions and those securities are illiquid.

240.   UBS paid its financial advisors as much as 40 percent of UBS's auction management fees for the aggregate amount of UBS Auction Rate Securities they sold to investors.

241.   These payments provided a substantial incentive for UBS's financial advisors to sell UBS Auction Rate Securities.  By comparison, the financial advisors would not have earned commissions, or would have earned much smaller commissions, had they sold money market funds to their clients.

242.   As UBS Securities came under increasing pressure to reduce its inventory of auction rate securities, the GEB directed UBS Financial Services to "amend its incentive structure with a view to support the growth of business within the Investment Bank," as reflected in the minutes of an August 8, 2007 GEB meeting.  Thus, UBS further incentivized its financial advisors to sell UBS Auction Rate Securities.

243.   Pursuant to a policy directive issued by Marcel Rohner, the Group Chief Executive Officer of UBS AG and a member of the GEB, UBS continued to pay commissions on UBS Auction Rate Securities to its financial advisors, despite the fact that UBS no longer supports the auctions and those securities are illiquid.

244.   Shulman has referred to the continued compensation for UBS's financial advisors as "battle pay," in light of the fact that the financial advisors "are getting calls from clients everyday" about the lack of liquidity in their UBS Auction Rate Securities.

**B.   Insider Sales**

245.   Between November 1, 2007 and February 12, 2008, at least seven UBS executives who were members of an internal working group on UBS Auction Rate Securities, including David Aufhauser, then the General Counsel for UBS Securities Americas, sold more than $21 million of their personal holdings of UBS Auction Rate Securities.

246.   In November 2007, UBS facilitated these sales by eliminating the requirement that UBS employees, including these executives, obtain clearance from compliance before selling UBS Auction Rate Securities.

247.   These executives had knowledge of undisclosed material facts about the risks associated with auction rate securities and UBS's plans to exit the auction market at the time they sold their UBS Auction Rate Securities.

248.   Shulman was one of these executives.   Shulman liquidated his UBS Auction Rate Securities at the same time that he encouraged UBS's financial advisors to sell those securities in order to take them off of UBS's books.

249.   For example, Shulman sold $475,000 of his UBS Auction Rate Securities on August 22, 2007, the same day that UBS held a conference call with several hundred financial advisors which Shulman had organized in order to "mobilize the troops" to sell UBS Auction Rate Securities.

250.   On the same date, Shulman also made plans to sell $2,000,000 more of his UBS Auction Rate Securities and to invest the proceeds in other Securities that had a put feature to ensure their liquidity.

251.   Between November 1, 2007 and November 28, 2007, Shulman sold $2,925,000 of his UBS Auction Rate Securities.   These sales took place when Shulman knew that UBS's inventory of UBS Auction Rate Securities exceeded the risk management ceiling.

252.   A few days after the last of these sales, on December 3, 2007, Shulman sent an email to a colleague at UBS, saying that he was "comfortable" with UBS Auction Rate Securities and that "[I] myself have decent exposure to these instruments."   Shulman failed to disclose to that he had recently liquidated millions of dollars of his UBS Auction Rate Securities.

253.   On December 7, 2007, Shulman instructed his UBS financial advisor to sell all of his UBS Auction Rate Securities when those shares came up for auction.

254.   Between December 10, 2007 and December 14, 2007, Shulman sold $5,500,000 of his UBS Auction Rate Securities.

255.   Shulman had sold all of his UBS Auction Rate Securities by the time that UBS withdrew its support for the auction market on February 13, 2008.

## NO SAFE HARBOR

256.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

257.   The statements pleaded herein were not identified as "forward-looking statements" when made.

258.   To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

259.   Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by a director or an executive officer of UBS who knew that those statements were false when made.

## LOSS CAUSATION/ECONOMIC LOSS

260.   As alleged above, during the Class Period, Defendants engaged in a comprehensive scheme and course of conduct to create, prop up, perpetuate and manipulate for their own benefit an artificial market for UBS Auction Rate Securities, to inflate the perceived value of UBS Auction Rate Securities, and to generate underwriting and auction management fees to the detriment of Class members.

261.   This comprehensive scheme and course of conduct operated as a fraud or deceit on Class members by, among other things, sending a false pricing signal to the market for UBS Auction Rate Securities; creating a false impression of the supply and demand for UBS Auction Rate Securities for the purpose of overvaluing the price of, and manipulating the interest rates

for, those securities; and omitting to disclose material foreseeable risks concerning the market for UBS Auction Rate Securities and the value, safety and liquidity risks of those investments.

262.    The materialization of the risks concealed by Defendants was foreseeable to Defendants throughout the Class Period.

263.    Those risks materialized when most of the auctions failed on or about February 13, 2008, because UBS and other broker-dealers refused to continue serving as buyers of last resort.

264.    Materialization of those risks and subsequent disclosures of those risks directly and/or proximately caused the damages sustained by Lead Plaintiffs and Class members.

265.    Only through the persistent conduct of UBS and other broker-dealers in artificially supporting, maintaining and intervening in the auctions, acting as buyers of last resort, and rigging the clearing rates was the market for UBS Auction Rate Securities able to exist during the Class Period.

266.    The auction rate securities market depended on the voluntary, pervasive and ongoing participation of UBS and other broker-dealers in the auctions, their manipulation of interest and dividend rates, and their acquisition of auction rate securities in order to keep the auctions from failing.    The conduct of UBS and other broker-dealers created an illusory market that, unbeknownst to Lead Plaintiffs and Class members, had a high risk of failing and limiting the interest or dividends payable to investors at below market rates.

267.    During the Class Period, UBS senior management recognized that UBS's willingness to continue to manipulate the auction process was highly uncertain without creating excessive risk to UBS.  As a result, UBS systematically sold off its own inventory of ARS Auction Rate Securities through an aggressive marketing campaign targeted at unsuspecting Class members.

268.    Defendants failed to disclose the purpose, nature and effect of their manipulative conduct to Lead Plaintiffs and Class members and the investing public generally.

269.    It was materially deceptive for Defendants to represent to Lead Plaintiffs and the Class that UBS Auction Rate Securities were cash equivalents or highly liquid investments, and

to signal to investors that UBS Auction Rate Securities traded and were priced based on the natural interplay of supply and demand.

270.     When the auctions failed on February 13, 2008, the concealed risks that UBS Auction Rate Securities would stop trading as cash equivalents and would not trade or be priced based on the natural interplay of supply and demand materialized.

271.     Because of Defendants' failure to disclose these and other material risks, Lead Plaintiffs and Class members were damaged when UBS and other broker-dealers withdrew their support for the auction market.

272.     If not for Defendants' manipulation of the market for UBS Auction Rate Securities, and their omissions and false and misleading statements of material fact about UBS Auction Rate Securities themselves, UBS's role in the auctions and the auction market in which those securities were traded, the conflicts of interest between UBS's brokerage and its investment bank with respect to UBS Auction Rate Securities, and the internal pressures to decrease the UBS's inventory of UBS Auction Rate Securities, Lead Plaintiffs and Class members would not have purchased UBS Auction Rate Securities or would not have purchased them for the prices and/or at the interest rates at which they did.

273.     Among other things, Defendants' comprehensive, manipulative and deceptive conduct caused the interest and dividend rates on UBS Auction Rate Securities both before and after the collapse of the auction market to be considerably lower than the rates that the market would have placed on them had the investing public been aware of the true characteristics and risks of UBS Auction Rate Securities and the auction market.

274.     Accordingly, UBS's wrongdoing directly or proximately caused economic losses to Class members by limiting the interest and dividends that they would have received in the absence of Defendants' manipulation.   Class members continue to receive interest and/or dividends on their UBS Auction Rate Securities at below market rates.

275.     Given the higher interest and dividend rates both before and after the collapse of the auction market that would have resulted from full disclosure, Lead Plaintiffs and Class members

would have been able to acquire a lower face amount of UBS Auction Rate Securities while still obtaining the same dollar amount of interest or dividends they received on the UBS Auction Rate Securities actually purchased.

276.    As a result of the materialization of the concealed risks and the subsequent additional disclosures concerning those risks, the perceived values of UBS Auction Rate Securities have declined substantially.  Many categories of UBS Auction Rate Securities remain illiquid and are unable to be sold at any price.  UBS has written down the value of UBS Auction Rate Securities to reflect the fact that they were worth less than par value.  Investors who have sold their UBS Auction Rate Securities on a recently developed secondary market have done so at steep discounts to par value.  Finally, Lead Plaintiffs and Class members continue to receive interest on their UBS Auction Rate Securities at below-market rates.

## TRANSACTION CAUSATION:

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE

### A.    Reliance on Material Omissions

277.    To the extent required, a presumption of reliance is applicable here due to UBS's use of standardized sales pitches which omitted on a uniform basis the material facts described in paragraphs 158-161 regarding UBS Auction Rate Securities, UBS's role in the auctions and the auction market in which those securities were traded, the conflicts of interest between UBS's brokerage and its investment bank with respect to UBS Auction Rate Securities, and the internal pressures to decrease the UBS's inventory of UBS Auction Rate Securities.

278.    The facts described in paragraphs 158-161, which UBS failed to disclose, were material in that there is a substantial likelihood that the disclosure of these facts would have been viewed by a reasonable investor as having significantly altered the total mix of information about UBS Auction Rate Securities made available.

279.    UBS's financial advisors were required to and did use uniform, standardized and materially identical sales pitches created and/or approved by UBS senior management to market

and sell UBS Auction Rate Securities to Lead Plaintiffs and Class members. The sales pitch did not vary appreciably, if at all.

280.    In light of Defendants' knowledge that their sales force routinely represented to investors that UBS Auction Rate Securities were safe, highly liquid investments with interest rates established by periodic auctions, it was materially misleading for Defendants to fail to correct the record and state expressly that UBS Auction Rate Securities were, among other things, neither safe nor liquid investments and had interest rates managed by UBS.

281.    Lead Plaintiffs and Class members would not have invested in UBS Auction Rate Securities, or alternatively, would not have purchased those securities on the terms at which they did, had Defendants' omissions of material fact not concealed the true nature of UBS Auction Rate Securities, UBS's role in the auctions and the auction market in which those securities were traded, the conflicts of interest between UBS's brokerage and its investment bank with respect to Auction Rate Securities, and the internal pressures to decrease the UBS's inventory of UBS Auction Rate Securities.

282.    Lead Plaintiffs' and Class members' fraud-based claims stem primarily, if not exclusively, from these omissions of material fact for which reliance may be presumed.

**B.    Fraud on the Market**

283.    In the alternative, and to the extent required, a presumption of reliance is applicable here because the auction rate securities market was well-developed and efficient throughout the Class Period.

284.    The presumption of reliance, based on the fraud-on-the-market doctrine, is applicable here, because among other things:

      (a)    Defendants made false and misleading omissions and misrepresentations of fact concerning UBS Auction Rate Securities during the Class Period;

      (b)    The omissions and misrepresentations were material in that there is a substantial likelihood that the disclosure of these facts would have been viewed by a reasonable investor as having significantly altered the total mix of available information about UBS Auction Rate Securities;

(c)     The omissions and misrepresentations alleged would tend to induce a reasonable investor to misjudge, among other things, the value of the securities at issue; and

(d)     Lead Plaintiffs and Class members purchased UBS Auction Rate Securities after Defendants made these omissions and misrepresentation, and did so without knowledge of the omitted and misrepresented facts.

285.    Auction rate securities and the auction market have existed since 1984, and have developed rapidly since that time.

286.    Throughout the Class Period, the auction market digested current information regarding UBS Auction Rate Securities and reflected that information in the prices of UBS Auction Rate Securities.

287.    Material news concerning UBS Auction Rate Securities had a prompt and immediate effect on the market price of those securities, as evidenced by, among other things, the rapid decline in the market price occurring after the collapse of the auction market in February 2008.

288.    Under these circumstances, all purchasers of UBS Auction Rate Securities suffered similar injury due to the fact that those securities were overvalued throughout the Class Period.

289.    When Lead Plaintiffs and Class members purchased UBS Auction Rate Securities, they did not know about, and could not reasonably have discovered, Defendants' wrongful conduct alleged in this Complaint.

290.    Lead Plaintiffs and Class members would not have invested in UBS Auction Rate Securities, or alternatively, would not have purchased those securities on the terms at which they did, but for Defendants' misconduct.

## C.    Fraud-Created-The-Market

291.    In the alternative, and to the extent required, a presumption of reliance is applicable here because Defendants' comprehensive scheme to defraud created the market for UBS Auction Rate Securities, as alleged in this Complaint.

292.    In purchasing UBS Auction Rate Securities, Lead Plaintiffs and Class members relied on the integrity of the market, that is, on the availability of UBS Auction Rate Securities on the market as an indication that those securities were genuine and entitled to be marketed.

293.   As described in this Complaint, however, Defendants' fraudulent scheme was so pervasive that it created an illusory auction market without which UBS Auction Rate Securities would not have existed or traded.

294.   The extent to which Defendants' fraudulent scheme created and sustained the market for UBS Auction Rate Securities became apparent when Defendants refused to continue supporting the auction market. UBS's withdrawal of "support" for the auctions caused the auction market to fail and UBS Auction Rate Securities to become illiquid.

295.   During the Class Period, Defendants underwrote UBS Auction Rate Securities, knowing that those securities would not clear either upon, or shortly after, issuance without Defendants' intervention. As a result, those securities were neither legally qualified to be issued nor capable of fulfilling a public purpose.

296.   But for the fraudulent scheme by which Defendants artificially supported, maintained and intervened in the auctions throughout the Class Period, the market for UBS Auction Rate Securities would have failed, and UBS Auction Rate Securities would not have been marketable at any price.

297.   Lead Plaintiffs and Class members would not have invested in UBS Auction Rate Securities, or alternatively, would not have purchased those securities on the terms at which they did, had Defendants' comprehensive scheme to defraud not created the market for those securities.

## COUNT I

### Violation Of Section 10(b) Of The Exchange Act
### And Rule 10b-5(a) and (c) Promulgated Thereto
### Against All Defendants By Lead Plaintiffs And The Class

298.   Lead Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs above as if fully set forth herein. Lead Plaintiffs bring this cause of action on behalf of themselves and the Class against all Defendants.

299.    During the Class Period, Defendants employed manipulative or deceptive devices or contrivances, in contravention of Rule 10b-5(a) and (c) promulgated by the SEC, which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and Class members; (ii) enable Defendants to sell billions of dollars of UBS Auction Rate Securities to current and prospective UBS clients, and on which UBS made substantial underwriting and auction management fees; (iii) enable Defendants to sustain an artificial market, and conceal failures of auctions, for UBS Auction Rate Securities; (iv) enable Defendants to manipulate the interest rates for UBS Auction Rate Securities; and (v) cause Plaintiffs and Class members to purchase overvalued UBS Auction Rate Securities.

300.    Defendants, jointly and individually (and each of them), (1) employed devices, schemes, and artifices to defraud, and (2) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of UBS Auction Rate Securities, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c).

301.    All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

302.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a comprehensive scheme and continuous course of conduct to manipulate the market for UBS Auction Rate Securities and to defraud purchasers of those securities, as specified herein.

303.    Defendants employed manipulative or deceptive devices or contrivances, schemes and artifices to defraud, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to deceive Lead Plaintiffs and Class members as to the value of UBS Auction Rate Securities, by in particular, misleading Lead Plaintiffs and Class members to believe that the prices at which they purchased UBS Auction Rate Securities were determined by the natural interplay of supply and demand, and were not rigged by UBS.

304.    Defendants had actual knowledge of the devices, schemes and artifices to defraud, and acts, practices and course of business which operated as a fraud and deceit upon the

purchasers of UBS Auction Rate Securities, as set forth herein, or acted with deliberate disregard for said conduct.

305.    Defendants employed the devices, schemes and artifices to defraud, and engaged in the acts, practices and course of business, described herein, knowingly or deliberately and for the purpose and effect of (a) manipulating the market for UBS Auction Rate Securities, (b) concealing the truth about the value, liquidity and risks of UBS Auction Rate Securities from Lead Plaintiffs, Class members and the investing public, and (c) supporting the overvalued price and market for UBS Auction Rate Securities.

306.    If Defendants did not have actual knowledge of the devices, schemes and artifices to defraud, and acts, practices and course of business which operated as a fraud and deceit on the purchasers of UBS Auction Rate Securities, they were deliberate in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover the manipulative purpose, nature and effect of their conduct.

307.    As a result of Defendants' devices, schemes and artifices to defraud, and acts, practices and course of business, the market price of UBS Auction Rate Securities failed to reflect a fair or just price of those securities and was artificially inflated during the Class Period.

308.    In ignorance of the fact that the market prices of UBS Auction Rate Securities were artificially inflated, and relying directly or indirectly on an assumption of an efficient market for UBS Auction Rate Securities free of manipulation by Defendants, and/or on the integrity of the auction market in with UBS Auction Rate Securities traded, and/or on the absence of material adverse information that was known to or deliberately disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiffs and Class members overvalued UBS Auction Rate Securities during the Class Period and were damaged thereby.

309.    At the time of Defendants employed the devices, schemes and artifices to defraud, and engaged in the acts, practices and course of business, described herein, Lead Plaintiffs and Class members were ignorant of their conduct, and believed UBS Auction Rate Securities to

trade in an efficient market free of manipulation at prices and with yields set by free market influences.

310.    Had Lead Plaintiffs, Class members and the marketplace known the truth regarding the value, liquidity and risks of UBS Auction Rate Securities, including in particular, the fact that the market for UBS Auction Rate Securities was rigged by UBS and not determined by the natural interplay of supply and demand, Lead Plaintiffs and Class members would not have purchased UBS Auction Rate Securities, or, if they had acquired such securities during the Class Period, they would not have done so at the overvalued prices which they paid.

311.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5(a) and (c) promulgated thereunder.

312.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and Class members suffered damages in connection with their respective purchases of UBS Auction Rate Securities during the Class Period.

## COUNT II

### Violation Of Section 20(a) Of The Exchange Act
### Against The Control Person Defendants By Lead Plaintiffs And The Class

313.    Lead Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs above as if fully set forth herein. Lead Plaintiffs bring this cause of action on behalf of themselves and the Class against the Control Person Defendants.

314.    Each of the Control Person Defendants acted as a controlling person of UBS Securities and/or UBS Financial Services within the meaning of Section 20(a) of the Exchange Act for the reasons alleged in this Complaint.

315.    By virtue of their operational and management control of UBS Securities' and UBS Financial Services' business and systematic involvement in the fraudulent scheme alleged in this Complaint, the Control Person Defendants each had the power to influence and control and did influence and control, directly or indirectly, the decision-making and actions of UBS Securities and UBS Financial Services, including the devices, schemes and artifices to defraud, and the

acts, practices and course of business, described herein which Plaintiffs contend manipulated the market for UBS Auction Rate Securities.

316.  The Control Person Defendants had the ability to prevent the employment of the devices, schemes and artifices to defraud, and the engagement in the acts, practices and course of business, described in this Complaint.

317.  Each of the Control Person Defendants had direct and supervisory involvement in the operations of UBS Securities and UBS Financial Services, and therefore, is presumed to have had and exercised the power to control or influence the particular conduct giving rise to the securities violations alleged in this Complaint.

318.  As set forth above UBS Securities and UBS Financial Services violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder by their acts and omissions as alleged in this Complaint.

319.  By virtue of their positions as controlling persons, the Control Person Defendants are liable pursuant to Section 20(a) of the Exchange Act.

320.  As a direct and proximate result of the Control Person Defendants' wrongful conduct, Lead Plaintiffs and Class members suffered damages in connection with their purchase of UBS Auction Rate Securities during the Class Period.

## COUNT III

### Violation Of Section 10(b) Of The Exchange Act<br>And Rule 10b-5(b) Promulgated Thereto<br>Against All Defendants By Lead Plaintiffs And The Subclass

321.  Lead Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs above as if fully set forth herein. Lead Plaintiffs bring this cause of action on behalf of themselves and the Subclass against all Defendants.

322.  During the Class Period, Defendants employed manipulative or deceptive devices or contrivances, in contravention of Rule 10b-5(b) promulgated by the SEC, which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs

and Subclass members; (ii) enable Defendants to sell billions of dollars of UBS Auction Rate Securities directly to current and prospective UBS clients, and on which UBS made substantial underwriting and auction management fees; (iii) enable Defendants to sustain an artificial market, and conceal failures of auctions, for UBS Auction Rate Securities; (iv) enable Defendants to manipulate the interest rates for UBS Auction Rate Securities; and (v) cause Plaintiffs and Subclass members to purchase overvalued UBS Auction Rate Securities from UBS.

323.    Defendants, jointly and individually (and each of them), engaged in a scheme to defraud and made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b).

324.    All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

325.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a comprehensive scheme to defraud and a continuous course of conduct to conceal adverse material information about UBS Auction Rate Securities sold directly by UBS, as specified herein including in particular the information specified in paragraphs 158-161 above.

326.    The information that Defendants failed to disclose to Lead Plaintiffs and Subclass members was material in that there is a substantial likelihood that the disclosure of the omitted information would have been viewed by a reasonable investor as having significantly altered the total mix of information about UBS Auction Rate Securities made available.

327.    Defendants employed manipulative or deceptive devices or contrivances, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure Lead Plaintiffs and Subclass members that UBS Auction Rate Securities sold directly by UBS were the same as cash and were highly liquid, safe short-term investment vehicles suitable for almost all investors.

328.   Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with deliberate disregard for the truth in that they failed to ascertain and to disclose such facts.

329.   Defendants made the material misrepresentations and/or omissions described herein knowingly or deliberately and for the purpose and effect of (a) concealing the truth about the value, liquidity and risks of UBS Auction Rate Securities sold by UBS from Lead Plaintiffs, Subclass members and the investing public, and (b) supporting the overvalued price and market for UBS Auction Rate Securities.

330.   If Defendants did not have actual knowledge of the misrepresentations and omissions alleged herein, they were deliberate in failing to obtain such knowledge and refraining from taking those steps necessary to discover whether those statements were false or misleading.

331.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of UBS Auction Rate Securities sold by UBS was artificially inflated during the Class Period.

332.   In ignorance of the fact that the market prices of UBS Auction Rate Securities sold directly by UBS were artificially inflated, and relying directly or indirectly on the false and misleading statements or omissions of material fact made by Defendants, and/or on the absence of material information that was known to or deliberately disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, and/or on the integrity of the auction market in which UBS Auction Rate Securities traded, Lead Plaintiffs and Subclass members acquired overvalued UBS Auction Rate Securities sold by UBS during the Class Period and were damaged thereby.

333.   At the time of said misrepresentations and omissions, Lead Plaintiffs and Subclass members were ignorant of their falsity, and believed them to be true.

334.   Lead Plaintiffs and Subclass members acted with due diligence, did not act with recklessness, and could not have discovered the true facts that Defendants misstated and/or failed to disclose.

335.    Had Lead Plaintiffs, Subclass members and the marketplace known the truth regarding the value, liquidity and risks of UBS Auction Rate Securities sold by UBS, which were not disclosed by Defendants, Lead Plaintiffs and Subclass members would not have purchased UBS Auction Rate Securities sold directly by UBS, or, if they had acquired such securities during the Class Period, they would not have done so at the overvalued prices which they paid.

336.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5(b) promulgated thereunder.

337.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and Subclass members suffered damages in connection with their respective purchases of UBS Auction Rate Securities sold directly by UBS during the Class Period.

## COUNT IV

### Violation Of Section 20(a) Of The Exchange Act
### Against The Control Person Defendants By Lead Plaintiffs And The Subclass

338.    Lead Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs above as if fully set forth herein. Lead Plaintiffs bring this cause of action on behalf of themselves and the Subclass against the Control Person Defendants.

339.    Each of the Control Person Defendants acted as a controlling person of UBS Securities and/or UBS Financial Services within the meaning of Section 20(a) of the Exchange Act for the reasons alleged in this Complaint.

340.    By virtue of their operational and management control of UBS Securities' and UBS Financial Services' business and systematic involvement in the fraudulent scheme alleged in this Complaint, the Control Person Defendants each had the power to influence and control and did influence and control, directly or indirectly, the decision-making and actions of UBS Securities and UBS Financial Services, including the content and dissemination of the various statements and omissions of material fact which Lead Plaintiffs contend are false and misleading.

341.    The Control Person Defendants had the ability to prevent the issuance of the statements and omissions of material facts described in this Complaint.

56

342.    Each of the Control Person Defendants had direct and supervisory involvement in the operations of UBS Securities and UBS Financial Services, and therefore, is presumed to have had and exercised the power to control or influence the particular conduct giving rise to the securities violations alleged in this Complaint.

343.    As set forth above UBS Securities and UBS Financial Services violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder by their acts and omissions as alleged in this Complaint.

344.    By virtue of their positions as controlling persons, the Control Person Defendants are liable pursuant to Section 20(a) of the Exchange Act.

345.    As a direct and proximate result of the Control Person Defendants' wrongful conduct, Lead Plaintiffs and Subclass members suffered damages in connection with their purchase of UBS Auction Rate Securities sold by UBS during the Class Period.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Lead Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, certifying Lead Plaintiffs as representatives of the Class and the Subclass under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' Lead Counsel, Co-Lead Counsel and Liaison Counsel as counsel for the Class;

B.    Awarding damages, including but not limited to rescission, other compensatory damages, consequential damages, restitution and disgorgement of ill-gotten gains in favor of Lead Plaintiffs and Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder; and

E.     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a trial by jury.

Dated: September 5, 2008                    Respectfully submitted,

                                        **GIRARD GIBBS LLP**

                                        By: *Daniel C Girard*

                                        Daniel C. Girard (admitted *pro hac vice*)
                                        Jonathan K. Levine (JL-8390)
                                        Aaron M. Sheanin (admitted *pro hac vice*)
                                        Christina H. C. Sharp (admitted *pro hac vice*)
                                        601 California Street, 14th Floor
                                        San Francisco, CA 94108
                                        Telephone: (415) 981-4800
                                        Facsimile: (415) 981-4846

                                        **Plaintiffs' Lead Counsel**

                                        Norman E. Siegel
                                        Matthew L. Dameron
                                        **STUEVE SIEGEL HANSON LLP**
                                        460 Nichols Road, Suite 200
                                        Kansas City, MO, 64112
                                        Telephone: (816) 714-7100
                                        Facsimile: (816) 714-7101

                                        **Plaintiffs' Co-Lead Counsel**

                                        Christopher A. Seeger (CS-4880)
                                        Stephen A. Weiss (SW-3520)
                                        David R. Buchanan (DB-6368)
                                        **SEEGER WEISS LLP**
                                        One William Street
                                        New York, NY 10004
                                        Telephone: (212) 584-0700
                                        Facsimile: (212) 584-0799

                                        **Plaintiffs' Liaison Counsel**

58

**Additional Counsel for Plaintiffs:**

Steven E. Fineman
Jennifer Gross
LIEFF CABRASER HEIMANN & BERNSTEIN LLP
780 Third Avenue, 48th Floor
New York, NY 10017-2024
Telephone:  (212) 355-9500
Facsimile:  (212) 355-9592

Jerome M. Congress (JC-2060)
Kent A. Bronson (KB-4906)
MILBERG LLP
One Pennsylvania Plaza
New York, NY 10019
Telephone:  (212) 594-5300
Facsimile:  (212) 273-4387

Jeff Westerman (JW-6500)
MILBERG LLP
One California Plaza
300 South Grand Avenue, Suite 3900
Los Angeles, CA  90071-3172
Telephone:  (213) 617-1200
Facsimile:  (213) 617-1975

George A. Shohet (admitted *pro hac vice*)
LAW OFFICES OF GEORGE A. SHOHET
A Professional Corporation
245 Main Street, Suite 310
Venice, CA  90291
Telephone:  (310) 452-3176
Facsimile:  (310) 452-2270

Michael J. Flannery
CAREY & DANIS, L.L.C.
8235 Forsyth Boulevard, Suite 1100
St. Louis, MO 63105
Telephone:  (314) 725-7700
Facsimile:  (314) 721-0905

Joseph Peter Guglielmo
WHATLEY, DRAKE & KALLAS, LLC
1540 Broadway, 37th Floor
New York, NY 10036
Telephone:  (212)-447-7070
Facsimile:  (212)-447-7077

Joseph E. Levi
Eduard Korsinsky
LEVI & KORSINSKY, LLP
39 Broadway, Suite 1601

New York, NY 10006
Telephone: (212) 363-7500
Facsimile: (212) 363-7171

# ATTACHMENT A

## LEAD PLAINTIFFS' TRANSACTIONS IN
## UBS AUCTION RATE SECURITIES BETWEEN
## MARCH 21, 2003 AND FEBRUARY 13, 2008

### DAVID AND SHELLY CHANDLER

| TRADE DATE | AUCTION RATE SECURITY | NUMBER OF SHARES | PRICE PER SHARE/UNIT | BUY OR SELL |
|---|---|---|---|---|
| 9/13/2007 | PIMCO California Municipal Income Fund II (Tuesday) Series B Auction Preferred | 6 | $25,002.50 | Bought |
| 8/31/2007 | PIMCO California Municipal Income Fund II (Thursday) Series D Auction Preferred | . 13 | $25,000 | Bought |
| 9/11/2007 | Eaton Vance California Insured Municipal Bond Fund Series T-7 | 6 | $25,000.00 | Bought |
| 9/14/2007 | PIMCO California Municipal Income Fund III (Thursday) Series B | 9 | $25,007.602 | Bought |
| 8/31/2007 | PIMCO California Municipal Income Fund II (Thursday) Series D Auction Preferred | 10 | $25,000 | Bought |

### ROBERT BEE

| TRADE DATE | AUCTION RATE SECURITY | NUMBER OF SHARES | PRICE PER SHARE/UNIT | BUY OR SELL |
|---|---|---|---|---|
| 6/2/2006 | Calamos Strategic Total Return Fund Series F | 55 | $25,000 | Bought |
| 9/22/2006 | DNP Select Income Fund Inc. F7 | 80 | $25,000 | Bought |
| 9/13/2007 | DNP Select Income Fund Inc. TH7 | 65 | $25,000 | Bought |
| 7/13/2006 | Eaton Vance Floating Rate Income Trust TH7 Series C | 45 | $25,000 | Bought |

| 6/2/2006 | PIMCO High Income Fund Series F | 14 | $25,000 | Bought |
| 6/6/2006 | Scudder RREEF Real Estate Fund Inc. (T) Series B | 20 | $25,000 | Bought |

## EDWARD TARAS

| TRADE DATE | AUCTION RATE SECURITY | NUMBER OF SHARES | PRICE PER SHARE/UNIT | BUY OR SELL |
|---|---|---|---|---|
| 9/22/2004 | Indiana Second Market Educational Loans Series 2004 | $1,600,000 | 100% par | Bought |
| 11/6/2006 | BlackRock Preferred Income Strategies Fund Series m-7, Auction Rate Preferred | 80 shares | $25,000 per share | Bought |
| 4/26/2007 | Massachusetts Educational Financing Authority Educational Loan | $1,000,000 | 100% par | Bought |
| 11/1/2007 | College Loan Corporation Trust 1-Series 2007-2 | $1,800,000 | 100% par | Bought |

## THE WATANABE FAMILY TRUST DATED 5/8/03, LARRY S. WATANABE, TRUSTEE

| TRADE DATE | AUCTION RATE SECURITY | NUMBER OF SHARES | PRICE PER SHARE/UNIT | BUY OR SELL |
|---|---|---|---|---|
| 2/21/2007 | BlackRock Muni Holdings California Insured | 10 | $25,000 | Bought |
| 1/24/2008 | Eaton Vance California Insured Muni | 3 | $25,000 | Bought |
| 5/11/2006 | Nuveen California Select Quality Muni | 12 | $25,000 | Bought |
| 7/16/2007 | PIMCO California Muni Income Fund II | 3 | $25,000 | Bought |
| 1/22/2008 | PIMCO California Muni Income Fund II | 3 | $25,000 | Bought |

| 5/10/2006 | PIMCO California Muni Income Fund II | 5 | $25,000 | Bought |
| 6/28/2007 | PIMCO California Muni Income Fund II | 8 | $25,000 | Bought |
| 1/24/2008 | PIMCO California Muni Income Fund II | 6 | $25,000 | Bought |
| 5/12/2006 | PIMCO California Muni Income Fund II | 7 | $25,000 | Bought |
| 7/13/2007 | PIMCO California Muni Income Fund II | 7 | $25,000 | Bought |
| 1/30/2008 | PIMCO California Muni Income Fund | 1 | $25,000 | Bought |
| 5/12/2006 | PIMCO California Muni Income Fund | 6 | $25,000 | Bought |
| 7/17/2007 | PIMCO California Muni Income Fund III | 4 | $25,000 | Bought |
| 1/22/2008 | PIMCO California Muni Income Fund III | 10 | $25,000 | Bought |
| 5/11/2006 | PIMCO California Muni Income Fund III | 10 | $25,000 | Bought |
| 6/28/2007 | PIMCO California Muni Income Fund III | 8 | $25,000 | Bought |
| 1/24/2008 | PIMCO California Muni Income Fund III | 6 | $25,000 | Bought |
| 6/28/2007 | Eaton Vance California Insured | 3 | $25,000 | Bought |
| 1/24/08 | Eaton Vance California Insured | 1 | $25,000 | Bought |

3

## THE SALLY LOU GHIZ TRUST AND THE GEORGE J. GHIZ TRUST, DAVID GHIZ, TRUSTEE

| TRADE DATE | AUCTION RATE SECURITY | NUMBER OF SHARES | PRICE PER SHARE/UNIT | BUY OR SELL |
|---|---|---|---|---|
| 2/6/2008 | BlackRock Preferred Income Strategies Fund Series W-7 | 40 | $25,000 | Bought |
| 2/7/2008 | Cohen & Steers Select Utility Fund Inc. (Thurs.) Series TH7 | 20 | $25,000 | Bought |
| 2/11/2008 | Franklin Templeton Limited Duration Income Trust Series M | 18 | $25,000 | Bought |
| 6/27/2006 | Arizona Health Facilities Authority 7-Day ARC B Rev. B/E Variable Rate | $75,000 | 100% par | Bought |
| 5/16/2005 | Yavapi County Arizona Industrial Development Authority Hospital Facility 7-Day Variable Rate | $500,000 | 100% par | Bought |
| 2/6/2008 | BlackRock Preferred Income Strategies Fund Series W-7 | 40 | $25,000 | Bought |
| 2/7/2008 | Cohen & Steers Select Utility Fund Inc. (Thurs.) Series TH7 | 40 | $25,000 | Bought |
| 2/5/2008 | Eaton Vance Limited Duration Income Fund Tuesday Taxable | 40 | $25,000 | Bought |
| 2/8/2008 | Franklin Templeton Limited Duration Income Trust Series F | 40 | $25,000 | Bought |
| 2/6/2008 | Kayne Anderson MLP Invest. W7 Series B | 38 | $25,000 | Bought |
| 2/6/2008 | Kayne Anderson MLP Invest. W7 Series B | 1 | $25,000 | Bought |
| 2/4/2008 | Nicholas Applegate Conv. & Income Fund II (Monday) 7 Day Series A | 40 | $25,000 | Bought |
| 2/5/2008 | Nuveen Multi-Strategy Income Growth Fund 2 Series T | 39 | $25,000 | Bought |
| 1/7/2008 | Yavapi County Arizona Industrial Development Authority Hospital Facility 7-Day Variable Rate | $675,000 | 100% par | Bought |

## M. RICHARD GOLDBERG

| TRADE DATE | AUCTION RATE SECURITY | NUMBER OF SHARES | PRICE PER SHARE/UNIT | BUY OR SELL |
|---|---|---|---|---|
| 8/19/2004 | California Infrastructure Eco. Wednesday Due 10/01/2018 | $350,000 | 100% par | Bought |
| 11/23/2004 | PIMCO California Municipal Income Fund III (Tue) Series A Auction Preferred | 3 | $25,000 | Bought |
| 6/8/2006 | Eaton Vance California Insured Municipal Bond Fund Series TH-7 | 15 | $25,000 | Bought |
| 7/18/2006 | California Health Facility Fin. 35 Day ARC Due 12/01/2035 | $250,000 | 100% par | Bought |
| 8/2/2006 | DNP Select Income Fund Inc. W7 Auction Preferred | 1 | $25,000 | Bought |
| 9/12/2006 | PIMCO California Municipal Income Fund II (Tue) Series B Auction Preferred | 9 | $25,000 | Bought |
| 9/28/2006 | Eaton Vance California Insured Municipal Bond Fund Series TH-7 | 15 | $25,000 | Sold |
| 3/20/2007 | PIMCO California Municipal Income Fund III (Tue) Series A Auction Preferred | 3 | $25,000 | Sold |
| 7/2/2007 | PIMCO California Municipal Income Fund II (Thurs) Series D | 80 | $25,000 | Bought |
| 7/13/2007 | PIMCO California Municipal Income Fund II (Fri) Series E | 29 | $25,000 | Bought |
| 8/2/2007 | Eaton Vance Insured California Municipal Bond Fund II Series W | 13 | $25,000 | Bought |
| 9/4/2007 | PIMCO California Municipal Income Fund II (Tue) Series B Auction Preferred | 8 | $25,000 | Sold |
| 8/2/2007 | PIMCO California Municipal Income Fund III (Thur) Series B Auction Preferred | 18 | $25,000 | Bought |

## CERTIFICATE OF SERVICE

J. Daniel Mora, being duly sworn, hereby deposes and says:

I am over the age of eighteen years and not a party to the within action and am employed

by the firm Seeger Weiss LLP, counsel for the plaintiff.

On September 05, 2008 I cause a true and correct copy of the foregoing

**PLAINTIFF'S AMENDED COMPLAINT**, to be served via U.S. Mail, with proper postage prepaid on

all counsel of record at the following addresses:

**Kent Andrew Bronson**
**Jerome M. Congress**
Milberg Weiss Bershad & Schulman LLP
(NYC)
One Pennsylvania Plaza
New York, NY 10119
kbronson@milberg.com

*representing Aric A. Streit and Mary Streit, as*
*Trustees for the Benefit of The Streit Living*
*Trust*

**Michael J. Flannery**
Carey & Danis, L.L.C.
8235 Forsyth Boulevard
Suite 1100
St.Louis, MI 63105
(314) 725-7700

*representing David Chandler, Randolph*
*Bonnist, Shelly Chandler*

**James Henry Glavin**
Stull Stull & Brody
6 East 45th Street, 5th Floor
New York, NY 10017
(212) 687-7230
212) 490-2022 (fax)
jhglavin@ssbny.com

*representing Steven Oppenheimer*

**Joseph Peter Guglielmo**
Whatley, Drake & Kallas, LLC (NYC)
1540 Broadway, 37th Floor
New York, NY 10036
(212)-447-7070
(212)-447-7077 (fax)
jguglielmo@whatleydrake.com

*representing  Randolph Bonnist,*

**Eduard Korsinsky**
Joseph E. Levi
Zimmerman Levi & Korsinsky, LLP (NY)
39 Broadway, Suite 1601
New York, NY 10006
212-363-7500
212-363-7171 (fax)
ek@zlklaw.com

*representing Ricardo L. Sanchez*

**Keith William Miller**
Paul, Hastings, Janofsky & Walker LLP (NYC)
75 East 55th Street
New York, NY 10022
(212)-318-6000
(212)-318-4090 (fax)
keithmiller@paulhastings.com

*representing UBS Financial Services Inc., UBS*
*Securities LLC*

Juan Eneas Monteverde
Levi & Korsinsky, LLP
39 Broadway
New York, NY 10006
(212)-363-7500
(212)-363-7171 (fax)
jmonteverde@zlk.com

*representing Ricardo L. Sanchez*

Frank Rocco Schirripa
Schoengold Sporn Laitman & Lometti, P.C.
19 Fulton Street, Suite 406
New York, NY 10038
212-964-0046
212-267-8137 (fax)
frank@spornlaw.com

*representing Ronald D. Kassover*

George A. Shohet
George A. Shohet, Law Offices
245 Main Stret
Suite 310
Venice, CA 90291-5216
(310) 452-3176
(310) 452-2270 (fax)

*representing David Chandler, Shelly Chandler*

William F. Sullivan
Howard M. Privette
John S. Durrant
Paul, Hastings, Janofsky & Walker LLP (CA)
515 S. Flower Street
Los Angeles, CA XXXXX
(213) 683-6252
(213)-627-0705 (fax)
williamsullivan@paulhastings.com
howardprivette@paulhastings.com
johndurrant@paulhastings.com

*Representing UBS Financial Services Inc., UBS Securities LLC*

James D. Wareham
Paul, Hastings, Janofsky & Walker LLP
875 15th Street, N.W.
Washington, DC 20005
(202) 551-1700
(202)-551-1705 (fax)
jameswareham@paulhastings.com

*Representing UBS Financial Services Inc.,  UBS Securities LLC.*

Jeff S. Westerman
Milberg LLP (Los Angeles)
One California Plaza
300 South Grand Avenue
Suite 3900
Los Angeles, CA 90071
(213) 617-1200
(213) 617-1975 (fax)

Daniel mora