## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

IN RE AUCTION RATE SECURITIES
LITIGATION

Case No:  08-CV-2967 (LMM)
ECF Case

This Document Relates To:  Nos. 08-CV-2967,
08-CV-3082, 08-CV-4352, 08-CV-5251

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
## JOSEPH SCOBY'S MOTION TO DISMISS
## FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

John F. Hartmann, P.C.
Paul M. G. Helms
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois 60654
(312) 862-2215

Andrew M. Genser
John P. Del Monaco
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4611
(212) 446-4809

*Counsel for Defendant Joseph Scoby*

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................1

SUMMARY OF AMENDED COMPLAINT .........................................................4

I.  AUCTION RATE SECURITIES ...................................................................4

II.  MR. SCOBY ...................................................................................................5

ARGUMENT ..........................................................................................................5

I.  THE AMENDED COMPLAINT FAILS TO STATE A MARKET
    MANIPULATION CLAIM AGAINST MR. SCOBY UNDER SECTION 10(b)
    AND RULE 10b-5. ..........................................................................................6

    A.  Plaintiffs Do Not Allege That Mr. Scoby Engaged In Any Manipulative
        Conduct. ..................................................................................................6

    B.  Plaintiffs Do Not And Cannot Allege That They Relied On Any Conduct
        Of Mr. Scoby. .........................................................................................9

    C.  Plaintiffs Fail To Allege That Mr. Scoby Acted With Scienter............13

II.  THE AMENDED COMPLAINT FAILS TO STATE A CONTROL PERSON
    CLAIM AGAINST MR. SCOBY UNDER SECTION 20(A). .........................16

    A.  Plaintiffs Fail To Allege A Primary Violation By UBS FS Or UBS
        Securities................................................................................................16

    B.  Plaintiffs Do Not And Cannot Allege That Mr. Scoby Controlled UBS FS
        Or UBS Securities..................................................................................17

    C.  Plaintiffs Fail To Allege That Mr. Scoby Was A "Culpable Participant" In
        UBS FS's And UBS Securities' Alleged Violations Of Section 10(b) And
        Rule 10b-5..............................................................................................18

CONCLUSION.......................................................................................................19

# TABLE OF AUTHORITIES

Page(s)

## Cases

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)..................................................................... 6, 13, 18

*Boguslavsky v. Kaplan*,
    159 F.3d 715 (2d Cir. 1998)............................................................ 16

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994)...................................................................... 7

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976)...................................................................... 13

*In re Adelphia Commc'ns Corp. Sec. and Derivative Litig.*,
    398 F. Supp. 2d 244 (S.D.N.Y. 2005)................................... 16, 17, 18

*In re Alstom SA Sec. Litig.*,
    406 F. Supp. 2d 433 (S.D.N.Y. 2005)..................................... 17, 18

*In re Bayou Hedge Fund Litig.*,
    534 F. Supp. 2d 405 (S.D.N.Y. 2007)..................................... 14

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    352 F. Supp. 2d 429 (S.D.N.Y. 2005)..................................... 17

*In re Global Crossing, Ltd. Sec. Litig.*,
    No. 02 Civ. 910, 2005 WL 1875445 (S.D.N.Y. Aug. 5, 2005) ...................... 17

*In re Parmalat Sec. Litig.*,
    570 F. Supp. 2d 521 (S.D.N.Y. 2008)..................................... 11

*In re Refco Sec. Litig.*,
    609 F. Supp. 2d 304 (S.D.N.Y. 2009)................................... passim

*In re Van der Moolen Holding N.V. Sec. Litig.*,
    405 F. Supp. 2d 388 (S.D.N.Y. 2005)..................................... 14

*Katz v. Image Innovations Holdings, Inc.*,
    542 F. Supp. 2d 269 (S.D.N.Y. 2008)..................................... 11

*Pugh v. Tribune Co.*,
    521 F.3d 686 (7th Cir. 2008) ............................................... 11

*Rombach v. Chang*,
    355 F.3d 164 (2d. Cir. 2004)................................................ 14

*Santa Fe Indus. v. Green*,
    430 U.S. 462 (1977)........................................................... 9

## TABLE OF AUTHORITIES (CONT'D)

Page(s)

*Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp., N.V.*,
    941 F. Supp. 1369 (S.D.N.Y. 1996)........................................................................ 17

*Stoneridge Inv. Partners LLC v. Scientific-Atlanta, Inc.*,
    552 U.S. 148,
    128 S. Ct. 761,
    169 L. Ed. 2d 627 (2008) ......................................................................... passim

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)................................................................................. 14

**Statutes**

15 U.S.C. § 78t(a) ......................................................................................... 16

15 U.S.C. § 78u-4(b)(2) ........................................................................... 13, 14

15 U.S.C. § 78u-4(b)(3) ............................................................................... 14

**Rules**

Fed. R. Civ. P. 9(b) ...................................................................................... 13

## INTRODUCTION

Plaintiffs and their Amended Complaint may be new, but the claims in this lawsuit against defendant Joseph Scoby remain baseless, no matter how labeled.

This lawsuit arises out of the February 2008 collapse of the market for certain types of auction rate securities ("ARS"), which are long-term bonds or preferred stocks that pay interest or dividends at rates set at periodic Dutch auctions. Defendant UBS Financial Services Inc. ("UBS FS") acted as a broker-dealer for investors—primarily wealthy individuals and corporate treasury departments—who bought and sold ARS in auctions. Defendant UBS Securities LLC ("UBS Securities") underwrote certain ARS issued by municipalities, student-loan organizations, and private entities. UBS Securities also managed or co-managed the periodic auctions for certain ARS and, at times, bought and sold ARS in those auctions for and from its own inventory.

Plaintiffs purchased ARS underwritten by UBS Securities, or in auctions managed or co-managed by UBS Securities ("UBS ARS"). One of the plaintiffs, Ann Elston, purchased UBS ARS from UBS FS in 2005. The other three Plaintiffs, David Neu, William Baumel, and Charles Dutcher, purchased UBS ARS not from UBS FS but from so-called "distributing brokers," namely, E*Trade, Wells Fargo, and Raymond James, in 2007. These four Plaintiffs purport to assert claims on behalf of all purchasers of UBS ARS during the period March 21, 2003 through February 13, 2008 (the "Class Period").

The gist of Plaintiffs' Amended Complaint is that UBS Securities fraudulently manipulated auctions for UBS ARS by buying UBS ARS for its own account in order to prevent those auctions from failing for lack of demand, and to influence (*i.e.*, suppress) UBS ARS interest rates. Plaintiffs allege that this "fraud" came to light on February 13, 2008, when UBS Securities and other major investment banks concluded that they could not keep buying ARS to

support ARS auctions, causing the market for certain types of ARS to collapse. Plaintiffs suggest that, because of this practice, they purchased UBS ARS that earned below-market interest. They also allege that the February 13, 2008 market collapse rendered their UBS ARS illiquid.

Based on these core allegations, Plaintiffs assert Exchange Act claims against (1) UBS Securities; (2) UBS FS; (3) David Shulman, the former Global Head of the Municipal Securities Group and Head of Fixed Income, Americas, at UBS Securities; and (4) Marten Hoekstra, the Deputy CEO, Global Wealth Management, and Head of Wealth Management, Americas, at UBS FS. Plaintiffs also reach beyond UBS Securities, UBS FS, and Defendants Shulman and Hoekstra to sue (5) UBS AG, the Swiss parent of UBS Securities and UBS FS; and (6) Marcel Rohner, the former Group Chief Executive Officer of UBS AG, even though UBS AG never sold UBS ARS, never managed UBS ARS auctions, and never purchased UBS ARS in UBS ARS auctions.

Not content to stop even there, Plaintiffs also have sued Joseph Scoby, who served as the Chief *Risk* Officer ("CRO") of *UBS AG* from October 1, 2007 through October 2008—thus, during the last four months of the five-year Class Period.[1] As UBS AG's Chief Risk Officer in late 2007 and early 2008, Mr. Scoby's job was to monitor and, to the extent possible, manage the risks of UBS AG, including the risks associated with UBS Securities' purchases of UBS ARS in ARS auctions. As part of that job, Mr. Scoby wrote a handful of internal emails in December 2007 and January and February 2008 relating to UBS Securities' ballooning ARS inventory.

---

[1]     Mr. Scoby now serves as the Global Head of UBS's Alternative and Quantitative Investments unit of the bank's Global Asset Management Group.

Based on excerpts from these internal emails, Plaintiffs allege that Mr. Scoby "participated in Defendants' scheme to manipulate and perpetuate the market for UBS ARS during the Class Period." (Am. Compl. ¶ 21.) Based, in turn, on this theory of "scheme liability," Plaintiffs assert claims against Mr. Scoby for market manipulation under Section 10(b) of the Exchange Act and SEC Rule 10b-5(a) and (c) (Count I), and for control person liability under Section 20(a) (Count II).

Plaintiffs' claims against Mr. Scoby fail as a matter of law. Plaintiffs' Section 10(b) claims fail because, under the Supreme Court's recent decision in *Stoneridge Investment Partners, LLC v. Scientific Atlanta, Inc.*, there is no such thing as "scheme liability" in private actions under Section 10(b) and Rule 10b-5. Rather, there are only primary violations, which means that, among other things, Plaintiffs must allege both that Mr. Scoby engaged in manipulative conduct and that Plaintiffs relied on that allegedly manipulative conduct. Here, Plaintiffs do neither. Nor do they allege facts sufficient to support a strong inference that Mr. Scoby acted with scienter. Furthermore, Plaintiffs' "control person" claim against Mr. Scoby fails because Plaintiffs do not allege a primary violation by UBS FS or UBS Securities; that Mr. Scoby had the power to control UBS FS or UBS Securities; or that Mr. Scoby was a culpable participant in any market manipulation scheme.

For all these reasons, the Court should dismiss the claims against Mr. Scoby with prejudice.[2]

---

[2]    Mr. Scoby joins in the Motion to Dismiss the Amended Consolidated Class Action Complaint and accompanying Memorandum of Law submitted by Defendants UBS Securities LLC, UBS Financial Services Inc., UBS AG, Hoekstra and Rohner (the "UBS Motion" and "UBS Memorandum," respectively) and adopts all of the arguments and points therein. Mr. Scoby submits his own Motion to Dismiss and Memorandum of Law to present further arguments and points that pertain to him individually.

## <u>SUMMARY OF AMENDED COMPLAINT</u>[3]

### I.    AUCTION RATE SECURITIES

ARS are long-term bonds or preferred stocks that pay interest or dividends at rates set at periodic Dutch auctions.  (Am. Compl. ¶¶ 3, 37, 41.)  These auctions typically occur every seven, twenty-eight, thirty-five, or forty-nine days.  (*Id*.)  The market for ARS first developed in 1984 and thereafter grew dramatically, ultimately attaining a value of approximately $330 billion by February 2008.  (*Id*. ¶ 39.)

As explained in the UBS Motion and Memorandum, it cannot seriously be disputed that UBS Securities' participation in ARS auctions was both legal and fully disclosed.  Still, Plaintiffs allege that UBS Securities had a fraudulent longstanding "uniform policy" of making "support bids" and purchases of UBS ARS for its own account in any UBS ARS auction that otherwise would have failed for lack of sufficient demand.  (*Id*. ¶¶ 51-55.)  Plaintiffs also allege that UBS used such support bids and purchases to suppress the interest and dividend rates paid on UBS ARS.  (*Id*. ¶¶ 67-69.)

Plaintiffs allege that, as UBS Securities increasingly made support bids and purchases in support of UBS ARS auctions in late 2007 and early 2008, it accumulated more and more UBS ARS inventory on its balance sheet.  (*See id*. ¶ 138.)  As Plaintiffs acknowledge, this ballooning ARS inventory posed an internal problem for UBS Securities and, in turn, UBS AG, because UBS AG's risk-management policies limited the amount of ARS that UBS Securities could hold at any given time.  (*Id*.)  In the fall of 2007, UBS Securities breached its ARS inventory limit.  (*Id*. ¶¶ 138-39.)  Two months later, on February 13, 2008, UBS Securities, like several other

---

[3]    By providing this summary, Mr. Scoby does not concede the truth or accuracy of any of the allegations contained in the Amended Complaint.

major investment banks before it, stopped placing support bids in its ARS auctions, resulting in multiple auction failures.  (*Id.* ¶ 103.)

## II.    MR. SCOBY

As noted above, Mr. Scoby served as UBS AG's Chief Risk Officer from October 1, 2007 through October 2008, which includes the last four months of the five-year Class Period. (*See id.* ¶ 21.)[4]

The Amended Complaint contains very few allegations of fact regarding Mr. Scoby. Indeed, Plaintiffs' only substantive references to Mr. Scoby relate to a handful of internal emails regarding ARS that were written in mid-December 2007 and in January and February 2008, when UBS Securities' purchases of ARS and increasing ARS inventory came to his attention in his role as UBS AG's Chief Risk Officer.  (*See* Am. Compl. ¶¶ 74-75, 145, 154-55, 157, 160.) As set forth more fully below, these emails do not support any inference of fraud.  Rather, they reflect Mr. Scoby's efforts to grasp, monitor, and manage the risks posed by UBS Securities' ballooning ARS inventory.  In other words, they show that he was doing his job.

## ARGUMENT

Plaintiffs' attempt to impose Exchange Act liability on Mr. Scoby should be rejected. Plaintiffs' Section 10(b) and Rule 10b-5 market manipulation claim against Mr. Scoby fails because the Amended Complaint does not allege that Mr. Scoby employed or engaged in any manipulative conduct; that Plaintiffs relied on any conduct of Mr. Scoby in deciding to purchase UBS ARS; or that Mr. Scoby acted with the requisite intent to defraud.  Plaintiffs' Section 20(a) claim fails because the Amended Complaint fails to allege a primary violation by UBS FS and

---

[4]    During this same period, Mr. Scoby served as a member of UBS AG's Group Executive Board ("GEB").  (*Id.*)

UBS Securities; that Mr. Scoby controlled UBS FS or UBS Securities; or that Mr. Scoby was a

"culpable participant" in any market manipulation scheme.  Accordingly, all of Plaintiffs' claims

against Mr. Scoby should be dismissed with prejudice.

I.    **THE AMENDED COMPLAINT FAILS TO STATE A MARKET MANIPULATION CLAIM AGAINST MR. SCOBY UNDER SECTION 10(b) AND RULE 10b-5.**

To state a claim for market manipulation under Section 10(b) and Rule 10b-5, Plaintiffs

must allege "(1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an

efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of

securities; (6) furthered by the defendant's use of the mails or any facility of a national securities

exchange."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007).  Since

market manipulation claims are subject to Rule 9(b), Plaintiffs "must plead with particularity the

nature, purpose, and effect of the fraudulent conduct and the roles of the defendants."  *Id. a*t 101.

Among other things, this means specifying "what manipulative acts were performed, which

defendants performed them, when the manipulative acts were performed, and what effect the

scheme had on the market for the securities at issue."  *In re Refco Sec. Litig.*, 609 F. Supp. 2d

304, 311 (S.D.N.Y. 2009).  Here, Plaintiffs fail to allege, let alone with the requisite specificity,

the manipulative conduct, reliance, and scienter elements of their market manipulation claim

against Mr. Scoby.

A.    **Plaintiffs Do Not Allege That Mr. Scoby Engaged In Any Manipulative Conduct.**

The Supreme Court has made clear that there is no such thing as aiding or abetting or

"scheme" liability in private actions under Section 10(b) and Rule 10b-5.  *Stoneridge Inv.

Partners LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 128 S. Ct. 761, 769-70, 169 L. Ed. 2d 627

(2008); *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191

(1994). Rather, to state a claim against a defendant under Section 10(b) and Rule 10b-5, plaintiffs must allege each of the elements required for primary liability. *Stoneridge*, 128 S. Ct. at 769. This means that Plaintiffs here must allege, among other things, that **Mr. Scoby** engaged in market manipulation. *In re Refco*, 609 F. Supp. 2d at 316 ("The critical holding of *Central Bank*—that liability to investors under Rule 10b-5 does not extend to those who merely aid and abet violations by primary actions—is not limited to violations of Rule 10b-5(b). To establish primary liability under other subsections of the Rule as well, 'a plaintiff must show that it was the defendant itself that 'employed' the scheme to defraud or 'engaged in the deceitful practice,' and not merely that the defendants assisted another party in its fraudulent practices."). Plaintiffs do no such thing.

As noted above, the gist of Plaintiffs' Section 10(b) and Rule 10b-5(a) and (c) claim is that UBS Securities secretly manipulated UBS ARS auctions by purchasing UBS ARS for its own account in order to create a false appearance of liquidity and to suppress interest rates. For the reasons stated in the UBS Motion and Memorandum, this claim is baseless.

Even if it were not, Plaintiffs do not and cannot allege that **Mr. Scoby** ever employed or engaged in such conduct. Mr. Scoby never worked for UBS Securities, never made a "support bid" in a UBS ARS auction, and never directed UBS Securities, or anyone at UBS Securities, to make such a bid or corresponding purchase. Moreover, the Amended Complaint makes clear that UBS Securities' alleged "uniform policy" of supporting UBS ARS auctions was in place long before Mr. Scoby assumed his position as UBS AG's Chief Risk Officer in late 2007, at the tail end of the Class Period. At that point, Mr. Scoby became responsible for monitoring and, to the extent possible, managing the **risks** posed by UBS Securities' longstanding practice of supporting auctions and its impact on UBS Securities' ballooning ARS inventory. In other

words, *it was his job to deal with UBS Securities' ARS inventory build-up*.  In effect, Plaintiffs claim that Mr. Scoby's efforts to address those risks somehow transformed him into a last-minute participant in a putative scheme to manipulate the market for UBS ARS.  This claim is utterly baseless but, even if it were not, Plaintiffs do not allege that Mr. Scoby personally "employed" UBS Securities' alleged scheme to manipulate UBS ARS auctions, or that he personally engaged in the alleged "deceitful practice" of placing "support bids" in such auctions. At best (and even this is ludicrous), Plaintiffs allege that Mr. Scoby *assisted* UBS Securities' alleged scheme, presumably by failing to halt it immediately upon learning that UBS Securities had exceeded its ARS inventory limit.  But that is plainly not enough.  Again, under *Stoneridge* and *Central Bank*, there is no such thing as aiding and abetting or scheme liability in private actions under Section 10(b) and Rule 10b-5.

Plaintiffs do not allege that Mr. Scoby engaged in any of the other purported "manipulative conduct" described in the Amended Complaint, either.  (*See* Am. Compl. ¶ 49.) Simply put, Plaintiffs do not, because they cannot, allege that Mr. Scoby made "false and misleading statements and incomplete disclosures about the liquidity of UBS ARS and UBS Securities' role in propping up the auction rate securities market"; that he "persuad[ed] issuers and credit rating agencies to waive the maximum limits or the interest rates priced on UBS ARS"; that he "pressur[ed] [ ] financial advisors and distributing firms to sell UBS ARS"; or that he "provid[ed] extra-ordinary financial incentives to financial advisors to sell UBS ARS."

(*See id.*)  Why?  Because Mr. Scoby never had anything to do with any of these alleged activities.[5]

In sum, this is a purported market manipulation case, yet Plaintiffs have failed completely to allege that Mr. Scoby employed or engaged in any manipulative conduct.

### B.      Plaintiffs Do Not And Cannot Allege That They Relied On Any Conduct Of Mr. Scoby.

Even if Plaintiffs somehow allege that Mr. Scoby "employed" or "engaged in" UBS Securities' alleged market manipulation scheme (which he did not), Plaintiffs' Section 10(b) and Rule 10b-5 claim against him still would fail.  Under the Supreme Court's decision in *Stoneridge*, Plaintiffs do not and cannot allege that they relied on **Mr. Scoby's** allegedly deceptive conduct.

In *Stoneridge*, the Supreme Court addressed the question of "when, if ever, an injured investor may rely upon § 10(b) to recover from a party that neither makes a public misstatement nor violates a duty to disclose but does participate in a scheme to violate § 10(b)."  128 S. Ct. at 767.  There, investors in Charter Communications, Inc. stock sought to impose Section 10(b) liability on Scientific-Atlanta and Motorola, who, acting both as customers and suppliers of Charter, agreed to sham arrangements that enabled Charter to fool its auditor and issue false financial statements inflating the value of Charter's stock price.  *Id.* at 766-67.  The investors

---

[5]    In their zeal to avoid having their lawsuit characterized as a misstatement or omissions case, Plaintiffs call these alleged activities "market manipulation," but the label does not fit.  Market manipulation is "virtually a term of art" in the securities context.  It applies to deceptive practices such as "wash sales, matched orders, or rigged prices"—*i.e.*, conduct that creates "a false impression of how market participants value a security."  *Santa Fe Indus. v. Green*, 430 U.S. 462, 476 (1977).  Plainly, it does **not** apply to false statements and incomplete disclosures regarding ARS, attempts to persuade issuers and rating agencies to waive interest rate caps, or providing extraordinary financial incentives to financial advisors to sell ARS.  Regardless of labels, however, Plaintiffs do not and cannot allege that Mr. Scoby engaged in any such conduct.

asserted that, even though Scientific-Atlanta and Motorola had no role in the preparation or dissemination of Charter's financial statements, they knew or recklessly disregarded that Charter intended to use the sham arrangements to inflate revenues and to issue misleading financial statements. *Id*. at 767, 770.

The Supreme Court rejected the investors' attempt to impose Section 10(b) liability on Scientific-Atlanta and Motorola. The Supreme Court concluded that Scientific-Atlanta and Motorola had no duty to disclose; that their deceptive acts were not disclosed to the investing public "except in an indirect chain that [is] too remote for liability"; and that "[i]t was *Charter*, not [Scientific-Atlanta and Motorola], that misled its auditor and filed fraudulent financial statements." *Id*. at 769-70 (emphasis added). The Supreme Court held that "[i]n these circumstances the investors cannot be said to have relied upon any of [Scientific-Atlanta's and Motorola's] deceptive acts in the decision to purchase or sell securities." *Id*. at 774. The Court also rebuffed the investors' attempt to invoke the same theory of "scheme liability" that Plaintiffs seek to invoke here. *Id*. at 770. The Court held that "this approach [did] not answer the objection that [the investors] did not in fact rely upon [Scientific-Atlanta's and Motorola's] own deceptive conduct." *Id*. Under *Stoneridge*, then, Section 10(b) plaintiffs must allege that they relied upon a deceptive act *of the defendant*. *Id*. at 770, 774. And where, as here, the conduct of a defendant such as Mr. Scoby was never communicated to Plaintiffs or to the investing public, then by definition plaintiffs cannot allege, let alone prove, Section 10(b)'s essential element of reliance. *Id*.

Since *Stoneridge*, numerous federal courts have rejected attempts to impose Section 10(b) liability on secondary actors whose allegedly deceptive statements or acts were never made known to the plaintiffs or to the public. *See*, *e.g.*, *Pugh v. Tribune Co.*, 521 F.3d 686 (7th Cir.

2008); *In re Refco, Inc. Sec. Litig.*, 609 F. Supp. 2d 304, 317 (S.D.N.Y. 2009); *Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 272-73 (S.D.N.Y. 2008); *In re Parmalat Sec. Litig.*, 570 F. Supp. 2d 521, 524-25 (S.D.N.Y. 2008).  In *Pugh*, for example, the Seventh Circuit rejected the plaintiffs' attempt to impose Section 10(b) liability on employees of the Tribune Co.'s Newsday subsidiary who allegedly participated in a scheme to inflate Newsday's circulation numbers but had no role in the preparation or dissemination of the allegedly false Tribune Co. financial statements.   521 F.3d at 697.   In *Refco*, Judge Lynch dismissed Section 10(b) claims against lawyers who negotiated and documented sham transactions designed to conceal an issuer's true financial condition because the plaintiffs had no knowledge of the lawyers' conduct that facilitated the fraudulent transaction.  *In re Refco*, 609 F. Supp. 2d at 317.  In *Katz*, Judge Koeltl dismissed Section 10(b) claims against individual defendants when the complaint alleged generally that they participated in a company's fraudulent scheme to book fictitious sales but failed to allege "how the alleged actions of these defendants were relied upon by purchasers of Image stock during the relevant period."  542 F. Supp. 2d at 272-73.  Finally, in *In re Parmalat Securities Litigation*, Judge Kaplan rejected Section 10(b) claims against certain of Parmalat's banks when the "evidence would establish only that investors relied on Parmalat's deceptive disclosures concerning transactions to which defendants were parties," and "would not establish reliance on any defendants' own deceptive conduct except 'in an indirect chain' the type of which the Supreme Court found 'too remote for liability'" in *Stoneridge*.  *In re Parmalat*, 570 F. Supp. 2d at 526.

   *Stoneridge* and its progeny preclude Plaintiffs' attempt to impose "scheme liability" on Mr. Scoby.  Here, Plaintiffs do not even attempt to allege that they were aware, or that UBS ARS investors generally were aware, of any of Mr. Scoby's conduct, let alone that they relied on his

conduct in making their decisions to purchase ARS.  Nor could they.  As stated above, Mr. Scoby did not become UBS AG's Chief Risk Officer until October 1, 2007, just four and a half months before the end of the Class Period, and he is not even mentioned in the chronology of events set forth in the Amended Complaint until mid-December 2007, just two months before the end of the Class Period.  Indeed, three of the Plaintiffs, Ms. Elston and Messrs. Neu and Baumel, made their ARS purchases long *before* Scoby became UBS AG's Chief Risk Officer, so they could not possibly have relied on his conduct in making their ARS purchases.  (Am. Compl. ¶¶ 11, 13-14.)

The remaining Plaintiff, Mr. Dutcher, made two of his three UBS ARS purchases before Mr. Scoby's first reference in the Amended Complaint in mid-December 2007, and his last purchase on December 20, 2007, just days after Mr. Scoby, in his role as UBS AG's Chief Risk Officer, first communicated with UBS Securities executives regarding UBS Securities' ARS inventory.  (*Compare id.* ¶ 12 *with id.* ¶ 74.)  Thus, any claim that Mr. Dutcher relied on Mr. Scoby's conduct also strains credulity.  Notably, Mr. Dutcher does not even allege whether and, if so, how UBS Securities actually supported the December 20, 2007 auction in which he made his last UBS ARS purchase.  Further still, Mr. Dutcher did not even purchase his UBS ARS from UBS FS.  Rather, he made his purchases of UBS ARS from Raymond James, a distributing broker, and he alleges absolutely nothing in the Amended Complaint about the circumstances of those purchases.  Finally, and most importantly, neither Mr. Dutcher nor any of his co-Plaintiffs alleges that any of the conduct of Mr. Scoby referenced in the Amended Complaint was ever made public.

Instead of alleging reliance on *Mr. Scoby's* conduct as required by *Stoneridge*, Mr. Dutcher and his co-plaintiffs claim that they are entitled to rely solely on an "integrity of the

market" presumption.   (*See id*. ¶¶ 173-80, 223.)   For the reasons stated in the UBS Memorandum, this Court should decline to recognize this new and novel theory of reliance.  But even if a presumption of reliance based on the "integrity of the ARS market" exists, it could not salvage Mr. Dutcher's Section 10(b) and Rule 10b-5 claim against Mr. Scoby.  In *Stoneridge*, the Supreme Court held that the well-recognized fraud-on-the-market presumption did not apply to defendants whose deceptive acts were never communicated to the investing public and, as a result, that the plaintiff in that case could not show reliance on the defendants' acts except in an "indirect chain" that was "too remote for liability."  *Stoneridge*, 128 S. Ct. at 769.  Under the same logic, Plaintiffs' *un*recognized "integrity of the market" presumption cannot apply to Mr. Scoby, whose conduct was never made public, either.  And, as a result, Plaintiffs cannot show reliance on Mr. Scoby's conduct except in an indirect chain that is too remote for liability.

### C.    Plaintiffs Fail To Allege That Mr. Scoby Acted With Scienter.

Plaintiffs' Section 10(b) claim also must be dismissed because the Amended Complaint fails to allege adequately that Mr. Scoby acted with the requisite scienter—*i.e.*, a "mental state embracing intent to deceive, manipulate, or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).

To plead scienter in a market manipulation case, a plaintiff must "plead with particularly facts giving rise to a strong inference that the defendant intended to deceive investors by artificially affecting the market price of securities."  *ATSI Commc'ns,* 493 F.3d at 102 (citing 15 U.S.C. § 78u-4(b)(2)).   Indeed, "[t]his pleading requirement is particularly important in manipulation claims because in some cases scienter is the only factor that distinguishes legitimate trading from improper manipulation."  *Id*.   Rule 9(b) requires Plaintiffs to plead scienter with particularity.  *See* Fed. R. Civ. P. 9(b).  In addition, the PSLRA requires Plaintiffs to "state with particularity *facts* giving rise to a strong inference [of scienter]."   15 U.S.C.

§ 78u-4(b)(2) (emphasis added).  Plaintiffs must do so for each defendant separately; they cannot allege scienter as to a group.  *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 408 (S.D.N.Y. 2005); *see also Rombach v. Chang*, 355 F.3d 164, 177 (2d. Cir. 2004) (holding that motive allegations must be sufficiently particularized and personal to the defendants).  If Plaintiffs fail to meet this strict pleading requirement as to Mr. Scoby, the claims against him must be dismissed.  15 U.S.C. § 78u-4(b)(3).

These standards for pleading pose a "stiff challenge" for Plaintiffs, *see In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405, 415 (S.D.N.Y. 2007), particularly in light of the Supreme Court's recent decision in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).  In *Tellabs*, the Supreme Court directed that, to determine whether a plaintiff alleges facts giving rise to the requisite "strong inference" of scienter, "a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."  551 U.S. at 310.  Under *Tellabs*, "[a] complaint will survive [a motion to dismiss under the PSLRA] only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.*  No reasonable person could reach such a conclusion based on Plaintiffs' allegations regarding Mr. Scoby.

Plaintiffs fail completely to allege facts giving rise to ***any*** inference that Mr. Scoby acted with scienter.  Of the 211 paragraphs in the Amended Complaint containing Plaintiffs' factual allegations, only seven specifically reference Mr. Scoby.  (*See* Am. Compl. ¶¶ 74, 102, 145, 154, 155, 157, 160.)  None of these paragraphs alleges that Mr. Scoby had a motive to commit fraud.  Nor do they allege facts suggesting that Mr. Scoby had any intention to commit fraud.

Here is the sum and substance of Plaintiffs' allegations regarding Mr. Scoby:

- Mr. Scoby became UBS AG's Chief Risk Officer on October 1, 2007, just four months before the end of the five-year Class Period. (*Id.* ¶ 21.) By then, UBS Securities' alleged uniform policy of supporting UBS ARS auctions had long been in place. (*Id.* ¶¶ 48-49, 51.)

- As UBS AG's Chief Risk Officer, Mr. Scoby's job was to monitor and manage UBS AG's risks. That job ***required*** him to address the risks posed by UBS Securities' accumulation of ARS inventory.

- Mr. Scoby first appears in Plaintiffs' UBS ARS chronology on December 11, 2007, just two months before the end of the Class Period, when he notified Mr. Shulman in an email that UBS Securities was "over limit" in ARS, and that UBS Securities had to ***"reduce"*** its ARS inventory. (*Id.* ¶ 74 (emphasis added).) Plainly, Mr. Scoby's notification to Mr. Shulman that UBS Securities needed to ***reduce*** its ARS inventory was ***not*** a direction to make "support bids" and purchases of UBS ARS in upcoming ARS auctions—*i.e.*, the purported "manipulative conduct" that Plaintiffs allege in the Amended Complaint—since such purchases would have ***increased*** UBS Securities' ARS inventory, and only exacerbated the already-existing risk-management issue.

- On December 17, 2007, Mr. Scoby asked Mr. Shulman and others in an email to provide him with daily status reports on UBS Securities' ARS inventory; to call "risk control" before supporting a "horrible auction" (*i.e.,* one in which sellers far outnumbered buyers); and to let risk control know if other banks allowed auctions to fail. (*Id.* ¶ 145.) In short, Mr. Scoby asked Mr. Shulman and others at UBS Securities to keep him apprised of the ARS inventory situation.

- On December 19, 2007 and January 9, 2008, Mr. Scoby asked Mr. Shulman and others in emails to prepare detailed reports regarding ARS for review and consideration by UBS AG's Governing Executive Board ("GEB"), the bank's overall decision-making body. (*Id.* ¶¶ 155, 157.)

- Plaintiffs allege that, on February 12, 2008, UBS AG's GEB decided that UBS Securities could not keep supporting UBS ARS auctions, and that it directed Mr. Scoby to monitor the market and decide when it should stop. (*Id.* ¶ 102.) UBS Securities stopped supporting auctions the next day, on February 13, 2008. (*Id.* ¶¶ 103, 105.)

Simply put, these allegations do not even suggest that Mr. Scoby participated in a scheme to defraud. To the contrary, they suggest that he did his best as Chief Risk Officer of UBS AG to deal with a difficult risk-management situation. For these reasons, the Section 10(b) claim against Mr. Scoby must be dismissed for failure to plead scienter.

## II.    THE AMENDED COMPLAINT FAILS TO STATE A CONTROL PERSON CLAIM AGAINST MR. SCOBY UNDER SECTION 20(A).

In Count II, Plaintiffs allege that Mr. Scoby "controlled" UBS FS and UBS Securities in connection with their alleged violations of Section 10(b) and Rule 10b-5 and, based on that conclusory allegation, seek to hold Mr. Scoby liable as a "control person" within the meaning of Section 20(a) of the Exchange Act.  (Am. Compl. ¶¶ 228-35.)

Section 20(a) establishes a limited form of secondary liability for those who control another person's primary violation of the Exchange Act.  15 U.S.C. § 78t(a).  To state a claim under this provision, Plaintiffs "must show '(1) a primary violation by the controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation.'" *In re Adelphia Commc'ns Corp. Sec. and Derivative Litig.*, 398 F. Supp. 2d 244, 261 (S.D.N.Y. 2005) (McKenna, J.) (quoting *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998)).  Further, Plaintiffs must allege the culpable participation of a control person with the particularity required by Rule 9(b) and the PSLRA.  *See In re Refco*, *Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 660-61 (S.D.N.Y. 2007).

Here, Plaintiffs do not allege any of the elements of Section 20(a) liability as to Mr. Scoby.

### A.    Plaintiffs Fail To Allege A Primary Violation By UBS FS Or UBS Securities.

As set forth in the UBS Motion and Memorandum, which Mr. Scoby joins and adopts, Plaintiffs fail to allege primary violations of the securities laws by any other person.  There can be no control person liability absent a primary securities law violation, and the claim for control person liability against Mr. Scoby fails for this reason alone.  *In re Adelphia*, 398 F. Supp. 2d at 261.

**B.    Plaintiffs Do Not And Cannot Allege That Mr. Scoby Controlled UBS FS Or UBS Securities.**

To state a control person claim against Mr. Scoby, Plaintiffs must do more than allege he was the Chief Risk Officer of UBS AG.  *In re Adelphia*, 398 F. Supp. 2d at 261 ("A person's status as an officer, director, or shareholder, absent more, is not enough to trigger liability under Section 20.") (citing *Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp., N.V.*, 941 F. Supp. 1369, 1378 (S.D.N.Y. 1996)).  Rather, Plaintiffs must allege facts showing that Mr. Scoby possessed the power to direct or cause the direction of the management and policies of UBS FS and UBS Securities—the entities he allegedly controlled—and, in particular, their conduct concerning ARS.  *See In re Adelphia*, 398 F. Supp. 2d at 262; *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005); *In re Global Crossing, Ltd. Sec. Litig.*, No. 02 Civ. 910, 2005 WL 1875445, at *3 (S.D.N.Y. Aug. 5, 2005).  Importantly, advising, persuading, or influencing members of management does not constitute control.  *See In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d at 487.  As this Court has made clear, the exercise of influence, without the power to direct or cause the direction of management and policies through ownership of voting securities, by contract, or in any other direct way, is insufficient to show control.  *See In re Adelphia*, 398 F. Supp. 2d at 262; *In re Alstom*, 406 F. Supp. 2d at 487; *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 457 (S.D.N.Y. 2005).

Here, Plaintiffs fail to allege facts sufficient to support an inference that, as Chief Risk Officer of UBS AG, Mr. Scoby possessed the power to direct or cause the direction of the management and policies of UBS FS and UBS Securities.  Plaintiffs do not and cannot allege that Mr. Scoby was an officer or director of either UBS FS or UBS Securities; that he had anything to do with UBS FS's sales practices with respect to ARS or any other investment product; that he had anything to do with UBS Securities' alleged "uniform policy" of placing

-17-

"support bids" in ARS auctions that would fail but for those bids; or that any of the individuals at UBS FS or UBS Securities who were responsible for these aspects of the ARS business ever reported to him.  At best, the facts alleged in the Amended Complaint show only that, in his role as Chief Risk Officer of UBS AG during the last four months of the Class Period, Mr. Scoby requested information from UBS FS and UBS Securities and advised officers of UBS Securities concerning their management of UBS Securities' ARS inventory.  Those actions are a far cry from directing the management and policies of UBS Securities with respect to sales or auctions of ARS or anything else.  Finally, Plaintiffs' allegation that the decision to withdraw support for ARS auctions was *the GEB's*—and not Mr. Scoby's—contradicts their argument that Mr. Scoby had the type of control necessary to sustain Section 20(a) liability.  (*See* Am. Compl. ¶¶ 102, 155, 157.)

C.    **Plaintiffs Fail To Allege That Mr. Scoby Was A "Culpable Participant" In UBS FS's And UBS Securities' Alleged Violations Of Section 10(b) And Rule 10b-5.**

To state a Section 20(a) claim against Mr. Scoby, Plaintiffs also must allege facts showing that Mr. Scoby was a "culpable participant" in UBS FS's and UBS Securities' alleged violations of Section 10(b) and Rule 10b-5.  *See ATSI Commc'ns, Inc.*, 493 F.3d at 108; *see also In re Adelphia*, 398 F. Supp. 2d at 261 & n.13.  The examination of facts supporting culpable participation often mirrors the analysis of scienter allegations.  Further, given this similarity, and the plain language of the PSLRA, Plaintiffs arguably must allege with particularity facts demonstrating a strong inference of "culpable" involvement.  *See*, *e.g.*, *In re Refco*, 503 F. Supp. 2d at 660-61; *In re Alstom*, 406 F. Supp. 2d at 489-90.

Here, Plaintiffs fail to allege facts showing Mr. Scoby's culpable participation in UBS FS's and UBS Securities' alleged misconduct for the same reasons Plaintiffs fail to allege that Mr. Scoby acted with scienter.  As explained above, Plaintiffs fail to allege that Mr. Scoby

engaged in any deceptive conduct at all. (*See supra* Argument Section I.C.) Indeed, the only reasonable inference to be drawn from the Amended Complaint is that Mr. Scoby was doing his job in good faith during the brief period that his conduct is even relevant.

## CONCLUSION

For the reasons stated above and in the UBS Motion and Memorandum of Law, the Amended Complaint should be dismissed against Mr. Scoby in its entirety with prejudice.


Dated: August 28, 2009

Respectfully Submitted,

KIRKLAND & ELLIS LLP


By:     s/ John F. Hartmann


John F. Hartmann, P.C.
Paul M. G. Helms
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois 60654
(312) 862-2215

Andrew M. Genser
John P. Del Monaco
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4611
(212) 446-4809

*Counsel for Defendant Joseph Scoby*