UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re UBS AUCTION RATE SECURITIES
LITIGATION

This Documents Relates To:

    All Actions

Case No. 08-CV-2967 (LMM)(KNF)
 ECF Case

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT DAVID SHULMAN'S MOTION TO DISMISS
THE FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

Robert J. Anello
Judith L. Mogul
Thomas M. Keane
MORVILLO, ABRAMOWITZ, GRAND,
 IASON, ANELLO & BOHRER, P.C.
565 Fifth Avenue
New York, New York 10017
(212) 856-9600

*Attorneys for Defendant David Shulman*

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................... ii

PRELIMINARY STATEMENT ..................................................................... 1

THE ARS MARKET ...................................................................................... 4

THE AMENDED COMPLAINT .................................................................... 6

THE ALLEGED MANIPULATIVE SCHEME.............................................. 7

THE LIMITED ALEGATIONS AGAINST DAVID SHULMAN................... 8

ARGUMENT.................................................................................................. 9

I.   The Amended Complaint fails to State a Claim for Market
     Manipulation Against Mr. Shulman........................................................ 9

     A.   The Amended Complaint Makes No Particularized
          Allegations Against David Shulman ............................................. 11

     B.   UBS's Practice of Supporting ARS Auctions Was Not
          Deceptive Conduct Actionable as Securities Fraud ...................... 14

     C.   At Best, Plaintiffs Appear to Allege Misrepresentations and
          Omissions, Which Are Not Attributed to Mr. Shulman ................. 15

     D.   The Amended Complaint Does Not Plead Facts Permitting a
          Strong Inference That Mr. Shulman Acted with Scienter ............. 19

II.  The Amended Complaint Fails to Allege a "Control Person"
     Claim Against Mr. Shulman .................................................................. 23

     CONCLUSION......................................................................................... 25

## TABLE OF AUTHORITIES

### CASES

*In re Alstom SA Sec. Litigation*, 406 F. Supp. 2d 433 (S.D.N.Y. 2005) ......................... 19, 23, 24

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007).................... *passim*

*Basic Inc. v. Levinson*, 485 U.S. 224, 108 S. Ct. 978 (1988) .......................................18

*In re Blech Sec. Litigation*, 961 F. Supp. 569 (S.D.N.Y. 1997) ....................................10

*Caiola v. Citibank, N.A.*, 295 F.3d 312 (2d Cir. 2002) ..........................................18-19

*Catton v. Defense Technology Systems, Inc.*,
  2006 WL 27470 (S.D.N.Y. Jan. 3, 2006)..............................................................17

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N. A.*,
  511 U.S. 164, 114 S. Ct. 1439 (1994) ...............................................................10

*Chiarella v. United States*, 445 U.S. 222, 100 S. Ct. 1108 (1980) ...............................18

*Chill v. General Electric Co.*, 101 F.3d 263 (2d Cir. 1996)......................................21

*In re Deutsche Telekom AG Sec. Litigation*,
  2002 WL 244597 (S.D.N.Y. Feb. 20, 2002) ..........................................................24

*Dietrich v. Bauer*, 76 F. Supp. 2d 312 (S.D.N.Y. 1999)..........................................23

*DiVittorio v. Equidyne Extractive Industrial, Inc.*, 822 F.2d 1242 (2d Cir. 1987)......................10

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S. Ct. 1375 (1976)................................24

*Filler v. Hanvit Bank*, 2003 WL 22110773 (S.D.N.Y. Sept. 12, 2003).....................................11

*Filler v. Hanvit Bank*, 156 Fed. Appx. 413 (2d Cir. 2005) .......................................18

*GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189 (3d Cir. 2001) ...........................................15

*In re Global Crossing, Ltd. Sec. Litigation*,
  2005 WL 1875445 (S.D.N.Y. Aug. 5, 2005)...........................................................23

*Joffee v. Lehman Brothers, Inc.*, 410 F. Supp. 2d 187 (S.D.N.Y. 2006)....................................11

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001).........................................................21

*Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269 (S.D.N.Y. 2008)......................14

*Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161 (2d Cir. 2005) ..............................................17

*In re Livent, Inc. Noteholders Sec. Litigation*,
    151 F. Supp. 2d 371 (S.D.N.Y. 2001)...................................................................................24

*Miller v Lazard, Ltd.*, 473 F. Supp. 2d 571 (S.D.N.Y. 2007)........................................................21

*Muller-Paisner v. TIAA*, 289 Fed. Appx. 461 (2d Cir. 2008).......................................................17

*Nanopierce Tech., Inc. v. Southridge Capital Management LLC*,
    2002 WL 31819207 (S.D.N.Y. Oct. 10, 2002).......................................................................15

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000)..................................................................17, 21

*Overton v. Todman & Co.*, 478 F.3d 479 (2d Cir. 2007) .............................................................18

*In re Par Pharm. Inc. Sec. Litigation*, 733 F. Supp. 668 (S.D.N.Y. 1990)...................................19

*In re Parmalat Sec. Litigation*, 570 F. Supp. 2d 521 (S.D.N.Y. 2008)..........................................14

*Pugh v. Tribune Co.*, 521 F.3d 686 (7th Cir. 2008) ....................................................................13

*In re Refco, Inc. Sec. Litigation*, 609 F. Supp. 2d 304 (S.D.N.Y. 2009)...................................13-14

*Rich v. Maidstone Financial, Inc.*,
    2002 WL 31867724 (S.D.N.Y. Dec. 20, 2002) .................................................................18, 24

*S.E.C. v. First Jersey Securities*, 101 F.3d 1450 (2d Cir. 1996)..................................................23

*S.E.C. v. Lucent Tech., Inc.*, 610 F. Supp. 2d 342 (D.N.J. 2009) ................................................17

*S.E.C. v. U.S. Environmental, Inc.*, 82 F. Supp. 2d 237 (S.D.N.Y. 2000) ...................................11

*Santa Fe Industrial v. Green*, 430 U.S. 462, 97 S. Ct. 1292 (1977)............................................14

*Schnell v. Conseco, Inc.*, 43 F. Supp. 2d 438 (S.D.N.Y. 1999)...................................................17

*Shapiro v. Cantor*, 123 F.3d 717 (2d Cir. 1997)........................................................................18

*Silva Run Worldwide Ltd. v. Gaming Lottery Corp.*,
    1998 WL 167330 (S.D.N.Y. Apr. 8, 1998) ..........................................................................24

*In re Sotheby's Holdings, Inc. Sec. Litigation*,
    2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000)........................................................................23

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.,*
  552 U.S. 148, 128 S. Ct. 761 (2008) .......................................................... 10, 13, 17

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank,*
  250 F.3d 87 (2d Cir. 2001) ................................................................................ 24

*Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857 (7th Cir. 1995) ....................... 15

*In re Take-Two Interactive Sec. Litigation*, 551 F. Supp. 2d 247 (S.D.N.Y. 2008) .................... 21

*TCS Capital Management, LLC v. Apax Partners, L.P.,*
  2008 WL 650385 (S.D.N.Y. Mar. 7, 2008) .................................................. 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
  551 U.S. 308, 127 S. Ct. 2499 (2007) ..................................................... 19-20

*Vogel v. Sands Brothers & Co.*, 126 F. Supp. 2d 730 (S.D.N.Y. 2001) ...................................... 21

*Wright v. Ernst & Young LLP*, 152 F.3d 169 (2d Cir. 1998) .................................................... 17

## STATUTES AND REGULATIONS

15 U.S.C. § 78u-4(b)(1) ........................................................................................ 17

15 U.S.C. § 78u-4(b)(2) ................................................................................... 11, 19

17 C.F.R. § 228.508 ............................................................................................ 14

17 C.F.R. § 240.10b-5 ................................................................................... *passim*

17 C.F.R. § 242.103 ............................................................................................ 14

62 Fed. Reg. 520 (Jan. 3, 1997) ........................................................................... 14

Fed. R. Civ. P. 9(b) ...................................................................................... 1, 10, 13

Fed. R. Civ. P. 12(b)(1) ......................................................................................... 1

Fed. R. Civ. P. 12(b)(6) ......................................................................................... 1

## MISCELLANEOUS

Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings,
  and Imposing Remedial Sanctions and a Cease-and-Desist Order Pursuant to Section
  8A of the Securities Act of 1933 and Section 15(b) of the Securities Act of 1934 (May
  31, 2006) ...................................................................................................... 5-6

Defendant David Shulman respectfully submits this Memorandum of Law in support of his motion to dismiss with prejudice the claims asserted against him in the First Amended Consolidated Class Action Complaint dated May 8, 2009 (the õAmended Complaintö), pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(1), and 12(b)(6), and under the Private Securities Litigation Reform Act (the õPSLRAö).[1]  Because plaintiffsø entire market manipulation scheme is vague, ill-defined, and unsupported by a single specific allegation, their allegations against Mr. Shulman are necessarily also unsupported by any specific assertion, let alone the particularized allegations required to state a claim for securities fraud.  The only allegedly õmanipulativeö conduct plaintiffs identify is UBSøs disclosed and legitimate practice of placing support bids in ARS auctions.  Plaintiffs do not allege that Mr. Shulman directed the practice of placing support bids or implemented it in connection with a single bid in a single auction. They also do not and could not allege that he was involved in designing or disseminating disclosures concerning ARS.  They also do not allege that they relied on any conduct or statement attributable to Mr. Shulman.  Finally, they do not allege facts from which it could plausibly be inferred that Mr. Shulman acted deceptively or with fraudulent intent.   For these reasons the Amended Complaint should be dismissed as against David Shulman.

## PRELIMINARY STATEMENT

This is the third attempt by a group of plaintiffs to plead a cognizable claim arising out of the collapse of the Auction Rate Securities (õARSö) market against a number of

---

[1] In addition, to the extent consistent with the arguments set forth herein, Mr. Shulman relies upon and incorporates by reference the arguments set forth in the Memorandum of Law submitted by defendants UBS AG, UBS Securities LLC (õUBS Securitiesö), UBS Financial Services Inc. (õUBS FSö), Marcel Rohner, and Marten Hoekstra in support of their Motion to Dismiss the Complaint (the õUBS Memorandumö or õUBS Mem.ö), as well as in the Memorandum of Law submitted by defendant Joseph Scoby (the õScoby Mem.ö).  This Memorandum of Law sets forth additional reasons why the claims against Mr. Shulman in his individual capacity should be dismissed.

UBS entities and individuals.[2]  By retaining David Shulman as an individual defendant in the Amended Complaint, plaintiffs persist in seeking to lay the blame for an industry-wide phenomenon at Mr. Shulman's feet, simply because he ran the UBS group which housed a portion of UBS's ARS business during part of the class period.  David Shulman served briefly as the head of the Municipal Securities Group ("MSG") of UBS Securities.  Plaintiffs do not allege that Mr. Shulman developed or devised any of the policies, practices or disclosures about which plaintiffs complain, or even that Mr. Shulman performed any of the acts on which they base their claims.  Plaintiffs' only allegations with respect to Mr. Shulman consist of his title and excerpts from *internal* communications that informed others within UBS of developments and priorities concerning the ARS market.  The Amended Complaint fails to identify any deceptive statements, omissions, or acts by Mr. Shulman, let alone any statement, omission of act of Mr. Shulman's upon which plaintiffs could have relied.

In the first attempt to bring an ARS-related class action against UBS, putative lead plaintiffs David and Shelly Chandler alleged damages stemming from the inability of UBS retail ARS purchasers to liquidate ARS they held after the ARS market collapsed in February 2008.  This first pleading alleged that UBS Securities, UBS FS, and UBS AG made misrepresentations regarding the liquidity of UBS ARS and failed to disclose to UBS customers facts relating to the liquidity of UBS ARS.  In August 2008, UBS entered into a settlement with the SEC and other regulators pursuant to which it agreed to buy back over $22 billion in ARS from its customers, restoring the liquidity of their investments.

Thereafter, on September 5, 2008, having seen the basis for their claim evaporate,

---

[2] The first such attempt came in a complaint filed in this action on March 21, 2008.  On September 5, 2008, a second complaint (the "Consolidated Class Action Complaint") was filed.  On March 30, 2009, the Court dismissed the Consolidated Class Action Complaint, but granted leave to amend.  On May 8, 2009, a substitute group of lead plaintiffs (the "Neu Group") filed the Amended Complaint (or "Am. Cmplt.").

the Chandlers filed a Consolidated Class Action Complaint premised on a new theory. They alleged – against the same three UBS corporate entities, as well as against four individuals (David Shulman, an employee of UBS Securities; Joseph Scoby, Chief Risk Officer of UBS AG; Marcel Rohner, CEO of UBS AG; and Marten Hoekstra, Deputy CEO of UBS FS) – new claims tailored to avoid the obvious conclusion that UBS customers had been made whole by UBS's settlement with the SEC. No longer able to assert claims based on a lack of liquidity, plaintiffs asserted that the defendants had (1) misrepresented to UBS customers the way that interest rates and dividends were set with respect to UBS ARS, (2) failed to disclose the extent of UBS's involvement in the auction process that set those rates, and (3) manipulated those rates to the plaintiffs' detriment, by setting rates that were artificially low.

Mr. Shulman individually moved to dismiss the Consolidated Class Action Complaint because it failed to state a claim against him. Among the defects he identified in that pleading, was its failure to allege a single misleading statement, omission or act by Mr. Shulman on which the plaintiffs could have relied. On March 30, 2009, the Court dismissed the Consolidated Class Action Complaint without reaching Mr. Shulman's individual arguments, holding that the named plaintiffs, each of whom had accepted UBS's offer to buy back their ARS, lacked standing to assert claims arising out their ARS purchases from UBS.[3]

Now, a substitute group of lead plaintiffs (the "Neu Group"), most of whom were never UBS clients, and none of whom alleges they ever dealt with Mr. Shulman, seek to assert

---

[3] The Court granted the Chandler plaintiffs leave to replead within 30 days, if they could do so consistent with their obligations under Rule 11. Instead, a new group of plaintiffs was substituted and filed the Amended Complaint. The plaintiffs obtained a stipulation from counsel for UBS and Messrs. Rohner and Hoekstra to extend the 30-day period in which they were to serve their amended pleading, but failed to seek or obtain any stipulation from counsel for Mr. Shulman or for Mr. Scoby. The Amended Complaint is therefore untimely with respect to Mr. Shulman and Mr. Scoby. This cavalier attitude by plaintiffs with respect to their claims against Mr. Shulman speaks volumes about the claims' substance, particularly when viewed in light of plaintiffs' persistent failure to allege any specific misconduct by Mr. Shulman. Simply put, plaintiffs appear to regard Mr. Shulman as an afterthought, rather than as a proper defendant.

ARS-related claims under yet another new theory of liability. The Amended Complaint now purports to assert a claim for market manipulation only, alleging that UBS's involvement in the auction process suppressed ARS interest rates and auction failures, supposedly concealing the true risks associated with the ARS plaintiffs purchased. *See* Am. Cmplt. ¶¶ 198-204.

       The manipulation claim plaintiffs seek to construct in the Amended Complaint makes no sense. They posit a scheme under which UBS deliberately took on billions of dollars of securities which it did not want, at inflated prices, earning artificially deflated interest rates – a "scheme" in which, by every measure, UBS would have been its own greatest "victim." Moreover, plaintiffs' allegations are internally inconsistent. Although their hypothetical scheme is predicated on UBS's *suppression* of interest rates paid at ARS auctions, plaintiffs focus on steps UBS took to *raise* those interest rates. They argue that UBS was wrong to bid in the auctions, yet their real complaint seems to be that UBS *stopped* bidding in the auctions, leaving them with illiquid securities. The Amended Complaint fails to articulate a legal basis for the manipulation claim against any UBS defendant. *See* UBS Mem. at 11-16. In particular, the plaintiffs' market manipulation claim utterly fails with respect to Mr. Shulman, who is not alleged to have performed any manipulative act, much less an act on which the plaintiffs relied, and against whom there are no allegations showing a likelihood that he acted with scienter.

## THE ARS MARKET[4]

       Auction rate securities ("ARS") are long-term debt instruments or perpetual equity instruments that pay interest or dividends at rates set at periodic auctions. *See* Am. Cmplt. ¶ 37. Prior to February 2008, ARS traded at par, with varying rates of interest or dividends set at regular internals (typically every seven, twenty-eight or thirty-five days) in a Dutch auction

---

[4] The Court may rely upon facts set forth in documents referenced in the complaint, matters of public record, and documents upon which Plaintiffs' claims are based, and may also take judicial notice of facts capable of accurate and ready determination from sources whose accuracy cannot reasonably be questioned. *See* UBS Mem. at n. 4.

process, based upon bids submitted by broker-dealers on behalf of current or prospective

purchasers. *See id.* ¶ 41. Investors bid to purchase ARS at particular rates of interest or

dividends. In a successful auction, the number of shares bid for purchase is greater than or equal

to the number of shares offered for sale, and the interest or "clearing" rate for the particular ARS

issue is set, until the next auction, at the lowest rate bid at which all shares could be sold. *Id.* at ¶

44. When more sellers exist than bidders at an ARS auction, the auction fails and the interest

rate or dividend is set according to a rate or formula provided in the offering documents for that

ARS issue, until the next successful auction. *See id.* ¶¶ 44-45.

ARS have been offered to investors since approximately 1984. *See id.* ¶¶ 39-40.

Historically, firms running ARS auctions placed "support" bids for their own accounts in some

ARS auctions – a recognized and well-publicized practice ensuring the orderly operation of the

auctions by preventing a failed auction or an "outside" bid from skewing the auction results. *See*

Sullivan Decl. Ex. T at 6[5]; Am. Cmplt. ¶ 52. In 2006, after investigating support bids by certain

financial institutions (not including UBS), the SEC concluded that the practice is not prohibited

if properly disclosed.[6] UBS disclosed on its website and in ARS prospectuses that it placed

support bids in the auctions it managed, explaining, for example, that "with full knowledge of the

bids submitted by other auction participants [UBS] may deem it appropriate (though not

obligatory) to submit bids for its own account during the auction, or the Firm might decide to bid

to prevent a failed auction or an outside bid from skewing the auction results." *See* Sullivan

Decl. Ex. T at 6. *See also id.* Ex. A at 48, Ex. B at 48-50, Ex. C at 34, Ex. D at 23. UBS also

---

[5] "Sullivan Decl." refers to the Declaration of William F. Sullivan, dated August 28, 2009, submitted in support of the motion to dismiss filed by defendants UBS AG, UBS FS, UBS Securities, Marten Hoekstra, and Marcel Rohner.

[6] *See* Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order Pursuant to Section 8A of the Securities Act of 1933 and Section 15(b) of the Securities Act of 1934, dated May 31, 2006 (the "2006 SEC Order), available at

disclosed that it placed support bids "in a large percentage of auctions" and "believ[ed] that a significant number of auctions would fail if it did not do so." *See* Sullivan Decl. Ex. T, at 6.

As the financial markets began to absorb the impact of the subprime crisis in August 2007, UBS and other broker-dealers opted not to place support bids for some auctions in a subcategory of ARS known as Auction Preferred Securities ("APS"). *See* Am. Cmplt. ¶ 87. The auctions for these APS products failed, resulting in a loss of liquidity for the holders of those products. *See id.* ¶¶ 50, 98-99. These failures and their consequences to investors were widely publicized in the mainstream press (*see* Sullivan Decl. Exs. M, N), and led many investors to reconsider their ARS investments. *See* Am. Cmplt. ¶¶ 50, 98-100. As the credit markets deteriorated further, UBS continued its practice of entering support bids at ARS auctions, pricing its bids aggressively as a consequence of the decreased demand for the product. *See* Am. Cmplt. ¶¶ 71-72, 100. As a result, UBS acquired ARS for its own account, and its inventory of ARS grew substantially. *See id.* ¶ 147 (alleging that UBS ended 2007 with an ARS inventory of $5 billion, which grew to nearly $11 billion by February 2008). Eventually, at the end of January and the beginning of February 2008, other broker-dealers stopped placing support bids, allowing the ARS auctions they conducted to fail. *See id.* ¶ 106. On February 12, 2008, UBS, then the last remaining institution to support the ARS product, also withdrew its support for the ARS auctions, resulting in failure for many of the auctions it managed. *See id.* ¶ 103.

## THE AMENDED COMPLAINT

The Amended Complaint acknowledges that the different UBS entities named as defendants played distinct roles in the UBS's ARS business. Such distinctions are critical in evaluating plaintiffs' claims against David Shulman as an individual defendant employed only

---

http://www.sec.gov/litigation/admin/2006/33-8684.pdf. A copy of the 2006 SEC Order is attached to the Sullivan Declaration as Exhibit E. UBS was not a subject of the SEC investigation.

by UBS Securities, who never worked for either UBS FS or UBS AG. *See id.* ¶ 20. According to the Amended Complaint, during a portion of the Class Period, UBS Securities underwrote some ARS issues (*see id.* ¶ 47) and conducted periodic ARS auctions. Mr. Shulman's employer, UBS Securities, did not sell ARS to retail customers. ARS were sold to retail customers such as the plaintiffs by UBS FS and by other broker-dealers including E*Trade, Raymond James and Wells Fargo, each of which was responsible for providing disclosures to its customers concerning the securities it sold. *See Am. Cmplt.* ¶ 11 (plaintiff Neu purchased ARS from E*Trade); *id.* ¶ 12 (plaintiff Dutcher purchased ARS from Raymond James); *id.* ¶ 14 (plaintiff Baumel purchased ARS from Wells Fargo).[7] UBS Securities also is not alleged to have determined whether to support or fail the ARS auctions. Instead, plaintiffs allege that that decision was directed by the Governing Executive Board (the "GEB") of UBS AG. *See id.* ¶¶ 102, 145, 154, 157-158. These distinctions between the different UBS entities are fatal to the claims against Mr. Shulman, who, as an employee of UBS Securities had no role in UBS AG, which allegedly decided whether to continue or withdraw support for the ARS auctions, and who also had no role in the sales or disclosures to any retail ARS purchaser.

## THE ALLEGED MANIPULATIVE SCHEME

The essence of plaintiff's supposed scheme claim is that by bidding to purchase ARS for its own account, UBS Securities allegedly prevented auction failure and effectively set interest rates for the ARS it auctioned too low to accurately reflect the risks associated with ARS. *See Am. Cmplt.* ¶¶ 51-77. According to plaintiffs, UBS FS concealed the true liquidity characteristics of UBS ARS by allegedly making misrepresentations to investors and failing to disclose the true risks associated with ARS. *See id.* ¶¶ 60-66. Under the scheme plaintiffs seek

---

[7] Plaintiff Elston purchased ARS from UBS FS, not from Mr. Shulman's employer, UBS Securities. *See* Am. Cmplt. ¶ 13.

to plead, UBS acquired more ARS for its own account than it was willing to hold, purportedly causing defendants to pressure UBS financial advisors ("FAs") to sell ARS to "unsuspecting" retail investors.  *See id.* ¶¶ 78-88.

Despite the fact that plaintiffs' scheme turns on UBS's alleged *suppression* of interest rates, plaintiffs include as part of the scheme allegations that UBS persuaded ARS issuers and credit rating agencies to grant temporary waivers of rate caps so that UBS could *raise* interest rates to attract investors.  *See id.* ¶¶ 89-92.  The final aspect of the alleged scheme occurred in February 2008, when, in response to the alleged preference of UBS AG's GEB, and without revealing its decision to investors in advance, UBS stopped the very practice of which plaintiffs complain, and ceased entering support bids, resulting in failure for most of the auctions it had supported.  *See id.* ¶¶ 98-107.  Strikingly, plaintiffs fail to specify a single ARS issue, ARS auction, interest rate, rate cap, or disclosure given to any plaintiff other than to identify the particular ARS they themselves own.  Moreover, although they quote from several of David Shulman's internal e-mails, they make no specific allegation concerning conduct or statements by Mr. Shulman which were improper or upon which they claim to have relied.

## THE LIMITED ALLEGATIONS AGAINST DAVID SHULMAN

Plaintiffs do not allege that David Shulman engaged in any of the conduct they contend constituted manipulation of the ARS markets.  In the sole paragraph in the Amended Complaint purporting to describe Mr. Shulman's role in the ARS business, plaintiffs make only broad, conclusory allegations:

> Defendant David Shulman ("Shulman") was the Global Head of Municipal Securities Group and the Head of Fixed Income Americas at UBS Securities during the Class Period.  Shulman managed UBS Securities' auction rate securities program during the Class Period and participated in Defendants' scheme to manipulate and perpetuate the market for UBS ARS during the Class Period, as described herein.

Am. Cmplt. ¶ 20.  Thereafter, Plaintiffs simply repeat that David Shulman "managed UBS's Auction Rate Securities program[.]" *Id*. ¶ 53.

This allegation of Mr. Shulman's supposed "participation" fails to specify when during the five-year Class Period Mr. Shulman is alleged to have "managed" UBS's ARS program or what conduct by Mr. Shulman as supposed "manager" of the ARS program constituted alleged manipulation of the ARS market.  Although the Amended Complaint relies elsewhere on e-mails sent by or to Mr. Shulman to fill in background details regarding UBS's role in the ARS market and the pressures caused by rising inventories, on the key issues, his emails shed no light.  Mr. Shulman's e-mails do not reflect any involvement on his part in UBS's alleged manipulation of the ARS market through placement of rate-depressing support bids, the disclosures regarding ARS made to investors such as the plaintiffs, or the determination of UBS's overall position on supporting the ARS auctions, and they certainly do not support a claim that he engaged in any act of market manipulation.  In fact, those e-mails demonstrate that Mr. Shulman believed UBS's support bids were aimed at raising, not suppressing ARS interest rates – precisely the opposite of the manipulative conduct alleged by plaintiffs.[8]

## ARGUMENT

### I. The Amended Complaint Fails to State a Claim For Market Manipulation Against Mr. Shulman

Although plaintiffs style their claim as one for market manipulation, they fail to allege any specific "manipulation" of the ARS markets by UBS, fail to supply any particulars regarding the manipulation they allege, and, most significantly for this motion, fail to allege any conduct by Mr. Shulman related to the manipulative scheme they claim occurred.  Such lack of specificity flies in the face of the applicable pleading standards, and threatens David Shulman

---

[8] *See* Am. Cmplt. ¶ 73 (quoting Mr. Shulman as saying "we continue to cheapen up our levels," meaning raise rates).

with being "improperly swept into the discovery stage of [this] litigation." *In re Blech Sec. Litig.*, 961 F. Supp. 569, 580 (S.D.N.Y. 1997) ("each defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which he individually stands charged.").

To make out their claim for securities fraud based on alleged market manipulation, plaintiffs must allege as to each defendant the elements of their claim, which are: (1) a manipulative act; (2) damage; (3) caused by reasonable reliance on the existence of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange. *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007). Moreover, plaintiffs must allege that they relied upon a fraudulent act actually committed by Mr. Shulman. *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 128 S. Ct. 761, 768, (2008) (plaintiff must have relied on the defendants' own statements or conduct).[9]

Not only must plaintiffs plead each of these elements with respect to Mr. Shulman individually, but they must do so with particularity. *See* Fed. R. Civ. P. 9(b) (requiring that plaintiffs "must state with particularity the circumstances constituting fraud"). To state a market manipulation claim, this requires plaintiffs to "plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants." *ATSI*, 493 F.3d at 102. That means that plaintiffs must plead facts sufficient to show how, as they put it in Paragraph 20 of the Amended Complaint, that Mr. Shulman personally "participated in Defendants' scheme[.]" *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987) ("Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform

---

[9] *See also Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N. A.*, 511 U.S. 164, 177-78, 114 S. Ct. 1439, 1448 (1994) (aiding and abetting liability does not exist under Rule 10b-5); *In re Blech*, 961 F. Supp. at 580 (to state a manipulation claim, plaintiffs must allege "direct participation" by the defendant).

each defendant of the nature of his alleged participation in the fraud.ö.[10]  Under the PSLRA,

moreover, plaintiffs must östate with particularity facts giving rise to a strong inference that the

defendant acted with the required state of mind.ö  15 U.S.C. § 78u-4(b)(2).  No such allegation is

made with respect to David Shulman.

### A.  The Amended Complaint Makes No Particularized Allegations Against David Shulman

Plaintiffs are required, at a minimum, to identify öwhat manipulative acts were

performed, which defendants performed them, when the manipulative acts were performed, and what

effect the scheme had on the market.ö  *ATSI*, 493 F.3d at 102.  Although plaintiffs need not separately

allege each 10(b)(5) element for each individual transaction, they must, at a minimum öcouple

specific allegations concerning sample transactions with more general allegations concerning the

conduct of the defendant.ö  *Joffee v. Lehman Bros., Inc.*, 410 F. Supp. 2d 187, 192 (S.D.N.Y. 2006).

*See also S.E.C. v. U.S. Environmental, Inc.*, 82 F. Supp. 2d 237, 240 (S.D.N.Y. 2000) (requiring

ödetailed descriptions of a few sample tradesö).  The allegations against Mr. Shulman fall well short

of that mark.  Plaintiffs allege merely that Mr. Shulman ömanaged UBS Securitiesø auction rate

securities program during the Class Period and participated in Defendantsø scheme to manipulate and

perpetuate the market for UBS ARS[.]ö  Am. Cmplt. ¶ 20.  They fail to identify a single sample

transaction that was manipulated, or any conduct by Mr. Shulman in furtherance of the alleged

manipulative scheme.

In fact, plaintiffs do not specify any ARS issue or any specific auction that was

öriggedö in the manipulation scheme they impute to UBS.  They do not identify a single interest

rate that was either raised or suppressed as a result of the scheme which they allege.  Rather,

---

[10] See also *S.E.C. v. U.S. Envtl., Inc.*, 82 F. Supp. 2d 237, 241 (S.D.N.Y. 2000) (ö[P]laintiff[s] must satisfy Rule 9(b) as to each individual defendant, and cannot do so by making vague allegations about the defendants as a unit.ö); *Filler v. Hanvit Bank*, 2003 WL 22110773, at *2 (S.D.N.Y. Sept. 12, 2003) (The öcomplaint may not simply clump defendants together in vague allegations.ö).

plaintiffs resort to sweeping generalized allegations such as "UBS Securities generally caused interest rates to decrease once it had sold sufficient UBS ARS to reduce its own inventory," Am. Cmplt. ¶ 70, although the only specific allegations they make regarding UBS inventories indicate a precipitous rise, rather than any decrease in ARS inventory levels. *See id.* ¶ 147. Plaintiffs do not identify when during the five-year class period UBS engaged in this alleged manipulation. Most importantly, plaintiffs do not ascribe any of the allegedly manipulative conduct to David Shulman, who for most of the class period had no involvement with ARS.[11] Such "[g]eneral allegations not tied to defendants" or those "resting upon speculation are insufficient" to state a claim for market manipulation and must be dismissed. *ATSI*, 493 F.3d at 102-03 (dismissing as insufficiently particularized manipulation claim that failed to state "even roughly how many shares the defendants [in an alleged short-selling scheme] sold, when they sold them, and why those sales caused the precipitous drop in stock price.").

       The lack of any specificity as to when during the five-year class period the alleged manipulation took place is particularly prejudicial to Mr. Shulman whose tenure in the MSG was limited in duration. Plaintiffs artfully allege only that Mr. Shulman was employed by the MSG "during" the class period, and that the alleged market manipulation also took place during the class period. Through these sweeping, unparticularized allegations, they imply, but certainly do not allege, some overlap between the manipulative conduct they claim occurred and Mr. Shulman's stint as head of the MSG. UBS's disclosed practice of placing support bids in auctions, however, began well before Mr. Shulman came to the MSG, and to the extent the challenged conduct took place before his arrival, has no connection whatsoever to Mr. Shulman. Moreover, inasmuch as the crux of plaintiffs' manipulation claim is that UBS artificially

---

[11]  The earliest e-mail plaintiffs quote as having been sent to or from David Shulman is dated August 22, 2007 (*see* Am. Cmplt. ¶ 80), and they allege no earlier involvement on his part.

depressed interest rates in order to signal to the market that ARS were low risk investments,[12] their allegations pertaining to Mr. Shulman undercut, rather than support that claim. Specifically, on the subject of UBS's role in supporting auctions they cite an e-mail in which Mr. Shulman acknowledges UBS's historical role in placing support bids in ARS auctions (*see* Am. Cmplt. ¶ 53), and an e-mail he allegedly wrote that says "we continue to cheapen up our levels to clear this paper." *Id.* ¶ 73 (to cheapen levels means to price aggressively, resulting in higher interest being paid to the ARS holder).[13]  Neither allegation provides any support for the plaintiffs' conclusory allegation that Mr. Shulman or anyone else at UBS participated in *any* conduct *reducing* interest rates.   By failing to allege any specifics as to when the manipulative conduct purportedly occurred, what it consisted of, how it effected the market in the manner they allege was manipulative, or Mr. Shulman's purported role in that alleged conduct, plaintiffs' fall woefully short of the particularized allegations required by Rule 9(b).[14]

Not only do plaintiffs fail to allege any manipulative conduct on Mr. Shulman's part, but they also do not and cannot allege that they relied on Mr. Shulman's conduct – a separate and independent basis for dismissal of their Section 10(b) and Rule 10b-5 claim against him.  Under the Supreme Court's recent decision in *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 128 S. Ct. 761, 770 (2008), plaintiffs must allege that they relied on some alleged deceptive conduct by Mr. Shulman that was communicated to them.  *See also Pugh v. Tribune Co.*, 521 F.3d 686, 697 (7th Cir. 2008); *In re Refco, Inc. Sec. Litig.*, 609 F.

---

[12] *See Am. Cmplt.* ¶ 76 (alleging that "purchasers of income securities such as bonds and preferred stocks consider higher interest rates to be an indicator of increased risk"); ¶ 70 ("UBS Securities generally caused interest rates to decrease once it had sold sufficient UBS ARS to reduce its own inventory."); ¶ 68 (alleging that UBS Securities kept rates low in order to avoid alienating issuer clients).

[13] *See also id.* ¶ 70 (referring to UBS as engaging in an "aggressive price approach"); ¶ 72 (referring to "aggressively widening spreads").

[14] Notably, Mr. Shulman made these arguments in response to Consolidated Class Action Complaint, but the Neu Group plaintiffs, represented by the same lead counsel, made no attempt to plead additional specifics when the Court allowed the filing of an amended complaint.

Supp. 2d 304, 312 (S.D.N.Y. 2009); *Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d

269, 272-73 (S.D.N.Y. 2008); *In re Parmalat Sec. Litig.*, 570 F. Supp. 2d 521, 524-25 (S.D.N.Y.

2008). Inasmuch as plaintiffs identify no conduct by Mr. Shulman, let alone conduct about

which they were aware, they fail to allege the requisite element of reliance and their claim

against him should be dismissed.[15]

### B. UBS's Practice of Supporting ARS Auctions Was Not Deceptive Conduct Actionable as Securities Fraud

By failing to particularize their allegations beyond merely identifying UBS's

disclosed, longstanding practice of auction support, plaintiffs seek to brand what they concede is

the historic, industry-wide practice of placing support bids as unlawful market manipulation. As

a matter of law, however, the placement of support bids cannot, in and of itself, constitute market

manipulation. Market manipulation is "virtually a term of art" in the securities fraud context,

and refers only to deceptive practices such as "wash sales, matched orders, or rigged prices."

*Santa Fe Indus. v. Green*, 430 U.S. 462, 476, 97 S. Ct. 1292, 1302 (1977). In order to be

actionable as securities fraud, activity challenged as manipulative must be aimed at deceiving

investors. *ATSI*, 493 F.3d at 101 (conduct "actionable as a manipulative act [under Section

10(b),] must be willfully combined with something more to create a false impression of how

market participants value a security"). Even if plaintiffs had alleged facts demonstrating that

UBS participated in auctions for ARS in which they invested, UBS's practice of placing support

bids in ARS auctions does not fall within the narrow scope of activities proscribed as

"manipulative" under the securities laws. As a general matter, market stabilizing activities are

recognized as beneficial to all market participants. *See* Anti-Manipulation Rules Concerning

Securities Offerings, 62 Fed. Reg. 520 (Jan. 3, 1997) (codified at 17 C.F.R. §§ 228.508, 242.103

---

[15] Indeed, as set forth in the UBS Memorandum, plaintiffs fail to plead any legally recognized theory of reliance. *See* UBS Mem. at 21-26.

(recognizing market stabilization as an "effective mechanism for fostering an orderly distribution of securities [that] promotes the interests of shareholders, underwriters, and issuers."). Moreover, the SEC has specifically found that the stabilizing activity of issuing support bids in ARS auctions is appropriate if properly disclosed. *See* Sullivan Decl. Ex. E, at 6 n.6.

UBS expressly disclosed not just that it entered support bids in auctions, but that it did so "in a large percentage of auctions" and "believ[ed] that a significant number of auctions would fail if it did not do so." *See* Sullivan Decl. Ex. T, at 6. It similarly disclosed that it placed support bids with full knowledge of the bids already submitted by other auction participants. *Id.* UBS's open and disclosed placement of support bids, consistent with longstanding industry practice, was thus a legitimate form of market stabilization, and lacked the deceptive component or improper purpose required to show market manipulation under the Section 10(b). *See ATSI*, 493 F.3d at 100 (market manipulation encompasses only conduct "aimed at deceiving investors"); *Nanopierce Tech., Inc. v. Southridge Capital Mgmt. LLC*, 2002 WL 31819207, at * 8 (S.D.N.Y. Oct. 10, 2002) (requiring a "combination of subjective intent and deceptive conduct" in order to state a claim for market manipulation). *See also GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 207 (3d Cir. 2001) (lawful short selling, even if it drives down stock price, does not constitute manipulation); *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 864-65 (7th Cir. 1995) (even "unprecedented massive short selling" did not constitute manipulation).

## C. At Best, Plaintiffs Appear to Allege Misrepresentations and Omissions, Which Are Not Attributed to Mr. Shulman

Plaintiffs appear to base their manipulation claim on alleged misrepresentations and omissions that they cannot and do not attribute to Mr. Shulman, who played no role in ARS disclosures and had no contact with plaintiffs. The Amended Complaint alleges that a key part

of the purported scheme consisted of "*making false and misleading statements and incomplete disclosures* about the liquidity of UBS ARS and UBS Securities' role in propping up the auction rate securities market[.]"  Am. Cmplt. ¶ 49 (emphasis added).  That allegation is restated and expanded upon in various forms repeatedly, throughout the Amended Complaint.  Plaintiffs allege that ARS were misrepresented as highly liquid cash equivalents.  *See id.* ¶ 5 (alleging that ARS were "falsely described . . . as highly liquid"); *id.* ¶ 61 (same); *id.* ¶ 178 (complaining about sale of ARS "as cash or money market equivalents").  Plaintiffs likewise allege that defendants "failed to disclose" the extent of UBS's placement of support bids.  *Id.* ¶ 57.  *See also id.* ¶ 59 (same); *id.* ¶ 66 (same); *id.* ¶ 87 (same).  In short, plaintiffs allege that ARS were sold "*without disclosing* that the market for those securities was manipulated on a systematic and pervasive basis."  *Id.* ¶ 178 (emphasis added).  And that "[d]efendants *failed to disclose* the purpose, nature, and effect of their manipulative conduct to Plaintiffs and Class members and the investing public generally."  *Id.* ¶ 206 (emphasis added).[16]  If only the truth had been *disclosed*, say plaintiffs, "the public would have been alerted to the true risk characteristics of the auction rate securities for which UBS Securities served as an auction dealer."  *Id.* ¶ 59.

Plaintiffs' claim thus turns not on the practice of placing support bids but on the adequacy of disclosures relating to that practice.  Indeed, in their first two complaints, plaintiffs alleged a now abandoned claim that they were misled by UBS, based on the same allegations they now contend support their manipulation claim.  Plaintiffs thus improperly seek to dress up a legally defective misrepresentation claim as a manipulation claim.  "[A]llegations of a scheme

---

[16] *See also* Am. Cmplt. ¶ 48 (alleging that low maximum rates were kept from becoming widely known); *id.* ¶ 60 (alleging that ARS were "falsely described" and sufficient information was not provided); *id.* ¶ 65 (alleging inadequate disclosure, including not providing prospectuses); *id.* ¶ 175 (alleging that use of the term "auction rate" was deceptive); *id.* ¶ 177 (alleging that "research reports and presentations . . . touted the longevity and durability of auction rate securities" and downplayed the risk of auction failures); *id.* ¶ 104 (complaining that the decision to stop placing support bids was not disclosed ); *id.* ¶ 159 (same).

based on the same misstatements that would form the basis of a misrepresentation claim under Rule 10b-5(b) and nothing more do not go beyond misrepresentations." *S.E.C. v. Lucent Tech., Inc.*, 610 F. Supp. 2d 342, 359 (D.N.J. 2009). *See also TCS Capital Mgmt., LLC v. Apax Partners, L.P.*, 2008 WL 650385, at * 22 (S.D.N.Y. Mar. 7, 2008) (holding that when a claim of "deception" lies in the alleged failure to disclose the "real terms" of the deal," the claim is one for failure to disclose, even if pled as a manipulation claim); *Catton v. Defense Technology Systems, Inc.*, 2006 WL 27470, at *7 (S.D.N.Y. Jan. 3, 2006) (holding that "pump and dump" claim that was based on misrepresentations, was not a market manipulation claim).

Plaintiffs cannot avoid the heightened pleading requirements that apply to a misrepresentation claim simply by casting the claim in terms of market manipulation. *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 177-78 (2d Cir. 2005). *See also Schnell v. Conseco, Inc.*, 43 F. Supp. 2d 438, 447-48 (S.D.N.Y. 1999) (holding that a claim alleged as one for market manipulation remains subject to the heightened pleading standard of the PSLRA where the manipulation claim "is largely based on alleged misrepresentations and omissions"). Pursuant to the PSLRA, therefore, plaintiffs must specify the statements or omissions that they contend were fraudulent, identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent. *See* 15 U.S.C. § 78u-4(b)(1); *Muller-Paisner v. TIAA*, 289 Fed. Appx. 461, 463 (2d Cir. 2008); *Novak v. Kasaks,* 216 F.3d 300, 306 (2d Cir. 2000). *See also Stoneridge*, 128 S. Ct. at 768 (plaintiff must have relied on the defendants' own statements or conduct); *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998) (one "cannot incur primary liability . . . for a statement not attributed to that actor at the time of its dissemination" that was known to the plaintiffs "in advance of the investment decision"). Because David

Shulman made no misrepresentations or omissions of any sort, the current pleading does not state a claim against him and should be dismissed.

Mr. Shulman is not alleged to have made a single public statement regarding ARS at any time during the class period. He is not alleged to have played any role in retail sales, much less to have participated in developing or disseminating UBS disclosures. Thus, to the extent the manipulation claim depends upon alleged misrepresentations, it should be dismissed as against Mr. Shulman, who is not alleged to have made any misstatement. *See Shapiro v. Cantor*, 123 F.3d 717, 720 (2d Cir. 1997) ("a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b)") (internal citation and quotations omitted); *Filler v. Hanvit Bank*, 156 Fed. Appx. 413, 415 (2d Cir. 2005) (holding that no claim can be stated if "none of the alleged false statements relied upon by plaintiffs were attributed to" the particular defendant).

To the extent the manipulation claim is in reality an omissions claim, the Amended Complaint also must be dismissed as against Mr. Shulman because Mr. Shulman had no duty of disclosure to the plaintiffs. "[B]efore an individual becomes liable for his silence, he must have an underlying duty to speak." *Overton v. Todman & Co.*, 478 F.3d 479, 483 (2d Cir. 2007) (citing *Chiarella v. United States*, 445 U.S. 222, 227-28, 100 S. Ct. 1108, 1114 (1980). *See also Basic Inc. v. Levinson*, 485 U.S. 224, 239, n. 17, 108 S. Ct. 978, 987, n. 17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."); *Rich v. Maidstone Financial, Inc.*, 2002 WL 31867724, at *9 (S.D.N.Y. Dec. 20, 2002) ("When the allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak.").

A duty to disclose only arises "from a relationship of trust and confidence *between parties to a transaction*," *Chiarella,* 445 U.S. at 230, 100 S. Ct. at 115 (emphasis

added), or when one has made a prior statement that would be misleading without additional disclosure. *See Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) ("[U]pon choosing to speak, one must speak truthfully about material issues."); 17 C.F.R. § 240.10b-5(b).[17]  Plaintiffs do not allege that Mr. Shulman had *any* relationship with them, let alone a relationship of trust and confidence giving rise to a legal duty to speak.  Similarly, because plaintiffs do not allege that Mr. Shulman made *any* disclosures, they cannot allege that he had a duty to correct prior, misleading, disclosures.  Accordingly, they cannot and do not state a claim against Mr. Shulman arising out of any failure to disclose material information concerning ARS.

### D.  The Amended Complaint does not Plead Facts Permitting a Strong Inference That Mr. Shulman Acted with Scienter

Plaintiffs' Section 10(b) claim against Mr. Shulman is also deficient because it fails to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," as required by the PSLRA.  15 U.S.C. § 78u-4(b)(2) – a deficiency that provides an independent basis for dismissal of that claim against Mr. Shulman.

To plead scienter in a market manipulation claim, the Amended Complaint must set forth particularized facts "giving rise to a strong inference that the defendant intended to deceive investors by artificially affecting the market price of the securities." *ATSI*, 493 F.3d at 102.[18]  Properly pleading scienter is particularly important in manipulation claims because "in some cases scienter is the only factor that distinguishes legitimate trading from improper manipulation." *Id.*  To survive a motion to dismiss, a plaintiff's scienter allegations must "give rise to a strong inference" of fraudulent intent, which takes into account plausible and opposing

---

[17] *Cf. In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 453 (S.D.N.Y. 2005) ("an omission is actionable when the failure to disclose renders a statement misleading"); *In re Par Pharm. Inc. Sec. Litig.*, 733 F. Supp. 668, 675 (S.D.N.Y. 1990) ("once corporate officers undertake to make statements, they are obligated to speak truthfully and to make such additional disclosures as are necessary to avoid rendering the statements made misleading").
[18] If construed as a misrepresentation and omission claim, the Amended Complaint makes no allegations of actionable statements or omissions, and the question of scienter therefore does not even arise.

inferences. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321, 127 S. Ct. 2499, 2508-09 (2007). For an inference of scienter to sustain a fraud claim under Section 10(b), "a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." 551 U.S. at 324, 127 S. Ct. at 2510.

Nothing in the Amended Complaint approaches the strength of the inference required by *Tellabs*. Plaintiffs identify no concrete benefit to UBS, let alone to Mr. Shulman, from UBS's practice supporting auctions other than the benefits that flowed to all investors, including plaintiffs, when UBS prevented auctions from failing. In light of the longstanding, industry wide practice of placing support bids in auctions, the most plausible inference – indeed the only plausible inference – is that UBS's support bids during the class period were intended, as they had been for years, to stabilize the ARS markets for the benefit of all participants.

Plaintiffs have articulated no coherent explanation for why UBS would have invested approximately $11 billion in placing the now-challenged support bids, other than its belief that the bids would help tide the market over during a period of declining demand. The notion that UBS would have invested $11 billion to generate underwriting fees of only $127 million (*see* Am. Cmplt. ¶ 112) is implausible on its face. The fact that UBS ultimately failed to stabilize the market does not mean that it placed support bids with fraudulent intent.

The inference of scienter for David Shulman is even more attenuated inasmuch as David Shulman is not alleged to have (1) devised the policy of entering support bids, (2) determined which auctions to support and at what levels, or (3) made the decision to withdraw support for the auctions. In light of the fact that Mr. Shulman ran a group which had engaged in this practice for years prior to his arrival, no shred of evidence suggests that he had the intent to transform a previously legitimate practice into one aimed at deceiving investors.

Plaintiffs similarly fail to identify any cognizable motive that Mr. Shulman could have had to manipulate interest rates. They claim that UBS engaged in this aspect of the alleged market manipulation to avoid "alienat[ing] the issuer clients on whom UBS Securities depended for continuing business and attendant underwriting commissions and auction dealer fees." Am. Cmplt. ¶ 68. This allegation is precisely the type of generic economic benefit that courts have found insufficient and too speculative to establish motive. *See Miller v Lazard, Ltd.*, 473 F. Supp. 2d 571, 589 (S.D.N.Y. 2007) (holding that the alleged desire to procure future business is too speculative to allege motive). *See also Vogel v. Sands Bros. & Co.*, 126 F. Supp. 2d 730, 739 (S.D.N.Y. 2001) (desire to realize greater transaction fees insufficient to show proper motive). Furthermore, there is no allegation that Mr. Shulman stood to gain personally from the business relationship UBS maintained with the issuer clients. The plaintiffs thus fail to allege any personal and concrete benefit of the sort necessary to provide motive for any alleged fraud.[19]

Plaintiffs point to a series of ARS sales from Mr. Shulman's personal account as indicative of scienter. *See* Am. Cmplt. ¶¶ 117-123. Those sales are alleged to have taken place during the last five months of 2007, as the credit markets deteriorated following the emergence of the subprime crisis. Assuming the truth of those allegations for the purpose of this motion only, nothing distinguishes Mr. Shulman's alleged sales from those of anyone else at that time. Mr. Shulman was one of thousands of investors responding to a deteriorating financial picture by moving away from ARS in a "flight to quality," as plaintiffs themselves acknowledge took place. *See* Am. Cmplt. ¶ 50 (after ARS auctions failed in the summer of 2007, "many institutional

---

[19] To plead motive, plaintiffs would have to identify "concrete benefits" that "inure to the particular defendant[s] in a -personal way." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 269 (S.D.N.Y. 2008), quoting *Novak*, 216 F.3d at 311. Ordinary profit motive, or the general desire to improve a company's performance are not enough. *Take-Two*, 551 F. Supp. 2d at 270 (alleged desire to improve year-end results is insufficient to plead scienter); *Chill v. General Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) (alleged desire to make an investment appear profitable is not sufficient to plead scienter); *Kalnit v. Eichler,* 264 F.3d 131, 140 (2d Cir. 2001) (alleged desire to maintain executive compensation is not sufficient to plead scienter).

investors began liquidating their positions in auction rate securities, and the overall deterioration in credit markets led to further selling pressure from corporate and retail holders of auction rate securities.ö).  The sales alleged do not support a strong inference of scienter.

Finally, any theory that Mr. Shulman was motivated to öprop upö the ARS auctions until he could sell his personal ARS holdings is implausible.  The Amended Complaint alleges that UBS AGøs GEB, not Mr. Shulman, had the authority to determine whether UBS would continue to participate in ARS auctions.  *See* Am. Cmplt. ¶ 154 (Mr. Shulman ösought guidance from . . . members of the GEBö concerning whether UBS would continue to support the ARS auctions).  According to the Amended Complaint, the GEB did not decide to withdraw UBS support from the auctions until mid-February 2008, long after Mr. Shulman had sold his ARS.  *See id.* ¶ 161 (quoting GEB member Marten Hoekstra saying that ö÷we planned on continuing to prop up the auctionsøand ÷we didnøt know how long/cost it would take to keep supporting the auction marketøö).  The obvious, and far more compelling, competing inference is that Mr. Shulmanøs management of the MSG in late 2007 and early 2008 was part of a legitimate effort by UBS to maintain liquidity for all ARS investors and to avert the collapse of the ARS market that ultimately came to pass as a result of market forces beyond UBSøs control.[20]

---

[20] Plaintiffsø suggestion that Mr. Shulmanøs sales were part of some pattern of sales by other executives is inconsistent with their specific allegations.  They begin their discussion of the defendantsøalleged improper sales by alleging that ö[b]etween November 1, 2007 and February 12, 2008, at least seven UBS executives who were members of an internal working group on UBS ARS . . . sold more than $21 million of their personal holdings of auction rate securities[.]ö Am. Cmplt. ¶ 114.  They further allege that these sales were made when the executives had knowledge of öundisclosed material facts about the risks associated with auction rate securities and UBS Securitiesøplans to exit the auction market[.]ö *Id.* ¶ 116.  The Complaint goes on to allege that öMr. Shulman was one of those executives.ö *Id.* ¶ 117.  But this allegation is inconsistent with plaintiffsøassertion that Mr. Shulmanøs allegedly improper sales started in August of 2007 (*see id.* at ¶ 118), well before November 1, 2007, and ended by December 14, 2007 (see id. at ¶ 123), *prior* to the first alleged meeting of the öinternal working groupö on December 21, 2007.  *See id.* at ¶ 153.  Mr. Shulmanøs sales, even as alleged by plaintiffs, thus do not fit whatever pattern of executive sales between November and February that the Complaint more broadly describes.

## II. The Amended Complaint Fails to Allege A
## Control Person" Claim Against Mr. Shulman

To establish a *prima facie* case of control person liability under Section 20(a), a plaintiff must show (1) a primary violation by the controlled person; (2) control of the primary violator by the defendant; and (3) that the defendant was in some meaningful sense a culpable participant in the controlled person's fraud. *ATSI*, 493 F.3d at 108. For the reasons set forth above, and for the reasons set forth in the UBS Memorandum, plaintiffs have not adequately alleged primary violations of the securities laws by any of the defendants. Accordingly, plaintiffs cannot allege a "control person" claim against Mr. Shulman.

In addition, liability under Section 20(a) must be based upon "actual control." *In re Alstom*, 406 F. Supp. 2d at 486. Actual control refers to the "power to direct or cause the direction of the management and policies of [the controlled] person." *S.E.C. v. First Jersey Securities*, 101 F.3d 1450, 1473 (2d Cir. 1996)(internal quotation and citation omitted). When "a defendant does not clearly occupy control status, the plaintiff must plead facts from which control status can be inferred." *Dietrich v. Bauer*, 76 F. Supp. 2d 312, 333 (S.D.N.Y. 1999). Moreover, control, for the purposes of Section 20(a), relates to control over the actual transaction that gives rise to the primary violation. *See In re Alstom*, 406 F. Supp. 2d at 487; *In re Global Crossing, Ltd. Sec. Litig.,* 2005 WL 1875445, at *3 (S.D.N.Y. Aug. 5, 2005); *In re Sotheby's Holdings, Inc. Sec. Litig.*, 2000 WL 1234601, at *8 (S.D.N.Y. Aug. 31, 2000).

Under this standard, the claim against David Shuman for control liability under Section 20(a) fails as a matter of law. As detailed above, plaintiffs' manipulation claim is based on unspecified transactions involving the placement of UBS support bids, at unspecified times. *See* Am. Cmplt. ¶¶47-59, 67-77. The Amended Complaint makes clear that there was an established policy at UBS of placing such support bids throughout the class period. *See id.*

23

¶¶ 53-54.  Plaintiffs do not allege that Mr. Shulman set this policy, nor could they, given that it

long pre-dated his involvement with UBS's ARS program.[21]  In fact, their allegations indicate

that UBS AG controlled the decision to end the practice of support auctions.  *See* Am. Cmplt. ¶¶

102, 145, 154.  Moreover, plaintiffs' allegations in support of their control person claim are

wholly conclusory.  *See* Am. Cmplt. ¶¶ 229-232.  For example, plaintiffs allege that all of the

control person defendants are "presumed to have had and exercised the power to control or

influence the particular conduct giving rise to the securities violations alleged in this [Amended]

Complaint."  *Id*. ¶ 232.

Such vague allegations of control are insufficient to state a claim for control

person liability under Section 20(a).  *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250

F.3d 87, 102 (2d Cir. 2001); *In re Deutsche Telekom AG Sec. Litig.*, 2002 WL 244597, at *7

(S.D.N.Y. Feb. 20, 2002).  Plaintiffs must allege facts from which it may be inferred that Mr.

Shulman "had actual power or influence over the controlled person."  *Rich*, 2002 WL 31867724,

at *11.  *See also Silva Run Worldwide Ltd. v. Gaming Lottery Corp.,*1998 WL 167330, at *13

(S.D.N.Y. Apr. 8, 1998).  In addition, plaintiffs must also plead *with particularity* that Mr.

Shulman was "in some meaningful sense" a culpable participant in the controlled person's fraud.

*ATSI*, 493 F.3d at 108*.*  Culpable participation requires an allegation of something more than

negligence.  *See In re Alstom,* 406 F. Supp. 2d at 490, citing *Ernst & Ernst v. Hochfelder*, 425

U.S. 185, 209 n. 28, 96 S. Ct. 1375, 1388 n.28 (1976).  At a minimum, the plaintiffs must plead

facts showing that the alleged "control person" was reckless.  *In re Livent, Inc. Noteholders Sec.*

*Litig.,* 151 F. Supp. 2d 371, 417-18 (S.D.N.Y. 2001).  Plaintiffs' conclusory allegation that Mr.

Shulman was a culpable participant in the conduct they allege was fraudulent falls short of this

---

[21] The Amended Complaint makes clear that Mr. Shulman looked to the GEB to determine whether this policy would be changed.  *See* Am. Cmplt. ¶ 154.

pleading burden.  Accordingly, because plaintiffs fail to plead facts sufficient to allege an

underlying violation by UBS of Rule 10b-5(a) and (c), fail to allege that Mr. Shulman controlled

UBSøs conduct in connection with any such violation, and fail to allege culpable participation by

Mr. Shulman, their control person cause of action must be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, and for the reasons set forth in the UBS Memorandum,

Mr. Shulman respectfully requests that the Amended Complaint be dismissed.

Dated: New York, New York
       August 28, 2009

MORVILLO, ABRAMOWITZ, GRAND,
 IASON, ANELLO & BOHRER, P.C.

By: _____s/Robert J. Anello_____
        Robert J. Anello
        Judith L. Mogul
        Thomas M. Keane
565 Fifth Avenue
New York, NY 10017
(212) 856-9600

*Attorneys for Defendant David Shulman*