## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
| --- | --- |
| IN RE AUCTION RATE SECURITIES LITIGATION<br><br><br>This Document Relates To:  Nos. 08-CV-2967, 08-CV-3082, 08-CV-4352, 08-CV-5251 | Case No:  08-CV-2967 (LMM)<br>ECF Case |

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT JOSEPH SCOBY'S MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

John F. Hartmann, P.C.
Paul M. G. Helms
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois 60654
(312) 862-2215

Andrew M. Genser
John P. Del Monaco
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4611
(212) 446-4809

*Counsel for Defendant Joseph Scoby*

**TABLE OF CONTENTS**

<u>Page</u>

PRELIMINARY STATEMENT ............................................................................1

ARGUMENT ...................................................................................................4

I.      PLAINTIFFS FAIL TO STATE A MARKET MANIPULATION CLAIM
AGAINST MR. SCOBY. .........................................................................4

          A.      Plaintiffs Fail To Allege That Mr. Scoby Engaged In Manipulative
Conduct. ..................................................................................5

          B.      Plaintiffs Fail To Allege That They Relied On Any Conduct Of
Mr. Scoby. ...............................................................................8

          C.      Plaintiffs Fail To Allege That Mr. Scoby Acted With *Scienter*...........................11

II.     PLAINTIFFS FAIL TO STATE A CONTROL PERSON CLAIM AGAINST
MR. SCOBY. ......................................................................................14

CONCLUSION...............................................................................................15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*ECA v. JP Morgan Chase Co.*,
  No. 07-1786-cv, 2009 WL 129911 (2d Cir. Jan. 21, 2009)..............................................12

*In re Bausch & Lomb, Inc. Sec. Litig.*,
  No. 06-CV-6294, 2008 WL 4911796 (W.D.N.Y. Nov. 13, 2008) ..................................11

*In re Bristol-Myers Squibb Co. Securities Litigation*,
  586 F. Supp. 2d 148 (S.D.N.Y. 2008)..............................................................................10

*In re Livent, Inc. Noteholders Sec. Litig.*,
  151 F. Supp. 2d 371 (S.D.N.Y. 2001)..........................................................................4, 12

*In re Nature's Sunshine Products Sec. Litig.*,
  No. 2:06-CV-267, 2008 WL 4442150 (D. Utah Sept. 23, 2008)....................................11

*In re Parmalat Sec. Litig.*,
  570 F. Supp. 2d 521 (S.D.N.Y. 2008)..........................................................................9, 11

*In re Refco Sec. Litig.*,
  609 F. Supp. 2d 304 (S.D.N.Y. 2009)............................................................................4, 5

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001)............................................................................................12

*Katz v. Image Innovations Holdings, Inc.*,
  542 F. Supp. 2d 269 (S.D.N.Y. 2008)............................................................................11

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)............................................................................................12

*Pugh v. Tribune Co.*,
  521 F.3d 686 (7th Cir. 2008) ..........................................................................................11

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*,
  552 U.S. 148 (2008)...................................................................................................passim

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)..............................................................................................2, 4, 12

ii

## PRELIMINARY STATEMENT

Plaintiffs strain to keep Defendant Joseph Scoby in this case and, in the process, stretch their own credibility past the breaking point.  Even a cursory review of Plaintiffs' joint opposition to the separate motions to dismiss filed by Messrs. Shulman and Scoby shows that Plaintiffs have little to say about Mr. Scoby.  And none of what they *do* say about Mr. Scoby can be taken at face value.

For starters, it is difficult to understand how Plaintiffs can argue in good faith that Mr. Scoby played a "central" or "lead" role "at the heart of" UBS Securities' alleged market manipulation scheme and that he "devised and implemented" UBS Securities' alleged practice of placing support bids in UBS ARS auctions (*see* Opp. Mem. at 1, 4, 14) when it is undisputed that Mr. Scoby never worked for UBS Securities, never made a support bid in a UBS ARS auction, never directed or even encouraged anyone at UBS Securities to do so, never had anything to do with UBS FS's ARS sales practices, did not become Chief Risk Officer of UBS AG until October 1, 2007 (less than four months before the end of the alleged class period), and does not even show up in Plaintiffs' chronology of the case until mid-December 2007 (just two months before the end of the class period).  Not surprisingly, Plaintiffs fail to explain how Mr. Scoby managed to "devise and implement" an alleged market manipulation scheme that, according to the Complaint, was in existence long before Mr. Scoby even shows up in the story.  Plaintiffs simply ignore this fundamental problem with their claims.

Another of Plaintiffs' principal themes — that Mr. Scoby purportedly directed Defendant David Shulman to manipulate ARS interest rates to attract buyers, even as he planned for the market's collapse (*see* Opp. Mem. at 1, 2, 5, 14, 22) — is equally incoherent.  Plaintiffs' sole support for this contention is a December 11, 2007 email wherein Mr. Scoby, in his role as UBS AG's Chief Risk Officer, notified Mr. Shulman that UBS Securities was "over limit" in ARS;

that UBS Securities had to *"reduce"* its ARS inventory; and that if UBS Securities needed to "burn $50 million" in order to do that, it should go ahead and do so. (Am. Compl. ¶ 74; Hartmann Decl. Ex. A.)[1] Plainly, this was ***not*** an instruction to manipulate ARS interest rates by placing support bids in ARS auctions, since such purchases ***increased*** UBS Securities' ARS inventory. Yet that is exactly how Plaintiffs contend Defendants manipulated ARS interest rates — by placing support bids in ARS auctions. (Am. Compl. ¶¶ 5, 51-55, 67-69.) Further, if Mr. Scoby truly intended to defraud ARS investors in anticipation of the market's collapse, it makes no sense that he would he direct UBS Securities to ***buy*** more ARS, since such purchases would ultimately harm UBS, not ARS investors, by leaving UBS Securities with even more ARS when the market finally froze. Plaintiffs ignore these flaws in their claim, too.

Plaintiffs hit bottom, though, when they insinuate repeatedly that Mr. Scoby instructed Mr. Shulman to "unload" ARS on "unsuspecting" retail investors during the alleged class period. (*See* Opp. Mem. at 1-2, 6-7, 22-23.) Plaintiffs' sole support for this assertion is an email that Mr. Scoby sent to Mr. Shulman at 8:42 p.m. on February 12, 2008. (Am. Compl. ¶ 160; Hartmann Decl. Ex. E.) By then, of course, all of the major players in the ARS market besides UBS had stopped supporting ARS auctions, and UBS AG's Group Executive Board (the "GEB") had decided that UBS Securities had to stop supporting them, too. (*Id*. ¶¶ 101-03.) Indeed, UBS Securities withdrew its support for ARS auctions the very next day. (*Id*. ¶ 102.) Thus, when Mr. Scoby wrote to Mr. Shulman on the night of February 12, 2008, the retail market for ARS

---

[1]  The Complaint sets forth excerpts of certain emails authored by Mr. Scoby. The full text of those emails, which the Court may properly consider on a motion to dismiss, *e.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), are appended as exhibits to the Declaration of John Hartmann in Support of Defendant Joseph Scoby's Motion to Dismiss the First Amended Consolidated Class Action Complaint, filed in connection with this brief.

had already ceased functioning, and any alleged dumping of ARS on unwitting retail investors was no longer even a possibility.  Plaintiffs gloss over this important contextual point.

Meanwhile, UBS Securities still had a massive ARS inventory and no clear way to reduce it.  It was this problem that prompted Mr. Scoby to send the following email to Mr. Shulman on the night of the 12th:

> Let's assume our peers are working feverishly to restructure and to unload paper to institutions, with the latter being akin to a sub underwriting.  Whatever the form, we need to beat the bushes harder than ever to unload this paper.
>
> One idea is to place a bunch of paper in a trust and tranche it up. The trust has long life.  We sell tranches to hedge funds or long only guys.  Have we explored this?
>
> What else can we do?

(Hartmann Decl. Ex. E.)  Plainly, this email has nothing to do with selling ARS to retail investors, let alone "unloading" ARS on "unsuspecting" retail investors through fraud.  To the contrary, the plain language of the email refers to the possibility of UBS Securities (and its peers) restructuring and then selling large blocks or tranches of ARS to sophisticated *institutions* such as hedge funds in order to reduce inventory.  Plaintiffs ignore this plain language.  Instead, they focus on Mr. Scoby's "beat the bushes" sentence — in isolation and out of context — and blithely distort it, just as they distort Mr. Scoby's earlier December 11, 2007 email to Mr. Shulman.

If Plaintiffs' opposition memorandum demonstrates anything, it is that Plaintiffs will say virtually anything to keep Mr. Scoby in this case, regardless of whether it has a basis in fact, logic, or law.  Plaintiffs also argue that Mr. Scoby is powerless to do anything about it — that challenging their misrepresentations is "forbidden" on a motion to dismiss.  (*See* Opp. Mem. at 22.)  Plaintiffs are wrong.  This Court need not accept claims that make no sense or that are

contrary to the very documents — here, Mr. Scoby's emails — on which they purportedly are based.  *See In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001).  Further, under the Supreme Court's seminal decision in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), this Court is ***required*** to examine whether Plaintiffs' allegations of *scienter* against Mr. Scoby are (1) cogent and (2) at least as compelling as opposing inferences of non-fraudulent intent.  When that is done here, Plaintiffs' claims against Mr. Scoby disintegrate.  At bottom, the Complaint fails to allege facts sufficient to support even an inference that Mr. Scoby engaged in market manipulation, much less that he did so with the requisite degree of scienter.  And even if it did, Plaintiffs do not even attempt to allege that any one of them relied on Mr. Scoby's own conduct in making his or her ARS purchases.  These fundamental pleading defects are fatal to their claims against Mr. Scoby.

## ARGUMENT

### I.    PLAINTIFFS FAIL TO STATE A MARKET MANIPULATION CLAIM AGAINST MR. SCOBY.

Plaintiffs concede, as they must, that under *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008), there is no longer any such thing as "scheme liability" or aiding and abetting liability in private actions under Section 10(b) and Rule 10b-5.  Rather, there is only primary liability, which means that in order to proceed on their market manipulation claim against Mr. Scoby, Plaintiffs must allege that ***Mr. Scoby*** engaged in manipulative conduct, that they relied on ***Mr. Scoby's*** conduct, and that ***Mr. Scoby*** acted with scienter.  *Stoneridge*, 552 U.S. at 158; *In re Refco Sec. Litig.*, 609 F. Supp. 2d 304, 316 (S.D.N.Y. 2009).  Plaintiffs have failed to do this.

4

###### A.      Plaintiffs Fail To Allege That Mr. Scoby Engaged In Manipulative Conduct.

To allege primary liability against Mr. Scoby, Plaintiffs must do more than allege merely that he was UBS AG's Chief Risk Officer at the very end of the class period, or even that he somehow assisted UBS Securities' alleged market manipulation scheme in December 2007 and January and early February 2008 (which, of course, he did not do).  Rather, Plaintiffs must allege that *Mr. Scoby himself* employed the scheme to defraud or engaged in the manipulative practice. *In re Refco Sec. Litig.*, 609 F. Supp. 2d 304, 316 (S.D.N.Y. 2009).  Thus, Plaintiffs must allege that Mr. Scoby "employed" (or, as Plaintiffs phrase it, "devised and implemented") UBS Securities' alleged scheme to place "support bids" in UBS ARS auctions that otherwise would have failed for lack of demand, or that he actually placed such support bids himself.  Try as they might, Plaintiffs cannot do this.

For example, Plaintiffs emphasize that Mr. Scoby "was a senior UBS AG executive who was in regular communication with Shulman about the UBS ARS program."  (Opp. Mem. at 14; *see also id.* at 1-2, 5.)  But this is hardly an allegation that Mr. Scoby engaged in market manipulation.  Moreover, *it was Mr. Scoby's job* to communicate with Mr. Shulman and others about UBS Securities' ARS holdings after he learned in mid-December 2007 that UBS Securities' ARS inventory had breached the Bank's risk-management limits.

Plaintiffs also claim that Mr. Scoby "knew that UBS [FS] sold the [ARS] securities as cash equivalents, when in fact their liquidity depended on UBS Securities' pervasive interventions in the auctions."  (Opp. Mem. at 1-2; *see also id.* at 14, 23.)  Plaintiffs' sole support for this assertion is a December 15, 2007 email from Mr. Shulman to Mr. Scoby, wherein Mr. Shulman wrote:  "I believe [ARS] have been sold for years as a cash alternative instrument." (Am. Compl. ¶ 154.)  At best, this email suggests that Mr. Scoby learned in mid-December 2007 that Mr. Shulman believed that *UBS FS* for years had sold ARS as cash alternatives.  But it does

5

*not* demonstrate that what Plaintiffs need to show with respect to Mr. Scoby: namely, that he personally employed or engaged in *UBS Securities'* alleged practice of placing support bids in UBS ARS auctions, which, according the Complaint, already had been in place for years.

Plaintiffs next suggest that Mr. Scoby "directed Mr. Shulman to manipulate UBS ARS interest rates to attract investors and reduce UBS Securities' own inventory." (Opp. Mem. at 2; *see also id*. at 5, 14, 22-23.) As explained in the Preliminary Statement above, this is a blatant mischaracterization of Mr. Scoby's December 11, 2007 email informing Mr. Shulman that UBS Securities had to *reduce* its ARS inventory, which was "over limit" and therefore on Mr. Scoby's risk-management radar screen. (*See* Hartmann Decl. Ex. A.) Again, it is pure nonsense to distort this email into a direction to manipulate ARS interest rates by placing support bids in auctions, since such purchases only *increased* UBS Securities' ARS inventory.[2]

Plaintiffs also note that, in a December 15, 2007 email, Mr. Scoby instructed Mr. Shulman: "If you find yourself experiencing a horrible auction … call risk control BEFORE you support it." (Opp. Mem. at 5; Hartmann Decl. Ex. B.) This email is another example of Mr. Scoby doing his job, which even Plaintiffs concede included monitoring UBS Securities' exposure to the ARS market. Moreover, this email shows that Mr. Scoby was *concerned* about UBS Securities' ongoing support of the UBS ARS auctions because of its impact on UBS Securities' ballooning ARS inventory — the risk issue for which he was responsible.

Next, Plaintiffs repeat their argument that Mr. Scoby instructed Shulman to "beat the bushes harder than ever" to sell ARS to unsuspecting investors. (Opp. Mem. at 14.) Again, this is a blatant mischaracterization of Mr. Scoby's February 12, 2008 email, which referred to the

---

[2] Plaintiffs refer to this email in isolation. When read in the context of the email string to which it belongs, however, the upshot of the email becomes clear: Mr. Scoby was telling Mr. Shulman that if, in order to reduce inventory, UBS Securities could sell a large block of ARS to another institution at a discount (i.e., "burn $50 million"), it should go ahead and do so.

possibility of UBS Securities restructuring and then selling large blocks of its ARS inventory to *"institutions"* at the very end of the class period, when the ARS auctions had ceased functioning and retail investors could no longer buy or sell them. (Hartmann Decl. Ex. E.) Just as importantly, it is *not* an allegation that Mr. Scoby employed or engaged in the market manipulation alleged in the Complaint — UBS Securities' alleged practice of placing support bids in UBS ARS auctions.

Finally, Plaintiffs suggest that Mr. Scoby "had ultimate authority to decide whether and when UBS Securities would 'fail' the auctions." (Opp. Mem. at 2; *see also id*. at 14, 23.) This is yet another distortion of the truth. Indeed, the Complaint demonstrates that the ultimate question of whether UBS Securities would continue to support ARS auctions was *not* for Mr. Scoby to decide. For example, Plaintiffs allege that, in December 2007 and January 2008, Mr. Scoby twice directed UBS Securities and UBS FS executives to prepare detailed reports regarding ARS *for the GEB* to review and consider. (Am. Compl. ¶¶ 122, 124; Hartmann Decl. Exs. C, D.) Plaintiffs also allege that, *on February 12, 2008*, *the GEB* determined in an "Extraordinary Audio Conference" that it "generally favored withdrawing support for the SLARS auctions and allowing them to fail," and that *the GEB* then directed Mr. Scoby to monitor the market and decide whether to halt UBS Securities' support, which occurred the very next day. (*Id.* ¶ 102.) In short, the Complaint alleges that *the GEB* possessed the authority to decide whether UBS Securities would support UBS ARS auctions. And, to the extent Mr. Scoby was ever delegated such authority, as the Complaint alleges, it was only during the last twenty-four hours of the class period, and it was to *end* UBS Securities' alleged practice of intervening in auctions — the alleged practice about which Plaintiffs complain — not to continue it.

In short, Plaintiffs have failed completely to allege the first element of their Section 10(b) claim against Mr. Scoby — namely, that he employed or engaged in market manipulation. Plaintiffs do not even allege facts supporting an inference that Mr. Scoby aided and abetted UBS Securities' alleged market-manipulation scheme, and even that would not be enough to support primary liability under Section 10(b). At best, Plaintiffs allege that Mr. Scoby became aware in mid-December of 2007 of UBS Securities' alleged practice of placing support bids in ARS auctions, and that he failed immediately and unilaterally to stop it (even though he plainly lacked the authority to do so). That is not market manipulation. That is not securities fraud.

### B.    Plaintiffs Fail To Allege That They Relied On Any Conduct Of Mr. Scoby.

Even if this Court were to conclude that the Complaint alleges somehow that Mr. Scoby actually engaged in market manipulation, Plaintiffs' claim against Mr. Scoby should still be dismissed for failure to allege reliance. With respect to this element, Plaintiffs' principal argument seems to be that they are entitled to rest entirely on an "integrity of the market" presumption of reliance. (Opp. Mem. at 16.) For the reasons stated in the UBS briefs, this Court should decline to recognize this new and novel theory of reliance. But even if a presumption of reliance based on the "integrity of the market" exists, merely invoking the presumption would not be enough to allege reliance on *Mr. Scoby*.

As Mr. Scoby pointed out in his opening brief, the petitioner in *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, also invoked a presumption of reliance — the well-recognized "fraud on the market" theory. 552 U.S. 148, 158 (2008). That same petitioner also argued that, in an efficient market, investors rely not only on the public financial statements of the issuer of a security, but also on the underlying transactions that are baked into those financial statements. The Supreme Court rejected this concept of reliance as too broad, however, holding that it was based on "an indirect chain" that was "too remote for liability." *Id.*; *see also*

8

*In re Parmalat Sec. Litig.*, 570 F. Supp. 2d 521, 526 (S.D.N.Y. 2008) (dismissing claims where "evidence would establish only that investors relied on *Parmalat's* disclosures concerning ***transactions*** to which the defendants were parties," and "would not establish reliance on defendants' own deceptive conduct except 'in an indirect chain' the type of which the [*Stoneridge*] Court found 'too remote for liability'") (emphasis in original). In doing so, the Supreme Court made clear that, in order to establish primary liability against a defendant, plaintiffs must allege reliance on that defendant's ***own*** alleged misconduct, and that plaintiffs cannot do this if the defendant's conduct never was made known to them or to the investing public. *Stoneridge*, 552 U.S. at 159-60; *see also In re Parmalat*, 570 F. Supp. 2d at 526 ("*Stoneridge* made plain that investors must show reliance upon a defendant's *own deceptive conduct* before that defendant, otherwise a secondary actor, may be found primarily liable.")

Here, Plaintiffs do not even make a serious attempt to allege that they relied on Mr. Scoby's conduct. Nor could they. It is undisputed that three of the named Plaintiffs, Ms. Elston and Messrs. Neu and Baumel, made all of their ARS purchases ***before*** Mr. Scoby even became UBS AG's Chief Risk Officer, and that the remaining Plaintiff, Mr. Dutcher, made two of this three ARS purchases prior to Mr. Scoby's first appearance in the Complaint. It is also undisputed that Mr. Dutcher made his ARS purchases not from UBS FS but, rather, from Raymond James, a downstream "distributing broker." (Am. Compl. ¶ 12.) It comes as no surprise, then, that Plaintiffs do not allege that either Mr. Dutcher or the public was aware of Mr. Scoby or his actions as UBS AG's Chief Risk Officer. What ***is*** surprising is that Plaintiffs do not allege ***any*** of the facts and circumstances of Mr. Dutcher's purchases of ARS from Raymond James. Indeed, Plaintiffs do not even allege that UBS Securities intervened in the auctions in which Mr. Dutcher allegedly made his ARS purchases through Raymond James. At

bottom, the best Plaintiffs can do is argue that the last of Mr. Dutcher's three ARS purchases "coincided" with Mr. Scoby's alleged participation in the scheme in December 2007.  (Opp. Mem. at 16-17.)  This is not even an allegation of reliance, let alone one that passes muster under *Stoneridge*.

Because they do not and cannot allege that Mr. Dutcher relied on Mr. Scoby's conduct, Plaintiffs devote several pages of their opposition brief to an argument that *Stoneridge* applies only to lawyers, accountants, and other outside professionals, and not to corporate "insiders" such as Mr. Scoby.  The first glaring flaw in this attempted end-run around *Stoneridge* is that all but one of the cases upon which Plaintiffs rely were decided ***before*** *Stoneridge* (*see* Opp. Mem. at 14-16), and the only one that was not — *In re Bristol-Myers Squibb Co. Securities Litigation*, 586 F. Supp. 2d 148 (S.D.N.Y. 2008) — is plainly distinguishable.  In *Bristol-Myers*, the plaintiffs challenged the adequacy of Bristol-Myers's disclosures concerning a litigation settlement that was personally negotiated by defendant Bodnar, a senior Bristol-Myers officer. *Id*. at 151.  The court denied Bodnar's motion to dismiss under *Stoneridge* because, even though he made no public statements, his behavior was "at the heart of Bristol-Myers's false and misleading conduct," and because his conduct was "communicated to the public" through Bristol-Myers's disclosures regarding the settlement.  *Id.* at 170.   Thus, even assuming *Bristol-Myers* was correctly decided, it is inapposite to Mr. Scoby who, for the reasons stated above, was not even a participant in UBS Securities' alleged market manipulation scheme.

The second and more fundamental problem Plaintiffs' attempt to avoid *Stoneridge* is that *Stoneridge* did not turn on a meaningless distinction between corporate insiders and outsiders. Nor did it turn on the defendants' proximity to the "heart" of the alleged fraud.  (Indeed, the defendants who escaped liability in *Stoneridge* arguably ***were*** at the heart of the alleged

10

misconduct, since they participated directly in the sham business contracts upon which the plaintiff based its claims.)  Rather, the outcome in *Stoneridge* turned on the petitioner's inability to allege the reliance element of its Section 10(b) claim against the defendants in that case. *Stoneridge*, 552 U.S. at 159-60.  *Stoneridge* makes clear that to establish primary liability, plaintiffs must allege reliance on each defendant's *own allegedly deceptive conduct*, and the Court made no exception to this requirement for "corporate insiders" or persons whose conduct was near or at "the heart" of the fraud.  *Id.*; *In re Parmalat Sec. Litig.*, 570 F. Supp. 2d 521, 526 (S.D.N.Y. 2008) ("Stoneridge made plain that investors must show reliance upon a defendant's *own deceptive conduct* before that defendant, otherwise a secondary actor, may be found primarily liable.") (emphasis in original).  Under *Stoneridge*, labels and characterizations do not matter.  What matters is whether plaintiffs can allege that they or the public was aware of the defendants' conduct and relied on it.  That is why the Supreme Court in *Stoneridge* affirmed the dismissal of two defendants whose conduct was "at the heart of" the alleged fraud in that case.  It is also why courts following *Stoneridge* have not hesitated to dismiss claims against "corporate insiders" who, like Mr. Scoby, were alleged to have engaged in deceptive conduct that was never communicated to plaintiffs or the public.[3]

In sum, Plaintiffs do not and cannot allege that they relied on Mr. Scoby's own conduct in making their ARS purchases, as required by the Supreme Court's decision in *Stoneridge*.

### C.    Plaintiffs Fail To Allege That Mr. Scoby Acted With *Scienter*.

Plaintiffs concede that they do not allege that Mr. Scoby had a motive to commit fraud. They argue instead that they "plead the broader motive of Scoby's employer to engage in the

---

[3]    *See, e.g.*, *Pugh v. Tribune Co.*, 521 F.3d 686, 696-97 (7th Cir. 2008); *In re Bausch & Lomb, Inc. Sec. Litig.*, No. 06-CV-6294, 2008 WL 4911796, at *16, 23 (W.D.N.Y. Nov. 13, 2008); *In re Nature's Sunshine Prods. Sec. Litig.*, No. 2:06-CV-267, 2008 WL 4442150, at *3-4 (D. Utah Sept. 23, 2008); *Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 272-73 (S.D.N.Y. 2008).

scheme." This is specious. There is no such thing as "group scienter." Rather, Plaintiffs must allege with particularity facts giving rise to a strong inference of scienter for each defendant. *See Stoneridge*, 552 U.S. at 158. Moreover, it is well-settled that Plaintiffs cannot allege scienter "based on motives possessed by virtually all corporate insiders, including … the desire to … sustain the appearance of corporate profitability ...." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). Finally, where, as here, Plaintiffs fail to allege a motive to commit fraud, their burden of alleging scienter based on circumstantial evidence is correspondingly greater. *ECA v. JP Morgan Chase Co.*, No. 07-1786-cv, 2009 WL 129911, at \*6 (2d Cir. Jan. 21, 2009) (quoting *Kalnit v. Eichler*, 264 F.3d 131, 140-41 (2d Cir. 2001)).

As noted in the Preliminary Statement above, Plaintiffs also argue that Mr. Scoby cannot challenge their mischaracterizations of his emails because to do so is "forbidden on a motion to dismiss." (Opp. Mem. at 22.) This argument also is specious. Plaintiffs are not free to distort Mr. Scoby's emails. *See In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 4-5-06 (S.D.N.Y. 2001) ("[A] court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or facts of which the court may take judicial notice."). More importantly, the Supreme Court's seminal decision in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), **requires** this Court to examine whether Plaintiffs' allegations of scienter are (1) cogent and (2) at least as compelling as opposing inferences of non-fraudulent intent.

Here, Plaintiffs' allegations of scienter against Mr. Scoby's are **not** cogent. Stated bluntly, it is nonsense to claim that Mr. Scoby "devised and implemented" UBS Securities' alleged multi-year practice of placing support bids in UBS ARS auctions when he does not even

appear in Plaintiffs' ARS chronology until mid-December 2007, just two months before the end of the purported class period.  It is disingenuous to claim that Mr. Scoby directed Mr. Shulman to manipulate ARS interest rates by placing support bids in ARS actions when the plain language of the email upon which Plaintiffs rely shows that Mr. Scoby instructed Mr. Shulman to *reduce* UBS Securities' ARS inventory.  (Hartmann Decl. Ex. A.)  And it is an outright fabrication to say that Mr. Scoby instructed Mr. Shulman to dump ARS on unwitting retail customers when both the timing and substance of Mr. Scoby's February 12, 2008 email establishes otherwise. (*See* Hartmann Decl. Ex. E.)  Again, Mr. Scoby wrote this email after the retail market for ARS had ceased functioning.  And in that email, Mr. Scoby referred to a possible restructuring and sale of ARS to *institutions*, not retail customers.  These contentions are the pillars of Plaintiffs' fraud claim against Mr. Scoby, and not one of them is even plausible.

The only plausible inference to be drawn from all of the allegations in the Complaint is that Mr. Scoby acted in good faith to try to grasp, monitor, and communicate to the GEB the risk-management issues raised by UBS Securities' rapid accumulation of ARS at the end of the class period.  Stripped of Plaintiffs' inflammatory and inaccurate rhetoric, the actual language of the emails of Mr. Scoby that are referenced in the Complaint show that he learned in December 2007 that UBS Securities' ARS inventory had breached risk-management limits, that he told Mr. Shulman to reduce that inventory, that he continued to monitor UBS Securities' accumulation of ARS, and that he asked for detailed reports for UBS AG's GEB regarding the Bank's exposure to the ARS market.  These are not the actions of someone who intended to commit fraud.  Rather, they are the actions of someone who was trying to do a difficult job.

In short, Plaintiffs have failed completely to allege facts giving rise to a strong inference that Mr. Scoby acted with the requisite degree of scienter.

## II.     PLAINTIFFS FAIL TO STATE A CONTROL PERSON CLAIM AGAINST MR. SCOBY.

Plaintiffs' argument that they have alleged Section 20(a) "control liability" against Mr. Scoby is also nonsensical.  In addition to failing to establish a primary violation, as established in Part I, Plaintiffs have failed to allege that Mr. Scoby controlled others who purportedly manipulated ARS auctions, which is the fraud alleged in this case.  Instead, they rely on a handful of emails (Opp. Mem. at 24) that, as demonstrated above, show only that Mr. Scoby attempted to understand and help manage the risk associated with UBS Securities' ARS inventory, in part by exploring the possibility of selling ARS to institutional investors.  Plaintiffs allege no facts showing that Mr. Scoby had anything to do with — let alone had any control over — the conduct of ARS auctions or the placing of support bids.  (*See* Opp. Mem. at 24.) Moreover, Plaintiffs allege that the decision to withdraw support for ARS auctions was initiated by ***the GEB*** and that, at most, Mr. Scoby had the delegated authority to ***end*** the support bids for a period of less than twenty-four hours before the end of the class period.  (*See* Am. Compl. ¶ 102; *see* Part I *supra*.)[4]  This does not constitute control over those engaged in the alleged manipulation, which according to Plaintiffs took place over the preceding five years when Mr. Scoby is not even alleged to have had that authority.  Plaintiffs' failure to allege such control is fatal to their Section 20(a) claim.

For the same reasons that Plaintiffs have failed to allege scienter or, even more basically, his participation in manipulative conduct (*see* Part I *supra*), they have failed to allege any

---

[4]     According to Plaintiffs, the GEB only delegated the power to decide when to stop supporting auctions to Mr. Scoby on February 12, 2008, the evening before the auctions failed and the end of the Class Period.  (Am. Compl. ¶¶ 102-03.)

culpable participation by Mr. Scoby, which is an independent ground requiring dismissal of their Section 20(a) claim.[5]

## CONCLUSION

For the foregoing reasons, and for the reasons stated in Mr. Scoby's opening brief, and in the opening and reply briefs of the UBS Defendants and Mr. Shulman, which are incorporated by reference, the Complaint should be dismissed in its entirety as to Mr. Scoby.


Dated:  November 6, 2009                    Respectfully Submitted,

                                            KIRKLAND & ELLIS LLP


                              By:    s/ John F. Hartmann


                                     John F. Hartmann, P.C.
                                     Paul M. G. Helms
                                     KIRKLAND & ELLIS LLP
                                     300 North LaSalle Street
                                     Chicago, Illinois 60654
                                     (312) 862-2215

                                     Andrew M. Genser
                                     John P. Del Monaco
                                     KIRKLAND & ELLIS LLP
                                     Citigroup Center
                                     153 East 53rd Street
                                     New York, New York 10022-4611
                                     (212) 446-4809

                                     *Counsel for Defendant Joseph Scoby*

---

[5]  Plaintiffs do not cite any case seriously undermining or challenging the principle that Section 20(a) claims are subject to heightened pleading standards.  (*See* Opp. Mem. at 23-25.)  The notion that Plaintiffs do not need to plead their Section 20(a) claims, which are derivative of a fraud-based Section 10(b) claim, is specious.  Regardless, Plaintiffs have not even met the lower pleading burden of Rule 8(a).