UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X
                                   :
In re UBS AUCTION RATE SECURITIES  :
LITIGATION                         :
                                   :
- - - - - - - - - - - - - - - - - -X
                                   :  08 Civ. 2967 (LMM)
THIS MEMORANDUM AND ORDER APPLIES  :  MEMORANDUM AND ORDER
TO:  Nos. 08-CV-2967, 08-CV-3082,  :
08-CV-4352, 08-CV-5251             :
                                   :
- - - - - - - - - - - - - - - - - -X


McKENNA, D.J.

        Plaintiffs in this putative class action sue UBS AG,

UBS Financial Services Inc., UBS Securities LLC, and

several UBS executives -- David Shulman, Joseph Scoby,

Marcel Rohner, and Marten Hoekstra.[1]  In Count I, Plaintiffs

sue UBS FS, UBS Securities, Shulman and Scoby pursuant to §

10(b) of the Securities Exchange Act of 1934 (the "Exchange

Act"), 15 U.S.C. § 78(j)(b), and Securities and Exchange

Commission ("SEC") Rule 10b-5(a) and (c), 17 C.F.R. §

240.10b-5(a), (c), promulgated thereunder.  (Am. Compl. ¶

212.)  In Count II, Plaintiffs sue UBS Securities, UBS AG,

---

[1] As used by the Court herein, the term "Defendants" refers collectively
to UBS AG, UBS Financial Services Inc. ("UBS FS"), UBS Securities LLC
("UBS Securities"), as well as to the individual defendants, David
Shulman ("Shulman"), Joseph Scoby ("Scoby"), Marcel Rohner ("Rohner"),
and Marten Hoekstra ("Hoekstra"); the term "Individual Defendants"
refers collectively to Shulman, Scoby, Rohner and Hoekstra; the term
"UBS" refers collectively to UBS AG, UBS FS, and UBS Securities; and
the term "Plaintiffs" or the "Neu Group" refers to named plaintiffs
David Neu ("Neu") and Charles H. Dutcher, III ("Dutcher").

Shulman, Scoby, Rohner and Hoekstra for control person liability pursuant to § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).[2]  (Am. Compl. ¶ 228.)

Plaintiffs bring this action as a putative class action on behalf of a class consisting of all persons and entities that purchased auction rate securities ("ARS") for which UBS Securities served as sole auction dealer, lead auction dealer, co-lead auction dealer, or joint auction dealer, during the period between March 21, 2003 and February 13, 2008, inclusive (the "Class Period") and were damaged thereby.[3]  (Am. Compl. ¶ 25.)  Plaintiffs' allege that the defendants engaged in deceptive and manipulative tactics with respect to ARS, including the following: (i) intervening in ARS auctions, for which UBS Securities served as the sole or lead auction-dealer, to create the

---

[2] Shulman argues that the First Amended Consolidated Complaint (the "Amended Complaint") is untimely with respect to Shulman and Scoby because although plaintiffs obtained a stipulation from counsel for UBS, Rohner and Hoekstra to extend the 30-day period in which they were to serve their amended pleading, they failed to seek or obtain any stipulation from counsel for Shulman or Scoby.  (Shulman Mem. at 3 n.3.)  Although Shulman does not formally do so, in effect he seeks a default judgment based on his contention that the Amended Complaint was untimely with respect to both Shulman and Scoby.  The Court rejects this argument in light of the modern view that "defaults are not favored by the law and any doubts usually will be resolved in favor of the defaulting party," because "contemporary procedural philosophy encourages trial on the merits," 10A Charles A. Wright et al., Federal Practice and Procedure § 2681, at 10 (3d ed. 1998) (footnotes omitted).

[3] The term "auction dealer," as used by the Court herein is intended to be interchangeable with the term "broker-dealer" and the term "UBS ARS" refers to ARS for which UBS Securities allegedly served as sole auction dealer, lead auction dealer, co-lead auction dealer, or joint auction dealer.

appearance of stability in the ARS market, mask the inherent illiquidity of UBS ARS, and prevent auction failures; (ii) making false and misleading statements and incomplete disclosures about the liquidity of UBS ARS and the role of UBS Securities in the ARS market; (iii) intervening in ARS auctions to set the rates of interest or dividends paid on UBS ARS; (iv) persuading issuers and credit rating agencies to waive the maximum limits on the interest rates paid on UBS ARS; (v) pressuring their financial advisors and distributing firms to sell UBS ARS; and (vi) providing "extraordinary" incentives to financial advisors to sell UBS ARS.  (Id. ¶ 49.)  Defendants move to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, and to dismiss the fraud claims pursuant to Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), Pub. L. No. 104-67, 109 Stat. 737, for failure to plead with the requisite particularity.

> For the reasons set forth below, Defendants' motions to dismiss are GRANTED.

## I.   BACKGROUND

**A.   The Parties**

### 1. Plaintiffs

Plaintiff Neu purchased UBS ARS from E*Trade on June 12, 2007.  (<u>Id.</u> ¶ 11 & Schedule A.)  Plaintiff Dutcher, on behalf of himself individually and as trustee of the Charles H. Dutcher, III Revocable Trust, purchased UBS ARS from Raymond James on August 10, October 31 and December 20 of 2007.  (<u>Id.</u> ¶ 12 & Schedule A.)  Plaintiffs continue to hold illiquid UBS ARS.  (<u>Id.</u> ¶¶ 11-12.)  Notably, neither of the Plaintiffs purchased ARS from UBS FS.

### 2. Defendants

Defendant UBS AG is a Swiss corporation with its headquarters in Zurich and Basel, Switzerland.  (<u>Id.</u> ¶ 16.) UBS AG is one of the world's leading financial firms and does business in the United States through its subsidiaries UBS Securities and UBS FS.  (<u>Id.</u>)

Defendant UBS FS is incorporated in Delaware and maintains its principal executive offices in New York, New York.  (<u>Id.</u> ¶ 18.)  UBS FS is a wholly owned subsidiary of UBS AG and is registered with the SEC as a broker-dealer and investment adviser pursuant to the Exchange Act and the Investment Advisers Act of 1940.  (<u>Id.</u>)  In addition, UBS

FS is a member of the Securities Industry and Financial Markets Association ("SIFMA"). (Id.) UBS FS offers investment advisory and brokerage services to UBS's Wealth Management clients. (Id.)

Defendant UBS Securities is incorporated in Delaware and maintains its principal executive offices in New York, New York. (Id. ¶ 17.) UBS Securities is a wholly owned subsidiary of UBS AG and is registered with the SEC as a broker-dealer pursuant to Section 15(b) of the Exchange Act. (Id.) In addition, UBS Securities is a member of the New York Stock Exchange ("NYSE") and the Financial Industry Regulatory Authority ("FINRA"). (Id.)

Defendant Shulman was the Global Head of the Municipal Securities Group and the Head of Fixed Income Americas at UBS Securities during the Class Period. (Id. ¶ 20.)

Defendant Scoby was the Chief Risk Officer ("CRO") for UBS AG and a member of UBS AG's Governing Executive Board during the Class Period. (Id. ¶ 21.)

Defendant Rohner was the Group Chief Executive Officer of UBS AG and a member of UBS AG's Governing Executive Board during the Class Period. (Id. ¶ 22.)

Defendant Hoekstra was UBS FS's Deputy CEO of Global Wealth Management and Head of Wealth Management Americas during the Class Period. (Id. ¶ 23.) Hoekstra was also a

member of the SIFMA Board of Directors during the Class
Period.  (Id.)

**B.  Procedural Background**

On March 21, 2008, David and Shelly Chandler filed a
putative class action complaint against UBS AG, UBS FS and
UBS Securities, alleging securities fraud based on
misrepresentations and omissions.  Subsequently, additional
putative class action lawsuits against all of the
Defendants were filed.  The Court consolidated the lawsuits
under the caption In re UBS Auction Rate Securities
Litigation and appointed lead plaintiffs.  On September 5,
2008, the Consolidated Class Action Amended Complaint (the
"Complaint") was filed.

On March 30, 2009, this Court dismissed the Complaint
on the grounds that the lead plaintiffs had not suffered
cognizable damages under Section 10(b) of the Exchange Act
since they had accepted an offer from UBS to repurchase
their ARS pursuant to an agreement reached with state and
federal regulators and law enforcement in August 2008 (the
"Regulatory Agreement" or "Settlement Order").  See In re
UBS Auction Rate Sec. Litig., No. 08 Civ. 2967, 2009 WL
860812, at *6 (S.D.N.Y. Mar. 30, 2009).  In addition, this
Court dismissed the claims asserted by the lead plaintiffs

on behalf of members of the putative class who continued to hold ARS on the grounds that the lead plaintiffs lacked standing to assert the claims of those absent class members.  Id.

On May 8, 2009, the Amended Complaint was filed and on July 29, 2009, the Court issued an order appointing the Neu Group as substitute lead plaintiffs.  Defendants then filed their motions to dismiss the Amended Complaint on August 28, 2009.

## C.  Factual Background

The factual allegations are detailed in the Amended Complaint, familiarity with which is presumed for purposes of this motion.  For purposes of this motion, the Court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in Plaintiffs' favor.  In re Parmalat Sec. Litig., 501 F. Supp. 2d 560, 572 (S.D.N.Y. 2007) (citing Levy v. Southbrook Int'l Invs., Ltd., 263 F.3d 10, 14 (2d Cir. 2001)).

### 1. Auction Rate Securities and the Auction Process

ARS are variable-rate equity or debt instruments of long-term or perpetual duration that pay interest or dividends at rates set at periodic auctions.  (Am. Compl. ¶

7

37.)  According to the particular terms of the ARS issued,
the auctions were generally held every 7, 28, 35 or 49
days.  (Id. ¶ 41.)  The auctions determined which investors
would own the securities as well as the "clearing rate"
(the rate of interest or dividends paid on those securities
until the next auction).  (Id.)  Participants in the
auctions were typically allowed to submit orders to buy,
sell, or hold ARS.  (Id.)  In addition to setting the
interest or dividend rate to be paid until the next
auction, the auction provided an opportunity for investors
to liquidate their ARS at par value, provided that the
demand for purchases was sufficient to absorb the number of
sell orders.  (Id. ¶¶ 42, 44.)

With respect to these "Dutch auctions," the issuer
selected and paid a broker-dealer (here, UBS Securities)
through which investors submitted orders for the issuer's
securities.  (Id. ¶¶ 41, 43.)  A firm that underwrote an
issuance of ARS generally served as auction dealer for
those securities.  (Id. ¶ 43.)  Investors could also place
orders through other designated firms, often referred to as
"remarketing agents" or "distributing firms," which would
then transmit the orders to the auction dealer.  (Id.)  A
successful auction occurred when the number of shares bid
for purchase at a particular rate was equal to or greater

than the number of shares offered for sale at that rate, with the result that all shares offered for sale were purchased. (Id. ¶ 44.)  However, if there was insufficient demand for ARS at a given auction, then the auction failed and no ARS were exchanged.  (Id. ¶ 45.)  A failed auction triggered the "maximum rate," a predetermined rate of interest or dividend that was intended to attract new buyers or prompt the issuer to refinance, thereby ensuring that the ARS remained liquid.  (Id. ¶¶ 45-46.)  Thus, an ARS that carried a low maximum rate was entirely dependent on the auction dealer's intervention in the auctions to ensure liquidity.  (Id. ¶ 46.)

The market for ARS experienced dramatic growth since the securities were first introduced in 1984, such that by February 2008, there were more than $330 billion of ARS outstanding.  (Id. ¶ 39.)  In the beginning, ARS were available only to highly sophisticated institutional investors with required minimum purchases of $250,000 or more.  (Id. ¶ 40.)  Prior to the start of the Class Period, however, issuers and underwriters lowered the minimum investment to $25,000, enabling sellers to market ARS to retail investors such as individuals, charities, and small businesses.  (Id.)

### 2. Defendants' Conduct

Throughout the Class Period, UBS Securities and its affiliates underwrote billions of dollars of ARS, placing additional supply in an already saturated market. (Id. ¶ 48.)  In addition, to accommodate the demands of issuers and obtain high credit ratings, UBS ARS were issued with maximum rates that were insufficient to attract liquidity to the ARS market in the event of an auction failure. (Id.)  Thus, according to Plaintiffs, in order to suppress auction failures, and prevent these low maximum rates from becoming widely known to ARS investors, Defendants played an increasingly active role with respect to UBS ARS auctions -- to the extent of engaging in deceptive and manipulative tactics directed at ARS investors to create the appearance of a functioning auction market in which ARS traded in accordance with actual supply and demand.  (Id. ¶¶ 48-49.)

### a. Intervention in ARS Auctions

UBS Securities' intervention in the auctions consisted in part of using its own capital to place bids, known as "support bids," in every auction in which it served as the sole auction dealer or as the lead auction dealer in multi-dealer auctions.  (Id. ¶ 51.)  According to Plaintiffs, the

placement of support bids was done pursuant to "a tacit understanding among UBS Securities and the issuers of UBS ARS that the auction dealer would act to prevent auction failures."  (Id.)  UBS Securities was able to do this because it was aware of the other bids placed in the auctions and could place its own bids after the bidding deadline for other investors, thereby preventing an auction failure that otherwise would have occurred due to insufficient demand.  (Id. ¶¶ 52, 56.)

Between January 1, 2006 and February 28, 2008, UBS Securities placed support bids in more than 30,000 auctions of its Municipal Auction Rate Certificates ("Municipal ARCs") and Student Loan Auction Rate Securities ("SLARS"), which prevented more than 85 percent of those auctions from failing.  (Id. ¶ 54.)  During the same timeframe, UBS Securities placed support bids in more than 27,000 auctions of its Auction Preferred Securities ("APS"), which prevented more than 50 percent of those auctions from failing.  (Id. ¶ 55.)[4]

---

[4] Municipal ARCs, SLARS and APS are different types of ARS.  As Defendants point out, the ARS market was comprised of many different securities issued both by governmental and private entities.  (UBS Reply Mem. at 4; see also Am. Compl. ¶ 38 ("[ARS] were issued by closed-end preferred funds . . . ; states, state agencies, municipalities, or other governmental authorities . . . ; public or private student loan originators and lenders . . . ; and other corporations and entities . . . .").)

### b. False and Misleading Statements About ARS

Plaintiffs also allege that throughout the Class Period, "UBS FS falsely described UBS ARS and the [ARS] market to investors, and failed to provide sufficient information to allow the investing public to understand the risks of those securities."[5]  (Id. ¶ 60.)  Although Plaintiffs do not point to any specific documents or website postings, they allege that UBS FS described UBS ARS as highly liquid and safe investments in UBS FS's investor clients' account statements, website postings, and "statement stuffers" sent to retail clients and employees. (Id. ¶¶ 61-62.)

With respect to insufficient disclosures, Plaintiffs complain that UBS FS did not deliver prospectuses to its

---

[5] The Amended Complaint does not assert a Section 10(b) claim based on material misrepresentations or omissions.  (See Am. Compl. ¶ 212 ("Plaintiffs bring this cause of action . . . under Section 10(b) of the Exchange Act and SEC Rule 10b-5(a) and (c) promulgated thereunder." (citations omitted)).)  In the Complaint, previously dismissed by this Court, Plaintiffs did assert a misrepresentations and omissions claim against Defendants.  However, "[i]t is well-established that an amended complaint ordinarily supersedes the original and renders it of no legal effect." Ping Tou Bian v. Taylor, 23 F. App'x 75, 77 (2d Cir. 2001) (internal quotation marks and citations omitted).  Furthermore, "where the sole basis for [market manipulation] claims is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under Rule 10b-5(a) and (c)." Lentell v. Merrill Lynch & Co., 396 F.3d 161, 177 (2d Cir. 2005).  Thus, the Court will not address these allegations independently, but rather only to the extent they form part of Defendants' course of conduct which allegedly amounts to market manipulation.  Regardless, Plaintiffs have not complied with the pleading requirements for a securities fraud claim based on misrepresentations and omissions. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007) (describing level of specificity required for pleading securities fraud claims based on misrepresentations and omissions under Fed. R. Civ. P. 9(b) and the PSLRA).

investor clients who purchased ARS at periodic auctions, as it treated such purchases as "secondary market sales" exempt from the prospectus delivery requirement.  (Id. ¶ 65.)  In addition, UBS FS and UBS Securities did not provide prospectuses to investors who purchased UBS ARS from distributing firms, or require the disclosure of any other material information to such purchasers by the distributing firms.  (Id.)  Plaintiffs further allege that "UBS FS never disclosed that UBS Securities maintained a policy of placing support bids as needed to suppress auction failures in every [UBS ARS] auction . . ., that these support bids masked the lack of liquidity in the market, and that the auctions would fail without these support bids."  (Id. ¶ 66.)

### c. Setting of ARS Interest Rates and Dividends

According to Plaintiffs, throughout the Class Period, UBS Securities set the clearing rate for the ARS auctions that would have failed but for UBS Securities' placement of support bids.  (Id. ¶ 67.)  For each auction, UBS Securities was aware of the other bids placed and could place its own bids after the bidding deadline for other investors.  (Id. ¶ 56.)  "Armed with this information," UBS Securities placed buy bids at specified rates and in

sufficient amounts to set the clearing rates.  (Id. ¶ 67.)
In addition, these rates were set "in such a manner as to
promote continued sales of [ARS] to the public, but without
letting clearing rates become or remain so high as to
alienate the issuer clients on whom UBS Securities depended
for continuing business and attendant underwriting
commissions and auction dealer fees."  (Id. ¶ 68.)

As noted above, through the placement of support bids,
UBS Securities was able to set clearing rates but by
placing these bids, UBS Securities also added to its own
inventory.  (Id. ¶ 69.)  In doing so, UBS Securities
pressed against the ceiling for UBS ARS holdings set
internally by UBS's risk management policies.  (Id. ¶ 78.)
Those policies allowed UBS to hold no more than a specified
amount of UBS ARS at any given time, resulting in
consistent pressure to reduce inventory.  (Id.)
Accordingly, UBS Securities and its distributing firms
reduced their excess inventory between auctions by selling
UBS ARS at the clearing rate that it had established at the
previous auction.  (Id. ¶ 69.)  Although at times UBS
Securities increased rates to draw buyers, it generally
caused rates to decrease once it sold enough to reduce its
own inventory.  (Id. ¶ 70.)

### d. Waivers of Maximum Limits on ARS Interest Rates

Many UBS ARS contained rate caps on the clearing rates that determined the amount issuers had to pay ARS holders. (Id. ¶ 89.)  In the fall of 2007, when UBS Securities placed bids in UBS ARS auctions in such a manner as to increase the clearing rates, in an effort to attract new buyers, it did so to the point of approaching these rate caps.  (Id.)  Investors, however, were ignorant of the fact that with respect to many ARS if the rate caps were triggered, the rates would be automatically reset to below-market levels, pursuant to provisions in the offering documents.  (Id.)  In order to avoid reaching the rate caps, UBS Securities sought and obtained temporary waivers of the caps from issuers and credit rating agencies.  (Id. ¶ 90.)

### e. Incentives and Pressure for Financial Advisers and Distributing Firms To Sell UBS ARS

Also, as a result of the consistent pressure to reduce UBS ARS inventory, Defendants pressured UBS FS's financial advisors and distributing firms to sell UBS ARS.  (Id. ¶¶ 78-88.)  According to Plaintiffs, this pressure came in the form of a number of conference calls, including one held by UBS Securities on August 22, 2007, with several hundred

financial advisors, which was intended to "'mobilize the troops internally'" and "'re-educat[e] the field as to the structure and credit quality' of UBS ARS."  (Id. ¶¶ 80-83.) At least eleven similar conference calls were held with UBS FS's financial advisors between September 2007 and the withdrawal of support for the auction market in mid-February 2008, the primary purpose of which "was to encourage financial advisors to sell UBS ARS."  (Id. ¶ 83.) Defendants did not disclose the risks associated with UBS ARS on any of these conference calls.  (Id.)

In addition, UBS FS provided extraordinary incentives to their financial advisors to sell UBS ARS, such as the payment of commissions of up to forty percent of auction-dealer fees.  (Id. ¶¶ 93-97.)  In comparison, the financial advisors would have earned no commissions, or much smaller commissions, had they sold money market funds to their clients.  (Id. ¶ 94.)  According to Plaintiffs, the high commissions "provided a disproportionate incentive for UBS FS's financial advisors to sell UBS ARS in relation to other cash management products."  (Id.)

### f. Withdrawal of Support for ARS Market

When the credit market deteriorated in the summer of 2007, UBS Securities and several other major auction

dealers chose not to intervene to prevent failures of
auctions for certain particularly risky ARS which consisted
largely of collateralized residential mortgage-backed
securities, secured by income streams from sub-prime
mortgages.  (Id. ¶¶ 98-99.)  UBS Securities did so in
response to pressure from UBS AG to reduce its exposure to
sub-prime mortgages.  (Id. ¶ 99.)  Beginning with the
initial wave of auction failures in August 2007,
institutional investors began to sell down their ARS
holdings.  (Id. ¶ 100.)  However, UBS Securities and other
auction dealers continued to support the market until on or
about February 13, 2008, when they collectively withdrew
their support for the ARS market, resulting in widespread
auction failure.  (Id. ¶¶ 101, 103.)  According to
Plaintiffs, as a result of this withdrawal of support, the
market collapsed permanently, rendering all outstanding UBS
ARS illiquid.  (Id. ¶ 107.)

      About six months later, on August 8, 2008, the SEC
announced that UBS Securities and UBS FS had entered into
the Regulatory Agreement, which provided for the repurchase
of UBS ARS from certain investors who bought the securities
directly from UBS.  (Id. ¶¶ 189, 193.)  However, the
Regulatory Agreement fails to provide relief to indirect
purchasers of UBS ARS who either continue to hold illiquid

UBS ARS or have sold them at a loss. (Id. ¶ 193.)

### 3. Disclosures

#### a. Prospectuses

The Court takes judicial notice of the prospectuses for the ARS allegedly purchased by Plaintiffs.  The prospectuses were filed with the SEC and are publicly available from EDGAR, the SEC's electronic filing system. (Declaration of William F. Sullivan, dated Aug. 28, 2009 (the "Sullivan Declaration" or "Sullivan Decl.") ¶¶ 2-4.)[6] These documents describe the terms of each of the particular ARS instruments and the related auction processes.  The prospectus related to the ARS purchased by Plaintiff Neu was filed with the SEC on May 21, 2003, as part of the Nicholas Applegate Convertible & Income Fund Registration Statement (the "Applegate Prospectus"). (Sullivan Decl. Ex. A.)  The prospectus related to the ARS purchased by Plaintiff Dutcher was filed with the SEC on September 25, 2003, as part of the Nicholas Applegate Convertible & Income Fund II Registration Statement (the "Applegate II Prospectus").  (Sullivan Decl. Ex. B.)  The

---

[6] It is proper to take judicial notice of the prospectuses since these documents are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2); see also Kramer v. Time Warner Inc., 937 F.2d 767, 773-74 (2d Cir. 1991) (permitting court to rely on public documents filed with the SEC).

prospectus related to additional ARS purchased by Plaintiff Dutcher was filed with the SEC on July 18, 2003, as part of the Eaton Vance Limited Duration Income Fund Registration Statement (the "Vance Prospectus"). (Sullivan Decl. Ex. C.)

The Applegate Prospectus and the Applegate II Prospectus contained the following relevant disclosures within the first few pages. First, the prospectuses made clear that "[t]he APS, which have no history of public trading, will not be listed on an exchange or automated quotation system." (Ex.[7] A at iv; Ex. B at iv; see also Ex. A at 1; Ex. B at 1.) In addition, the prospectuses disclosed that:

> Broker-Dealers may maintain a secondary trading market in the APS outside of Auctions; however, they have no obligation to do so, and there can be no assurance that a secondary market for the APS will develop or, if it does develop, that it will provide holders with a liquid trading market (i.e., trading will depend on the presence of willing buyers and sellers and the trading price will be subject to variables to be determined at the time of the trade by such Broker-Dealers)." (Ex. A at iv; Ex. B at iv.)

In addition, the first item listed under the heading "SPECIAL RISK CONSIDERATIONS" is "Auction Risk." (Ex. A at 6; Ex. B at 6.) Under this subheading, the Applegate

---

[7] Unless otherwise noted, "Exhibit" or "Ex." refers to the exhibits attached to the Sullivan Declaration.

Prospectus and the Applegate II Prospectus state the following:

> You may not be able to sell your APS at an Auction if the Auction fails; that is, if there are more APS offered for sale than there are buyers for those shares. As a result, your investment in APS may be illiquid. Neither the Broker-Dealers nor the Fund are obligated to purchase APS in an Auction or otherwise, nor is the Fund required to redeem APS in the event of a failed Auction.

(Ex. A at 6; Ex. B at 6.)  The third item listed under this section is entitled "Secondary Market Risk," which states the following:

> You could receive less than the price you paid for your APS if you sell them outside of an Auction, especially when market interest rates are rising.  Although the Broker-Dealers may maintain a secondary trading market in the APS outside of Auctions, they are not obligated to do so, and no secondary market may develop or exist at any time for the APS.

(Ex. A at 6; Ex. B at 6.)  Later in the prospectuses, there are additional disclosures regarding the risks of investing in these APS.  Under the heading "Auction Risk," the prospectuses state the following:

> You may not be able to sell your APS at an Auction if the Auction fails; that is, if there are more APS offered for sale than there are buyers for those shares. If Sufficient Clearing Bids do not exist in an Auction, the Applicable Rate will be the [Maximum Rate], and in such event, owners of APS wishing to sell will not be able to sell all, and may not be able to sell any, of such shares in the Auction. As a result, your investment in APS may be illiquid. Neither

> the Broker-Dealers nor the Fund are obligated to purchase APS in an Auction or otherwise, nor is the Fund required to redeem APS in the event of a failed Auction.

(Ex. A at 29; Ex. B at 30.)

The Applegate Prospectus and the Applegate II Prospectus also describe the applicable dividend rate which will be paid on the APS (the "Applicable Rate") and how such rate will be determined.   (See Ex. A at 10-12; Ex. B at 11-12.)   According to the prospectuses, "the Applicable Rate for any Dividend Period for APS will not be more than the [Maximum Rate] applicable to such shares."   (Ex. A at 12; Ex. B at 12.)   In addition, the prospectuses state:

> If Sufficient Clearing Bids do not exist . . . the Applicable Rate will be the [Maximum Rate], and in such event, Existing Holders that have submitted Sell Orders will not be able to sell in the Auction all, and may not be able to sell any, APS subject to such Sell Orders. Thus, in certain circumstances, Existing Holders and, thus, the Beneficial Owners they represent may not have liquidity of investment.

(Ex. A at 13; Ex. B at 14; see also Ex. A at 45; Ex. B at 46.)

With respect to UBS's participation in the auctions, and of great significance to the success of Plaintiffs' claims is the following disclosure:

> A Broker-Dealer also may hold APS for its own account as a Beneficial Owner. A Broker-Dealer thus may submit Orders to the Auction Agent as a Beneficial Owner or a Potential Beneficial Owner

> and therefore participate in an Auction as an
> Existing Holder or Potential Holder on behalf of
> both itself and its customers.

(Ex. A at 13, 43; Ex. B at 13, 44.)  Similarly, the

prospectuses explain the following:

> The Broker-Dealer Agreements provide that a
> Broker-Dealer may submit Orders in Auctions for
> its own account . . . .  If a Broker-Dealer
> submits an Order for its own account in any
> Auction of APS, it may have knowledge of Orders
> placed through it in that Auction and therefore
> have an advantage over other Bidders, but such
> Broker-Dealer would not have knowledge of Orders
> submitted by other Broker-Dealers in that
> Auction.

(Ex. A at 48; Ex. B at 49-50.)

The prospectuses also disclose that "[t]he Auction

Agent after each Auction will pay a service charge . . . to

each Broker-Dealer on the basis of the purchase price of

APS placed by such Broker-Dealer at such Auction."  (Ex. A

at 48; Ex. B at 49.)  Similarly, with respect to the dual

role of the underwriters of these APS, the Applegate

Prospectus states that "[t]he Underwriters will act in

Auctions as Broker-Dealers . . . and will be entitled to

fees for services as Broker-Dealers . . . ."  (Ex. A at

70.)

The Vance Prospectus also contains disclosures within

the first few pages regarding the potential illiquidity of

the ARS.  First, the prospectus explains the following:

> The APS will not be registered on any stock exchange or on any automated quotation system. APS may only be bought or sold through an order at an auction with or through a broker-dealer that has entered into an agreement with the auction agent of the Fund, or in a secondary market that may be maintained by certain broker-dealers. These broker-dealers are not required to maintain this market and it may not provide you with liquidity.

(Ex. C at iv; see also Ex. C at 3.) Similarly, the prospectus discloses that "[i]n certain circumstances, holders of APS may be unable to sell their APS in an Auction and thus may lack liquidity of investment." (Ex. C at iv.)

In addition, the Vance Prospectus discloses the following risks under the heading "RISK FACTORS SUMMARY":

> If an auction fails you may not be able to sell some or all of your APS; . . . Because of the nature of the market for APS, you may receive less than the price you paid for your shares if you sell them outside of the auction . . . .

(Ex. C at 3.) Later in the prospectus, under the heading "AUCTION RISK," the prospectus states that "[h]olders of APS may not be able to sell APS at an Auction if the auction fails; that is, if there are more APS offered for sale than there are buyers for those APS." (Ex. C at 19.) Further highlighting the risk of auction failure, the prospectus states:

> If Sufficient Clearing Bids have not been made, Beneficial Owners that have Submitted Sell Orders

> will not be able to sell in the Auction all, and
> may not be able to sell any, of the APS subject
> to such Submitted Sell Orders.  Thus, under some
> circumstances, Beneficial Owners may not have
> liquidity of investment.

(Ex. C at 38 (citation omitted).)  Also in the "RISK

CONSIDERATIONS" section, under the heading "SECONDARY

MARKET RISK," the prospectus states:

> It may not be possible to sell APS between
> auctions or it may only be possible to sell them
> for a price of less than $25,000 per share plus
> any accumulated dividends. . . . Broker-dealers
> may maintain a secondary trading market in the
> APS outside of Auctions; however, they have no
> obligation to do so and there can be no assurance
> that a secondary market for the APS will develop
> or, if it does develop, that it will provide
> holders with a liquid trading market (i.e.,
> trading will depend on the presence of willing
> buyers and sellers and the trading price is
> subject to variables to be determined at the time
> of the trade by the broker-dealers). The APS will
> not be registered on any stock exchange or on any
> automated quotation system.

(Ex. C at 19-20; see also Ex. C at 40.)

With respect to the Maximum Rate, the Vance Prospectus

provides that the "rate set at auction will not exceed the

Maximum Rate."  (Ex. C at 4.)  Furthermore, the prospectus

explains how the Maximum Rate will be calculated (Ex. C at

36) and explains that, "[i]f Sufficient Clearing Bids have

not been made . . . , the Applicable Rate for such Dividend

Period will be equal to the [Maximum Rate]" (Ex. C at 38).

With respect to UBS's participation in the auctions,

and, again, of great significance to the success of

Plaintiffs' claims is the following disclosure:

> The Broker-Dealer Agreements provide that a
> Broker-Dealer may submit Orders in Auctions for
> its own account . . . .  If a Broker-Dealer
> submits an Order for its own account in any
> Auction of APS, it may have knowledge of Orders
> placed through it in that Auction and therefore
> have an advantage over other Bidders, but such
> Broker-Dealer would not have knowledge of Orders
> submitted by other Broker-Dealers in that
> Auction.

(Ex. C at 34.)  Similarly, the prospectus later discloses

the following:

> A Broker-Dealer also may hold APS in its own
> account as a Beneficial Owner. A Broker-Dealer
> thus may submit Orders to the Auction Agent as a
> Beneficial Owner or a Potential Beneficial Owner
> and therefore participate in an Auction as an
> Existing Holder or Potential Holder on behalf of
> both itself and its customers.

(Ex. C at 36.)

The Vance Prospectus also discloses the dual role of

underwriters, stating that "[t]he Underwriters will act in

Auctions as Broker-Dealers . . . and will be entitled to

fees for services as Broker-Dealers . . . ."  (Ex. C at

47.)  Regarding the fees to be paid to the broker-dealers,

the prospectus further explains that "[t]he Auction Agent

after each Auction will pay a service charge from funds

provided by the Fund to each Broker-Dealer on the basis of

the purchase price of APS placed by such Broker-Dealer at

such Auction." (Ex. C at 34.)

### b. News Items

As discussed below, the Court takes judicial notice of several news items (Exs. F-N) submitted in support of Defendants' motion to dismiss.

First, in August 2004, the California Debt and Investment Advisory Commission (the "CDIAC") issued an issue brief entitled "Auction Rate Securities" (the "CDIAC Issue Brief"). (Ex. J.) The CDIAC Issue Brief notes some of the risks of issuing and investing in ARS. According to the issue brief:

> Because ARS do not carry a "put" feature (which allows the bondholder to require the purchase of the bonds by the issuer or by a specified third party), they are very sensitive to changes in credit ratings and normally require the highest ratings . . . to make them marketable.

(Id. at 2.) With respect to the risk of auction failures, the issue brief states:

> A "failed auction" can occur due to a lack of demand and no clearing bid received. In the event of a failed auction, existing holders will hold their positions at the maximum rate set in the official statement until sufficient bids are entered to set a clearing bid at the next auction. Although the underwriting broker/dealers are not required to do so, they can provide a "clearing bid" to ensure the success of each auction and provide liquidity to investors who wish to sell. Failed auctions are associated with downgrades in credit quality of

either the issuer or insurer of the issue.

(Id. at 3-4.)  And again, regarding the liquidity risks
related to ARS, the issue brief states:

> ARS do not [require a letter of credit] because
> the investor does not possess a put option but
> rather relies on the liquidity generated by the
> Dutch auction process and the credit-worthiness
> of the issuer or insurer.

(Id. at 4.)

On March 24, 2005, The Wall Street Journal reported on
the liquidity risks associated with ARS in an article
entitled "Auction-Rate Securities Under Fire." (Ex. G.)
Significantly, the article reports:

> In a memo published in late February [of 2005],
> PricewaterhouseCoopers warned clients that while
> [ARS] act like short-term securities in some
> ways, there is one important distinction:
> investors rely on the broker-dealers who conduct
> the auctions to provide liquidity, rather than
> the issuers themselves.
>
> That means that, in the event an auction fails,
> existing investors are left holding their
> securities until the next auction, with no access
> to their funds.

(Id. at 1; see also Ex. H.)  The article further states
that "[t]he attention generated by the accounting issue
also has highlighted the relative risk of holding [ARS] as
opposed to other instruments that are truly short-term in
nature." (Id. at 2.)  The article observed that the price
of ARS would reflect the additional risk, stating that

"[b]ut even if [ARS] retain their popularity as a cash-management tool, corporations are likely to demand higher yields to compensate for the additional risk they now realize they are taking on."  (Id.)

On March 25, 2005, an article posted on CFO.com entitled "Auction-Rate Securities: Short-Term or Long?", similarly reported on the liquidity risks associated with ARS and reported that the Big Four accounting firms were advising clients that they should no longer treat ARS as cash or cash-equivalents.  (See Ex. H); see also Steven D. Jones, Outside Audit: Firms Ponder What Constitutes Cash, Wall St. J., July 27, 2006, at C3 (reporting on liquidity risks and same change in accounting treatment of ARS).[8]

A CFO Magazine article from May 1, 2005, entitled "Don't Bet Your ARS," also reported on the liquidity risks of investing in ARS.  (See Ex. I.)  The article pointed to the "accounting treatment recalls" issued by the Big Four auditors which resulted in treatment of ARS as investments rather than cash or cash equivalents.  (Id. at 3.)  In addition, the article states that "[s]ome investment

---

[8] The Court notes that Exhibit K appears to be misattributed to the Chicago Tribune. (See Sullivan Decl. ¶ 12.)  The text of the article attached as Exhibit K is actually the text of an article that appeared in The Wall Street Journal on the same date.  See Jones, Outside Audit: Firms Ponder What Constitutes Cash, supra.  Given that this misattribution does not affect the content of the article, and thus will work no prejudice against any of the parties, the Court will take judicial notice of the article, as it appeared in The Wall Street Journal, in deciding the present 12(b)(6) motion.

advisers are now warning corporate treasurers that ARS may
no longer provide the level of liquidity they seek."  (Id.)
The article quotes one advisor as stating that "he is
unsure if the ARS market can retain enough liquidity to
weather supply-and-demand 'rough patches.'"  (Id.)
According to the CFO Magazine article, "The ARS market is
already under pressure from rising interest rates and
investigations by the [SEC] over deal bid 'rigging.'"
(Id.)  At that point, however, the article did not predict
auction failures: "No one expects a less robust market to
lead to ARS auction failures, but many advisers, as well as
the SEC, are reportedly calling for reform to assure more
liquidity."  (Id.)

    On September 19, 2005, a Bond Buyer article reported
on the SEC's investigation into the role of broker-dealers
in the ARS auction process.  (See Ex. F.)  The article
reported that the chief of the SEC's Office of Municipal
Securities indicated that some of "[t]he program documents
make an [ARS] program 'appear to be a very pure Dutch-
auction process' when in fact the SEC has learned that
'it's more of a process that's managed' by the broker-
dealers running the auctions . . . ."  (Id. at 1.)  The SEC
official emphasized that "'[t]hat's not necessarily to say
that managed is bad,' . . . .  The problem is that it's

29

simply not disclosed to investors."  (Id.)  The article
reports that "[the SEC official] pointed out that typically
in [ARS] programs, the dealers are trying to serve both the
investors, who want as high interest rates as possible, and
the issuers, who want as low interest rates as possible."
(Id.)  However, the article also notes that "typically, a
dealer is not trying to manage the auction to reap any
monetary gain for itself."  (Id.)

     The article specifically refers to the practice of
broker-dealer intervention in auctions:

> The SEC has learned that some broker-dealers
> intervene in the auction process either by
> bidding for their own accounts, or suggesting
> that investors change their bids . . . .
>
> There are at least three situations in which a
> dealer might intervene . . . .  They might want
> to ensure that all of the securities are
> purchased to prevent an auction from failing.
> They might want to influence the clearing rate
> . . . if they believe that the bids they've
> received do not really reflect the market.  They
> also might want to prevent an "all hold" auction,
> in which the interest rate would be set very low
> because none of the investors wanted to sell
> their bonds.

(Id. at 2.)  With respect to the broker-dealers' potential
information advantage, the article reports that "[t]here
are more concerns when a single dealer is handling the
auction and is privy to all of the bids and to what the
clearing rate should be . . . ."  (Id.)

A Business Wire article from August 15, 2007, reported on several failed ARS auctions and their consequences. (See Ex. L.)  According to the article, "In the event of a 'failed' auction, investors in the [ARS] would be required to hold on to their investment for at least another 28 days, and would be paid a fixed maximum rate over Libor . . . ."  (Id. at 1.)  The article reported that "given the recent turbulent market conditions, there have been several 'failed' auctions . . . and Fitch [Ratings] would not be surprised to see further failed auctions in the days or weeks ahead."  (Id.; see also Exs. M & N (describing wave of ARS auction failures in August 2007).)

### c. Materials Issued by the SEC

On March 4, 2005, the SEC issued a release entitled "Current Accounting and Disclosure Issues in the Division of Corporation Finance" (the "SEC Release"), which indicated it was improper to classify ARS as "cash equivalent" because of the liquidity risks associated with the securities.[9]  The SEC Release notes that "[t]he holder

---

[9] As with the other SEC materials available on the SEC website, considered here, the Court finds it proper to take judicial notice of this release because it is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).  The SEC Release was prepared by the accounting staff members in the Division of Corporation Finance of the SEC and is available at

can participate in the auction and liquidate the [ARS] to
prospective buyers through their broker/dealer," however,
"[t]he holder does not have the right to put the security
back to the issuer." Id. Similarly, the SEC Release
states:

> [ARS] are considered highly liquid by market
> participants because of the auction process.
> However, because the [ARS] have long-term
> maturity dates and there is no guarantee the
> holder will be able to liquidate its holdings,
> these securities do not meet the definition of
> cash equivalents in paragraphs 8 and 9 of
> [Financial Accounting Standards Board] Statement
> No. 95, Statement of Cash Flows.

Id.

On May 31, 2006, the SEC issued an Order Instituting
Administrative and Cease-and-Desist Proceedings, Making
Findings, and Imposing Remedial Sanctions and a Cease-and-
Desist Order Pursuant to Section 8A of the Securities Act
of 1933 and Section 15(b) of the Securities Exchange Act of
1934 (the "SEC Order"). (See Ex. E.) The Court takes
judicial notice of the SEC Order, which is also available
on the SEC website. The order describes, in detail, the
broker-dealer practice of intervening in ARS auctions
through bidding in the auctions from proprietary accounts.

---

http://www.sec.gov/divisions/corpfin/acctdis030405.htm#P514_81909. In
addition, Plaintiffs quote this section of the release in the Amended
Complaint (see Am. Compl. ¶ 64). San Leandro Emergency Med. Group
Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 808-09 (2d Cir.
1996) (holding it was permissible to consider documents partially
quoted in complaint).

(Id. at 6.)  With respect to a broker-dealer's potential
information advantage, the SEC Order notes that "[i]n
practice . . . if there is only one broker-dealer, the
broker-dealer can discern the clearing rate before
submitting the orders to the auction agent."  (Id. at 5.)
According to the order, "Certain Respondents intervened in
auctions by bidding for their proprietary accounts . . .
without adequate disclosures.  In certain instances, the
interventions affected the clearing rate."  (Id. at 6
(footnote omitted).)  Significantly, the SEC Order makes
clear that "[t]his Order does not prohibit broker-dealers
from bidding for their proprietary accounts when properly
disclosed."  (Id. 6 n.6.)  However, with respect to certain
respondents named in the order -- which did not include
Defendants -- the SEC found inadequate disclosure.  (Id. at
6.)


## II. DISCUSSION

### A.  Standard of Review

A complaint should be dismissed if it "fail[s] to
state a claim upon which relief can be granted."  Fed. R.
Civ. P. 12(b)(6).  "In deciding a motion to dismiss, the
Court ordinarily accepts as true all well-pleaded factual
allegations and draws all reasonable inferences in the

33

plaintiff's favor."  In re Parmalat, 501 F. Supp. 2d at
572.  "To survive dismissal, the plaintiff must provide the
grounds upon which his claim rests through factual
allegations sufficient 'to raise a right to relief above
the speculative level.'"  ATSI, 493 F.3d at 98 (quoting
Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

Plaintiffs' securities fraud claims are subject to
additional pleading requirements.  Plaintiffs' § 10(b)
claims are subject to the heightened pleading standard of
Federal Rule of Civil Procedure 9(b), which requires that
allegations of fraud must be stated with particularity.
These claims are also subject to the heightened pleading
standards of the PSLRA, ATSI, 493 F.3d at 99, which
requires that for any action for money damages that
requires proof of scienter, a plaintiff must "state with
particularity facts giving rise to a strong inference that
the defendant acted with the required state of mind," 15
U.S.C. § 78u-4(b)(2).  Finally, to allege control person
liability under § 20(a) of the Exchange Act, Plaintiffs
must allege "some level of culpable participation at least
approximating recklessness in the section 10(b) context."
Lapin v. Goldman Sachs Group, Inc., 506 F. Supp. 2d 221,
248 (S.D.N.Y. 2006).

Generally, "the court is not permitted to consider factual matters submitted outside of the complaint unless the parties are given notice that the motion to dismiss is being converted to a motion for summary judgment under Rule 56 and are afforded an opportunity to submit additional affidavits." Campo v. 1st Nationwide Bank, 857 F. Supp. 264, 269 (E.D.N.Y. 1994). However, "[i]n certain circumstances, the court may permissibly consider documents other than the complaint in ruling on a motion under Rule 12(b)(6). Documents that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered." Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007). In deciding the motion, the Court may also consider matters of which judicial notice may be taken. Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993) (citation omitted).

**B.  Motion to Strike**

A threshold issue the Court must decide is whether Exhibits F through N and T to the Sullivan Declaration and the declaration of Robert J. Anello, dated August 28, 2009 (the "Anello Declaration"), submitted by Defendants, may be considered in deciding this motion to dismiss. In their motion to strike, Plaintiffs make a number of arguments as

to why these documents should be stricken, but except as to
Exhibit T, the Court finds these arguments unavailing.
Thus, despite Plaintiffs' objection, the Court takes
judicial notice of Exhibits F through N (in addition to the
other items noted elsewhere in this opinion) for the
limited purpose of recognizing their existence.  With
respect to Exhibit T, however, the Court grants Plaintiffs'
motion to strike.

### 1. Exhibits F-N

With respect to Exhibits F through N to the Sullivan
Declaration, Plaintiffs argue that the exhibits should be
stricken because they "improperly exceed the scope of the
[Amended] Complaint, have not been properly authenticated,
and are irrelevant to the motions pending before the
Court."  (Mot. to Strike at 5.)  The Court agrees with
Plaintiffs that none of these exhibits were incorporated by
reference into the Amended Complaint.  Nonetheless, the
Court finds that Exhibits F through N are properly subject
to judicial notice.  Exhibits F through I and L through N
are press publications and as such are properly subject to
judicial notice.  Staehr v. Hartford Fin. Servs. Group, 547
F.3d 406, 425 (2d Cir. 2008) (recognizing that "it is
proper to take judicial notice of the fact that press

coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents"). Similarly, the Court finds that it is appropriate to take judicial notice of Exhibit J, the CDIAC Issue Brief.

Although Plaintiffs argue that these exhibits have not been properly authenticated (Mot. to Strike at 5-6), the press publications contained in Exhibits F through I and L through N are self-authenticating under Federal Rule of Evidence 902(6). See Fed. R. Evid. 902(6) ("Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to . . . [p]rinted materials purporting to be newspapers or periodicals.") The CDIAC Issue Brief, Exhibit J, is also self-authenticating under Federal Rule of Evidence 902(5). See Fed. R. Evid. 902(5) ("Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to . . . [b]ooks, pamphlets, or other publications purporting to be issued by public authority.") Furthermore, Plaintiffs have not presented the Court with any reason to question the authenticity of these exhibits.

Plaintiffs contend that Exhibits F through N are not relevant to the present motion because none of these

exhibits explicitly mention any of the Defendants and there has been no showing that Plaintiffs ever read, received, or had any knowledge of these exhibits.  (Mot. to Strike at 6.)  The Court rejects these arguments.  It is clear that what information was available to the investing public regarding the ARS market -- even if not specific to Defendants -- and when that information was made available are relevant to the Court's consideration of this motion to dismiss.  See, e.g., In re Citigroup Auction Rate Sec. Litig., No. 08 Civ. 3095, 2009 WL 2914370, at *7 (S.D.N.Y. Sept. 11, 2009) (granting motion to dismiss, in part, because "documents proffered by Defendants, and of which the Court takes judicial notice, negate any inference that reliance . . . was reasonable").  The Court, again, emphasizes that it takes judicial notice of the fact that these exhibits contained certain information and not for the truth of the matters asserted therein.

### 2. Exhibit T

Plaintiffs also move to strike Exhibit T, a copy of an investment guide entitled "Putting Liquidity to Work: A Guide to Cash Alternatives," which, according to the Sullivan Declaration, was available on UBS FS's website. (Sullivan Decl. ¶ 21.)  Despite Defendants' argument to the

contrary, the Court finds that the reference to "postings
on [UBS FS's] website" (Am. Compl. ¶ 62) is insufficient to
support a finding that Exhibit T was incorporated by
reference into the Amended Complaint.  The Second Circuit
has made clear that "a plaintiff's reliance on the terms
and effect of a document in drafting the complaint is a
necessary prerequisite to the court's consideration of the
document on a dismissal motion; mere notice or possession
is not enough."  Chambers v. Time Warner, Inc., 282 F.3d
147, 153 (2d Cir. 2002).  Furthermore, it is clear that
even "[l]imited quotation from or reference to documents
that may constitute relevant evidence in a case is not
enough to incorporate those documents, wholesale, into the
complaint."  Sira v. Morton, 380 F.3d 57, 67 (2d Cir.
2004).  Here, Exhibit T was not attached to, quoted in or
referenced in the Amended Complaint and there is no
evidence that Plaintiffs relied on the document in drafting
the Amended Complaint.  Thus, the only possible means of
considering Exhibit T for purposes of this motion is
judicial notice.

The Second Circuit, and several district courts in
this Circuit, have found it appropriate to take judicial
notice of the contents of a party's website for the fact of
its publication.  See, e.g., Muller-Paisner v. TIAA, 289 F.

39

App'x 461, 466 n.5 (2d Cir. 2008) ("Judicial notice may be
taken of the defendants' website for the fact of its
publication."); Doron Precision Sys., Inc. v. FAAC, Inc.,
423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006) ("For purposes
of a 12(b)(6) motion to dismiss, a court may take judicial
notice of information publicly announced on a party's
website, as long as the website's authenticity is not in
dispute and 'it is capable of accurate and ready
determination.'" (quoting Fed. R. Evid. 201(b))).  Here,
however, the Court finds that it is inappropriate to take
judicial notice of Exhibit T because Defendants have failed
to provide the Court with any information regarding where
and when this document is or was located on UBS FS's
website.  Even if the Court could locate the document on
UBS FS's current website, current websites maintained by a
defendant cannot be taken as controlling evidence of the
facts that existed at an earlier date.  See Fortis
Corporate Ins., S.A. v. M/V Cielo del Canada, 320 F. Supp.
2d 95, 98 (S.D.N.Y. 2004).  Thus, the Court grants
Plaintiffs' motion to strike with respect to Exhibit T.

### 3. Anello Declaration

Plaintiffs contend that the Anello Declaration is
improper because it "pertains to matters that are well

beyond the scope of the [Amended] Complaint, contains improper legal argument, and attests to facts that are outside of Mr. Anello's personal knowledge." (Mot. to Strike at 1.) Defendants counter, in part, by questioning the authority of the Court to strike the declaration. (Shulman Opp'n to Mot. to Strike at 2.) However, on a 12(b)(6) motion to dismiss the Court can exclude matters presented outside the pleadings. Fonte v. Bd. of Managers of Cont'l Towers Condo., 848 F. 2d 24, 25 (2d Cir. 1988) ("Rule 12(b) gives district courts two options when matters outside the pleadings are presented in response to a 12(b)(6) motion: the court may exclude the additional material and decide the motion on the complaint alone or it may convert the motion to one for summary judgment . . . .") In addition, the Court has inherent authority to control its own docket. See, e.g., Farid v. Bouey, 554 F. Supp. 2d 301, 313 (N.D.N.Y. 2008) (considering motion to strike because "request[ed] relief . . . squarely lies within the inherent authority of the court").

Nonetheless, the Court declines to strike the Anello Declaration in its entirety. Rather, the Court relies on the declaration only to the extent that it reflects the personal knowledge of the declarant. In addition, the Court will disregard any portions of the declaration which

set forth new facts, beyond the scope of the complaint, or legal arguments, both of which are not appropriate for consideration on a motion to dismiss.   See, e.g., Capitol Records, Inc. v. MP3tunes, LLC, No. 07 Civ. 9931, 2008 WL 4450259, at *2 (S.D.N.Y. Sept. 29, 2008) (striking certain statements of individuals lacking personal knowledge, based on principle that "[a]ny evidence submitted outside the pleadings on a motion to dismiss . . . must be competent" (citation omitted)).

## C.  Market Manipulation

Plaintiffs allege that defendants engaged in market manipulation in violation of Section 10(b) and Rule 10b-5(a) and (c).  According to the Second Circuit, in order to state a claim for market manipulation, a plaintiff must allege (1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange.  ATSI, 493 F.3d at 101.

Plaintiffs claim that had they "known the truth regarding the value, liquidity, and risks of UBS ARS, including the extent to which the market for UBS ARS was

42

sustained by Defendants and not determined by the natural interplay of supply and demand, Plaintiffs and Class members would not have purchased UBS ARS at all or would not have done so at the prices they paid." (Am. Compl. ¶ 225.) And, furthermore, that "[a]s a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and Class members suffered damages in connection with their purchases of UBS ARS during the Class Period." (Id. ¶ 227.) According to Plaintiffs, now that the concealed risk that Defendants were manipulating the market for UBS ARS has come to light, "the true value and liquidity characteristics of UBS ARS have been revealed," with the result that "UBS ARS remain illiquid and cannot be sold at par value on the open market" and "[i]nvestors who have sold their UBS ARS on [the] secondary market have realized substantial losses." (Id. ¶ 211.)

Defendants urge this Court to dismiss the Amended Complaint for, inter alia, failure to sufficiently plead the manipulative acts and reliance elements of their market manipulation claim. Because this motion to dismiss is decided on the grounds discussed below, the Court does not reach Defendants' remaining arguments in favor of dismissal.

### 1. Manipulative Acts

As noted above, Plaintiffs' § 10(b) claims are subject to the heightened pleading standard of Rule 9(b), which requires that allegations of fraud must be stated with particularity.  ATSI, 493 F.3d at 101 ("Because a claim for market manipulation is a claim for fraud, it must be pled with particularity under Rule 9(b).")  Thus, "a manipulation complaint must plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants."  Id. at 102.  "This test will be satisfied if the complaint sets forth, to the extent possible, 'what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue.'"  Id. (quoting Baxter v. A.R. Baron & Co., No. 94 Civ. 3913, 1995 WL 600720, at *6 (S.D.N.Y. Oct. 12, 1995)).  Notably, however, since "[a] claim of manipulation . . . can involve facts solely within the defendant's knowledge . . . , at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim."  (Id.)  Despite the somewhat relaxed standard for manipulation claims, the Court finds that Plaintiffs have not met the heightened pleading standard of Rule 9(b).

First, with the exception of the allegations regarding the waivers of maximum limits on ARS interest rates, Plaintiffs do not set forth any manipulative conduct as that term is used in the context of securities law. As the Supreme Court stated in Santa Fe Industries, Inc. v. Green, "'Manipulation' is 'virtually a term of art when used in connection with securities markets.'" 430 U.S. 462, 476 (1977) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199 (1976)). The term "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." Ernst & Ernst, 425 U.S. at 199 (footnote omitted); see also Gurary v. Winehouse, 190 F.3d 37, 45 (2d Cir. 1999) ("The gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." (citation omitted)). Consistent with this, "nondisclosure is usually essential to the success of a manipulative scheme." Santa Fe, 430 U.S. at 477; see also Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787, 796 n.11 (2d Cir. 1969) ("[T]he violation of 10b-5 consist[ed] of nondisclosure of the manipulation.")

45

Defendants persuasively argue that Plaintiffs cannot premise a claim of securities fraud under Section 10(b) on conduct and risks that were previously disclosed to the investing public.[10]  See In re Merrill Lynch Auction Rate Sec. Litig., No. 09 MD 2030, 2010 WL 1257597, at *10 (S.D.N.Y. Mar. 31, 2010) ("The market is not misled when a transaction's terms are fully disclosed.")  As the Second Circuit recently stated, "case law in this circuit and elsewhere has required a showing that an alleged manipulator engaged in market activity aimed at deceiving investors as to how other market participants have valued a security."  ATSI, 493 F.3d at 100.  "The deception arises from the fact that investors are misled to believe 'that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators.'"  Id. (quoting Gurary, 190 at 45).  Here, the prospectuses for each of the ARS purchased by Plaintiffs disclosed that Defendants could, although they were not obligated to do so, engage in the very conduct of which Plaintiffs primarily complain -- the

---

[10] The Court notes that only disclosures contained in offering documents that were publicly available prior to each Plaintiff's respective purchases are relevant to the analysis of whether Defendants' conduct was deceptive.  Thus, the Court has considered only the information available prior to each purchase to determine whether Plaintiffs have sufficiently alleged manipulative conduct by Defendants for each of their respective purchases.

placing of support bids -- and the information advantages that Defendants would have if they did engage in such conduct.  These documents disclosed that the ARS market was not necessarily set by the "natural interplay of supply and demand," but that it could be influenced by broker-dealers.

Since, regarding this practice, Plaintiffs were not led to believe one thing when another was true, a reasonable jury could not find that Defendants' alleged conduct was deceptive.  See United States v. Bongiorno, No. 05 Cr. 390, 2006 WL 1140864, at *6 (S.D.N.Y. May 1, 2006) ("The question is therefore whether a reasonable jury could find that the alleged fraud involved an act or acts of deception.  If the answer is yes, the motion to dismiss as to subsections (a) and (c) must be denied.").  "Broad as the concept of 'deception' may be, it irreducibly entails some act that gives the victim a false impression." United States v. Finnerty, 533 F.3d 143, 148 (2d Cir. 2008). Thus, Plaintiffs have failed to identify what manipulative acts were performed by the Defendants, as is required to state a claim of market manipulation under Section 10(b). See In re Merrill Lynch, 2010 WL 1257597, at *10-12 (dismissing market manipulation claim in similar case, in part, because of failure to plead manipulative acts); In re Alstom SA Sec. Litig., 406 F. Supp. 2d 433, 477 (S.D.N.Y.

2005) (dismissing scheme liability claim brought pursuant
to subsections (a) and (c) where underlying conduct was not
in and of itself deceptive); cf. Bongiorno, 2006 WL
1140864, at *7 (denying motion to dismiss where
"defendants' customers were led to believe one thing when
another was true -- and this deception was integral to the
alleged scheme to defraud because had defendants' customers
known the truth, they may have shaped their orders
differently . . . or not placed orders at all").

Plaintiffs correctly point out that Section 10(b)
prohibits a broad range of conduct (Pl. Mem. at 8), but
even though "'[s]ection 10(b) is aptly described as a
catchall provision, . . . what it catches must be fraud.'"
Finnerty, 533 F.3d at 150 (quoting Chiarella v. United
States, 445 U.S. 222, 234-35 (1980)).  Here, even the SEC
agrees that there is nothing improper about the practice as
long as it is properly disclosed.  (See Sullivan Decl. Ex.
E at 6 n.6 ("This Order does not prohibit broker-dealers
from bidding for their proprietary accounts when properly
disclosed.").)[11]  However aggressive or self-interested

---

[11] Plaintiffs point out that the SEC's lawsuit and the Settlement Order
against UBS Securities and UBS FS was premised in part on the
determination that Defendants' disclosures concerning their ARS
practices and procedures were inadequate.  (Am. Compl. ¶¶ 189, 191; Pl.
Mem. at 7, 12-13, 16.)  However, "[i]n a settlement order, the
respondent neither admits nor denies liability, and the order
(including the theory of liability asserted therein) is not reviewed by

Defendants' actions in placing support bids, or failing to do so, might have been, the fact remains that there was nothing deceptive about Defendants engaging in this fully disclosed practice.  The Court's conclusion on this point is consistent with recent district court decisions, which have dealt with similar allegations.  See, e.g., In re Merrill Lynch, 2010 WL 1257597 (dismissing similar claims based on disclosure of defendants' material ARS practices and procedures in SEC order and on defendants' website); In re Citigroup, 2009 WL 2914370 (dismissing similar claims based on disclosure of defendants' material ARS practices and procedures in offering materials and on defendants' website).

Second, assuming arguendo that the allegations with respect to Defendants in the Amended Complaint identified conduct that can be considered manipulative or deceptive, the Court finds that Plaintiffs failed to set forth when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue, as

any Article III court. Thus, their value as authority is limited."  SEC v. Masri, 523 F. Supp. 2d 361, 371 n.16 (S.D.N.Y. 2007); see also In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig., No. 03 Civ. 8208, 2006 WL 1008138, at *5 (S.D.N.Y. Apr. 18, 2006) ("statements made by the SEC and NASD in the settlement documents are not law; they are rather untested assertions made by litigants.  . . .  Further, the position articulated in the SEC settlement agreement is not binding on this Court.").  In addition, the Settlement Order was reached in the context of a complaint brought by the SEC under Section 15(c) of the Exchange Act, which is not at issue here.  (See Am. Compl. ¶ 192.)

required by ATSI.  As Defendants point out, Plaintiffs fail
to connect their allegations of market manipulation with
any of the specific ARS issues allegedly purchased by
Plaintiffs.  Rather, Plaintiffs set forth conclusory
allegations regarding Defendants' practices in connection
with the ARS market, generally.  For example, Plaintiffs
allege that "[b]etween January 1, 2006 and February 28,
2008, UBS Securities placed support bids in more than
30,000 auctions of its Municipal ARCs and SLARS, which
prevented more than 85 percent of those auctions from
failing."  (Am. Compl. ¶ 54.)  Similarly, Plaintiffs allege
that "[b]etween January 1, 2006 and February 28, 2008, UBS
Securities placed support bids in more than 27,000 auctions
of its APS, which prevented more than 50 percent of those
auctions from failing."  (Id. ¶ 55.)  Plaintiffs do not
identify any specific auctions in which UBS Securities
intervened.  Furthermore, Plaintiffs assert that "[w]hile
at times during the Class Period UBS Securities increased
rates to draw buyers . . ., UBS Securities generally caused
interest rates to decrease once it had sold sufficient UBS
ARS to reduce its own inventory. (Id. ¶ 70.)  This
allegation is characteristic of Plaintiffs' failure to
identify when the allegedly manipulative acts were

performed and what effect these acts had on the market for the securities at issue.

Plaintiffs further allege that Defendants' manipulative conduct consisted of pressuring UBS FS's financial advisors and distributing firms to sell UBS ARS, as well as providing extraordinary incentives to UBS FS financial advisors for the sale of UBS ARS.  Plaintiffs have not shown how either of these practices could amount to market manipulation.

First, Plaintiffs point to a series of conference calls that UBS held with UBS FS financial advisors, beginning in August 2007, "[a] primary purpose" of which "was to encourage financial advisors to sell UBS ARS." (Id. ¶¶ 80-83.)  In addition, Plaintiffs point to subsequent email exchanges between UBS employees indicating that they were under a lot of pressure to sell UBS ARS. (Id. ¶¶ 84-88.)  That UBS made the business decision to engage in an aggressive campaign to encourage its own sales force of UBS FS financial advisors to sell UBS ARS is insufficient to make out the "manipulative act" element of a claim of market manipulation.

Secondly, Plaintiffs have failed to point to any authority indicating that the type of incentive structure alleged here is manipulative or deceptive.  In fact, courts

have not only held that such an incentive structure is
acceptable, but, furthermore, that "[t]here is no duty to
disclose the incentives that a company provides its own
employees to encourage those employees to sell specific
products." Hoffman v. UBS-AG, 591 F. Supp. 2d 522, 533
(S.D.N.Y. 2008); see also United States v. Skelly, 442 F.3d
94, 97 (2d Cir. 2006) ("Tracing back to the common law
principle of caveat emptor, it is a fundamental tenet of
Anglo-American commercial law that neither a seller nor a
middleman has an obligation to disclose his financial
incentives for selling a particular commodity."); United
States v. Alvarado, No. 01 CR. 156, 2001 WL 1631396, at *8
(S.D.N.Y Dec. 19, 2001) ("Neither the SEC nor NASD have
required registered representatives of broker/dealers to
disclose their own compensation . . . although both have
been fully aware that registered representatives often
received special incentives beyond the normal compensation
to sell a particular product." (citation omitted));
Castillo v. Dean Witter Discover & Co., No. 97 Civ. 1272,
1998 WL 342050, at *9 (finding no violation of antifraud
provisions of securities laws where firm did not have a
duty to disclose that account executives received more
compensation for selling proprietary mutual funds than
other funds.); cf. Hoffman, 591 F. Supp. 2d at 535 ("With

regard to disclosing commissions, the Second Circuit has stated that a broker ordinarily only has a duty to disclose 'excessive commissions.'" (quoting <u>United States v. Santoro</u>, 302 F.3d 76, 80 (2d Cir. 2002))).

Furthermore, Plaintiffs fail to connect the exertion of pressure or provision of financial incentives with the sale of any of the specific ARS allegedly purchased by Plaintiffs.  Rather, Plaintiffs set forth conclusory allegations regarding Defendants' "pressuring" of, and providing incentives to, UBS FS financial advisors and distributing firms in connection with the sale of UBS ARS, generally.  Plaintiffs Neu and Dutcher did not even purchase their ARS directly from UBS FS financial advisors, but rather made their purchases through E*Trade and Raymond James, respectively.  Thus, again Plaintiffs' allegations fall short of the standards of Rule 9(b) and <u>ATSI</u>.

Finally, Plaintiffs' also allege that Defendants' manipulative conduct consisted of UBS Securities seeking and obtaining temporary waivers of interest rate caps on ARS from issuers and credit rating agencies, so as to avoid triggering rate caps, which would result in the rates being automatically reset to below-market levels.  (Am. Compl. ¶¶ 89-92.)  In contrast to the allegations discussed above, the Court is persuaded that this is the type of

manipulative and deceitful conduct that Section 10(b) and
Rule 10b-5(a) and (c) was intended to proscribe.
Plaintiffs describe this conduct in the Amended Complaint
as follows:

> When UBS increased its inventory of UBS ARS in
> the fall of 2007, it also placed bids at the
> periodic auctions in such a manner as to increase
> the clearing rates for those securities -- to the
> point of approaching the rate caps -- in an
> effort to "salt the mine" by raising the interest
> rates on the securities to a level sufficient to
> attract new buyers.

(Am. Compl. ¶ 89.)  It was important to avoid setting the
clearing rates at or above the rate caps because, in the
event the rate caps were triggered, as noted above, the
interest rates on many UBS ARS would be reset automatically
to levels well below market rates for comparable
securities.  (Id.)  Thus, in order to "bait investors by
manipulating the auctions to increase the rates of interest
paid on UBS ARS," without triggering the rate caps, "UBS
Securities negotiated with issuers to obtain temporary
waivers of these interest rate limitations."  (Pl. Mem. at
17-18.)  According to Plaintiffs, "UBS Securities knew, but
never disclosed, that upon expiration of these waivers,
interest rates would plummet, leaving investors with
illiquid securities paying below-market interest once the
auctions failed."  (Id. at 18.)  The Court finds that this

alleged conduct "connotes intentional or willful conduct
designed to deceive or defraud investors by controlling or
artificially affecting the price of securities." Ernst &
Ernst, 425 U.S. at 199 (footnote omitted).

Defendants argue that seeking to remove rate caps is
not manipulative conduct. However, the Court finds that
the undisclosed practice of seeking and obtaining temporary
cap waivers with respect to certain ARS combined with the
practice of setting UBS ARS clearing rates at amounts in
excess of the interest rate limits specified in the
offering documents -- which limits would kick in, in the
absence of and upon expiration of the temporary waivers --
resulted in the market prices of these ARS being
artificially inflated. Defendants contend that "the
increased rates in the months leading up to auction
failure, would indicate to any reasonable investor
increased risk associated with such investments." (UBS
Mem. at 16 n.12.) Here, however, Plaintiffs were misled
into thinking that the ARS could continue to carry the
increased rates as compensation for the increased risk. In
reality, upon expiration of the cap waivers, the rates
would automatically reset to lower rates, which were not
associated with any corresponding decrease in risk. This
conduct sent a false pricing signal to the market. Thus,

Case 1:08-cv-02967-LMM   Document 179   Filed 06/10/10   Page 56 of 76

as to this conduct, Plaintiffs have alleged the "manipulative act" element of their market manipulation claim.

Nonetheless, Plaintiffs, again fail to set forth what effect the scheme had on the market for the securities at issue as required by ATSI.  For example, Plaintiffs fail to allege that Defendants obtained an interest cap waiver with respect to any of the specific ARS issues allegedly purchased by Plaintiffs and even admit that not all UBS ARS contained interest rate caps in the first place (see Am. Compl. ¶ 89 ("[m]any UBS ARS contained caps") (emphasis added)).  Plaintiffs' vague allegations that UBS Securities sought and obtained temporary interest cap waivers with respect to unspecified ARS at some time during the fall of 2007 are insufficient.  Thus, here also, Plaintiffs' failure to provide particularized allegations regarding the allegedly manipulative conduct falls short of the standards of Rule 9(b) and ATSI.[12]

---

[12] The Court notes that since, according to Plaintiffs' allegations, UBS Securities did not seek and obtain waivers of rate caps until the fall of 2007 (Am. Compl. ¶ 90), this allegedly manipulative conduct could not have affected purchases of UBS ARS that were made prior to the fall of 2007.  See, e.g., Samuel M. Feinberg Testamentary Trust v. Carter, 652 F. Supp. 1066, 1080 (S.D.N.Y. 1987) ("Where the only manipulative or deceptive acts identified in a complaint occur after a challenged securities purchase or sale, a court must dismiss the complaint as failing to state a cause of action for federal securities fraud.").

56

**2. Reliance**

A necessary element of a market manipulation claim is "damage . . . caused by reliance on an assumption of an efficient market free of manipulation." ATSI, 493 F.3d at 101; see also In re Initial Pub. Offering Sec. Litig., 241 F. Supp. 2d 281, 297 (S.D.N.Y. 2003) (holding that to satisfy pleading obligations for market manipulation claims, "Plaintiffs must plead . . . reliance on the integrity of the market (i.e., that they believed it was not manipulated)").[13]   In other words, Plaintiffs must show that they were deceived by reliance on Defendants' deceptive conduct.   Furthermore, the Second Circuit has noted "the general rule . . . that reasonable reliance must be proved as an element of a securities fraud claim.'" First Lincoln Holdings, Inc. v. Equitable Life Assurance Soc'y of the U.S., 43 F. App'x 462, 463 (2d Cir. 2002) (internal quotation marks and citation omitted); see also Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 195 (2d Cir. 2003) (noting that for the

---

[13] Plaintiffs claim that, under Competitive Associates, Inc. v. Laventhol, Krekstein, Horwath & Horwath, 516 F.2d 811 (2d Cir. 1975) and Schlick v. Penn-Dixie Cement Corp., 507 F.2d 374 (2d Cir. 1974), they are not required to show reliance because they have alleged that Defendants engaged in a comprehensive scheme to defraud, which includes not only omissions and misrepresentation, but substantial collateral conduct as well.  (Pl. Mem. at 24.)  The Court rejects this argument in light of ATSI, in which the Court of Appeals made clear that reliance is a required element of a market manipulation claim. See ATSI, 493 F.3d at 101; see also In re Merrill Lynch, 2010 WL 1257597, at *18 (considering and rejecting same argument in light of ATSI).

plaintiff to prevail on theory of recovery based on violation of Rule 10b-5, it has to establish "reasonable reliance").

### a. Reasonable Reliance on Assumption of Efficient ARS Market Free of Defendants' Intervention in UBS ARS Auctions

Here, even if Plaintiffs sufficiently alleged manipulative acts by Defendants, except as to the alleged manipulative conduct relating to the temporary interest cap waivers, Plaintiffs cannot satisfy the reliance element. This is because -- regardless of whether they have sufficiently alleged actual reliance or are entitled to a rebuttable presumption of reliance[14] -- in light of the extensive disclosures to the contrary, Plaintiffs cannot show that they reasonably relied on an assumption of an efficient ARS market free of Defendants' intervention in auctions for UBS ARS (i.e., free of the allegedly manipulative conduct).

---

[14] Plaintiffs argue that they are entitled to a presumption of reliance under the Basic, Inc. v. Levinson, 485 U.S. 224 (1988), fraud-on-the-market theory; under Affiliated Ute Citizens v. United States, 406 U.S. 128 (1972); and under the "fraud created the market" theory. (Pl. Mem. at 24-27.)  Because regardless of whether any of these presumptions apply -- except as to the alleged manipulative conduct related to the temporary cap waivers, which will be discussed separately -- the Court finds that the disclosures and information available to Plaintiffs prior to their respective purchases rebut any presumption of reliance, the Court does not, here, address whether Plaintiffs would be entitled to a presumption of reliance under any of these theories.  See Black v. Finantra Capital Inc., 418 F.3d 203, 209 (2d Cir. 2005) (holding both fraud-on-the-market and Affiliated Ute presumptions of reliance are rebuttable).

"The Second Circuit has held that, as to the element of reliance, '[a]n investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth.'" <u>Ashland Inc. v. Morgan Stanley & Co., Inc.</u>, No. 09 Civ. 5415, 2010 WL 1253932, at *13 (S.D.N.Y. Mar. 30, 2010) (quoting <u>Brown v. E.F. Hutton Group, Inc.</u>, 991 F.2d 1020, 1032 (2d Cir. 1993)).  Thus, Plaintiffs cannot establish reasonable reliance if, through minimal diligence, they should have discovered the conduct that constituted the alleged market manipulation.  The Court agrees with Defendants that, here, Plaintiffs cannot establish reasonable reliance in light of the extensive disclosures contained in the prospectuses, information set forth in SEC documents and reported in press publications.[15]  All of this information was publicly available and easily obtainable -- with the exception of the CDIAC Issue Brief, which was available, but from a relatively obscure source.

The prospectuses disclosed the possibility that Defendants could engage in the very conduct of which Plaintiffs complain, while explicitly stating that they were not obligated to do so; explained the ability of such

---

[15] The Court notes that only disclosures contained in prospectuses, press publications and SEC materials published and publicly available prior to each Plaintiff's respective purchase are relevant to the analysis of whether Plaintiffs can establish the element of reasonable reliance.

conduct to affect auction clearing rates; and discussed the possibility that the auctions could fail in the absence of sufficient demand.  The Plaintiffs could have, with minimal diligence, read the prospectuses for the ARS they purchased.  As the Second Circuit has noted, the prospectus is "the single most important document and perhaps the primary resource an investor should consult in seeking [ ] information."  Brown, 991 F.2d at 1032.  Furthermore, the prospectuses are easily accessible to investors.  As another recent district court opinion, also involving ARS, stated, "'[I]n today's world it is unrealistic to argue that documents available on the SEC website are not readily accessible to the investing public.'"  In re Merrill Lynch, 2010 WL 1257597, at *15 (quoting In re Keyspan Corp. Sec. Litig., 383 F. Supp. 2d 358, 373 (E.D.N.Y. 2003)); see also Berwecky v. Bear, Stearns & Co., Inc., 197 F.R.D. 65, 70 (S.D.N.Y. 2000) ("[S]ince the . . . prospectus is a public filing, all members of the public are chargeable with knowledge of its contents.")

In addition, the SEC documents and press publications further detailed that it was common practice for broker-dealers to place support bids in order to prevent ARS auction failures and influence the clearing rate, and highlighted the risk of auction failure in the event

broker-dealers withdrew their support for ARS auctions.
For example, the 2006 SEC Order detailed the fact that
auction dealers had placed support bids to prevent failed
auctions and specifically noted that such conduct was not
prohibited as long as it was properly disclosed.  (Sullivan
Decl., Ex. E at 6 n.6.)  The Court notes that Plaintiffs'
contention that they reasonably relied on the assumption of
an efficient ARS market free of manipulation is even weaker
with respect to ARS purchases that were made after press
reports publicized the wave of auction failures that
occurred in August 2007, as a result of the decision by a
number of broker-dealers not to intervene to prevent
auction failures for certain particularly risky ARS.
Plaintiffs essentially concede that, upon the occurrence of
such auction failures, "investors would have been alerted
to the true risk characteristics of UBS ARS, including the
significant risk of illiquidity."  (Pl. Mem. at 4 (citation
omitted).)

   Although Plaintiffs argue that they are not precluded
from establishing reasonable reliance because the 2006 SEC
Order and the press publications did not refer specifically
to any of the Defendants (Pl. Mem. at 15-16), the Court
disagrees.  Here, the company-specific disclosures in the
prospectuses combined with the publicly available

information discussing broker-dealer participation in the ARS market, generally, are sufficient to preclude Plaintiffs from establishing that they reasonably relied on an efficient market free of Defendants' intervention in UBS ARS auctions, as a matter of law.  See Staehr, 547 F.3d at 434 (finding, in context of storm warnings inquiry, absence of company-specific references insufficient to put investors on constructive notice of fraud, but stating "[m]ore articles in mainstream publications discussing the . . . issue, combined with a reference in the 10-K, would present a different case").

Plaintiffs also argue that it is inappropriate to decide the issue of reasonable reliance in the context of a motion to dismiss.  (Pl. Mem. at 13, 25.)  The Court also finds this argument to be without merit.  Plaintiffs are correct that reasonable reliance is ordinarily a question of fact to be determined by the jury; however, there are times that a court may find a plaintiff's reliance unreasonable as a matter of law.  And, again, there are several recent cases in this district which -- on similar facts and in the context of a motion to dismiss -- determined that disclosures regarding the defendants' practices as to ARS rendered plaintiffs' reliance on an efficient market free of manipulation unreasonable as a

matter of law.  See, e.g., In re Merrill Lynch, 2010 WL
1257597, at *21-22; In re Citigroup, 2009 WL 2914370, at
*7-8.

### b. Reliance on Efficient ARS Market Free of Undisclosed Temporary Waivers of Rate Cap Limits

As to the allegations regarding the temporary
interest rate cap waivers, however, Defendants have not
demonstrated that, as a matter of law, Plaintiffs cannot
show the element of reasonable reliance.  In other words,
Defendants have not set forth any arguments sufficient to
rebut either (i) a presumption of reliance or (ii)
allegations of actual reliance on an efficient ARS market
free of undisclosed temporary waivers of rate cap limits.
Therefore, if Plaintiffs have established either a
presumption of reliance or sufficiently alleged actual
reliance then they will have adequately pled the reliance
element of this market manipulation claim.

First, Plaintiffs claim that "[i]f not for
Defendants' manipulation of the market for UBS ARS,
Plaintiffs and Class members would not have purchased UBS
ARS or would not have purchased them at the prices and/or
the interest rates at which they did."  (Am. Compl. ¶ 210;
see also id. ¶ 225 ("Had Plaintiffs, Class members, and the

marketplace known the truth regarding the value, liquidity, and risks of UBS ARS . . . Plaintiffs and Class members would not have purchased UBS ARS at all or would not have done so at the prices they paid.").)  This is sufficient at this stage because sufficient pleading of reliance, also known as transaction causation, "only requires allegations that but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction."  ATSI, 493 F.3d at 106 (internal quotation marks and citation omitted).

Second, as noted above, Plaintiffs argue that they are entitled to a presumption of reliance under the Basic fraud-on-the-market theory, under Affiliated Ute, and under the "fraud created the market" theory. (Pl. Mem. at 24-27.) The Court agrees with Plaintiffs that they have made sufficient allegations to demonstrate that they may ultimately be entitled to a presumption of reliance under both Basic and Affiliated Ute.

### i. Fraud-on-the-Market

First, Plaintiffs argue that reliance should be presumed under the fraud-on-the-market theory.  (Pl. Mem. at 25-26.)  The fraud-on-the-market theory is based on the "premise that the market price of shares traded on well-

64

developed markets reflects all publicly available information, and, hence, any material misrepresentations." Basic, 485 U.S. at 246.  The theory "creates a rebuttable presumption that (1) misrepresentations by an issuer affect the price of securities traded in the open market, and (2) investors rely on the market price of securities as an accurate measure of their intrinsic value."  Hevesi v. Citigroup Inc., 366 F.3d 70, 77 (2d Cir. 2004).  According to the Second Circuit, "the doctrine 'arose as a practical response to the difficulties of proving direct reliance in the context of modern securities markets, where impersonal trading rather than a face-to-face transaction is the norm.'"  Id. (quoting In re Worldcom, Inc. Sec. Litig., 219 F.R.D. 267, 291 (S.D.N.Y. 2003)).  Although the fraud-on-the-market theory has been applied primarily in the context of claims alleging false or misleading statements under Rule 10b-5(b), a number of courts have held that the theory is equally applicable to claims alleging market manipulation.  In re Merrill Lynch, 2010 WL 1257597, at *13 (collecting cases).  The Court agrees with the rationale that "[t]reating misrepresentation and manipulation claims alike in this regard makes sense because both types of misconduct result in the injection of a false premise into

the marketplace," which "is then reflected in the price of
the security."  (Id.)

Significantly, however, the fraud-on-the-market
presumption is only available where the securities at issue
"traded on an impersonal, well-developed (i.e., efficient)
market."  In re Salomon Analyst Metromedia Litig., 544 F.3d
474, 481 (2d Cir. 2008) (citing Basic, 485 U.S. at 248
n.27).  There is no set checklist for determining market
efficiency, but courts typically look at the following
factors: (1) the average weekly trading volume of the
securities, (2) the number of securities analysts following
and reporting on the securities, (3) the extent to which
market makers traded in the securities, (4) the issuer's
eligibility to file an SEC registration Form S-3, and (5)
the demonstration of a cause and effect relationship
between unexpected, material disclosures and changes in the
securities' prices.  In re Merrill Lynch, 2010 WL 1257597,
at *14 (citing Teamsters Local 445 Freight Div. Pension
Fund v. Bombardier Inc., 546 F.3d 196, 200 (2d Cir. 2008)).

Defendants object to the application of the fraud-on
the-market theory on the grounds that "[i]n this case,
Plaintiffs have not and cannot allege that ARS were traded

66

in such an 'efficient' market." (UBS Mem. at 23.)[16]  This
objection is without merit because the Court finds that
Plaintiffs have alleged sufficient facts to support their
entitlement to the fraud-on-the-market presumption of
reliance.  Plaintiffs alleged, inter alia, that material
news had an immediate effect on the market price of UBS ARS
(Am. Compl. ¶ 180); UBS Securities was a market maker for
UBS ARS (Pl. Mem. at 26); and UBS Securities and other
firms published research reports on UBS ARS throughout the
Class Period (Am. Compl. ¶ 177.)  "The question on a motion
to dismiss is not whether plaintiff has proved an efficient
market, but whether he has pleaded one."  In re Parmalat
Sec. Litig., 376 F. Supp. 2d 472, 509 (S.D.N.Y. 2005)
(internal quotation marks and citation omitted).  Although
Defendants persuasively point out that certain of
Plaintiffs' allegations place the efficiency of the market
for UBS ARS in question, the Court cannot say, on the
record before it, that the Plaintiffs cannot demonstrate an

---

[16] The Court rejects Defendants' contention that Plaintiffs have conceded
the lack of an efficient market, and that because Plaintiffs alleged
"that the ARS auctions were 'manipulated on a systematic and pervasive
basis,'" Plaintiffs are entirely precluded from arguing that the market
for UBS ARS was efficient. (See UBS Mem. at 3 (quoting Am. Compl. ¶¶
173, 178).)  If the allegation that a defendant manipulated a market
for securities precluded a plaintiff from arguing that the market for
the securities at issue was efficient, then the "fraud-on-the-market"
presumption would never be available in market manipulation cases.
Clearly, this is not the case.  See In re Merrill Lynch, 2010 WL
1257597, at *13 (collecting cases in which courts held fraud-on-the-
market presumption was available in context of market manipulation
claims.)

efficient market.  It is well-established that whether the
fraud on the market theory applies is not a pure question
of law.  In re Initial Pub. Offering, 241 F. Supp. 2d at
377.  Consequently, it is rarely appropriate to decide the
issue on a motion to dismiss.  This is not one of those
rare occasions.  Whether the ARS at issue here traded in an
efficient market is a question of fact, the resolution of
which must await presentation of further proof at trial.


### ii. **Affiliated Ute**

Plaintiffs also claim that they are entitled to a
presumption of reliance under Affiliated Ute.  (Pl. Mem. at
25.)  According to the Supreme Court, "if there is an
omission of a material fact by one with a duty to disclose,
the investor to whom the duty was owed need not provide
specific proof of reliance."  Stoneridge Inv. Partners, LLC
v. Scientific-Atlanta, Inc., 552 U.S. 148, 159 (2008)
(citing Affiliated Ute, 406 U.S. at 153-54).

First, Defendants argue that the Affilated Ute
presumption is inapplicable here because Plaintiffs do not
bring an omissions claim under Rule 10b-5(b), but rather
bring a market manipulation claim under Rule 10b-5(a) and
(c).  (UBS Mem. at 25.)  The Court finds this argument
unpersuasive.  Plaintiffs' market manipulation claim, as to

the temporary interest cap waivers consists, in part, of Defendants' failure to disclose its practice of seeking and obtaining the waivers, as well as their failure to disclose the temporary nature of the waivers (i.e., in large part, their claim consists of omissions).

Defendants cite to a handful of cases outside the Second Circuit, as well as one case from this district, to support their contention that "[t]he Affiliated Ute presumption does not apply to manipulation cases." (UBS. Mem. at 25). Defendants cite to the Ninth Circuit's decision in Desai v. Deutsche Bank Securities Ltd., 573 F.3d 931 (9th Cir. 2009), which held that the Affiliated Ute presumption does not apply when a plaintiff alleges a market manipulation claim, even if the claim involves alleged omissions. Id. at 940-41. However, the Second Circuit has not adopted that holding. This Court agrees with the analysis of this issue as explained in In re Initial Public Offering, 671 F. Supp. 2d 467 (S.D.N.Y. 2009), in which defendants' set forth and the court rejected the same argument. Id. at 495-96.

Defendants also cite to the Tenth Circuit's decision in Joseph v. Wiles, 223 F.3d 1155 (10th Cir. 2000), to support their argument (UBS Mem. at 25); however, in that case, the court rejected a blanket rule as to the applicability of

the Affiliated Ute presumption to claims involving both omissions and misrepresentations, opting instead for a more practical approach. Id. at 1162-63. This approach consisted of "analyz[ing] the complaint to determine whether the offenses it alleges can be characterized primarily as omissions or misrepresentations in order to determine whether the Affiliated Ute presumption should apply." Id. at 1162. This flexible and practical approach is particularly sensible in light of the rationale behind the presumption: "the Affiliated Ute presumption of reliance exists in the first place to aid plaintiffs when reliance on a negative would be practically impossible to prove." Id.; see also Piper v. Chris-Craft Indus., Inc., 430 U.S. 1, 50 (Blackmun, J., concurring) ("Because cases involving omissions create difficult problems of proof of reliance, and hence causation, the [Supreme] Court elaborated on the Mills test in Affiliated Ute Citizens . . . ."). Significant to the Tenth Circuit's conclusion (that the Affiliated Ute presumption did not apply) was that its application there "would fail to serve the . . . presumption's purpose since [it was] not a case where reliance would be difficult to prove because it was based on a negative." Joseph, 223 F.3d at 1163. In contrast, this case is such a case primarily involving omissions

where reliance would be difficult to prove because Plaintiffs' claim is based on a negative.[17]

Second, Defendants argue that the Amended Complaint fails to show that Defendants owed a duty to disclose to Plaintiffs.  However, "[w]here a defendant has engaged in conduct that amounts to 'market manipulation' under Rule 10b-5(a) or (c), that misconduct creates an independent duty to disclose."  In re Initial Pub. Offering, 241 F. Supp. 2d at 381.  "This is so because participants in the securities markets are entitled to presume that all of the actors are behaving legally."  Id. at 381-82.

Third, Defendants question the materiality of the alleged omission.  "An omission is material if there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'"  Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002) (quoting Basic, 485 U.S. at 231-32).  Since the materiality of an omission is a mixed

---

[17] Defendants also cite to Teamsters Local 445 Freight Division Pension Fund, No. 05 Civ. 1898, 2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006) and Abell v. Potomac Insurance Co., 858 F.2d 1104 (5th Cir. 1988) in support of their contention that the Affiliated Ute presumption is not available in the context of a market manipulation claim.  (UBS Mem. at 25.)  However, the Court does not read these cases as standing for that proposition.  In both of those cases, in contrast to here, the courts found that positive statements or "distortions," rather than omissions, were central to the alleged fraud.  See Teamsters, 2006 WL 2161887, at *9; Abell, 858 F.2d at 1119.

question of law and fact, courts often will not dismiss a securities fraud complaint at the pleading stage, unless "reasonable minds could not differ on the importance of the omission." Id. Here, the Court cannot say that reasonable minds could not differ on the importance of Defendants' omissions regarding the temporary interest cap waivers.

Thus, Plaintiffs have sufficiently pled an omission of a material fact by one with a duty to disclose and have, therefore, made out a prima facie case of entitlement to the Affiliated Ute presumption of reliance. Defendants have not set forth arguments sufficient to rebut this presumption of reliance, as noted above, and, therefore, Plaintiffs have adequately pled reliance with respect to the allegations of market manipulation relating to the temporary interest cap waivers under Affiliated Ute, as well.

### iii. Fraud Created the Market

Plaintiffs also contend they are entitled to a presumption of reliance under, what they refer to as, the "fraud created the market" theory. (Pl. Mem. at 26-27.) Under this theory, "reliance may be presumed if the defendants' fraudulent activity is 'so pervasive that it goes to the very existence of the [securities] and the

72

validity of their presence on the market.'"  In re Refco, Inc. Sec. Litig., 609 F. Supp. 2d 304, 318 (S.D.N.Y. 2009) (quoting Ross v. Bank S., N.A., 885 F.2d 723, 729 (11th Cir. 1989)).  However, as Judge Lynch noted in In re Refco:

> This Circuit has never adopted this presumption and it has been criticized by at least two other Courts of Appeals. See Ockerman v. May Zima & Co., 27 F.3d 1151, 1159 (6th Cir. 1994); Eckstein v. Balcor Film Investors, 8 F.3d 1121 (7th Cir. 1993) (rejecting the presumption).  Whatever its merits (and those merits appear to be in grave doubt after Stoneridge), courts that apply the presumption appear to agree that the touchstone of this standard is "unmarketability."  Such "unmarketability" must mean either economic unmarketability, which occurs when a security is patently worthless, or legal unmarketability, which occurs when a regulatory or municipal agency would have been required by law to prevent or forbid the issuance of the security.

Id. (citation omitted).

     As in In re Refco, there are no allegations, here, that the issuer was prohibited from issuing the securities as a matter of law.  Id.  Plaintiffs do allege that the market for UBS ARS would not have existed absent Defendants' manipulative conduct (Am. Compl. ¶ 5); however, according to Plaintiffs' own allegations, the ARS market has existed since 1984 (id. ¶ 39) -- almost twenty years before the date Plaintiffs allege that Defendants' manipulative

conduct commenced.[18]  Furthermore, Plaintiffs allege that
investors purchased the securities at "overvalued prices"
(see, e.g., Am. Compl. ¶ 6), but nowhere allege that UBS
ARS are "patently worthless."  Thus, even assuming arguendo
that it is a valid theory in this Circuit, Plaintiffs would
not be entitled to the fraud-created-the-market presumption
of reliance.[19]

## D.  Control Person Liability

Plaintiffs also allege § 20(a) control person liability
against UBS AG, UBS Securities, and the Individual
Defendants.  (Am. Compl. ¶ 42.)  "To establish a prima
facie case of control person liability, a plaintiff must
show (1) a primary violation by the controlled person, (2)
control of the primary violator by the defendant, and (3)
that the defendant was, in some meaningful sense, a
culpable participant in the controlled person's fraud."
ATSI, 493 F.3d at 108.  Thus, since Plaintiffs have failed

---

[18] Plaintiffs do not allege that Defendants engaged in manipulative
conduct prior to March 21, 2003, which is the start of the Class
Period.
[19] To the extent Plaintiffs attempt to rely on an "integrity of the
market" theory, as Defendants insist they do (UBS Mem. at 25-26),
Plaintiffs have not pointed to any support in existing case law or
statute which suggests it is a valid theory upon which Plaintiffs can
obtain a presumption of reliance.  See also Desai, 573 F.3d at 943-46
(O'Scannlain, J., concurring) ("reject[ing] the invitation to recognize
this new presumption of reliance" and referring to it as "legally
unsupported and logically inadvisable").  Thus, the Court declines to
recognize this novel "integrity of the market" presumption.

to allege a primary violation under section 10(b) and Rule
10b-5, their cause of action under section 20(a) of the
Exchange Act for control person liability must fail as
well.


**E.   Leave to Replead**

Defendants' motions to dismiss have been granted due to
Plaintiffs' failure to sufficiently plead manipulative acts
and, with respect to most of the allegations, Plaintiff's
inability to demonstrate the element of reasonable reliance
as a matter of law.  However, because Plaintiffs may be
able to cure their failure to meet the pleading standards
of Rule 9(b) as to the allegations concerning the temporary
interest cap waivers, leave to replead is granted for that
limited purpose.  Thus, Plaintiffs may replead (if they can
do so consistently with Federal Rule of Civil Procedure 11)
within [[20]] days of the date hereof.

### III. CONCLUSION

For the reasons stated above, defendants' motions to dismiss are granted.

SO ORDERED.

Dated: June *10*, 2010

.Lawrence M. McKenna
U.S.D.J.

76